IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

ZEPHYRINUS EGBUONU,        2008 APR -7  A 10: 40
#27041-265
        Plaintiff,            DEBRA P. HACKETT, CLK
                              U.S. DISTRICT COURT
                              MIDDLE DISTRICT ALA

        v.                        *        2:07-CV-998-WKW

CAPTAIN BARRETT, *et al.*,         *

        Defendants.                *

## AFFIDAVIT

        I,  Zephyrinus Egbuonu, hereby certify and affirm that I
currently an immigration civil detainee at the Federal Detention
Center in Oakdale, Louisiana; that the attached documents are
true, exact, and verbatim copy of the documents presented to and
or received or obtained from the Courts, United States Supreme
Court opinions, Alabama State Court of Criminal Appeals decisions,
Alabama Supreme decision,  Georgia Supreme decision, Alabama
Department of Corrections Prison Officials, Alabama State Depart-
ment of Corrections' website (www. doc. state. al. us/adminregs.
asp) and Plaintiff's State Defense Counsel, and that I am over
the age of nineteen (19) years and competent to tesify to the
aforesaid documents and matters stated therein.

        I further certify and affirm that said documents presented
to and or received or obtained, maintained and kept in accordance
with provision of records of regularly conduct activity and that

**SCANNED**

said documents (and the entries therein in part not all) were made at, or reasonably near the time that such acts, events and transactions referred to therein are said to have occurred.

This, I do hereby certify and affirm to on the _____ day of March, 2008

*Egbuonu Zephyr*

Zephyrinus Egbuonu
Acting Pro-Se

**STATE OF LOUISIANA**

**OAKDALE, LOUISIANA**

Sworm to and subscribed before and under my hand official seal this the _19TH_ day of March, 2008.

*Jarry 053496*

Notary Public

My Commission expires: _at Death_

2

ZEPHYRINUS EGBUONU
27041265
F.D.C. BOX 5010
OAKDALE, LA 71463

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL

7007 2560 0002 0752 7402

UNITED STAT
POSTAL SERV

000

ZEPHYRIN[illegible]
27041265
F.D.C. [illegible]
OAKDALE, [illegible]

THE CLERK
U.S. DISTRICT CO
MIDDLE DISTRICT
NORTHERN DIVIS

Westlaw.

911 So.2d 748

911 So.2d 748
(Cite as: 911 So.2d 748)

**EXHIBIT 1**

**H**

Ex parte EgbuonuAla.Crim.App.,2004.
Court of Criminal Appeals of Alabama.
Ex parte Zephyriums EGBUONU.
(In re State of Alabama
v.
Zephyriums Egbuonu).
CR-03-1721.

Nov. 24, 2004.
Rehearing Denied Jan. 21, 2005.

**Background:** Defendant, a resident of California who was arrested and extradited to Alabama on charges of identity theft, filed petition for writ of habeas corpus. The Circuit Court, Jefferson County, No. CC-04-1422,Alfred Bahakel, J., denied petition, and defendant appealed.

**Holdings:** The Court of Criminal Appeals held that:

(1) claim that venue provision of identity theft statute violated constitution was cognizable in habeas corpus;

(2) identity theft statute that allowed venue to be placed in the county of the residence of the person who was subject of identification documents or identifying information did not violate constitution;

(3) venue was proper in Alabama county where victim resided;

(4) Alabama had authority to enact statute penalizing identity theft separate from law enacted by federal government; and

(5) $100,000 bail was not excessive.

Petition denied.

Shaw, J., concurred in the result.

Certiorari denied, Ala., 911 So.2d 755.
West Headnotes
[1] Habeas Corpus 197 ⟶444

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(A) Ground and Nature of Restraint
            197k443 Jurisdictional Defects
                197k444   k.   Personal   Jurisdiction;
Venue. Most Cited Cases
Defendant's claim that statute allowing that venue for identity theft is proper in county other than where offense occurred was unconstitutional was cognizable in pretrial petition for writ of habeas corpus, where claim, if meritorious, would render charges void. Code 1975, §§ 13A-8-196, 15-21-1.

[2] Habeas Corpus 197 ⟶445

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(A) Ground and Nature of Restraint
            197k445 k. Void or Invalid Judgment or Order. Most Cited Cases
The writ of habeas corpus is against void but not irregular or voidable judgments. Code 1975, § 15-21-1.

[3] Criminal Law 110 ⟶107

110 Criminal Law
    110IX Venue
        110IX(A) Place of Bringing Prosecution
            110k107 k. Constitutional and Statutory Provisions. Most Cited Cases
Identity theft statute that allowed venue to be placed in the county of the residence of the person who was subject of identification documents or

Westlaw.

911 So.2d 748                                                          Page 1

911 So.2d 748
(Cite as: 911 So.2d 748)

**H**

Ex parte Egbuonu.Ala.Crim.App.,2004.
Court of Criminal Appeals of Alabama.
Ex parte Zephyrius EGBUONU.
(In re State of Alabama
v.
Zephyrius Egbuonu).
**CR-03-1721.**

Nov. 24, 2004.
Rehearing Denied Jan. 21, 2005.

**Background:** Defendant, a resident of California who was arrested and extradited to Alabama on charges of identity theft, filed petition for writ of habeas corpus. The Circuit Court, Jefferson County, No. CC-04-1422.Alfred Bahakel, J., denied petition, and defendant appealed.

**Holdings:** The Court of Criminal Appeals held that:

(1) claim that venue provision of identity theft statute violated constitution was cognizable in habeas corpus;

(2) identity theft statute that allowed venue to be placed in the county of the residence of the person who was subject of identification documents or identifying information did not violate constitution;

(3) venue was proper in Alabama county where victim resided;

(4) Alabama had authority to enact statute penalizing identity theft separate from law enacted by federal government; and

(5) $100,000 bail was not excessive.

Petition denied.

Shaw, J., concurred in the result.

Certiorari denied, Ala., 911 So.2d 755.
West Headnotes
**[1] Habeas Corpus 197 ⬅️444**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(A) Ground and Nature of Restraint
            197k443 Jurisdictional Defects
                197k444 k. Personal Jurisdiction; Venue. Most Cited Cases
Defendant's claim that statute allowing that venue for identity theft is proper in county other than where offense occurred was unconstitutional was cognizable in pretrial petition for writ of habeas corpus, where claim, if meritorious, would render charges void. Code 1975, §§ 13A-8-196, 15-21-1.

**[2] Habeas Corpus 197 ⬅️445**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(A) Ground and Nature of Restraint
            197k445 k. Void or Invalid Judgment or Order. Most Cited Cases
The writ of habeas corpus is against void but not irregular or voidable judgments. Code 1975, § 15-21-1.

**[3] Criminal Law 110 ⬅️107**

110 Criminal Law
    110IX Venue
        110IX(A) Place of Bringing Prosecution
            110k107 k. Constitutional and Statutory Provisions. Most Cited Cases
Identity theft statute that allowed venue to be placed in the county of the residence of the person who was subject of identification documents or

911 So.2d 748

911 So.2d 748
(Cite as: 911 So.2d 748)

identifying information did not violate
constitutional requirement that venue be placed in
county where offense occurred. Const. Art. 1, § 6;
Code 1975, § 13A-8-196.

**[4] Criminal Law 110 ⬡108(1)**

110 Criminal Law
  110IX Venue
    110IX(A) Place of Bringing Prosecution
      110k108 Locality of Offense in General
        110k108(1) k. In General. Most Cited
Cases
By utilizing the doctrine of a continuing offense,
congress may provide that the locality of a crime
shall extend over the whole area through which
force propelled by an offender operates.

**[5] Criminal Law 110 ⬡107**

110 Criminal Law
  110IX Venue
    110IX(A) Place of Bringing Prosecution
      110k107 k. Constitutional and Statutory
Provisions. Most Cited Cases
The legislature has the authority, within the
confines of the constitution, to enact special venue
statutes.

**[6] Criminal Law 110 ⬡108(1)**

110 Criminal Law
  110IX Venue
    110IX(A) Place of Bringing Prosecution
      110k108 Locality of Offense in General
        110k108(1) k. In General. Most Cited
Cases
Venue for California defendant's trial for identity
theft was proper in Alabama county where victim
resided. Code 1975, § 13A-8-192.

**[7] Criminal Law 110 ⬡108(1)**

110 Criminal Law
  110IX Venue
    110IX(A) Place of Bringing Prosecution
      110k108 Locality of Offense in General
        110k108(1) k. In General. Most Cited
Cases

Identity theft, by its definition, is a continuing
offense that in most instances will occur in more
than one county or even more than one state, for the
purposes of venue. Code 1975, § 13A-8-192.

**[8] Criminal Law 110 ⬡106**

110 Criminal Law
  110IX Venue
    110IX(A) Place of Bringing Prosecution
      110k106 k. Nature and Necessity of
Venue in Prosecution. Most Cited Cases
Where there is no legislation on the matter of venue
courts look to the purpose of the statute defining the
offense.

**[9] Criminal Law 110 ⬡106**

110 Criminal Law
  110IX Venue
    110IX(A) Place of Bringing Prosecution
      110k106 k. Nature and Necessity of
Venue in Prosecution. Most Cited Cases
Venue in a criminal case, though a constitutional
matter, requires an inquiry into what conduct the
statute proscribes.

**[10] Criminal Law 110 ⬡108(1)**

110 Criminal Law
  110IX Venue
    110IX(A) Place of Bringing Prosecution
      110k108 Locality of Offense in General
        110k108(1) k. In General. Most Cited
Cases
Places that suffer the effects of a crime are entitled
to consideration for venue purposes.

**[11] False Pretenses 170 ⬡2**

170 False Pretenses
  170k2 k. Statutory Provisions. Most Cited Cases

**States 360 ⬡18.15**

360 States
  360I Political Status and Relations
    360I(B) Federal Supremacy; Preemption
      360k18.15 k. Particular Cases. Preemption

911 So.2d 748

Page 3

911 So.2d 748
(Cite as: 911 So.2d 748)

or Supersession. Most Cited Cases

Alabama had authority to enact statute penalizing identity theft separate from law enacted by federal government.

**[12] Extradition and Detainers 166 ☞39**

166 Extradition and Detainers
    166I Extradition
        166I(B) Interstate
            166k39 k. Examination, Determination, and Review of Proceedings. Most Cited Cases

Defendant's waiver of extradition and voluntary return to Alabama precluded appellate review of challenge to validity of extradition.

**[13] Extradition and Detainers 166 ☞42**

166 Extradition and Detainers
    166I Extradition
        166I(B) Interstate
            166k42 k. Rights of Persons Illegally Brought Within Jurisdiction. Most Cited Cases

Once a fugitive has been brought within custody of the demanding state, legality of extradition is no longer proper subject of any legal attack by him.

**[14] Bail 49 ☞52**

49 Bail
    49II In Criminal Prosecutions
        49k50 Amount of Bail
            49k52 k. Excessive Bail. Most Cited Cases

Bail of $100,000 on charge of identity theft was not excessive with respect to California defendant who was citizen of Nigeria who had no ties to Alabama. Rules Crim.Proc., Rule 7.2.

*750 Sidney J. Hughes, Homewood, for petitioner.

Troy King, atty. gen., and Andy Scott Poole, asst. atty. gen., for respondent.

PER CURIAM.

The petitioner, Zephyriuns Egbuonu, appeals the denial of his petition for a writ of habeas corpus.

In March 2003, the petitioner was arrested in California and charged with first-degree identity theft of the identity of an Alabama resident. § 13A-8-192, Ala.Code 1975. The charges stemmed

from items sent to a post office box in California addressed to "James Roberson" [FN1] a captain in the Jefferson County Sheriff's Department. Apparently, the post office box was traced to **Egbuonu.**[FN2] **Egbuonu** waived any challenge to extradition, and he was returned to Alabama in October 2003. Bail was set at $100,000. In July 2004, **Egbuonu** filed a petition for a writ of habeas corpus in Jefferson County-the county where he is incarcerated. **Egbuonu** alleged that he is being illegally detained in the Jefferson county jail because, he argues, the statute that determines venue for the crime of identity theft, § 13A-8-196, Ala.Code 1975, is unconstitutional. Specifically, he argued that § 13A-8-196 conflicts with Art. I, § 6, Ala. Const. of 1901. Egbuonu also moved to reduce his $100,000 bail. Judge Alfred Bahakel held a hearing and denied the petition and the motion to reduce bail. This appeal followed.

> FN1. The victim's name is spelled differently throughout the documents that have been filed with this Court.
>
> FN2. The documents that this Court has received contain very little information concerning the facts surrounding the charge.

Because this case concerns the matter of pretrial bail, on August 26, 2004, we issued an order informing the parties that we would expedite this case pursuant to Rule 9(a), Ala.R.App.P.,[FN3] and treat it as an original petition for a writ of habeas corpus. See *Colbert v. State,* 717 So.2d 868 (Ala.Crim.App.1998), and Rule 21(c), Ala.R.App.P. **Egbuonu's** trial is scheduled for January 10, 2005.

> FN3. Rule 9(a), Ala.R.App.P., states:
> "A review authorized by law from an order refusing or imposing conditions of release shall be determined promptly. Upon entry of an order refusing or imposing conditions of release, the trial court shall state in writing the reasons for the action taken. The review shall be heard without the necessity of briefs upon such papers,

911 So.2d 748

911 So.2d 748
(Cite as: 911 So.2d 748)

affidavits and portions of the record as the parties shall present. The appellate court may order the release of the appellant pending the review."

[1] Egbuonu argues that § 13A-8-196, Ala.Code 1975, which provides that venue for the offense of identity theft is proper in a county other than where the offense occurred is unconstitutional because, he argues, it conflicts with Art. I, § 6, Ala. Const. of 1901. The State asserts that we should not address this issue in this habeas corpus petition; it argues that the only issue that is appropriately before this *751 Court is the petitioner's claim that his bail is excessive.

The circuit court held a hearing on Egbuonu's petition and then made the following entry on the case action summary sheet: "Motion for Petition for habeas corpus regarding alleged improper venue heard and denied."

Alabama's habeas corpus statute, § 15-21-1, Ala.Code 1975, provides:

"Any person who is imprisoned or restrained of his liberty in the State of Alabama on any criminal charge or accusation or under any other pretense whatever, except persons committed or detained by virtue of process issued by a court of the United States or by a judge thereof in cases of which such courts have exclusive jurisdiction under the laws of the United States or have acquired exclusive jurisdiction by the commencement of actions in such courts, *may prosecute a writ of habeas corpus according to the provisions of this chapter to inquire into the cause of such imprisonment or restraint.*"

(Emphasis added.)

[2] The Alabama Supreme Court has stated the following concerning a petition for a writ of habeas corpus:

"Where one is in custody which is predicated upon an assumed and exercised judicial jurisdiction of matter or person that it is asserted did not legally exist, habeas corpus is the remedy to institute an investigation of the existence of such jurisdiction; an inquiry very different from one involving the

merely erroneous or irregular exercise of existent jurisdiction. Code 1896, § 4838; *Ex parte Sam,* 51 Ala. 34 [(1824)], *City of Selma v. Till,* 42 South. 405 [(Ala.1906)]; Church on Habeas Corpus, §§ 356, 352. That this remedy, under the conditions defined, is appropriate, has, on several occasions, served to invite, without question, the decision of this court. We therefore take up for review the constitutionality of the act approved August 2, 1907. Acts 1907, pp. 518-519."

*Fourment v. State,* 155 Ala. 109, 112-13, 46 So. 266, 267 (1908). In *Howard v. Bessemer,* 40 Ala.App. 317, 114 So.2d 158 (1959), the Alabama Court of Appeals stated:"In *Barton v. City of Bessemer,* 234 Ala. 20, 173 So. 626, 627 [(1937)], it was held that the constitutionality of an ordinance under which the petitioner had been convicted may be determined in a habeas corpus proceedings, for if the ordinance be unconstitutional, then, 'the court would have no jurisdiction, and the arrest, trial, and conviction of the defendant under a void ordinance would be a nullity, and the petitioner would be entitled to his discharge on habeas corpus.' "

40 Ala.App. at 321, 114 So.2d at 162. "The writ is against void but not irregular or voidable judgments. " *Hable v. State,* 41 Ala.App. 398, 399, 132 So.2d 271, 272 (1961). See also *Greer v. State,* 49 Ala.App. 36, 268 So.2d 502 (1972); *Parham v. State,* 285 Ala. 334, 231 So.2d 899 (1970); *Nations v. State,* 41 Ala.App. 581, 141 So.2d 537 (1962); *State v. Baker,* 268 Ala. 410, 108 So.2d 361 (1959). Because **Egbuonu's** arguments, if meritorious, would render the charges against him void, we will consider those claims in this habeas corpus petition.

Art. I, § 6, Ala. Const. of 1901, states, in pertinent part:

"That in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either; to demand the nature and cause of the accusation; and to have a copy thereof; to be confronted by the witnesses against him; to have compulsory process for obtaining *752 witnesses in his favor; to testify in all cases, in his own behalf, if he elects so to do; and, in all prosecutions by indictment, a speedy, public trial, *by an impartial jury of the county or district in which the offense was committed ....*"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

911 So.2d 748                                                                                                    Page 6

911 So.2d 748
(Cite as: 911 So.2d 748)

Art. I, § 6, Ala. Const. of 1901.[FN4]

> FN4. The Minnesota Supreme Court, in
> *State v. Krejci,* 458 N.W.2d 407
> (Minn.1990), reviewing a special venue
> statute related to venue for a case
> involving child abuse, held that the
> child-abuse statute that provided that
> venue was proper in the county where the
> abuse occurred or the county where the
> child is found did not conflict with
> Minnesota's constitutional provision
> regarding venue, which is identical to our
> constitutional provision on venue.

[6] Egbuonu also argues that § 13A-8-192,
Ala.Code 1975, is unconstitutional and that the
charges against him are void because § 13A-8-192
seeks to extend Alabama's jurisdiction beyond the
borders of the State. He argues that no element of
the crime with which he is charged occurred in
Alabama; therefore, he argues, Alabama is without
jurisdiction to prosecute the crime.

[7] No provision in Art. I, § 6, Ala. Const.1901,
limits venue in a criminal case to one county or
even one state. Section 13A-8-192, Ala.Code 1975,
defines the crime of identity theft as follows:
"(a) A person commits the crime of identity theft if,
without the authorization, consent, or permission of
the victim, and with the intent to defraud for his or
her own benefit or the benefit of a third person, he
or she does any of the following:
"(1) Obtains, records, or accesses identifying
information that would assist in accessing financial
resources, obtaining identification documents, or
obtaining benefits of the victim.
"(2) Obtains goods or services through the use of
identifying information of the victim.
"(3) Obtains identification documents in the victim's
name."

The Legislature in § 13-8-196 specifically
designated that venue is proper either in the county
where the crime took place or where the victim
resides. Identity theft, by its definition, is a
continuing offense that in most instances will occur
in more than one county or even more than one state.

[8][9][10] However, where there is no legislation on
the matter of venue courts look to the purpose of the
statute defining the offense. "Venue in a criminal
case, though a constitutional matter, requires an
inquiry into what conduct the statute proscribes."
*United States v. Muench,* 153 F.3d 1298, 1304
(11th Cir.1998).
"[A] review of relevant authorities demonstrates
that there is no single defined policy or mechanical
test to determine constitutional venue. Rather, the
test is best described as a substantial contacts rule
that takes into account a number of factors-the site
of the defendant's acts, *754 the elements and
nature of the crime, the locus of the effect of the
criminal conduct, and the suitability of each district
for accurate factfinding....
"....
"... [P]laces that suffer the effects of a crime are
entitled to consideration for venue purposes. Such
districts have an obvious contact with the litigation
in their interest in preventing such effects from
occurring. To some extent this factor overlaps with
the definition and nature of the crime...."

*United States v. Reed,* 773 F.2d 477, 481-82 (2d
Cir.1985). See also *United States v. Johnson,* 323
U.S. 273, 65 S.Ct. 249, 89 L.Ed. 236 (1944).

Section 13A-8-190 et seq., Ala.Code 1975, entitled,
"The Consumer Identity Protection Act," by its very
name was enacted to protect Alabama citizens from
defendants seeking to steal their identities. Section
13A-8-196 specifically provides that venue is
proper where the victim resides. See *United States
v. Muench,* 153 F.3d at 1301-02 ("The victims of
Muench's crime ... are in Florida. Therefore, the
United States Attorney for the Northern District of
Florida has a particularly strong interest in
prosecuting Muench for his failure to pay past due
child support."). This issue has no merit.

[11] Egbuonu further argues that Alabama cannot
enact identity-theft legislation because the federal
government has already passed laws on identity
theft.

As the United States Supreme Court stated in
*United States v. Wheeler,* 435 U.S. 313, 320, 98
S.Ct. 1079, 55 L.Ed.2d 303 (1978):

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

911 So.2d 748

911 So.2d 748
(Cite as: 911 So.2d 748)

"States and the National Government are separate political communities. State and Federal Governments '[derive] power from different sources,' each from the organic law that established it. *United States v. Lanza*, 260 U.S. 377, 382 [(1922)]. Each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses, and in doing so each 'is exercising its own sovereignty, not that of the other.' *Ibid.* And while the States, as well as the Federal Government, are subject to the overriding requirements of the Federal Constitution, and the Supremacy Clause gives Congress within its sphere the power to enact laws superseding conflicting laws of the States, this degree of federal control over the exercise of state governmental power does not detract from the fact that it is a State's own sovereignty which is the origin of its power."

(Footnote omitted.) This argument thus has no merit.

[12][13] Egbuonu next argues that his extradition from California was illegal because, he argues, he was incorrectly labeled as a "fugitive." However, as Egbuonu admits in his petition, he waived extradition to return voluntarily to Alabama. As this Court stated in *Davis v. State*, 536 So.2d 110 (Ala.Crim.App.1987):
"[T]he appellant was returned to Alabama because of his voluntary waiver of extradition. In *Siegel v. Edwards*, 566 F.2d 958, 959-60 (5th Cir.1978), the court stated:
" 'Although the extradition papers of which appellant complains were never executed, appellant's return to Louisiana was not the result of those extradition papers. Appellant was returned to Louisiana because of his voluntary waiver of extradition. Once a fugitive has been brought within custody of the demanding state, legality of extradition is no longer proper subject of any legal attack by him.' "

536 So.2d at 116.

[14] Last, Egbuonu argues that his $100,000 bail is excessive. Identity theft *755 in the first degree is a Class C felony. The bail schedule found in Rule

7.2, Ala.R.Crim.P., recommends a bail of between $1,000 to $10,000 for a Class C felony. However, we have held that the factors set out in Rule 7.2(a)(1-14), Ala.R.Crim.P., may be used to increase the recommended bail. See *Ex parte Thomas*, 815 So.2d 592 (Ala.Crim.App.2001). As Egbuonu goes to great lengths to point out in his brief, he has no ties to Alabama; he is a citizen of Nigeria who was living in California at the time he was arrested. Given the unique circumstances of this case and the sparse record before this Court we cannot say that the $100,000 bail in this case is excessive.

For the foregoing reasons, this petition for a writ of habeas corpus is due to be denied.

PETITION DENIED.

McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur; SHAW, J., concurs in the result.
Ala.Crim.App.,2004.
Ex parte Egbuonu
911 So.2d 748

END OF DOCUMENT

Westlaw.

911 So.2d 755                                                              Page 1

911 So.2d 755
(Cite as: 911 So.2d 755)


**H**

Ex parte EgbuonuAla.,2005.
Supreme Court of Alabama.
Ex parte Zephyrinus C. **EGBUONU**.[FN1]

> FN1. The defendant filed his petition
> under the name "Zephyrinus C. **Egbuonu**."
> The related case in the Court of Criminal
> Appeals spelled his name "Zephyriums C.
> **Egbuonu**."
>> (In re State of Alabama
>> v.
>> Zephyriuns C. **Egbuonu**).
>> **1040647.**

April 22, 2005.


Petition for Writ of Certiorari to the Court of
Criminal Appeals (Jefferson Circuit Court,
CC-04-1422, Alfred Bahakel, Judge; Court of
Criminal Appeals, CR-03-1721).

Sid Hughes, Homewood, for petitioner.
Submitted on petitioner's brief only.
Prior report: Ala.Cr.App., 911 So.2d 748.

STUART, Justice.
The petition for the writ of certiorari is denied. See
*Strassheim v. Daily,* 221 U.S. 280, 31 S.Ct. 558, 55
L.Ed. 735 (1911); and *Heath v. Jones,* 941 F.2d
1126 (11th Cir.1991).

In denying the petition for the writ of certiorari, this
Court does not wish to be understood as approving
all the language, reasons, or statements of law in the
Court of Criminal Appeals' opinion. *Horsley v.
Horsley,* 291 Ala. 782, 280 So.2d 155 (1973).

WRIT DENIED.

NABERS, C.J., and SEE, LYONS, HARWOOD,
WOODALL, SMITH, BOLIN, and PARKER, JJ.,

concur.
Ala.,2005.
Ex parte Egbuonu
911 So.2d 755

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

February 13, 2006

TO:        Egbuonu, Zephyriuns, AIS: 242109

FROM:      Law Library

This is a list of the cases you requested:

CLARK V UNITED STATES, US Supreme Statutory Case law Number 05-5491 (2005)
BEARD V BANKS, US Supreme Court Case Number 04X-1739 (2005)
UNITED STATES V HAVENS, Case Number 04-2956 (2005) Federal Circuit Case
UNITED STATES V. WILLIAM, No. 05-11594 (2006) Federal Circuit Case
UNITED STATES V CLARK No 05-4274 2006 (Federal Circuit Case)
MARY CLE, LLC V FIRST CHOICE INTERNET, INC. WL 2895955 (2004)
STATE V KREJCI, 458 NW 2d 407, 411

We were not successful in finding any of the cases you requested.  Our system is not geared to find
cases by case number alone which is all you are providing.  These are the citation formats we need to search for
US Supreme Court cases:  141 led 2d 111  or  517 us 843.

On the cases you requested from the federal circuits, we only have access to cases in the 11th Circuit
which includes Alabama, Georgia, and Florida, or the 5th Circuit which includes Texas, Louisiana, and Mississippi.
There are no circuits listed on any of the federal circuit cases unless you were requesting cases from the Federal
Circuit itself to which we do not have access.  We have no access to federal district or circuit cases from the 1st,
2nd, 3rd, 4th, 6th, 7th, 8th, 9th, 10th, D.C. or Federal Circuits other than the hardback volumes currently in the
back room of the law library which ended with cases whose opinions were issued in approximately March of 2005.

This is a copy of the results of our search.

<u>U.S. SUPREME COURT CASES</u>
CLARK V U.S. No 04-8819, March 18, 2005
CLARK V U.S. No 04-9037, April 18, 2005
CLARK V U.S. No. 04-5169, January 24, 2005
CLARK V. U.S. No. 04-6340, January 24, 2005
CLARK V. U.S. No. 04, 9864, June 6, 2005
CLARK V. U.S. No. 04-7815, January 24, 2005

BEARD V. BANKS, No 02-1603, January 24, 2004

<u>FEDERAL CIRCUIT CASES</u>
UNITED STATES V. WILLIAM, No. 05-11594 (2006) Federal Circuit Case
This was the only hit for the 5th or 11th Circuit.  US. V. WILLIAMS, No 02-12738, December 27, 2002.
UNITED STATES V CLARK No 05-4274 2006 (Federal Circuit Case)
This was the only hit for the 5th or 11th Circuit.  U.S. V. CLARK, No 02-10427, December 30, 2002.
U.S. V. HAVENS, 04-2956, 2005, no hits for the 5th or 11th Circuit
MARY CLE, LLC V. FIRST CHOICE INTERNET, WL 2895955, 2004, no hits for the 5th or 11th Circuit

<u>CASES FROM OTHER STATES</u>
STATE V KREJCI, 458 NW 2d 407, 411.
This case is not a state case from the State of Alabama. It is from the Northwestern Reporter which we do
not have.

I am attaching a copy of a form to be sent to the Alabama Department of Corrections Legal Division which
you may fill out requesting these materials and send to DOC Legal Division, 301 S. Ripley Street. Montgomery, AL
36104.



**EXHIBIT 2**

LEXSEE 622 SE2D 836

### THE STATE v. MAYZE.

#### S05A1225.

### SUPREME COURT OF GEORGIA

*280 Ga. 5; 622 S.E.2d 836; 2005 Ga. LEXIS 825; 2005 Fulton County D. Rep. 3521*

**November 21, 2005, Decided**

**PRIOR HISTORY:** [***1] *OCGA § 16-9-125*; constitutional question. Clayton Superior Court. Before Judge Boswell. *State v. Mayze, 2005 Ga. LEXIS 638 (Ga., Oct. 3, 2005)*

**DISPOSITION:** Judgment reversed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant was charged in Clayton County with two counts of identity fraud in violation of *O.C.G.A. § 16-9-121*. Defendant's demurrer to the indictment was sustained. The State appealed.

**OVERVIEW:** Defendant argued that the venue provision of *O.C.G.A. § 16-9-125* violated Ga. Const. art. art. VI, § II, para. VI, which required that the venue of a criminal case be set in the county where the crime was committed. The state's highest court held that the nature of identity fraud was the protection of the personal information contained in the victim's records. That information was deemed to be in the lawful possession of the victim, so that when a defendant violated *O.C.G.A. § 16-9-121* by engaging in an unauthorized access to the records, he engaged in the fraudulent use of information located in the county where the victim resided or was found. Since the crime of identity fraud, as defined by *O.C.G.A. §§ 16-9-121* and *16-9-125* when read in para materia, took place in the county where the victim and his or her personal information were located, there was no constitutional bar to trying the defendant in that county. *O.C.G.A. § 16-9-125* complied with the constitutional mandate. As it was alleged that defendant committed the crime of identity fraud in Clayton County by using personal information that was in the lawful possession of a resident of that county, venue was proper.

**OUTCOME:** The judgment was reversed.

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
[HN1] See Ga. Const. art. VI, § II, para. VI.

*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
*Governments > State & Territorial Governments > Legislatures*
[HN2] The Georgia general assembly is certainly bound by Ga. Const. art. VI, § II, para. VI, and cannot

EXHIBIT 3

enact a law providing for the prosecution of a crime in any county other than that wherein it was committed. Nevertheless, it is equally clear that the power to create crimes and to prescribe punishment therefor is legislative.

*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
[HN3] Ga. Const. art. VI, § II, para. VI does not limit venue in a criminal case to one county. It provides for trial in whatever county the offense was committed. A crime may be ongoing or continuing, in which case venue would be appropriate in any county wherein the offense occurred.

*Governments > Legislation > Interpretation*
[HN4] Under the "verb test," the verbs which appear in a criminal statute and relate to the proscribed conduct are the determinative factor in identifying the substantive nature of the offense. The Georgia Supreme Court, like the Supreme Court of the United States, has never before held that verbs are the sole consideration in identifying the conduct that constitutes an offense. While the "verb test" certainly has value as an interpretative tool, it cannot be applied rigidly, to the exclusion of other relevant statutory language. The test unduly limits the inquiry into the nature of the offense and thereby creates a danger that certain conduct prohibited by statute will be missed.

*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
*Governments > Legislation > Interpretation*
[HN5] Exclusive reliance on the "verb test" when considering the constitutionality of a venue provision enacted by the Georgia general assembly is inappropriate. "Other relevant statutory language" must be considered in determining the scope of the prohibition imposed by *O.C.G.A. § 16-9-121* and, consequently, the location of permissible venues for a prosecution under that statute.

*Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses*
*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
*Governments > Legislation > Interpretation*
[HN6] *O.C.G.A. §§ 16-9-121* and *16-9-125* are in pari materia and must, therefore, be construed together. Looking beyond the verbs contained in *O.C.G.A. § 16-9-121* and giving consideration to the additional language contained in *O.C.G.A. § 16-9-125*, the Georgia general assembly has clearly defined the crime of identity fraud as a continuing offense which extends into the county where the victim resides or is located.

*Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses*
*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
[HN7] See *O.C.G.A. § 16-9-125*.

*Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses*
*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
[HN8] The "other relevant statutory language" clearly indicates that, regardless of where the victim's records may be physically located, the nature of the offense of identity fraud is the protection of the personal information contained therein. Moreover, that information is deemed to be in the lawful possession of the victim, so that when a defendant violates *O.C.G.A. § 16-9-121* by engaging in an unauthorized access to the records, he thereby engages in the fraudulent use of information located in the county where the victim resides or is found.

*Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation*
*Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses*
*Criminal Law & Procedure > Jurisdiction & Venue > Venue*

[HN9] Since the crime of identity fraud, as defined by *O.C.G.A. § § 16-9-121* and *16-9-125* when read in para materia, takes place in the county where the victim and his or her personal information are located, there is no constitutional bar to trying the defendant in that county.

*Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation*
*Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses*
*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
[HN10] The "act" which constitutes the crime of "identity fraud" does occur in the county of the victim's residence, because that act is the unauthorized use of the victim's personal information. There is a valid connection between the act of accessing records and the use of information contained therein. Regardless of where the records were accessed, the use of the information obtained therefrom is consummated in the county where the victim lives. There is not any constitutional impediment to the authority of the Georgia general assembly to define a crime in such a manner as to provide that a defendant's conduct which takes place in one jurisdiction culminates in an unauthorized act or, as in this case, an unauthorized use occurring in another.

*Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses*
*Criminal Law & Procedure > Criminal Offenses > Homicide > Murder*
*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
[HN11] The Georgia general assembly can provide that the venue of a murder case is in the county where the death occurred, regardless of where the fatal act took place. This shows that the general assembly is not constitutionally bound by the "verb test," and can establish legislatively whether the crime of murder occurred where the defendant committed the act or where the victim died. If the "verb test" is not a limit on the general assembly's authority to define the crime of murder so as to compel a prosecution where the accused's act occurred, it cannot constitute a limit on legislative authority to define the crime of "identity fraud" so as to provide that an unauthorized use of information can be prosecuted in the county of residence of the victim whose privacy was invaded.

*Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses*
*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
[HN12] It is undisputed that the Georgia Supreme Court has the duty to safeguard the defendant's constitutional right of prosecution in the county where the crime was committed. However, it also has the responsibility of upholding the Georgia general assembly when it passes constitutional legislation to protect the citizens of Georgia by authorizing a criminal prosecution in their counties of residence as against those who would make fraudulent use of the personal information located in those counties.

*Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses*
*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
*Governments > State & Territorial Governments > Legislatures*
[HN13] When exercising its constitutional power to create crimes, the Georgia general assembly is authorized to define identity fraud in such a way that, regardless of where the defendant may have accessed the records, the offense actually constitutes an unauthorized use of the personal information contained therein, which proscribed conduct occurs in the county where the information and the individual who is the subject thereof, rather than the underlying records themselves, are located.

*Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation*
*Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses*
*Criminal Law & Procedure > Jurisdiction & Venue > Venue*
[HN14] *O.C.G.A. § 16-9-125* clearly provides that an element of the offense of identity fraud is the unauthorized use of personal information, which element occurs in the county where the victim lives. The fact that the language denoting identity fraud as an offense involving the victim's possessory interest in his

or her own personal information appears in § 16-9-125, rather than *O.C.G.A. § 16-9-121*, does not have any constitutional significance.

### *Constitutional Law > The Judiciary > Case or Controversy > Constitutionality of Legislation*
### *Criminal Law & Procedure > Jurisdiction & Venue > Venue*

[HN15] There is a fundamental distinction between the location where a defendant commits an act and the site where a crime occurs. The Georgia Constitution does not require that the Georgia general assembly provide that venue of a prosecution shall be only in the county where the accused committed a physical act. So long as venue is set in the county where the crime occurred, as that crime is defined by the general assembly, the constitutional mandate is satisfied.

### *Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses*
### *Criminal Law & Procedure > Criminal Offenses > Homicide > Murder*
### *Criminal Law & Procedure > Jurisdiction & Venue > Venue*

[HN16] Unlike homicide or other crimes against the person, identity fraud is an offense against the victim's possessory interest in his or her personal information. Establishing the victim's residence as the venue of a prosecution for a crime committed through the invasion of that possessory interest certainly is not "based completely on fictional concepts." Personal information is an intangible commodity. Therefore, as evidenced by the numerous statutes from other jurisdictions which are analogous to Georgia's, it is entirely reasonable to provide that, personal information is deemed to be located in whatever county the owner of that information resides.

### *Constitutional Law*

[HN17] The principle of strict construction cannot be used as a tool to achieve an unconstitutional result.

### *Criminal Law & Procedure > Criminal Offenses > Fraud > False Pretenses*
### *Criminal Law & Procedure > Jurisdiction & Venue > Venue*

[HN18] *O.C.G.A. § 16-9-125* complies with the constitutional mandate that the venue of a criminal case be set in the county where the crime was committed.

**HEADNOTES:** Georgia Advance Headnotes

(1) **Criminal Law & Procedure. Jurisdiction & Venue. Venue.** Exclusive reliance on the "verb test" when considering the constitutionality of a venue provision enacted by the General Assembly is inappropriate. Looking beyond the verbs contained in *OCGA § 16-9-121* and giving consideration to the additional language contained in *OCGA § 16-9-125*, the General Assembly clearly defined the crime of identity fraud as a continuing offense which extends into the county where the victim resides or is located.

(2) **Criminal Law & Procedure. Criminal Offenses. Fraud.** Since the crime of identity fraud, as thus defined by *OCGA § § 16-9-121* and *16-9-125* when read in para materia, takes place in the county where the victim and his or her personal information are located, there is no constitutional bar to trying the defendant in that county. The "act" which constitutes the crime of "identity fraud" does occur in the county of the victim's residence, because that act is the unauthorized use of the victim's personal information.

(3) **Criminal Law & Procedure. Criminal Offenses. Fraud.** When exercising its constitutional power to create crimes, the General Assembly is authorized to define identity fraud in such a way that, regardless of where the defendant may have accessed the records, the offense actually constitutes an unauthorized use of the personal information contained therein, which proscribed conduct occurs in the county where the information and the individual who is the subject thereof, rather than the underlying records themselves, are located. It is entirely reasonable to provide that personal information is deemed to be located in whatever county owner of that information resides.

**(4) Criminal Law & Procedure. Criminal Offenses. Fraud.** *OCGA § 16-9-125* complies with the constitutional mandate that the venue of a criminal case be set in the county where the crime was committed. Because it was alleged that defendant committed the crime of identity fraud in a county by using personal information which was in the lawful possession of a resident of that county, venue of the prosecution was proper; the trial court erred in sustaining his demurrer to the indictment.

**COUNSEL:** *Jewel C. Scott, District Attorney, Todd E. Naugle, Tiffany C. Boulware, Anece B. White, Assistant District Attorneys,* for appellant.

*Brown & Gill, Angela B. Dillon,* for appellee.

**JUDGES:** Carley, Justice. All the Justices concur, except Sears, C. J., Hines and Melton, JJ., who dissent.

**OPINIONBY:** Carley

**OPINION:**

[*5] [**838] Carley, Justice.

In 2003, Owanna Lloyd, who resides in Clayton County, misplaced his wallet in Fulton County. Using information contained in the wallet, Willie Mayze allegedly accessed Mr. Lloyd's credit history in DeKalb County. Eventually, Mayze was arrested and charged in Clayton County with two counts of identity fraud in violation of *OCGA § 16-9-121.* In accordance with *OCGA § 16-9-125,* venue of the prosecution was predicated on Mr. Lloyd's residence in Clayton County.

Mayze filed a demurrer to the indictment, asserting that *OCGA § 16-9-125* was unconstitutional insofar as it authorized venue of an identity fraud prosecution in the county where the victim "resides or is found, ... regardless of whether the defendant was ever actually in such county." After a hearing, the trial court sustained the demurrer, and the State brings this appeal [***2] from that order.

We note at the outset that, in creating the crime of identity fraud and providing for venue of the prosecution in the county where the victim resides or is found, Georgia is not alone. A growing number of other states enacted comparable provisions, including the following: Alabama (*Ala. Code § 13A-8-196*); Connecticut (*C.G.S.A. § 54-1d (c)*); District of Columbia (*DC Code § 22-3227.06 (1)*); Florida (West's *F.S.A. § 817.568 (15), (16)*); Illinois (*720 ILCS 5/1-6 (s)*); Iowa (*I.C.A. § 715A.8 (5)*); Kentucky (*KRS § 514.160 (5)*); Maryland (*MD Code, Criminal Law, § 8-301 (m) (2)*); Michigan (*M.C.L.A. § 762.10c (1) (c)*); Minnesota (*M.S.A. § 609.527, Subd. 6 (1)*); Missouri (*V.A.M.S. § 541.033 (2)*); Nevada (2005 Nevada Laws Ch. 485 (S.B. 347), § 13 (2) (effective October 1, 2005)); New Hampshire (*N.H. Rev. Stat. § 638:27*); New Mexico (*N.M.S.A. 1978, § 30-16-24.1 (G)*); North Carolina (NC Sess. Laws 2005-414, § 2 (effective December 1, 2005)); North Dakota (*NDCC § 12.1-23-12*); Pennsylvania (*18 Pa.C.S.A. § 4120 (e.1)*); Utah (*U.C.A. 1953 § 76-1-201 (7)*); [***3] Virginia (*Va. Code Ann. § 18.2-186.3 (D)*); Washington (*West's RCWA § 9.35.020 (5)*). The precise issue presented for resolution in this case is the constitutionality of the venue provision of our statute. [HN1] "[A]ll criminal cases shall be tried in the county where the crime was committed ... ." *Art. VI, Sec. II, Par. VI of the Georgia Constitution of 1983.* [*6] [HN2] The General Assembly is certainly bound by this provision, and cannot enact a law providing for the prosecution of a crime in any county other than that wherein it was committed. Nevertheless, it is equally clear that " '[t]he power to create other crimes and to prescribe punishment therefor is legislative.' [Cit.]" (Emphasis omitted.) *Knight v. State,* 243 Ga. 770, 771 (1) (257 SE2d 182) (1979). Thus, if the offense of "identity fraud," as defined by the General Assembly, is one which occurred in the county where the victim resides or is found, then there is no constitutional impediment to trying the defendant there.

[HN3] Art. VI, Sec. II, Par. VI of our Constitution does not limit venue in a criminal case to one county. It provides for trial in whatever county the offense was committed. A [***4] crime may be ongoing or continuing, in which case venue would be appropriate in any county wherein the offense occurred. See *State v. Kell,* 276 Ga. 423 (577 SE2d 551) (2003). Mayze contends that the continuing crime theory does not apply because identity fraud, as defined by *OCGA § 16-9-121,* can be committed only in a county wherein the defendant obtained or recorded identifying information of the victim or accessed or attempted to access the resources of the victim. That interpretation of the limited scope of the offense

presumably is based on the so-called [HN4] "verb test," whereby the verbs which appear in a criminal statute and relate to the proscribed conduct are the determinative factor in identifying the substantive nature of the offense. It is true that "[s]tudying 'the key verbs which define the criminal offense in the statute is helpful in determining venue in doubtful cases.' [Cit.]" *State v. Kell, supra at 425*. However, this Court, like the Supreme Court of the United States, has

> [**839] never before held ... that verbs are the sole consideration in identifying the conduct that constitutes an offense. While [***5] the "verb test" certainly has value as an interpretative tool, it cannot be applied rigidly, to the exclusion of other relevant statutory language. The test unduly limits the inquiry into the nature of the offense and thereby creates a danger that certain conduct prohibited by statute will be missed.

*United States v. Rodriguez-Moreno, 526 U. S. 275, 280 (II) (119 S. Ct. 1239, 143 LE2d 388) (1999)* (interpreting *Art. III, Sec. 2, Cl. 3 of the Federal Constitution*, which provides that "[t]he Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed" and which is, therefore, virtually identical to our comparable state constitutional provision). **(1)** Thus, [HN5] exclusive reliance on the "verb test" when considering the constitutionality of a venue provision enacted by the General Assembly is inappropriate. "[O]ther [*7] relevant statutory language" must be considered in determining the scope of the prohibition imposed by *OCGA § 16-9-121* and, consequently, the location of permissible venues for a prosecution under that statute.

[HN6] *OCGA § § 16-9-121* and *16-9-125* [***6] are in pari materia and must, therefore, be construed together. See generally *State v. Griffin, 268 Ga. 540, 542 (491 SE2d 340) (1997)*. Looking beyond the verbs contained in *OCGA § 16-9-121* and giving consideration to the additional language contained in *OCGA § 16-9-125*, the General Assembly has clearly defined the crime of identity fraud as a continuing offense which extends into the county where the victim resides or is located. *OCGA § 16-9-125* expressly states:

> [HN7] The General Assembly finds that identity fraud involves the use of identifying information which is uniquely personal to the consumer or business victim of that identity fraud and which information is considered to be in the lawful possession of the consumer or business victim wherever the consumer or business victim currently resides or is found. Accordingly, the fraudulent use of that information involves the fraudulent use of information that is, for purposes of this article, found within the county where the consumer or business victim of the identity fraud resides or is found.

[HN8] This "other relevant statutory [***7] language" clearly indicates that, regardless of where the victim's *records* may be physically located, the nature of the offense of identity fraud is the protection of the personal *information* contained therein. Moreover, that information is deemed to be in the lawful possession of the victim, so that when a defendant violates *OCGA § 16-9-121* by engaging in an unauthorized access to the records, he thereby engages in the fraudulent use of information located in the county where the victim resides or is found. [HN9] **(2)** Since the crime of identity fraud, as thus defined by *OCGA § § 16-9-121* and *16-9-125* when read in para materia, takes place in the county where the victim and his or her personal information are located, there is no constitutional bar to trying the defendant in that county.

Therefore, [HN10] the "act" which constitutes the crime of "identity fraud" does occur in the county of the victim's residence, because that act is the unauthorized use of the victim's personal information. There is a valid connection between the act of accessing records and the use of information contained therein. Regardless [***8] of where the records were accessed, the use of the information obtained therefrom is consummated in the county where the victim lives. There is not any constitutional impediment to the authority of the General Assembly to define a crime in such a manner as to provide that a defendant's [*8] conduct which takes place in one jurisdiction culminates in an unauthorized act or, as in this case, an

unauthorized use occurring in another. As another example of the breadth of the constitutional power to legislate in this context, we note that [HN11] the General Assembly could provide that the venue of a murder case is in the county where the death occurred, regardless of where the fatal act took place. *Roach v. State, 34 Ga. 78, 82 (1864)* (holding that "at common law the jurisdiction attached in the county where the death occurred; by statute, the jurisdiction attaches in the county where the mortal blow was given."). This shows that the General Assembly is not constitutionally bound by the "verb test," and can establish legislatively [**840] whether the crime of murder occurred where the defendant committed the act or where the victim died. If the "verb test" is not a limit on the General Assembly's [***9] authority to define the crime of murder so as to compel a prosecution where the accused's act occurred, it cannot constitute a limit on legislative authority to define the crime of "identity fraud" so as to provide that an unauthorized use of information can be prosecuted in the county of residence of the victim whose privacy was invaded.

The conclusion that *OCGA § 16-9-125* passes constitutional muster is further supported by a recent Alabama decision. *Art. I, Sec. VI of the Alabama Constitution* is virtually identical to the comparable provision in our Constitution, and provides that criminal prosecutions in that state are to be held in "the county or district in which the offense was committed ... ." The relevant provision of the Alabama "identity theft" statute is also comparable to our "identity fraud" law, and provides that the crime is committed if a defendant,

> without the authorization, consent, or permission of the victim, and with the intent to defraud for his or her own benefit or the benefit of a third person, ... [o]btains, records, or accesses identifying information that would assist in accessing financial resources, obtaining identification [***10] documents, or obtaining benefits of the victim.

*Ala. Code § 13A-8-192 (a) (1)*. In accordance with a legislative enactment that is analogous to our *OCGA § 16-9-125*, venue of a prosecution for violating the Alabama identity theft statute is

> in any county in which any part of the crime took place, regardless of whether the defendant was ever actually present in that county, or in the county of residence of the person who is the subject of the identification documents or identifying information.

[*9] *Ala. Code § 13A-8-196*. As against the assertion that this venue provision was unconstitutional, the Court of Criminal Appeals of Alabama held that

> we believe that the Legislature ... defined the crime of identity theft as a continuing offense. [Cit.] ... "Venue in a criminal case, though a constitutional matter, requires an inquiry into what conduct the statute proscribes." [Cit.] "(A) review of relevant authorities demonstrates that there is no single defined policy or mechanical test to determine constitutional venue. Rather, the test is best described as a substantial [***11] contacts rule that takes into account a number of factors -- the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding ... . Places that suffer the effects of a crime are entitled to consideration for venue purposes. Such districts have an obvious contact with the litigation in their interest in preventing such effects from occurring. To some extent this factor overlaps with the definition and nature of the crime ... ." [Cits.] *Section 13A-8-190, et seq., Ala. Code 1975*, entitled, "The *Consumer Identity Protection Act*," by its very name was enacted to protect Alabama citizens from defendants seeking to steal their identities. *Section 13A-8-196* specifically provides that venue is proper where the victim resides. [Cit.] This issue has no merit.

*Ex parte Egbuonu, 911 So. 2d 748 (Ala. Crim. App. 2004).*

This analysis by the Alabama court is compelling and, although not controlling, is persuasive authority for the construction of our own analogous constitutional [***12] and statutory provisions. A contrary holding based upon rigid adherence to the "verb test" would have the unfortunate effect of depriving the residents of Georgia of the protection which the General Assembly sought to provide them as against those who seek to steal their identities. A victim of identity fraud in this state would not have any protection against one who stole his or her identity by unauthorized access to records located outside of Georgia. Even when the records are located in this state, the victim would be put to the time and expense of traveling to the county where his or her records were maintained to testify in the prosecution. [HN12] It is undisputed that this Court has the duty to safeguard the defendant's constitutional right of prosecution in [**841] the county where the crime was committed. However, we also have the responsibility of upholding the General Assembly when it passes constitutional legislation to protect the citizens of this state by [*10] authorizing a criminal prosecution in their counties of residence as against those who would make fraudulent use of the personal information located in those counties.

Notwithstanding the dissent's protestations to the contrary, today's [***13] decision is actually an extremely narrow one. (3) The extent of our holding is that, [HN13] when exercising its constitutional power to create crimes, the General Assembly is authorized to define identity fraud in such a way that, regardless of where the defendant may have accessed the records, the offense actually constitutes an unauthorized use of the personal information contained therein, which proscribed conduct occurs in the county where the information and the individual who is the subject thereof, rather than the underlying records themselves, are located. Thus, the dissent misrepresents our holding by asserting on page 16 that we have "overlook[ed] the undisputed fact that no element of the offense of identity fraud as set forth in *OCGA § 16-9-121* actually occurred in the county where the defendant was tried in this case." The truth is that, in resolving this appeal, we have not erroneously limited our consideration to *OCGA § 16-9-121*, but we have instead properly taken into account that statute and all other provisions which are in pari materia. What is overlooked by the dissent is that [HN14] *OCGA § 16-9-125* [***14] clearly provides that an element of the offense is the unauthorized use of personal information, which element occurs in the county where the victim lives. The fact that the language denoting identity fraud as an offense involving the victim's possessory interest in his or her own personal information appears in *OCGA § 16-9-125*, rather than *OCGA § 16-9-121*, does not have any constitutional significance.

Essentially, the dissent fails to acknowledge [HN15] the fundamental distinction between the location where a defendant commits an act and the site where a crime occurs. The Constitution does not require that the General Assembly provide that venue of a prosecution shall be only in the county where the accused committed a physical act. So long as venue is set in the county where the crime occurred, as that crime is defined by the General Assembly, the constitutional mandate is satisfied. The dissent does not suggest any reason why, for purposes of protecting the citizens of this state from unauthorized use of their personal information, the General Assembly cannot constitutionally determine that the locus of the crime is where the victim [***15] resides or is found, regardless of the fortuitous location where the defendant accessed the records containing the information. [HN16] Unlike homicide or other crimes against the person, identity fraud is an offense against the victim's possessory interest in his or her personal information. Establishing the victim's residence as the venue of a prosecution for a crime committed through the invasion of that possessory interest certainly is not "based completely on fictional concepts." Dissent, p. [*11] 15. Personal information is an intangible commodity. Therefore, as evidenced by the numerous statutes from other jurisdictions which are analogous to ours, it is entirely reasonable to provide that, personal information is deemed to be located in whatever county the owner of that information resides.

The dissent apparently believes that its analysis is predicated upon a strict construction of our Constitution. However, the holding that it proposes would violate the principle of the separation of powers, invade the constitutional authority of the General Assembly to create crimes, and substitute the judiciary's determination as to proper venue for the legislative decision. [HN17] The principle of strict [***16] construction cannot be used as a tool to achieve an unconstitutional result.

(4) Accordingly, we hold that [HN18] *OCGA § 16-9-125* complies with the constitutional mandate that the venue of a criminal case be set in the county where the crime was committed. Because it is alleged that Mayze committed the crime of identity fraud in Clayton County by using personal information which

was in the lawful possession of a resident of that county, venue of the prosecution was proper. Therefore, [**842] the trial court erred in sustaining his demurrer to the indictment.

*Judgment reversed. All the Justices concur, except Sears, C. J., Hines and Melton, JJ., who dissent.*

**DISSENTBY: Melton**

**DISSENT:**

Melton, Justice, dissenting.

Today, on motion for reconsideration, the majority damages longstanding constitutional law in favor of the most palatable outcome, and, in doing so, effectively overrules Art. VI, Sec. II, Par. VI of the Georgia Constitution. As such, the majority opinion greatly exceeds the bounds of our authority, and it creates a dangerous precedent allowing this Court to rewrite the constitution both in cases regarding venue and any case involving interpretation of a constitutional [***17] provision which impinges on the power of either this Court or the General Assembly.

This case represents an instance in which the constitutionally-required holding leads to what can only be called an unfortunate result. Nonetheless, it is exactly in such unfortunate cases where we must fight hardest to safeguard our constitution and avoid the temptation to create bad law in order to reach the outcome that is most satisfying. Nevertheless, the majority muddies our constitutional waters when it is completely unnecessary to do so.

This is not a case about computers, yet the majority focuses its analysis on identity fraud committed by computer. This is not a case without a constitutional solution that does not exceed the authority of this Court or the General Assembly. The solutions to the immediate [*12] problem surely exist, but they must be discovered by the General Assembly, not created by this Court based on factual scenarios not before us and through alteration of longstanding precedent. Finally, this is not a case about the General Assembly's discretion. It is, instead, a case about constitutional limitations placed on the General Assembly, limitations which the majority of this Court [***18] now removes, opening a floodgate that cannot be logically closed in all future cases regarding venue.

Without a doubt, identity fraud is a growing crime, and many have analogized it as a plague on our computer-driven society. As the crime evolves, our manner of dealing with it must evolve as well, but, as always, this legal evolution should occur within the framework of our constitution. The majority has wholly stepped outside of this all-important framework, and while I might prefer the majority's outcome, I must strongly dissent to it because it is derived by unconstitutional means.

1. This matter requires us to determine whether the statutory venue provisions set forth for the crime of identity fraud in *OCGA § 16-9-125* satisfy the mandate of the Georgia Constitution of 1983 that a criminal case must be tried in the county where the crime was committed. *OCGA § 16-9-125* as it is currently drafted is unconstitutional to the limited extent that it provides that venue for identity fraud is proper in the county where the victim resides or is found, irrespective of whether the defendant obtains or records identifying information [***19] of the victim or accesses or attempts to access the resources of the victim in the county of the victim's residence.

Art. VI, Sec. II, Par. VI of the Georgia Constitution provides: "[A]ll criminal cases shall be tried in the county where the crime was committed, except cases in the superior courts where the judge is satisfied that an impartial jury cannot be obtained in such county." n1 In criminal cases, venue requirements generally are for the benefit of the defendant, and "[v]enue is a jurisdictional fact that must be proved by the prosecution beyond a reasonable doubt." *Graves v. State, 269 Ga. 772, 773 (1) (504 SE2d 679) (1998)*. Addressing venue for the crime of identity fraud, *OCGA § 16-9-125* states, in turn:

> The General Assembly finds that identity fraud involves the use of identifying information which is uniquely personal to the consumer or business victim of that identity fraud and which information is considered to be in the lawful possession of the consumer or business victim wherever the consumer or business victim currently resides [**843] or is found. [*13] Accordingly, the fraudulent use of that information involves the fraudulent [***20]

use of information that is, for the purposes of this article, found within the county where the consumer or business victim of the identity fraud resides or is found. Accordingly, in a proceeding under this article, the crime will be considered to have been committed in any county where the person whose means of identification or financial information was appropriated resides or is found, or in any county in which any other part of the offense took place, regardless of whether the defendant was ever actually in such county.

Given this definition, it must then be determined whether *OCGA § 16-9-125* satisfies the mandate of Art. VI, Sec. II, Par. VI of the Georgia Constitution and accurately describes the places where identity fraud is committed.

> n1 This constitutional mandate is codified at *OCGA § 17-2-2 (a)*.

The crime of identity fraud occurs when:

> without the authorization or permission of a person with the intent unlawfully to appropriate resources [***21] of or cause physical harm to that person, or of any other person, to his or her own use or to the use of a third party he or she: (1) Obtains or records identifying information of a person which would assist in accessing the resources of that person or any other person; or (2) Accesses or attempts to access the resources of a person through the use of identifying information.

*OCGA § 16-9-121.*

Each element of identity fraud will have some specific situs. With this in mind, *OCGA § 16-9-125* properly places venue "in any county in which any other part of the offense took place." In other words, this portion of the statute may appropriately be read to indicate that, due to identity fraud's nature as an ongoing crime, venue would be appropriate in any county in which an act in furtherance of the crime is committed. See, e.g., *State v. Kell, 276 Ga. 423 (577 SE2d 551) (2003)* (regarding venue for ongoing crime of medicaid fraud); *Callaway v. State, 247 Ga. App. 310, 315 (2) (542 SE2d 596) (2000)* (regarding venue for insurance fraud). In this way, venue is placed in any county where any portion of the crime has been committed.

To the extent, [***22] however, that *OCGA § 16-9-125* places venue in the county where the victim resides or is found, irrespective of whether the defendant obtains or records identifying information of the victim or accesses or attempts to access the resources of the victim in the county of residence, the statute violates the constitutional mandate that a crime must be tried in the county where it is [*14] committed. As the specific facts of this case show, the crime of identity fraud will not always occur in the county of the victim's residence, as contemplated by the current language of *OCGA § 16-9-125.*

In considering these issues, one must not confuse the situs where an act of identity fraud is committed with the place that the results of the crime are most strongly manifested. Identity fraud can be committed in any county; its manifestations, however, will be strongest at the home county of the victim. Unless the manifestations precipitated by an act constitute a part of the crime itself, n2 venue nonetheless must be placed where a crime occurs, not where its consequences are felt. Furthermore, although identity fraud may constitute a continuing crime, [***23] this classification does not automatically allow it to be tried in the county of the victim's residence. For a continuing offense, venue generally may be appropriate in any county where the crime was begun, continued, or completed. n3 The beginning, middle, or end of the crime of identity fraud, as currently defined by the General Assembly, does not always occur in the county of the victim's residence, as in this case.

n2 For example, some acts which criminally interfere with interstate commerce may be tried in

the place where interstate commerce has actually been affected, as well as the place that the act causing the effect occurred. See, e.g., *United States v. Craig, 573 F2d 513 (7th Cir. 1978)* (violation of federal *Hobbs Act* properly tried in place where act of extortion impacted interstate commerce).

n3 See, e.g., *United States v. Muench, 153 F3d 1298 (11th Cir. 1998)* (violation of federal *Child Support Recovery Act* by failure to pay child support may be tried in county and state where child resides, as that is the place where the act is completed).

[***24]

Applying all of these rules and considerations to the case at hand, venue for Mayze's [**844] crimes of identity fraud does not lie in Clayton County, as Mayze did not obtain or record identifying information of the victim or access or attempt to access the resources of the victim there. Accordingly, the trial court's ruling on this issue should be affirmed.

2. Both the State and the majority argue that, unless *OCGA § 16-9-125* is upheld, Georgia citizens will be vulnerable to identity fraud committed by individuals who may never come to this state. I certainly share this concern that, due to the complexities of modern technology, identity fraud has largely become a computer-based crime in which perpetrators from other states access computer databases containing the identifying information of victims in Georgia. In this case, which does not involve the use of a computer, there is no assertion that any element of the underlying offense occurred in the county of the victim's residence, where the case was ultimately tried. Therefore, as discussed above, this Court, under the proper constitutional analysis, has no discretion in its determination that, to the [*15] extent [***25] that it places venue in the county of the victim's residence irrespective of whether any element of the crime is committed there, *OCGA § 16-9-125* is unconstitutional.

The solutions to this temporary problem must be crafted by the General Assembly, not created by this Court through a strained analysis which circumvents our constitution. In addressing instances of identity fraud perpetrated by individuals located outside of this State, the General Assembly may wish to look to statutory provisions such as *OCGA § 16-9-94 (4)* to address this situation. n4 The General Assembly might also choose to broaden the means by which identity fraud is committed in *OCGA § 16-9-121* to include causing certain economic impact to the victim. Although the General Assembly could not dictate where the impact occurs by edict, economic harm to the victim will likely occur most profoundly in the county where he or she resides. Venue, therefore, might be proper in that county because an element of the crime occurred there, not because the General Assembly unconstitutionally assigned venue there irrespective of the facts involved. [***26]

n4 Under this provision, venue for a computer crime under *OCGA § 16-9-93* lies in "any county from which, to which, or through which any use of a computer or computer network was made, whether by wires, electromagnetic waves, microwaves, or any other means of communication."

3. In reaching its conclusion, the majority recognizes that the General Assembly holds the power to create crimes and to prescribe punishment for these crimes. The majority then states: "Thus, if the offense of 'identity fraud,' as defined by the General Assembly, is one which occurred in the county where the victim resides or is found, then there is no constitutional impediment to trying the defendant there."

This logic, though superficially appealing, omits at least two constitutionally important considerations. First and foremost, the majority's interpretation of the law renders the constitutional mandate regarding venue wholly meaningless. The majority fails to recognize that, although the General Assembly has [***27] the power to create crimes and prescribe punishment, it does not have the power to create venue by dictating the county in which the crime was committed, without regard to whether any part of the crime took place in that county.

The majority's opinion rests its analysis on the circular conclusion that venue exists anywhere the General Assembly indicates, irrespective of whether its choice of situs is based completely on fictional concepts. If adopted, this precept wholly negates the constitutional mandate that venue shall be in the

county where the crime is committed, because the crime will be committed anywhere the [*16] General Assembly says it is. For example, under the majority's analysis, the General Assembly could legislate that murder is the taking of a victim's life, that this life (or identity) exists in the county of the victim's residence, and, therefore, venue always exists in the county of the victim's residence, even if it were undisputed that no act in furtherance of the murder occurred there. Despite the heinous nature of murder, our General Assembly recognized that it had to [**845] place venue in a place where there was at least some physical evidence that the crime occurred. [***28] See *OCGA § 17-2-2 (c)*. We cannot apply any different set of rules to this case.

Second, the majority overlooks the undisputed fact that no element of the offense of identity fraud as set forth in *OCGA § 16-9-121* actually occurred in the county where the defendant was tried in this case. As it is currently defined, impact upon the victim is not an element of the offense of identity fraud as set forth in *OCGA § 16-9-121*, fully considering *any* language therein. This analysis is not dependent on the "verb test," a doctrine wholly irrelevant to the required constitutional outcome in this case. What is relevant here is the fact that no element of the crime of identity fraud occurred in the county of the victim's residence. Moreover, where our Constitution mandates a determination of venue based specifically on where the offense in question was "committed," looking to the location where the acts making up the offense took place is not only reasonable, but required. This remains true even though it requires this Court to consider the meaning of verbs. Wholly fictional concepts of the situs of "identifying [***29] information" in *OCGA § 16-9-125* cannot heal this statute's constitutional breach, and the majority's characterizations of the matter before us in terms of the "verb test" simply do not speak to this fundamental problem. As such, in this case, venue cannot be proper in the county of the victim's residence without violating the constitution.

In its opinion, the majority relies on an Alabama Court's recent decision in *Ex parte Egbuonu, 911 So. 2d 748 (Ala. Crim. App. 2004)* n5 [*17] and notes that a number of other states have passed comparable venue provisions for identity fraud. Such a recitation is meaningless. We do not judge the constitutionality of our own laws by surveying other states' statutes.

n5 In its compiled quotation from two wholly separate parts of *Egbuonu*, the majority omits the fact that the Alabama Court largely based its analysis regarding venue for continuing crimes on the following statement from *United States v. Johnson, 323 U. S. 273, 275 (65 S. Ct. 249, 89 LE2d 236) (1944)* (analyzing venue under the *Federal Denture Act*): "By utilizing the doctrine of continuing offense, Congress may, to be sure, provide that the locality of a crime shall extend over the whole area through which force propelled by an offender operates." Neither the Alabama Court nor the majority provide the full quote, which states:

By utilizing the doctrine of a continuing offense, Congress may, to be sure, provide that the locality of a crime shall extend over the whole area through which force propelled by an offender operates. Thus, an illegal use of the mails or of other instruments of commerce may subject the user to prosecution in the district where he sent the goods, or in the district of their arrival, or in any intervening district. Plainly enough, such leeway not only opens the door to needless hardship to an accused by prosecution remote from home and from appropriate facilities for defense. It also leads to the appearance of abuses, if not to abuses, in the selection of what may be deemed a tribunal favorable to the prosecution.

Id. At the very least, *Johnson* is distinguishable from the concept of identity fraud, and, as such, it supports neither the majority nor *Egbuonu*.

[***30]

To the contrary, in examining the venue provision for identity fraud, it is this Court's solemn duty to safeguard this state's constitutional mandate that all crimes shall be tried in the county where the crime is

committed. It is evident from the General Assembly's language in *OCGA § 16-9-125* that it desired to place venue in the county of the victim's residence because that is the place where the major impact of the crime will occur. The General Assembly, however, failed to define the crime of identity fraud in *OCGA § 16-9-121* in such a way that this impact, itself, is a part of the crime committed. In the present case, no part of the underlying crime, as defined, actually occurred in the county of the victim's residence. Under these circumstances, *OCGA § 16-9-125* is unconstitutional in the limited instances where it places venue in the county of the victim's residence irrespective of the fact that no part of the underlying crime actually occurs there. Based on the current drafting of the statutes regarding identity fraud, the desires expressed by the General Assembly regarding venue must give way [***31]  to the overriding requirements of our constitution.

[**846]  There is no dispute that identity fraud is a crime of a continuing nature, and its beginning, middle, and end may stretch across more than one county. It must be remembered, however, that identity fraud is a continuing crime because *acts taken in furtherance of the crime* may occur in different counties. It is not, as the majority argues, a continuing offense simply because it creates some impact to the victim in the county of his or her residence which lingers after the last element of the crime is complete. If this were true, then every crime which has some effect on an individual would be a continuing crime, be it theft, murder, identity fraud, or anything else. Likewise, any and every such crime could be brought in the county of the victim's residence, wherever that residence might be at the time of prosecution. As a result of such a construction, venue no longer has any real nexus to the situs of the criminal activity in question. Undoubtedly, this is not the result that the framers of our constitution intended. To the contrary, it is exactly this result they were trying to avoid.

[*18]  I am authorized to state that Chief Justice [***32]  Sears and Justice Hines join in this dissent.

STATE OF ALABAMA

IN THE CIRCUIT COURT

FOR THE COUNTY OF JEFFERSON

TENTH JUDICIAL CIRCUIT

CRIMINAL


STATE OF ALABAMA,

      Plaintiff,

      v.

ZEPHYRIUNS C. EGBUONU,          CC-2004-1422,

      Defendant.

FILED IN OFFICE
CIRCUIT CRIMINAL

NOV 2 9 2005

ANNE-MARIE ADAMS
Clerk


REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL


        The ABOVE-STYLED CAUSE came on to be heard before the Honorable Circuit Judge Alfred Bahakel and jury at the Criminal Justice Center, 801 Richard Arrington Boulevard North, Birmingham, Alabama, on the 23rd day of May, 2005, before Suzanne B. Frazier, CSR, RPR, Court Reporter and Commissioner.

EXHIBIT 4

## APPEARANCES

FOR THE STATE:

        Alan Baty, Esq.

        Joe Hicks, Esq.   (Motion Hearing)

        Deputies District Attorney

        Jefferson County

        801 North Richard Arrington Boulevard

        Room L-01

        Birmingham, AL  35203


FOR THE DEFENDANT:

        Sidney J. Hughes, Esq.

        Jeffrey H. Dial, Esq. (Trial Proceedings)

        Attorneys at Law

        2908 Crescent Avenue

        Homewood, AL 35209


        G.R. Mahmood, Esq.   (Sentencing

            Proceedings)

        Foley & Mahmood, P.C.

        1630-4th Avenue North, Suite 602

        Birmingham, AL  35203

<div align="center">INDEX</div>

MOTIONS -- 9, 33, 193, 357, 408, 440


IDENTIFICATION OF VENIRE -- 42

VOIR DIRE OF VENIRE BY MR. BATY -- 49

VOIR DIRE OF VENIRE BY MR. HUGHES -- 92

JURY SELECTION -- 104


OPENING STATEMENT OBJECTIONS:

State of Alabama, Mr. Baty -- 112, 113

Defense, Mr. Hughes -- 0


<div align="center">STATE'S EVIDENCE</div>

STATE'S WITNESSES:

SCOTT ROEMHILDT

Direct Examination by Mr. Baty -- 114, 149

Cross-Examination by Mr. Hughes -- 139, 149

JIM ROBERSON

Direct Examination by Mr. Baty -- 150

Cross-Examination by Mr. Hughes -- 157

DARRYL BROWN

Direct Examination by Mr. Baty -- 163, 187

Cross-Examination by Mr. Hughes -- 178, 189

# INDEX (continued)

STATE'S WITNESSES (continued):

DETECTIVE BRYAN WONG

Direct Examination by Mr. Baty -- 194, 206

Cross-Examination by Mr. Hughes -- 203

DETECTIVE MAX DOKE

Direct Examination by Mr. Baty -- 207, 247

Cross-Examination by Mr. Hughes -- 234, 249

JOE ROBERTS

Direct Examination by Mr. Baty -- 252

Cross-Examination by Mr. Hughes -- 261

CHARLES BRASHEAR

Direct Examination by Mr. Baty -- 275, 292, 296

Cross-Examination by Mr. Hughes -- 285, 293

STEPHEN DREXLER

Direct Examination by Mr. Baty -- 298, 352, 355

Cross-Examination by Mr. Hughes -- 338, 353


STATE'S EXHIBITS:

| NO. | MARKED | ADMITTED |
| --- | --- | --- |
| 1 | 112 | 218 |
| 2 | 112 | 441 |
| 3 | 112 | 441 |
| 4 | 112 | 201 |

his mind later.

Has the State made an offer?

MR. BATY:  Your Honor, we had discussed last week the possibility of a misdemeanor plea.  It is my understanding that defense counsel talked to his client and the defendant declined.

THE COURT:  I am not saying what the offer ought to be or not ought not to be.  I am saying, as in any case -- this case or any case -- you need to make one and you need to seriously think about it.

I am telling you from the heart, with all of this floating around -- and I haven't seen the whole case -- that you need to weigh the risks involved in this case before you make a hasty decision.  Don't make a decision out of pride; make it out of logic. You need to use your mind on this one.  Okay?

DEFENDANT:  (Nods.)

THE COURT:  We will have the jury list completed in just a second.  And let me know what your decision is, but please make a careful decision.

(Proceedings in recess at 2:42 p.m.)

Just say:  Alan, I am not sure what you said
right there.  I didn't quite hear it.  I am
not quite understanding what you are asking
about.  Can you clarify that?

I will ask it again.  I will be
happy to do that, just let me know.  Is
everybody okay with that?  Okay.

This is Mr. Sid Hughes.  The
judge introduced him before.  Does anyone know
Mr. Hughes?  He is an attorney in private
practice here in town.  Has anyone ever sought
his advice on a matter?  I won't ask you about
what.

(No response.)

MR. BATY:  How about Mr. Jeff Dial?  This
is Jeff Dial.  Does anyone know Mr. Dial?

(No response.)

MR. BATY:  I will ask you about
Mr. Egbuonu.  He was a California resident.  I
assume nobody knows him, but I want to ask
just to be safe.  Does anybody know him?

(No response.)

MR. BATY:  We have several witnesses who
may testify in this case.  All but one or two
are from out of town.  I will ask you if

anybody knows them.   Scott Romehildt from

Minnesota?

           (No response.)

     MR. BATY:   Bryan Wong from Los Angeles?

           (No response.)

     MR. BATY:   Max Doke from Los Angeles?

This is Max Doke, back here.   He is with the

sheriff's department of Los Angeles.

           (No response.)

     MR. BATY:   James Roberson is with us.

Mr. Roberson, would you stand up.

     VICTIM JAMES ROBERSON:    (Complied with

the request.)

     MR. BATY:   Does anyone know Mr. Roberson?

He works with the sheriff's department here.

He is the victim in this case.   Does anybody

know him?

           (No response.)

     MR. BATY:   Darryl Brown, who is from Los

Angeles?

           (No response.)

     MR. BATY:   Charles Brashear, also from

Los Angeles?

           (No response.)

     MR. BATY:   Steve Drexler, who works with

the Alabama Department of Forensic Sciences
here in town?

        (No response.)

    MR. BATY:  Joe Roberts, who works with
the district attorney's office, does anyone
know him?

        (No response.)

    MR. BATY:  Who watches the TV shows --
you know, the law shows on TV?

    PROSPECTIVE JUROR COPELAND:  Court TV
sometimes.

    MR. BATY:  Court TV sometimes?  Yeah.
Anybody else?  Come on.  Raise your hand.  I
know you do.  I do when she has got the remote
control.  I do eight or nine hours of this
every day, and then I go home and have to
watch "Law and Order" on all of those cable
channels.  I keep telling her:  You should
have gone to law school.  You wouldn't have to
watch it on TV.

        There are a lot of TV shows out
there:  drama shows; some of them are
real-life stuff like Court TV; some of them
are talk shows about legal cases going on.
There are a lot of things being said on TV.

You will see a lot of different scenarios and cases on TV.

Can everybody put aside everything you saw and heard on TV about the law, about crime, and all of those sorts of things? Can you set that aside and judge this case for both sides, judge it fairly based on the evidence that you get off the witness stand? Can everybody agree to do that?

Set aside what you heard that Greta VanSustern said about this and that. Set aside what they say on Court TV about cases out in California or New York or something like that. Can y'all set that aside?

You will be given some law in this case if you are on the jury. You will get that from the judge. It is the law that stands in our state. Does everybody agree to use only that law -- not what you think the law should be or what it ought to be, but just what the law is? That is what we are all charged with obeying; right? Does everybody agree to use just what the judge gives you?

I want to talk about some of

the evidence in this case. You will have to
pardon me. My allergies for some reason are
very bad this spring, and my voice may get
somewhat hoarse. Just bear with me.

Some of the evidence in this
case and some of the issues that may come up,
I want you to be aware of and I want your
opinion on those. In this case James Roberson
did not lose any money. Okay? We have
charged this man with stealing his identity
and running up a credit account in California.

Mr. Roberson was out a lot of
headache, a lot of time, a lot of phone calls,
a lot of personal time just resolving all of
this matter, but he is not out any money out
of his pocket other than money for phone calls
and that sort of thing. Does anybody have a
problem with us prosecuting a case where the
victim actually didn't lose any money, but it
was actually the credit card company that lost
the money? Does anybody have a problem with
that?

Would anybody not be able to
return a verdict of guilty if we prove our
case simply based on that? There is a

monetary amount that we expect the evidence to

show -- that is required that we show -- in

order to reach a conviction.   That amount is a

loss that was incurred by a company.

          Mr. Roberson didn't go out

there to California and charge those things

up, so he is not responsible for it.   He is

not out that amount of money out of his

pocket.   Does anyone think we shouldn't be

prosecuting that case because of that?

          (No response.)

     MR. BATY:   How about another issue, the

theft of the identification or the use of the

identification, Mr. Roberson's Social Security

number?

          And the purchase of those goods

on credit under that Social Security number

didn't happen here in Alabama.   It happened in

California.   Now, he lives here, of course --

here in Jefferson County.   He has for many,

many years.

          We don't expect there to be any

evidence that this defendant ever came to

Alabama except for the trial.   Okay?

          Is there anyone, assuming we

1      have proved our case, who would not be able to

2      convict because it did not happen here?  It is

3      our contention that the effect was felt here.

4      The damage to Mr. Roberson's credit, the

5      trouble he incurred, all of that happened

6      here.  The actual act itself happened in

7      California.

8            Does anyone have a problem with

9      us prosecuting this case because of that,

10     knowing those facts?

11          (No response.)

12      MR. BATY:  There is also another issue

13     that the defense may talk about and I want

14     your opinion on.  I don't expect we will be

15     able to show how that man came into possession

16     of Mr. Roberson's Social Security card or

17     Social Security number.  We can't show that.

18     As with many identity theft cases, you never

19     know.  But we do expect the evidence to show

20     that he did have it and he did use it.  And

21     that is what we expect.

22           Would anyone require us -- in

23     order to convict, would anyone require us to

24     show how he got hold of it?

25     PROSPECTIVE JUROR HALLIDAY:  (Nods.)

Q.   Is that your handwriting at all?

A.   No.

Q.   Did you authorize anybody to use your Social
     Security number in filling this out?

A.   No, sir, I did not.

Q.   Did you have to pay any money out of your
     pocket to anybody that said you owed them
     money because of this?

A.   No, I did not.   Initially they told me I was
     responsible and they gave me directions if I
     wanted to dispute those things that I had to
     do.

Q.   Did you incur any expenses in clearing all of
     this up, such as telephone expenses or
     postage?

A.   Phone calls, over the next year some had to be
     made from my personal residence; and I did
     incur those expenses.

Q.   What about postage?

A.   Postage on the different letters back and
     forth to the credit reporting bureaus and also
     to the different companies who alleged I had
     accounts with them.

Q.   Did you authorize anybody to open a Mervyn's
     account under your name?

Mr. Brashear, what did you do with them?

A.   I entered them into evidence, made copies, and checked the names and numbers on those items.

Q.   Did you subsequently check those items out of evidence?

A.   Yes.

Q.   And who did you deliver them to?

A.   I delivered them to Mr. Joe Roberts, Birmingham, Alabama, district attorney's office.

MR. BATY:   That is all I have, Detective. Thank you.

THE COURT:   Cross?

CROSS-EXAMINATION

BY MR. HUGHES:

Q.   Detective Doke, during your investigation, did you ever check to see if Zephyriuns lived or had any connection with the state of Alabama?

A.   No.

Q.   Did you ever check to see if Jerome Bivens had any contact with the state of Alabama?

A.   Are you asking if I checked specifically for Alabama?

Q.   Yes.   You said you received a phone call from Alabama.

A.   Yes.

Q.   And did you check to see if there was any
     connection?

A.   I actually did database checks of both,
     Mr. Egbuonu, when I found out his identity,
     and Jerome Bivens.

Q.   And what were the results of your database
     checks?

A.   I had no connections with Alabama on either
     one of those individuals.

Q.   When you looked at Jerome Bivens, did you see
     any -- let me ask it this way.  How many
     Jerome Bivenses did you find in the state of
     California?

A.   I found the one Jerome Bivens driver's license
     which came back to the post office box in
     Grenada Hills.

Q.   Did you check to see if there were any other
     Jerome Bivenses?

A.   I did.

Q.   And what were the results of that?

A.   I did not find any other Jerome Bivens in my
     database.

Q.   Did you check to see if there was a Jerome
     Bivens in another state?

the use of the victim's identifying

information.  Under the law of complicity that

I have given to you, the State is not required

to prove that the defendant is the one who

actually received the goods or services.

To establish that element of

the crime, you need only be convinced that the

defendant intended for someone to receive the

goods or services through the use of the

victim's identifying information and that

someone did receive those goods or services.

I also charge you that one of

the elements of both Count One and Count Two

is that there must be a financial loss of

greater than two hundred fifty dollars.  It is

not necessary that Jim Roberson be the person

who incurred that loss.  The State need only

prove that some person or entity incurred that

loss.

I also charge you, ladies and

gentlemen, that during the course of the

trial, you heard evidence of acts of the

defendant which may be similar to those

charged in the indictment, but which were

committed on some other occasion.

four dollars and sixty-one cents in witness

expenses to bring witnesses from California,

one thousand eighty-one dollars in extradition

costs.

THE COURT:  To the district attorney's

office; is that right?

MR. BATY:  No.  I think the extradition

cost goes to the State comptroller and witness

expenses would go to the DA's office and six

hundred seventy-eight dollars and fifty-five

cents to Target.

THE COURT:  And how about Chief Roberson?

I suppose the credit card companies made up

the loss.

VICTIM DEPUTY CHIEF ROBERSON:  They did.

THE COURT:  And you may get some

information from them later on?

MR. BATY:  I have the six hundred

seventy-eight dollars and fifty-five cents for

Target.

MR. HUGHES:  Your Honor, if it would be

appropriate, we would object to the

restitution being involved because the victim

himself stated he had no out-of-pocket

expenses in this and that the remedies of the

## § 13A-8-192. Identity theft - Elements.

(a)  A person commits the crime of identity theft if, without the authorization, consent, or permission of the victim, and with the intent to defraud for his or her own benefit or the benefit of a third person, he or she does any of the following:

(1) Obtains, records, or accesses identifying information that would assist in accessing financial resources, obtaining identification documents, or obtaining benefits of the victim.

(2) Obtains goods or services through the use of identifying information of the victim.

(3) Obtains identification documents in the victim's name.

(b)  Identity theft in which there is a financial loss of greater than five hundred dollars ($500) or the defendant has previously been convicted of identity theft constitutes identity theft in the first degree. Identity theft in the first degree is a Class C felony.

(c)  Identity theft in which the defendant has not previously been convicted of identity theft and there is no financial loss or the financial loss is five hundred dollars ($500) or less constitutes identity theft in the second degree. Identity theft in the second degree is a Class A misdemeanor.

(d)  This section shall not apply when a person obtains the identity of another person to misrepresent his or her age for the sole purpose of obtaining alcoholic beverages, tobacco, or another privilege denied to minors.

**History:** Acts 2001, No. 01-312; Acts 2003, No. 03-355.

**Effective date.** - Acts 2003, No. 03-355, effective September 1, 2003.

**2003 amendments.** Substituted "five hundred dollars ($500)" for "two hundred fifty dollars ($250)" in subsections (b) and (c); and made a nonsubstantive change.

**Related statutes.** - Acts 2003, No. 03-355, § 2: "Notwithstanding any other provision of law, in municipal court, the maximum fine for every person either convicted for violating any misdemeanor in this act adopted as a municipal ordinance violation or adjudicated as a youthful offender shall be one thousand dollars ($1,000)."

**Cross references.** - As to punishment for Class A misdemeanors, see § 13A-5-7.

As to punishment for Class C felonies, see § 13A-5-6.

### CASE NOTES

**Cited in** Ex parte Egbuonu 911 So. 2d 748, 2004 Ala. Crim. App. LEXIS 244 (Ala. Crim. App. 2004),

© 2006 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT 11

01-312.

## § 13A-8-196. Jurisdiction.

In any criminal proceeding brought pursuant to this article, the crime shall be considered to be committed in any county in which any part of the crime took place, regardless of whether the defendant was ever actually present in that county, or in the county of residence of the person who is the subject of the identification documents or identifying information.

**History:** Acts 2001, No. 01-312.

### CASE NOTES

**Constitutionality**
Where Ala. Code § 13A-8-196 was not in conflict with Ala. Const. art. I, § 6, and identity theft, in violation of Ala. Code § 13A-8-192, was a continuing offense that in most instances occurred in more than one county or even more than one state, Section 13A-8-196 was not unconstitutional; thus, a detainee was not entitled to a writ of habeas corpus granting him a release from custody. Ex parte Egbuonu 911 So. 2d 748, 2004 Ala. Crim. App. LEXIS 244 (Ala. Crim. App. 2004), cert. denied, 911 So. 2d 755 (Ala. 2005).

© 2006 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT 12

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
    Clerk
Sonja McKnight
    Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

January 21, 2005

**CR-03-1721**

Ex parte Zephyriuns C. Egbuonu   (In re: State of Alabama vs. Zephyriuns C. Egbuonu)
(Jefferson  Circuit Court: CC04-1422)

## NOTICE

You are hereby notified that on January 21, 2005 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

cc: Hon. Anne-Marie Adams, Circuit Clerk
    Sidney J. Hughes, Attorney
    Hon. Troy King, Attorney General
    Andy Scott Poole, Asst. Atty. Gen.
    Hon. Joe Roberts, Asst. District Attorney



**EXHIBIT 13**

Westlaw.

911 So.2d 755

Page 1

911 So.2d 755
(Cite as: 911 So.2d 755)

**H**
Ex parte EgbuonuAla.,2005.
Supreme Court of Alabama.
Ex parte Zephyrinus C. EGBUONU.[FN1]

> FN1. The defendant filed his petition under the name "Zephyrinus C. Egbuonu." The related case in the Court of Criminal Appeals spelled his name "Zephyriuns C. Egbuonu."

(In re State of Alabama
v.
Zephyriuns C. Egbuonu).
**1040647.**

April 22, 2005.

Petition for Writ of Certiorari to the Court of Criminal Appeals (Jefferson Circuit Court, CC-04-1422, Alfred Bahakel, Judge; Court of Criminal Appeals, CR-03-1721).

Sid Hughes, Homewood, for petitioner.
Submitted on petitioner's brief only.
Prior report: Ala.Cr.App., 911 So.2d 748.

STUART, Justice.
The petition for the writ of certiorari is denied. See *Strassheim v. Daily*, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911); and *Heath v. Jones*, 941 F.2d 1126 (11th Cir.1991).

In denying the petition for the writ of certiorari, this Court does not wish to be understood as approving all the language, reasons, or statements of law in the Court of Criminal Appeals' opinion. *Horsley v. Horsley*, 291 Ala. 782, 280 So.2d 155 (1973).

WRIT DENIED.

NABERS, C.J., and SEE, LYONS, HARWOOD, WOODALL, SMITH, BOLIN, and PARKER, JJ.,

concur.
Ala.,2005.
Ex parte Egbuonu
911 So.2d 755

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**EXHIBIT 14**

[526 US 275]

UNITED STATES, Petitioner

v

JACINTO RODRIGUEZ-MORENO

526 US 275, 143 L Ed 2d 388, 119 S Ct 1239

[No. 97-1139]

Argued December 7, 1998. Decided March 30, 1999.

**Decision:** Venue in prosecution under 18 USCS § 924(c)(1) for using or carrying firearm during and in relation to crime of violence held to be proper in any federal judicial district where crime of violence was committed.

## SUMMARY

After a drug dealer stole cocaine from a drug distributor during a drug transaction in Texas, the distributor, an accused, and others, in seeking to find the dealer, drove from Texas to New Jersey to New York to Maryland while holding captive the middleman in the transaction. In Maryland, the accused took possession of a gun and threatened to kill the middleman. The middleman escaped, and the accused eventually was charged in the United States District Court for the District of New Jersey with, among other offenses, conspiracy to kidnap, kidnapping, and violating 18 USCS § 924(c)(1) (later amended), which prohibited using and carrying a firearm in relation to any crime of violence. After the District Court denied the accused's motion to dismiss the § 924(c)(1) charge on the asserted basis that venue for trial of that charge was proper in only Maryland, which was the only federal judicial district in which the government had proved that the accused had used the gun, the accused was found guilty on both kidnapping charges and on the § 924(c)(1) charge. The United States Court of Appeals for the Third Circuit, in reversing the § 924(c)(1) conviction, applied what it called the "verb test" in concluding that venue for a 924(c)(1) charge was proper in only a district in which a defendant used or carried a firearm, and thus was improper in New Jersey in this case, even though venue was proper there for the kidnapping charges (121 F3d 841).

On certiorari, the United States Supreme Court reversed. In an opinion by THOMAS, J., joined by REHNQUIST, Ch. J., and O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., it was held that venue in a prosecution under § 924(c)(1) was proper in any federal judicial district where the underlying crime of violence was committed, and therefore, venue was proper in New

Summaries of Briefs; Names of Participating Attorneys, p 1167, infra.

388

Jersey for prosecution of the § 924(c)(1) charge against the accused, because (1) the kidnapping, to which the § 924(c)(1) offense was attached, was committed in all of the places in which any part of the kidnapping took place, (2) 18 USCS § 3237(a) provided that a continuing offense can be tried in any district in which such offense was begun, continued, or completed, and (3) where venue was appropriate for the underlying crime of violence, so too it was for the § 924(c)(1) offense.

SCALIA, J., joined by STEVENS, J., dissenting, expressed the view that (1) the crime defined in § 924(c)(1) could be committed only where the defendant both engaged in the acts making up the predicate offense and used or carried a gun, and (2) because the accused's use of the gun occurred only in Maryland, venue lay only there.

## HEADNOTES

Classified to United States Supreme Court Digest, Lawyers' Edition

**Courts § 485; Weapons and Firearms § 1 — venue — using or carrying firearm in single district — crime of violence in multiple districts**

1a-1c. Venue in a prosecution under 18 USCS § 924(c)(1) (later amended)—which prohibits using or carrying a firearm during and in relation to any crime of violence—is proper in any federal judicial district where the underlying crime of violence was committed, and therefore, venue is proper in New Jersey for prosecution of a § 924(c)(1) charge against an accused who is also charged with conspiracy to kidnap and kidnapping in connection with holding an individual captive while traveling through several states, including New Jersey and Maryland, because, although Maryland is the only place where the government has proved that the accused used a gun, (1) § 924(c)(1) proscribes both the use of a firearm and the commission of acts that constitute a violent crime, (2) where a crime consists of distinct parts which have different localities, the whole may be tried where any part can be proved to have been done, (3) the kidnapping, to which the § 924(c)(1) offense is attached, is a continuing offense that was committed in all of the places in which any part of the kidnapping took place, (4) 18 USCS § 3237(a) provides that a continuing offense can be tried in any district in which such offense was begun, continued, or completed, and (5) where venue is appropriate for the underlying crime of violence, so too it is for the § 924(c)(1) offense. (Scalia and Stevens, JJ., dissented from this holding.)

**Courts § 485 — venue — federal crimes — place of commission**

2. The location of a charged offense must be determined, for purposes of venue, from the nature of the crime alleged and the location of the act or acts constituting it; in performing this inquiry, a court must (1) initially identify the conduct constituting the offense, and (2) then discern the location of the commission of the criminal acts.

**Statutes § 164.2 — language — criminal statutes**

3. The verbs of a criminal statute are not the sole consideration in identifying the conduct that consti-

EXHIBIT 15

tutes an offense, as, although the "verb test" has value as an interpretive tool, (1) it cannot be applied rigidly, to the exclusion of all other relevant statutory language, and (2) the test unduly limits the inquiry into the nature of the offense and thereby creates a danger that certain conduct prohibited by statute will be missed.

**Weapons and Firearms § 1 — using and carrying gun — crime of violence**

4. To prove a violation of 18 USCS § 924(c) (later amended)—which prohibits using or carrying a firearm during and in relation to any crime of violence for which a defendant may be prosecuted in a court of the United States—against an accused who is charged with a kidnapping in connection with which the accused allegedly used a gun, the government is required to show that the accused (1) used a firearm, (2) committed all the acts necessary to be subject to punishment for kidnapping in a court of the United States, and (3) used the gun during and in relation to the kidnapping; § 924(c)(1) contains two distinct conduct elements, which, as relevant to the instant case, are the using and carrying of a gun and the commission of a kidnapping.

**Abduction and Kidnapping § 1 — nature of offense**

5. Kidnapping, as defined by 18 USCS § 1201, is a unitary crime; a kidnapping, once begun, does not end until the victim is free; it does not make sense, then, to speak of it in discrete geographical fragments.

---

## RESEARCH REFERENCES

1 Am Jur 2d, Abduction and Kidnapping § 1; 21 Am Jur 2d, Criminal Law §§ 507, 509, 513; 79 Am Jur 2d, Weapons and Firearms § 7.5

18 USCS §§ 924(c)(1), 1201, 3237(a)

L Ed Digest, Courts § 485; Weapons and Firearms § 1

L Ed Index, Abduction and Kidnapping; Carrying Firearm; Venue; Weapons and Firearms

Annotations:

Prerequisites of applicability of federal statute (18 USCS § 3237(a)) as to multiple venue of prosecution in federal courts. 5 L Ed 2d 973.

Venue of prosecution in federal court for act initiated in one district and continued or completed in another. 83 L Ed 567.

What constitutes "use" of firearm for purposes of 18 USCS § 924(c)(1), providing penalty for use of firearm during drug trafficking or crime of violence. 125 ALR Fed 545.

Construction and application of provisions of Omnibus Crime Control and Safe Streets Act of 1968 (18 USCS § 924(c)) that person who uses firearm to commit, or carries firearm unlawfully during commission of, federal felony, shall be sentenced to term of imprisonment in addition to punishment provided for such felony. 25 ALR Fed 678.

SHEPARD'S® Citations Service. For further research of authorities referenced here, use SHEPARD'S to be sure your case or statute is still good law and to find additional authorities that support your position. SHEPARD'S is available exclusively from LexisNexis™.

### APPEARANCES OF COUNSEL ARGUING CASE

**Paul R. Q. Wolfson** argued the cause for petitioner.
**John P. McDonald** argued the cause for respondent.
Summaries of Briefs; Names of Participating Attorneys, p 1167, infra.

### SYLLABUS BY REPORTER OF DECISIONS

A drug distributor hired respondent and others to find a New York drug dealer who stole cocaine from him during a Texas drug transaction and to hold captive the middleman in the transaction, Ephrain Avendano, during the search. The group drove from Texas to New Jersey to New York to Maryland, taking Avendano with them. Respondent took possession of a revolver in Maryland and threatened to kill Avendano. Avendano eventually escaped and called police, who arrested respondent and the others. Respondent was charged in a New Jersey District Court with, inter alia, using and carrying a firearm in relation to Avendano's kidnaping, in violation of 18 USC § 924(c)(1) [18 USCS § 924(c)(1)]. He moved to dismiss that count, arguing that venue was proper only in Maryland, the only place where the Government had proved he had actually used a gun. The court denied the motion, and respondent was convicted of the § 924(c)(1) offense. The Third Circuit reversed. After applying what it called the "verb test," it determined that venue was proper only in the district where a defendant actually uses or carries a firearm.

*Held:* Venue in a prosecution for using or carrying a firearm "during and in relation to any crime of vio-lence" in violation of § 924(c)(1) is proper in any district where the crime of violence was committed. Under the *locus delicti* test, a court must initially identify the conduct constituting the offense (the nature of the offense) and then discern where the criminal acts occurred. See *United States v Cabrales*, 524 US 1, 6-7, 141 L Ed 2d 1, 118 S Ct 1772. Although the Third Circuit relied on the statute's verbs to determine the nature of the offense, this Court has never held that verbs are the sole consideration, to the exclusion of other relevant statutory language. A defendant's violent acts are essential conduct elements of the § 924(c)(1) offense despite being embedded in the prepositional phrase, "during and in relation to any crime of violence." Thus, the statute contains two distinct conduct elements—as is relevant to this case, using and carrying a gun and committing a kidnaping. Where a crime consists of distinct parts which have different localities, venue is proper for the whole charge where any part can be proved to have been committed. See *United States v Lombardo*, 241 US 73, 60 L Ed 897, 36 S Ct 508. Respondent's argument that § 924(c)(1) is a "point-in-time" offense that only is committed in the place where the kidnaping and use

of a gun coincide is unpersuasive. Kidnaping is a unitary crime, which, once begun, does not end until the victim is free. It does not matter that respondent used the gun only in Maryland because he did so "during and in relation to" a kidnaping that began in Texas and continued in New York, New Jersey, and Maryland. The kidnaping, to which the § 924(c)(1) offense is attached, was committed in all of the places that any part of it took place, and venue

for the kidnaping charge was appropriate in any of them. Where venue is appropriate for the underlying crime of violence, so too it is for the § 924(c)(1) offense.

121 F3d 841, reversed.

Thomas, J., delivered the opinion of the Court, in which Rehnquist, C. J., and O'Connor, Kennedy, Souter, Ginsburg, and Breyer, JJ., joined. Scalia, J., filed a dissenting opinion, in which Stevens, J., joined.

## OPINION OF THE COURT

[526 US 276]

Justice **Thomas** delivered the opinion of the Court.

[1a] This case presents the question whether venue in a prosecution for using or carrying a firearm "during and in relation to any crime of violence," in violation of 18 USC § 924(c)(1) [18 USCS § 924(c)(1)], is proper in any district where the crime of violence was committed, even if the firearm was used or carried only in a single district.

### I

During a drug transaction that took place in Houston, Texas, a New York drug dealer stole 30 kilograms of a Texas drug distributor's cocaine. The distributor hired respondent, Jacinto Rodriguez-Moreno, and others to find the drug dealer and to hold captive the middleman in the transaction,

[526 US 277]

Ephrain Avendano, during the search. In pursuit of the dealer, the distributor and his henchmen drove from Texas to New Jersey with Avendano in tow. The group used Avendano's New Jersey apartment as a base for their operations for a few days. They soon moved to a house in New York and then to a house in Maryland, taking Avendano with them.

Shortly after respondent and the others arrived at the Maryland house, the owner of the home passed around a .357 magnum revolver and respondent took possession of the pistol. As it became clear that efforts to find the New York drug dealer would not bear fruit, respondent told his employer that he thought they should kill the middleman and end their search for the dealer. He put the gun to the back of Avendano's neck but, at the urging of his cohorts, did not shoot. Avendano eventually escaped through the back door and ran to a neighboring house. The neighbors called the Maryland police, who arrested respondent along with the rest of the kidnapers. The police also seized the .357 magnum, on which they later found respondent's fingerprint.

Rodriguez-Moreno and his codefendants were tried jointly in the United States District Court for the District of New Jersey. Respondent was charged with, *inter alia*, conspiring to kidnap Avendano, kidnaping Avendano, and using and carrying a firearm in relation to the kidnaping of Avendano, in violation of 18 USC § 924(c)(1) [18 USCS § 924(c)(1)]. At the conclusion of the Government's

case, respondent moved to dismiss the § 924(c)(1) count for lack of venue. He argued that venue was proper only in Maryland, the only place where the Government had proved he had actually used a gun. The District Court denied the motion, App. 54, and the jury found respondent guilty on the kidnaping counts and on the § 924(c)(1) charge as well. He was sentenced to 87 months' imprisonment on the kidnaping charges, and was given a mandatory consecutive term of 60 months' imprisonment for committing the § 924(c)(1) offense.

[526 US 278]

On a 2-to-1 vote, the Court of Appeals for the Third Circuit reversed respondent's § 924(c)(1) conviction. *United States v Palma-Ruedas*, 121 F3d 841 (1997). A majority of the Third Circuit panel applied what it called the "verb test" to § 924(c)(1), and determined that a violation of the statute is committed only in the district where a defendant "uses" or "carries" a firearm. *Id.*, at 849. Accordingly, it concluded that venue for the § 924(c)(1) count was improper in New Jersey even though venue was proper there for the kidnaping of Avendano. The dissenting judge thought that the majority's test relied too much "on grammatical arcana," *id.*, at 865, and argued that the proper approach was to "look at the substance of the statutes in question," *ibid.* In his view, the crime of violence is an essential element of the course of conduct that Congress sought to criminalize in enacting § 924(c)(1), and therefore, "venue for a prosecution under [that] statute lies in any district in which the de-

fendant committed the underlying crime of violence." *Id.*, at 863. The Government petitioned for review on the ground that the Third Circuit's holding was in conflict with a decision of the Court of Appeals for the Fifth Circuit, *United States v Pomranz*, 43 F3d 156 (1995). We granted certiorari, 524 US 915, 141 L Ed 2d 156, 118 S Ct 2296 (1998), and now reverse.

### II

Article III of the Constitution requires that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." Art. III, § 2, cl. 3. Its command is reinforced by the Sixth Amendment's requirement that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed," and is echoed by Rule 18 of the Federal Rules of Criminal Procedure ("prosecution shall be had in a district in which the offense was committed").

[526 US 279]

[2] As we confirmed just last Term, the " 'locus delicti [of the charged offense]' must be determined from the nature of the crime alleged and the location of the act or acts constituting it.' " *United States v Cabrales*, 524 US 1, 6-7, 141 L Ed 2d 1, 118 S Ct 1772 (1998) (quoting *United States v Anderson*, 328 US 699, 703, 90 L Ed 1529, 66 S Ct 1213 (1946)).[1]

---

1. When we first announced this test in *United States v Anderson*, 328 US, at 703, 90 L Ed 1529, 66 S Ct 1213, we were comparing § 11 of the Selective Training and Service Act of 1940, 54 Stat. 894, in which Congress did "not indicate where [it] considered the place of committing the crime to be," 328 US, at 703, 90 L Ed 1529, 66 S Ct 1213, with statutes where Congress was explicit with respect to venue. Title 18 USC § 924(c)(1) [18 USCS § 924(c)(1)], like the Selective Training and Service Act, does not contain an express venue provision.

In performing this inquiry, a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts.[2] See *Cabrales, supra,* at 6-7, 141 L Ed 2d 1, 118 S Ct 1772; *Travis v United States,* 364 US 631, 635-637, 5 L Ed 2d 340, 81 S Ct 358 (1961); *United States v Cores,* 356 US 405, 408-409, 2 L Ed 2d 873, 78 S Ct 875 (1958); *Anderson, supra,* at 703-706, 90 L Ed 1529, 66 S Ct 1213.

[3] At the time respondent committed the offense and was tried, 18 USC § 924(c)(1) [18 USCS § 924(c)(1)] provided:

"Whoever, during and in relation to any crime of violence . . . for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence . . . be sentenced to imprisonment for five years . . . ."[3]

The Third Circuit, as explained above, looked to the verbs of the statute to determine the nature of the substantive offense.

[526 US 280]

But we have never before held, and decline to do so here, that verbs are the sole consideration in identifying the conduct that constitutes an offense. While the "verb test" certainly has value as an interpretative tool, it cannot be

applied rigidly, to the exclusion of other relevant statutory language. The test unduly limits the inquiry into the nature of the offense and thereby creates a danger that certain conduct prohibited by statute will be missed.

[4] In our view, the Third Circuit overlooked an essential conduct element of the § 924(c)(1) offense. Section 924(c)(1) prohibits using or carrying a firearm "during and in relation to any crime of violence . . . for which [a defendant] may be prosecuted in a court of the United States." That the crime of violence element of the statute is embedded in a prepositional phrase and not expressed in verbs does not dissuade us from concluding that a defendant's violent acts are essential conduct elements. To prove the charged § 924(c)(1) violation in this case, the Government was required to show that respondent used a firearm, that he committed all the acts necessary to be subject to punishment for kidnaping (a crime of violence) in a court of the United States, and that he used the gun "during and in relation to" the kidnaping of Avendano. In sum, we interpret § 924(c)(1) to contain two distinct conduct elements—as is relevant to this case, the "using and carrying" of a gun and the commission of a kidnaping.[4]

[526 US 281]

[1b, 5] Respondent, however, ar-

gues that for venue purposes "the New Jersey kidnapping is completely irrelevant to the firearm crime, because respondent did not *use* or *carry* a gun *during* the New Jersey crime." Brief for Respondent 12. In the words of one *amicus,* § 924(c)(1) is a "point-in-time" offense that only is committed in the place where the kidnaping and the use of a gun coincide. Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 11. We disagree. Several Circuits have determined that kidnaping, as defined by 18 USC § 1201 (1994 ed. and Supp III) [18 USCS § 1201], is a unitary crime, see *United States v Seals,* 130 F3d 451, 461-462 (CADC 1997); *United States v Denny-Shaffer,* 2 F3d 999, 1018-1019 (CA10 1993); *United States v Godinez,* 998 F2d 471, 473 (CA7 1993); *United States v Garcia,* 854 F2d 340, 343-344 (CA9 1988), and we agree with their conclusion. A kidnaping, once begun, does not end until the victim is free. It does not make sense, then, to speak of it in discrete geographic fragments. Section 924(c)(1) criminalized a defendant's use of a firearm "during and in relation to" a crime of violence; in doing so, Congress proscribed both the use of the firearm *and* the commission of acts that constitute a violent crime. It does not matter that respondent used the .357 magnum revolver, as the Government concedes, only in Maryland because he did so "during and in relation to" a kidnaping that was begun in Texas and continued in New York, New Jersey, and Maryland. In our view, § 924(c)(1) does not define a "point-in-time" offense when a firearm is used during and in relation to a continuing crime of violence.

[1c] As we said in *United States v Lombardo,* 241 US 73, 60 L Ed 897, 36 S Ct 508 (1916), "where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." *Id.,* at 77, 60 L Ed 897, 36 S Ct 508; cf. *Hyde v United States,* 225 US 347, 356-367, 56 L Ed 1114, 32 S Ct 793 (1912) (venue proper

[526 US 282]

against defendant in district where co-conspirator carried out overt acts even though there was no evidence that the defendant had ever entered that district or that the conspiracy was formed there). The kidnaping, to which the § 924(c)(1) offense is attached, was committed in all of the places that any part of it took place, and venue for the kidnaping charge against respondent was appropriate in any of them. (Congress has provided that continuing offenses can be tried "in any district in which such offense was begun, continued, or completed," 18 USC § 3237(a) [18 USCS § 3237(a)].) Where venue is appropriate for the underlying crime of violence, so too it is for the § 924(c)(1) offense. As the kidnaping was properly tried in New Jersey, the § 924(c)(1) offense could be tried there as well.

* * *

We hold that venue for this prosecution was proper in the district where it was brought. The judgment of the Court of Appeals is therefore reversed.

It is so ordered.

---

2. The Government argues that venue also may permissibly be based upon the effects of a defendant's conduct in a district other than the one in which the defendant performs the acts constituting the offense. Brief for United States 16-17. Because this case only concerns the *locus delicti,* we express no opinion as to whether the Government's assertion is correct.

3. The statute recently has been amended, see Pub. L. 105-386, 112 Stat. 3469, but it is not argued that the amendment is in any way relevant to our analysis in this case.

4. By way of comparison, last Term in *United States v Cabrales,* 524 US 1, 141 L Ed 2d 1, 118 S Ct 1772 (1998), we considered whether venue for money laundering, in violation of 18 USC §§ 1956(a)(1)(B)(ii) and 1957 [18 USCS §§ 1956(a)(1)(B)(ii) and 1957], was proper in Missouri, where the laundered proceeds were unlawfully generated, or rather, only in Florida, where the prohibited laundering transactions occurred. As we interpreted the laundering statutes at issue, they did not proscribe "the anterior criminal conduct that yielded the funds

allegedly laundered." *Cabrales,* 524 US, at 7, 141 L Ed 2d 1, 118 S Ct 1772. The existence of criminally generated proceeds was a circumstance element of the offense but the proscribed conduct—defendant's money laundering activity—occurred "after the fact" of an offense begun and completed by others." *Ibid.* Here, by contrast, given the "during and in relation to" language, the underlying crime of violence is a critical part of the § 924(c)(1) offense.

## SEPARATE OPINION

Justice **Scalia**, with whom Justice **Stevens** joins, dissenting.

I agree with the Court that in deciding where a crime was committed for purposes of the venue provision of Article III, § 2, of the Constitution, and the vicinage provision of the Sixth Amendment, we must look at "the nature of the crime alleged and the location of the act or acts constituting it." *Ante*, at 279, 143 L Ed 2d, at 393 (quoting *United States v Cabrales*, 524 US 1, 7, 141 L Ed 2d 1, 118 S Ct 1772 (1998), in turn quoting *United States v Anderson*, 328 US 699, 703, 90 L Ed 1529, 66 S Ct 1213 (1946)) (internal quotation marks omitted). I disagree with the Court, however, that the crime defined in 18 USC § 924(c)(1) [18 USCS § 924(c)(1)] is "committed" either where the defendant commits the predicate offense or where he uses or carries the gun. It seems to me unmistakably clear from the text of the law that this crime can be committed only where the

[526 US 283]

defendant *both* engages in the acts making up the predicate offense *and* uses or carries the gun.

At the time of respondent's alleged offense, § 924(c)(1) read:

"Whoever, during and in relation to any crime of violence or drug trafficking crime . . . for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years."

This prohibits the act of using or carrying a firearm "during" (and in relation to) a predicate offense. The provisions of the United States Code defining the particular predicate offenses already punish all of the defendant's alleged criminal conduct except his use or carriage of a gun; § 924(c)(1) itself criminalizes and punishes such use or carriage "during" the predicate crime, because that makes the crime more dangerous. Cf. *Muscarello v United States*, 524 US 125, 132, 141 L Ed 2d 111, 118 S Ct 1911 (1998). This is a simple concept, and it is embodied in a straightforward text. To answer the question before us we need only ask where the defendant's alleged act of using a firearm during (and in relation to) a kidnaping occurred. Since it occurred only in Maryland, venue will lie only there.

The Court, however, relies on *United States v Lombardo*, 241 US 73, 77, 60 L Ed 897, 36 S Ct 508, 60 L Ed 897, 36 S Ct 508 (1916), for the proposition that " 'where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done.' " *Ante*, at 281, 143 L Ed 2d, at 395. The fallacy in this reliance is that the crime before us does *not* consist of "distinct" parts that can occur in different localities. Its two parts are bound inseparably together by the word "during." Where the gun is being used, the predicate act must be occurring as well, and vice versa. The Court quite simply reads this requirement out of the statute—as though there were no difference between a statute making it a crime to steal a cookie

[526 US 284]

and eat it (which could be prosecuted either in New Jersey, where the cookie was stolen, or in Maryland, where it was eaten) and a statute making it a crime to eat a cookie while robbing a bakery (which could be prosecuted only where the ingestive theft occurred).

The Court believes its holding is justified by the continuing nature of the kidnaping predicate offense, which invokes the statute providing that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 USC § 3237(a) [18 USCS § 3237(a)]. To disallow the New Jersey prosecution here, the Court suggests, is to convert § 924(c)(1) from a continuing offense to a "point-in-time" offense. *Ante*, at 281, 143 L Ed 2d, at 395. That is simply not so. I in no way contend that the kidnaping, or, for that matter, the use of the gun, can occur only at one point in time. Each can extend over a protracted period, and in many places. But § 924(c)(1) is violated only so long as, *and where*, both continuing acts are being committed simultaneously. That is what the word "during" means. Thus, if the defendant here had used or carried the gun throughout the kidnaping, in Texas, New Jersey, New York, and Maryland, he could have been prosecuted in any of those States. As it was, however, he used a gun during a kidnaping only in Maryland.

Finally, the Government contends that focusing on the "use or carry" element of § 924(c)(1) is "difficult to square" with the cases holding that there can be only one § 924(c)(1) violation for each predicate offense. Reply Brief for United States 9 (citing *United States v Palma-Ruedas*, 121 F3d 841, 862-863 (CA3 1997) (Alito, J., concurring in part and dissenting in part) (case below)). See, e.g., *United States v Anderson*, 59 F3d 1323, 1328-1334 (CADC) (en banc), cert. denied, 516 US 999, 133 L Ed 2d 444, 116 S Ct 541 (1995); *United States v Taylor*, 13 F3d 986, 992-994 (CA6 1994); *United States v Lindsay*, 985 F2d 666, 672-676 (CA2), cert. denied, 510 US 832, 126 L Ed 2d 70, 114 S Ct 103 (1993). This

[526 US 285]

is an odd argument for the Government to make, since it has disagreed with those cases, see, e.g., *Anderson, supra*, at 1328; *Lindsay, supra*, at 674, and has succeeded in persuading two Circuits to the contrary, see *United States v Camps*, 32 F3d 102, 106-109 (CA4 1994), cert. denied, 513 US 1158, 130 L Ed 2d 1082, 115 S Ct 1118 (1995); *United States v Lucas*, 932 F2d 1210, 1222-1223 (CA8), cert. denied *sub nom. Shakur, aka Tyler v United States*, 502 US 869, 116 L Ed 2d 159, 112 S Ct 199 (1991). But this dispute has nothing to do with the point before us here. I do not contend that using the firearm is "the entire essence of the offense." Reply Brief for United States 9. The predicate offense is assuredly an element of the crime—and if, for whatever reason, that element has the effect of limiting prosecution to one violation per predicate offense, it can do so just as effectively even if the "during" requirement is observed rather than ignored.

The short of the matter is that this defendant, who has a constitutional right to be tried in the State and district where his alleged crime was "committed," U. S. Const., Art. III, § 2, cl. 3; Amdt. 6, has been prosecuted for using a gun during a kidnaping in a State and district where all agree he did not use a gun during a kidnaping. If to state this case is not to decide it, the law has departed

further from the meaning of language than is appropriate for a government that is supposed to rule (and to be restrained) through the written word.

[524 US 1]

UNITED STATES, Petitioner

v

VICKIE S. CABRALES

524 US 1, 141 L Ed 2d 1, 118 S Ct 1772

[No. 97-643]

Argued April 29, 1998. Decided June 1, 1998.

**Decision:** Missouri held improper venue for trial of money laundering charges under 18 USCS §§ 1956(a)(1)(B)(ii) and 1957, where money allegedly derived from illegal acts by others in Missouri, but where alleged money laundering by defendant occurred entirely in Florida.

### SUMMARY

A woman who allegedly had made deposits in and withdrawals from banks in Florida, involving money which was allegedly traceable to illegal cocaine sales in Missouri, was indicted in the United States District Court for the Western District of Missouri on charges of (1) conspiracy to avoid the transaction-reporting requirement of 18 USCS § 1956(a)(1)(B)(ii); (2) conducting a financial transaction to avoid that requirement; and (3) engaging in monetary transactions in criminally derived property in violation of 18 USCS § 1957. The woman moved to dismiss the indictment for improper venue, and the District Court, while denying the motion with respect to the conspiracy count on the ground that the woman had committed certain acts in furtherance of the conspiracy in Missouri, dismissed the two money laundering counts. In affirming the dismissal of the money-laundering counts, the United States Court of Appeals for the Eighth Circuit held that (1) both the Federal Constitution and Rule 18 of the Federal Rules of Criminal Procedure require that a person be tried for an offense where the offense is committed; and (2) since the counts in question alleged acts which occurred in only Florida and alleged no act committed by the woman in Missouri, and since it was not alleged that the woman transported the money from Missouri to Florida, the counts could not be tried in Missouri (109 F3d 471, 1997 US App LEXIS 5497). The government's petition for rehearing en banc was denied (115 F3d 621, 1997 US App LEXIS 14178).

---

**SUBJECT OF ANNOTATION**

Beginning on page 793, infra

Applicability and application of 18 USCS § 3237 (and similar predecessor provisions), authorizing more than one venue for prosecution of some continuing federal offenses—Supreme Court cases

---

Summaries of Briefs; Names of Participating Attorneys, p 883, infra.

1


EXHIBIT 16

U.S. SUPREME COURT REPORTS          141 L Ed 2d

On certiorari, the United States Supreme Court affirmed. In an opinion by GINSBURG, J., expressing the unanimous view of the court, it was held that although the money allegedly laundered allegedly derived from illegal sales of cocaine in Missouri, Missouri was not the appropriate venue for the trial of the money laundering counts, since those counts alleged acts occurring entirely in Florida.

### HEADNOTES

Classified to United States Supreme Court Digest, Lawyers' Edition

**Courts § 485 — venue — federal crimes — money laundering**

1a-1d. Missouri is not a proper venue for a defendant's federal criminal trial on counts of an indictment which charge the defendant with money laundering—specifically, with conducting a financial transaction to avoid the transaction-reporting requirement of 18 USCS § 1956(a)(1)(B)(ii) and with engaging in monetary transactions in criminally derived property in violation of 18 USCS § 1957—because (1) although the money allegedly laundered by the defendant was allegedly derived from illegal sales of cocaine in Missouri, the counts at issue alleged acts occurring entirely in Florida and did not allege that the defendant had transported the laundered funds from Missouri to Florida; (2) the statutes involved proscribed only the financial transactions described, and not the anterior criminal conduct that yielded the funds allegedly laundered; (3) the counts at issue did not charge the defendant with conspiracy or as an aider and abettor in the Missouri drug trafficking; and (4) while the prosecution urged the efficiency of trying the defendant in Missouri since evidence in Missouri showed that the money allegedly laundered derived from unlawful activity, the prosecution was not prevented from linking the defendant to drug trafficking, as the defendant could be and had been charged with conspiring with drug dealers in Missouri, and as the de-

fendant's money laundering in Florida could be shown as overt acts in furtherance of the conspiracy.

*[See annotation p 793, infra]*

**Courts § 485 — venue — federal crimes — place of commission**

2a, 2b. Both the Federal Constitution and Rule 18 of the Federal Rules of Criminal Procedure require that a person be tried for an offense where that offense is committed; the site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it; continuing offenses which were begun in one district and completed in another may be tried in any district in which such offenses were begun, continued, or completed.

*[See annotation p 793, infra]*

**Courts § 485 — venue — federal crimes — place of commission**

3. Although it might be said that when a defendant acts after the fact to conceal a crime, the first crime is an essential element of the second, it is immaterial, in determining the appropriate venue to try the "after the fact" actor, whether the actor knew where the first crime was committed; a money launderer must know that he or she is dealing with funds derived from specified unlawful activity, but where that activity occurred is irrelevant in determining the proper venue for the money laundering trial.

UNITED STATES v CABRALES
(1998) 524 US 1, 141 L Ed 2d 1, 118 S Ct 1772

### RESEARCH REFERENCES

21 Am Jur 2d, Criminal Law § 363

18 USCS §§ 1956(a)(1)(B)(ii), 1957

L Ed Digest, Courts § 485

L Ed Index, Money Laundering; Venue

**Annotations:**

Prerequisites of applicability of federal statute (18 USCS § 3237(a)) as to multiple venue of prosecution in federal courts. 5 L Ed 2d 973.

Venue of prosecution in federal court for act initiated in one district and continued or completed in another. 83 L Ed 567.

Where is embezzlement committed for purposes of territorial jurisdiction or venue. 80 ALR3d 514.

Venue for currency reporting offense under Currency and Foreign Transactions Reporting Act (CFTRA) (31 USCS §§ 5311 et seq.). 113 ALR Fed 639.

Proper venue in prosecution under 21 USCS § 846 for attempt or conspiracy to violate Comprehensive Drug Abuse Prevention and Control Act of 1970. 74 ALR Fed 669.

Construction and application of 18 USCS § 3238 relating to venue in cases of federal criminal offenses committed outside jurisdiction of any state or district. 24 ALR Fed 365.

SHEPARD'S® Citations Service. For further research of authorities referenced here, use SHEPARD'S to be sure your case or statute is still good law and to find additional authorities that support your position. SHEPARD'S is available exclusively from LEXIS Publishing™.

### APPEARANCES OF COUNSEL ARGUING CASE

**Malcolm L. Stewart** argued the cause for petitioner.

**John W. Rogers** argued the cause for respondent.

Summaries of Briefs; Names of Participating Attorneys, p 883, infra.

### SYLLABUS BY REPORTER OF DECISIONS

An indictment returned in the United States District Court for the Western District of Missouri charged respondent Cabrales, as sole defendant, with conspiracy under 18 USC § 371 [18 USCS § 371] to violate § 1956(a)(1)(B)(ii) (conducting a financial transaction to avoid a transaction-reporting requirement) (Count I), and with money laundering in violation of the latter section (Count II) and § 1957 (engaging in a

monetary transaction in criminally derived property of a value greater than $10,000) (Count III). The indictment alleged that, in January 1991, Cabrales deposited $40,000 with the AmSouth Bank of Florida and, within a week, made four separate $9,500 withdrawals from that bank. The money deposited and withdrawn was traceable to illegal cocaine sales in Missouri. Cabrales moved to dismiss the indictment in its entirety for

improper venue. The District Court denied the motion as to Count I, the conspiracy count, but dismissed Counts II and III, the money-laundering counts, because the money-laundering activity occurred entirely in Florida. In affirming that dismissal, the Eighth Circuit noted that the Constitution, Art. III, § 2, cl. 3, and Amdt. 6, as well as Federal Rule of Criminal Procedure 18, requires that a person be tried where the charged offense was committed. While recognizing that a continuing offense "begun in one district and completed in another . . . may be . . . prosecuted in any district in which such offense was begun, continued, or completed," 18 USC § 3237(a) [18 USCS § 3237(a)], the court said that Cabrales was not accused of a continuing offense, but was charged with money-laundering transactions that began, continued, and were completed only in Florida. It was of no moment that the money came from Missouri, the court explained, because Cabrales dealt with it only in Florida, the money-laundering counts alleged no act committed by Cabrales in Missouri, and the Government did not assert that Cabrales transported the money from Missouri to Florida.

*Held:* Missouri is not a place of proper venue for the money-laundering offenses with which Cabrales is charged. The *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it. *United States* v *Anderson,* 328 US 699, 703, 90 L Ed 1529, 66 S Ct 1213. Here, the crimes charged in Counts II and III are defined in statutory proscriptions, §§ 1956(a)(1)(B)(ii) and 1957, that interdict only the financial transactions (acts located entirely in Florida), not the anterior criminal conduct that yielded the funds alleg-

edly laundered. Contrary to the Government's contention, the crimes charged in those counts do not fit under § 3237(a) as offenses begun in Missouri and completed in Florida, but are crimes that took place wholly within Florida. Notably, the counts at issue do not charge Cabrales with conspiracy; they do not link her to, or assert her responsibility for, acts done by others. Nor do they charge her as an aider or abettor, punishable as a principal, in the Missouri drug trafficking, see 18 USC § 2 [18 USCS § 2]. Rather, those counts charge her with criminal activity "after the fact" of an offense begun and completed by others. Cf. § 3. Whenever a defendant acts "after the fact" to conceal a crime, it might be said, as the Government urges, that the first crime is an essential element of the second, and that the second facilitated the first or made it profitable by impeding its detection. But the question here is the *place* appropriate to try the "after the fact" actor. It is immaterial whether that actor knew where the first crime was committed. The money launderer must know she is dealing with funds derived from specified unlawful activity, here, drug trafficking, but the Missouri venue of that activity is, as the Eighth Circuit said, of no moment. Money laundering arguably might rank as a continuing offense, triable in more than one place, if the launderer acquired the funds in one district and transported them into another, but that is tellingly not this case. Neither *Hyde* v *United States,* 225 US 347, 56 L Ed 1114, 32 S Ct 793, nor *In re Palliser,* 136 US 257, 34 L Ed 514, 10 S Ct 1034, supports the Government's position that money launderers can in all cases be prosecuted at the place where the funds they handled were generated. *Hyde* involved a conspiracy prosecu-

tion in which the Court held venue proper in the District of Columbia based on overt acts committed by a co-conspirator in the District. *Palliser* concerned a prosecution for mailings from New York to Connecticut in which the Court held Connecticut venue proper because the mailings were completed in that State. By contrast, the counts here at issue allege no conspiracy, but describe activity in which Cabrales alone engaged. Nor do they charge that she dispatched any missive from one State into another; instead, they portray her and the money she deposited and withdrew as moving inside Florida only. Finally, the Court rejects the Government's contention that efficiency warrants trying Cabrales in Missouri because evidence there, and not in Florida,

shows that the money she allegedly laundered derived from unlawful activity. The Government is not disarmed from showing that Cabrales is in fact linked to the drug trafficking. She can be, and indeed has been, charged with conspiring with the drug dealers in Missouri. If the Government can prove the agreement it has alleged in Count I, Cabrales can be prosecuted in Missouri for that confederacy, and her Florida money laundering could be shown as overt acts in furtherance of the conspiracy. See § 371. As the Government acknowledged, the difference in her sentence probably would be negligible.

109 F3d 471 and 115 F3d 621, affirmed.

Ginsburg, J., delivered the opinion for a unanimous Court.

**OPINION OF THE COURT**

**[524 US 3]**

Justice **Ginsburg** delivered the opinion of the Court.

[1a] This case presents a question of venue, specifically, the place appropriate for trial on charges of money laundering in violation of 18 USC § 1956(a)(1)(B)(ii) [18 USCS § 1956(a)(1)(B)(ii)] (conducting a financial transaction to avoid a transaction-reporting requirement) and § 1957 (engaging in a monetary transaction in criminally derived property of a value greater than $10,000). The laundering alleged in the indictment occurred entirely in Florida. The currency purportedly laundered derived

**[524 US 4]**

from the unlawful distribution of cocaine in Missouri. The defendant, respondent Vickie S. Cabrales, is not alleged to have transported funds from Missouri to Florida. Nor is she charged, in the counts before us, with participation

in the Missouri cocaine distribution that generated the funds in question. In accord with the Court of Appeals for the Eighth Circuit, we hold that Missouri is not a proper place for trial of the money-laundering offenses at issue.

I

In a three-count indictment returned in the United States District Court for the Western District of Missouri, Cabrales, as sole defendant, was charged with the following offenses: conspiracy to avoid a transaction-reporting requirement, in violation of 18 USC §§ 371, 1956(a)(1)(B)(ii) [18 USCS §§ 371, 1956(a)(1)(B)(ii)] (Count I); conducting a financial transaction to avoid a transaction-reporting requirement, in violation of § 1956(a)(1)(B)(ii) (Count II); and engaging in a monetary transaction in criminally derived property of a value greater than $10,000, in violation of § 1957 (Count III). The indictment alleged that, in January 1991,

Cabrales deposited $40,000 with the AmSouth Bank of Florida and, within a week's span, made four separate withdrawals of $9,500 each from that bank. The money deposited and withdrawn was traceable to illegal sales of cocaine in Missouri.

Cabrales moved to dismiss the indictment in its entirety for improper venue. On recommendation of the Magistrate, the District Court denied the motion as to Count I, the conspiracy count, based on the Government's assertions that Cabrales "was present in Missouri during the conspiracy, lived with a conspirator in Missouri, and participated in various activities in Missouri in furtherance of the conspiracy." App. to Pet. for Cert. 11a, 14a-15a. Also on the Magistrate's recommendation, the District Court granted the motion to dismiss Counts II and III, the money-laundering counts, because the deposit and withdrawals occurred in Florida and

**[524 US 5]**

"[n]o activity of money laundering . . . occurred in Missouri." *Id.*, at 11a, 14a.

On the Government's appeal, the Eighth Circuit affirmed the District Court's dismissal of the money-laundering counts. 109 F3d 471, as amended, 115 F3d 621 (CA8 1997). The conspiracy charge was not part of the appeal, and that count remains pending in the Missouri District Court. 109 F3d, at 472, n 2, as amended, 115 F3d 621.

[2a] The Court of Appeals first recounted law that is not in doubt: "Both Rule 18 of the Federal Rules of Criminal Procedure and the Constitution require that a person be tried for an offense where that offense is committed," 109 F3d, at 472; also, the site of a charged offense " 'must be determined from the nature of the crime alleged and the

location of the act or acts constituting it,' " *ibid.* (quoting *United States v Anderson*, 328 US 699, 703, 90 L Ed 1529, 66 S Ct 1213 (1946)). "Continuing offenses," the Court of Appeals recognized, those "begun in one district and completed in another," 18 USC § 3237(a) [18 USCS § 3237(a)], may be tried " 'in any district in which such [an] offense was begun, continued, or completed.' " 109 F3d, at 472 (quoting § 3237(a)).

But "Cabrales was not accused of a 'continuing offense,' " the Eighth Circuit said, *ibid.*; "[s]he was charged with money laundering, for transactions which began, continued, and were completed only in Florida," *ibid.* "That the money came from Missouri is of no moment," the Court of Appeals next observed, for "Cabrales dealt with it only in Florida." *Ibid.* The money-laundering counts "include[d] no act committed by Cabrales in Missouri," the Eighth Circuit emphasized, nor did "the [G]overnment charge that Cabrales transported the money from Missouri to Florida." *Ibid.*

The Government urges that, in conflict with the Eighth Circuit, other Courts of Appeals "have held that venue for money laundering offenses is proper in the district in which the funds were unlawfully generated, even if the financial transaction that constitutes the laundering occurred wholly within another district." Pet. for Cert. 9-10 (citing *United*

**[524 US 6]**

*States v Heaps*, 39 F3d 479, 482 (CA4 1994); *United States v Beddow*, 957 F2d 1330, 1335-1336 (CA6 1992); *United States v Sax*, 39 F3d 1380, 1390-1391 (CA7 1994); *United States v Angotti*, 105 F3d 539, 544-545 (CA9 1997)). We granted certiorari to resolve the conflict, 522 US 1072, 139 L Ed 2d 749, 118 S Ct 751 (1998), and now affirm the Eighth Circuit's judgment.

## II

Proper venue in criminal proceedings was a matter of concern to the Nation's founders. Their complaints against the King of Great Britain, listed in the Declaration of Independence, included his transportation of colonists "beyond Seas to be tried."[1] The Constitution twice safeguards the defendant's venue right: Article III, § 2, cl 3, instructs that "Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed"; the Sixth Amendment calls for trial "by an impartial jury of the State and district wherein the crime shall have been committed." Rule 18 of the Federal Rules of Criminal Procedure, providing that "prosecution shall be had in a district in which the offense was committed," echoes the constitutional commands.

[1b, 2b] We adhere to the general guide invoked and applied by the Eighth Circuit: "[T]he *locus delicti*

**[524 US 7]**

must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Anderson*, 328 US, at 703, 90 L Ed 1529, 66 S Ct 1213. Here, the crimes described in Counts II and III are defined in statutory proscriptions, 18 USC §§ 1956(a)(1)(B)(ii), 1957 [18 USCS §§ 1956(a)(1)(B)(ii), 1957], that interdict only the financial transactions (acts located entirely in Florida), not the anterior criminal conduct that yielded the funds allegedly laundered.

Congress has provided by statute for offenses "begun in one district and completed in another"; such offenses may be "prosecuted in any district in which [the] offense was begun, continued, or completed." 18 USC § 3237(a) [18 USCS § 3237(a)]. The Government urges that the money-laundering crimes described in Counts II and III of the indictment against Cabrales fit the § 3237(a) description. We therefore confront and decide this question: Do those counts charge crimes begun in Missouri and completed in Florida, rendering venue proper in Missouri, or do they delineate crimes that took place wholly within Florida?

[1c] Notably, the counts at issue do not charge Cabrales with conspiracy; they do not link her to, or assert her responsibility for, acts done by others. Nor do they charge her as an aider or abettor in the Missouri drug trafficking. See 18 USC § 2 [18 USCS § 2] (one who aids or abets an offense "is punishable as a principal"). Cabrales is charged in the money-laundering counts with criminal activity "after the fact" of an offense begun and completed by others. Cf. § 3 ("Whoever, knowing that an offense against the United States has been committed, . . . assists the offender in order to hinder or prevent his . . . punishment, is an accessory after the fact," punishable not as a principal, but by a term of imprisonment or fine generally "not more than one-half the maximum . . . pre-

---

1. The Declaration recited among injuries and usurpations attributed to the King: "transporting us beyond Seas to be tried for pretended offences." The Declaration of Independence, para. 21 (1776). A complaint of the same tenor appeared earlier, in the 1769 "Virginia Resolves." See Blume, The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue, 43 Mich. L. Rev. 59, 64 (1944). Parliament had decreed that colonists charged with treason could be tried in England. See 16 Parliamentary History of England from the Earliest Period to Year 1803, pp 476-510 (T. Hansard ed. 1813). In response, the Virginia House of Burgesses unanimously passed a resolution condemning the practice of sending individuals "beyond the Sea, to be tried" as "highly derogatory of the Rights of British subjects." Journals of the House of Burgesses of Virginia, 1766-1769, p 214 (J. Kennedy ed. 1906).

scribed for the punishment of the principal[.]").

[3] Whenever a defendant acts "after the fact" to conceal a crime, it might be said, as the Government urges in this case, that the first crime is an essential element of the second, see Brief for United States 9, and that the second

**[524 US 8]**

facilitated the first or made it profitable by impeding its detection, see *id.*, at 14. But the question here is the *place* appropriate to try the "after the fact" actor. As the Government recognizes, it is immaterial whether that actor knew when the first crime was committed. See Tr. of Oral Arg. 5-6. The money launderer must know she is dealing with funds derived from "specified unlawful activity," here, drug trafficking, but the Missouri venue of that activity is, as the Eighth Circuit said, "of no moment." 109 F3d, at 472.[2]

[1d] Money laundering, the Court of Appeals acknowledged, arguably might rank as a "continuing offense," triable in more than one place, if the launderer acquired the funds in one district and transported them into another. *Id.*, at 473. But that is tellingly not this case. In the counts at issue, the Government indicted Cabrales "for transactions which began, continued, and were completed only in Florida." *Id.*, at 472. Under these circumstances, venue in Missouri is improper.

The Government identified *Hyde* v *United States*, 225 US 347, 56 L Ed 1114, 32 S Ct 793 (1912), and *In re Palliser*, 136 US 257, 34 L Ed 514, 10 S Ct 1034 (1890), as the two best cases for its position that money launderers can in all cases be pros-

ecuted at the place where the funds they handled were generated. See Tr. of Oral Arg. 6. Neither decision warrants the ruling the Government here seeks.

In *Hyde*, the defendants were convicted in the District of Columbia of conspiracy to defraud the United States. Although none of the defendants had entered the District as part of the conspiracy, venue was nevertheless appropriate, the Court ruled, based on the overt acts of a co-conspirator there. 225 US, at 363, 56 L Ed 1114, 32 S Ct 793. By contrast, the counts at issue in this case allege no conspiracy. They describe activity in which Cabrales alone, untied to others, engaged.

**[524 US 9]**

*In re Palliser* concerned a man who sent letters from New York to postmasters in Connecticut, attempting to gain postage on credit, in violation of then-applicable law. The Court held that the defendant could be prosecuted in Connecticut, where the mail he addressed and dispatched was received. 136 US, at 266-268, 34 L Ed 514, 10 S Ct 1034. The *Palliser* opinion simply recognizes that a mailing to Connecticut is properly ranked as an act completed in that State. Cf. 18 USC § 3237(a) [18 USCS § 3237(a)] ("Any offense involving the use of the mails . . . is a continuing offense and . . . may be . . . prosecuted in any district from, through, or into which such . . . mail matter . . . moves."); *United States* v *Johnson*, 323 US 273, 275, 89 L Ed 236, 65 S Ct 249 (1944) (consistent with the Constitution "an illegal use of the mails . . . may subject the user to prosecution in the district where he sent the goods, or in the district of their arrival, or in any

intervening district"). Cabrales, however, dispatched no missive from one State into another. The counts before us portray her and the money she deposited and withdrew as moving inside Florida only.

Finally, the Government urges the efficiency of trying Cabrales in Missouri, because evidence in that State, and not in Florida, shows that the money Cabrales allegedly laundered derived from unlawful activity. Although recognizing that the venue requirement is principally a protection for the defendant, Reply Brief 10, the Government further maintains that its convenience, and the interests of the community victimized by drug dealers, merit consideration.

But if Cabrales is in fact linked to the drug-trafficking activity, the Government is not disarmed from showing that is the case. She can be, and indeed has been, charged with conspiring with the drug dealers in Missouri. If the Government can prove

the agreement it has alleged, Cabrales can be prosecuted in Missouri for that confederacy, and her money laundering in Florida could be shown as overt acts in furtherance of the conspiracy. See 18 USC § 371 [18 USCS § 371] (requiring proof of an "act to effect the object of the conspiracy").

**[524 US 10]**

As the Government acknowledged, the difference in the end result "probably . . . would be negligible." Tr. of Oral Arg. 52; see United States Sentencing Commission, Guidelines Manual § 1B1.3 (Nov. 1995) (providing for consideration of "Relevant Conduct" in determining sentence).

* * *

We hold that Missouri is not a place of proper venue for the money-laundering offenses with which Cabrales is charged. For the reasons stated, the judgment of the Court of Appeals for the Eighth Circuit is affirmed.

---

**EDITOR'S NOTE**

An annotation on "Applicability and application of 18 USCS § 3237 (and similar predecessor provisions), authorizing more than one venue for prosecution of some continuing federal offenses—Supreme Court cases," p 793, infra.

---

2. Cf. *United States* v *Lanoue*, 137 F3d 656, 661 (CA1 1998) (stating that crime of being a felon in possession of a firearm, in violation of 18 USC § 922(g)(1) [18 USCS § 922(g)(1)], occurs only where the firearm is actually possessed).

UNITED STATES, Petitioner

v

ALFONSO LOPEZ, JR.

514 US —, 131 L Ed 2d 626, 115 S Ct 1624

[No. 93-1260]

Argued November 8, 1994. Decided April 26, 1995.

Decision: Gun-Free School Zones Act of 1990 (18 USCS § 922(q)(1)(A)), prohibiting possession of firearm in school zone, held to exceed authority of Congress to regulate commerce under Federal Constitution's commerce clause (Art I, § 8, cl 3).

### SUMMARY

An accused, who was then a 12th-grade student, was charged in a federal grand jury indictment with the knowing possession of a firearm at a school zone, in violation of 18 USCS § 922(q)(1)(A), the Gun-Free School Zones Act of 1990, which prohibits any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone (defined as in, or on the grounds of, a public, parochial, or private school or within a distance of 1,000 feet from the grounds of such a school). The United States District Court for the Western District of Texas, denying the accused's motion to dismiss the indictment, concluded that the Act was a constitutional exercise of Congress' power to regulate activities in and affecting commerce, and that the business of elementary, middle, and high schools affects interstate commerce. The accused was then tried in the District Court and convicted of violating the Act. The accused appealed, claiming that the Act exceeded the power of Congress to legislate under the commerce clause of the Federal Constitution, Art I, § 8, cl 3. The United States Court of Appeals for the Fifth Circuit agreed and reversed, holding that in light of what the court characterized as insufficient congressional findings and legislative history, the Act, in the full reach of its terms, was invalid as beyond the power of Congress under the commerce clause (2 F3d 1342).

On certiorari, the United States Supreme Court affirmed. In an opinion by REHNQUIST, Ch. J., joined by O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., it was held that the Act exceeded the authority of Congress to regulate commerce among the several states under the commerce clause and that the

Act could not be sustained as a regulation of an activity that substantially affects interstate commerce, because (1) the Act is a criminal statute that by its terms has nothing to do with commerce or any sort of economic enterprise, and—since possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce—the Act could not be sustained under prior Supreme Court cases upholding regulations of intrastate activities that arose out of or were connected with a commercial transaction which viewed in the aggregate substantially affected interstate commerce, (2) the Act contains no jurisdictional element which would insure that the firearm possession in question affected interstate commerce, that is, the Act has no express jurisdictional element which might limit the Act's reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce, (3) while Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce, to the extent that congressional findings would have enabled the Supreme Court to evaluate the legislative judgment that the possession of a firearm in a local school zone substantially affected interstate commerce, such findings were lacking in the case at hand, and (4) the Supreme Court would not (a) pile inference upon inference in a manner that would bid fair to convert congressional authority under the commerce clause to a general police power of the sort retained by the states, and (b) conclude that there will never be a distinction between what is truly national and what is truly local.

KENNEDY, J., joined by O'CONNOR, J., concurring, expressed the view that the Act upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power, in that (1) neither the actors nor their conduct in the case at hand had a commercial character, and neither the purpose nor the design of the Act have an evident commercial nexus, and (2) the Act intrudes upon an area of traditional state concern, because (a) education is a traditional concern of the states, and if a state or municipality determines that harsh criminal sanctions are necessary and wise to deter students from carrying guns on school premises, the reserved powers of the states are sufficient to enact those measures, and (b) the Act forecloses the states from experimenting and exercising their own judgment in an area to which states lay claim by right of history and expertise, and does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term.

THOMAS, J., concurring, expressed the view that the Supreme Court, in an appropriate case, should reconsider the "substantial effects" test, which is far removed from both the Constitution and the Supreme Court's early case law, and that the Constitution does not support the proposition that Congress has authority over all activities that substantially affect interstate commerce.

STEVENS, J., dissenting, expressed the view that Congress' power to regulate commerce in firearms includes the power to prohibit possession of



EXHIBIT 17

guns at any location because of their potentially harmful use, and that it follows that Congress may also prohibit their possession in particular markets, such as that of school-age children.

SOUTER, J., dissenting, expressed the view that (1) the court, in reviewing legislation under the commerce clause, defers to the congressional judgment that Congress' regulation addresses a subject substantially affecting interstate commerce if there is any rational basis for such finding and, if so, considers whether the means chosen by Congress are reasonably adapted to the end permitted by the Constitution, (2) a connection between commerce and the subjects of the Act, education and enforcement of criminal law, is not remote, and (3) if Congress had made explicit findings that guns in schools had a substantial effect on interstate commerce, such findings might not have allowed a court to subject the legislation to less scrutiny or to defer to such findings, as the only question is whether the legislative judgment was within the realm of reason.

BREYER, J., joined by STEVENS, SOUTER, and GINSBURG, JJ., dissenting, expressed the view that (1) Congress could have had a rational basis for finding a significant or substantial connection between (a) gun-related school violence, which poses a widespread, serious, and substantial physical threat to teaching and learning, and (b) interstate commerce, to which such teaching and learning are inextricably tied, and (2) the court's holding creates serious legal problems in that (a) the holding runs contrary to modern Supreme Court cases that have upheld congressional actions despite connections to interstate or foreign commerce that are less significant than the effect of school violence, (b) the court's distinction between commercial and noncommercial transactions results in a question of the power of Congress turning upon a formula which gives controlling force to nomenclature rather to consideration of the actual effects of the activity upon interstate commerce, and (c) the court's holding threatens legal uncertainty in an area of law that had seemed reasonably well settled.

### HEADNOTES

Classified to United States Supreme Court Digest, Lawyers' Edition

**Commerce § 78 — regulation by Congress — crimes — possession of firearms in school zone**

1a-1e. The Gun-Free School Zones Act of 1990, 18 USCS § 922(q)(1)(A)—which prohibits an individual's knowing possession of a firearm at a place the individual knows, or has reasonable cause to believe, is a school zone—exceeds the authority of Congress to regulate commerce among the several states under the Federal Constitution's commerce

628

clause, Art I, § 8, cl 3, in that the Act (1) is neither a regulation of the use of the channels of interstate commerce nor an attempt to prohibit the interstate transportation of a commodity through the channels of commerce, (2) cannot be justified as a regulation by which Congress has sought to protect an instrumentality of interstate commerce or a thing in interstate commerce, and (3) cannot be sustained as a regulation of an activity that substantially affects in-

terstate commerce, because (a) the Act is a criminal statute that by its terms has nothing to do with commerce or any sort of economic enterprise and is not an essential part of a larger regulation of economic activity in which the regulatory scheme could be undercut unless the intrastate activity were regulated, possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce, and the Act, therefore, may not be sustained under prior United States Supreme Court cases upholding regulations of activities that arise out of or are connected with a commercial transaction which viewed in the aggregate substantially affects interstate commerce, (b) the Act contains no jurisdictional element which would insure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce, that is, the Act has no express jurisdictional element which might limit the Act's reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce, (c) while Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce, to the extent that congressional findings would enable the Supreme Court to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, such findings are lacking in the case at hand, and (d) the Supreme Court will not (i) pile inference upon inference in a manner that would bid fair to convert congressional authority under the commerce clause to a general police

power of the sort retained by the states, and (ii) conclude that there will never be a distinction between what is truly national and what is truly local. (Breyer, Stevens, Souter, and Ginsburg, JJ., dissented from this holding.)

**Commerce § 61 — regulation by Congress**

2a, 2b. Congress, under the Federal Constitution's commerce clause, Art I, § 8, cl 3, may regulate three broad areas of activity: (1) the use of the channels of interstate commerce, (2) the protection of the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities, and (3) those activities that substantially affect interstate commerce; where economic activity substantially affects interstate commerce, congressional legislation regulating that activity will be sustained.

**States, Territories, and Possessions § 47 — federalism — criminal law**

3a, 3b. Under the federal system, the states possess primary authority for defining and enforcing the criminal law; when Congress criminalizes conduct already denounced as criminal by the states, it effects a change in the sensitive relation between federal and state criminal jurisdiction.

**Commerce § 78 — regulation by Congress — firearms**

4. The importation of congressional findings regarding the regulation of firearms through previous enactments is especially inappropriate to justify the validity—under the Federal Constitution's commerce clause, Art I, § 8, cl 3—of the Gun-Free School Zones Act, 18 USCS

629

§ 922(q)(1)(A), where (1) the prior federal enactments or congressional findings do not speak to the subject matter of the Act—the prohibition of the possession of firearms in or near schools—or its relationship to interstate commerce, and (2) the Act represents a sharp break with the long-standing pattern of federal firearms legislation.

**Commerce § 61 — regulation by Congress — local schools**

5. While Congress has authority under the Federal Constitution's commerce clause, Art I, § 8, cl 3, to regulate numerous commercial activities that substantially affect interstate commerce and also affect the educational process, that authority, though broad, does not include the authority to regulate each and every aspect of local schools.

**Commerce § 61 — regulation by Congress**

6. Although a determination whether an intrastate activity is commercial or noncommercial, in respect to the validity—under the Federal Constitution's commerce clause, Art I, § 8, cl 3—of congressional regulation of the activity, may in some cases result in legal uncertainty; and although, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the commerce clause always will engender legal uncertainty, this uncertainty is mandated by the Constitution by the withholding from Congress of a plenary police power that would authorize enactment of every type of legislation.

Seizure and forfeiture of firearms or ammunition under 18 USCS § 924(d). 57 ALR Fed 234.

Validity, construction, and application of 18 USC § 922(a)(6), making it unlawful to knowingly make any false or fictitious oral or written statement in connection with the acquisition or attempted acquisition of any firearm or ammunition. 43 ALR Fed 338.

Auto-Cite®: Cases and annotations referred to herein can be further researched through the Auto-Cite® computer-assisted research service. Use Auto-Cite to check citations for form, parallel references, prior and later history, and annotation references.

---

**RESEARCH REFERENCES**

15A Am Jur 2d, Commerce §§ 9, 16, 78-80; 79 Am Jur 2d, Weapons and Firearms § 6

USCS, Constitution, Art I, § 8, cl 3; 18 USCS § 922(q)(1)(A)

L Ed Digest, Commerce § 78

L Ed Index, Commerce; Weapons and Firearms

ALR Index, Commerce Clause; Police Power; Weapons and Firearms

**Annotations:**

What constitutes receipt of firearm, under 18 USCS § 922(h), prohibiting certain persons from receiving any firearm which has been shipped or transported in interstate or foreign commerce. 74 ALR Fed 486.

Receipt, possession, or transportation of multiple firearms as single or multiple offense under 18 USCS Appx § 1202(a)(1), making it federal offense for convicted felon to receive, possess, or transport any firearm. 62 ALR Fed 829.

Compliance with provision of Gun Control Act of 1968 (18 USCS § 922(e)) regulating transportation of firearms on carrier. 60 ALR Fed 305.

---

**APPEARANCES OF COUNSEL**

**Drew S. Days, III** argued the cause for petitioner.
**John R. Carter** argued the cause for respondent.

**SYLLABUS BY REPORTER OF DECISIONS**

After respondent, then a 12th-grade student, carried a concealed handgun into his high school, he was charged with violating the Gun-Free School Zones Act of 1990, which forbids "any individual knowingly to possess a firearm at a place that [he] knows . . . is a school zone," 18 USC § 922(q)(1)(A) [18 USCS § 922(q)(1)(A)]. The District Court denied his motion to dismiss the indictment, concluding that § 922(q) is a constitutional exercise of Congress' power to regulate activities in and affecting commerce. In reversing, the Court of Appeals held that, in light of what it characterized as insufficient congressional findings and legislative history, § 922(q) is invalid as beyond Congress' power under the Commerce Clause.

*Held:* The Act exceeds Congress' Commerce Clause authority. First, although this Court has upheld a wide variety of congressional Acts regulating intrastate economic activity that substantially affected interstate commerce, the possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, have such a substantial effect on interstate commerce. Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly those terms are defined. Nor is it an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under the Court's cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce. Second, § 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearms possession in question has the requisite nexus with interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to in-

terstate commerce. To uphold the Government's contention that § 922(q) is justified because firearms possession in a local school zone does indeed substantially affect interstate commerce would require this Court to pile inference upon inference in a manner that would bid fair to convert congressional Commerce Clause authority to a general police power of the sort held only by the States.

2 F3d 1342, affirmed.

Rehnquist, C. J., delivered the opinion of the Court, in which O'Connor, Scalia, Kennedy, and Thomas, JJ., joined. Kennedy, J., filed a concurring opinion, in which O'Connor, J., joined. Thomas, J., filed a concurring opinion. Stevens, J., and Souter, J., filed dissenting opinions. Breyer, J., filed a dissenting opinion, in which Stevens, Souter, and Ginsburg, JJ., joined.

## OPINION OF THE COURT

Chief Justice **Rehnquist** delivered the opinion of the Court.

**[1a]** In the Gun-Free School Zones Act of 1990, Congress made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 USC § 922(q)(1)(A) (1988 ed, Supp V) [18 USCS § 922(q)(1)(A)]. The Act neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce. We hold that the Act exceeds the authority of Congress "[t]o regulate Commerce . . . among the several States . . . ." US Const, Art I, § 8, cl 3.

On March 10, 1992, respondent, who was then a 12th-grade student, arrived at Edison High School in San Antonio, Texas, carrying a concealed .38 caliber handgun and five bullets. Acting upon an anonymous tip, school authorities confronted respondent, who admitted that he was carrying the weapon. He was arrested and charged under Texas law with firearm possession on school pre-

mises. See Tex Penal Code Ann § 46.03(a)(1) (Supp 1994). The next day, the state charges were dismissed after federal agents charged respondent by complaint with violating the Gun-Free School Zones Act of 1990. 18 USC § 922(q)(1)(A) (1988 ed, Supp V) [18 USCS § 922(q)(1)(A)].[1]

A federal grand jury indicted respondent on one count of knowing possession of a firearm at a school zone, in violation of § 922(q). Respondent moved to dismiss his federal indictment on the ground that § 922(q) "is unconstitutional as it is beyond the power of Congress to legislate control over our public schools." The District Court denied the motion, concluding that § 922(q) "is a constitutional exercise of Congress' well-defined power to regulate activities in and affecting commerce, and the 'business' of elementary, middle and high schools . . . affects interstate commerce." App to Pet for Cert 55a. Respondent waived his right to a jury trial. The District Court conducted a bench trial, found him guilty of violating § 922(q), and sentenced him to six months' imprisonment and two years' supervised release.

On appeal, respondent challenged his conviction based on his claim that § 922(q) exceeded Congress' power to legislate under the Commerce Clause. The Court of Appeals for the Fifth Circuit agreed and reversed respondent's conviction. It held that, in light of what it characterized as insufficient congressional findings and legislative history, "section 922(q), in the full reach of its terms, is invalid as beyond the power of Congress under the Commerce Clause." 2 F3d 1342, 1367-1368 (1993). Because of the importance of the issue, we granted certiorari, 511 US ——, 128 L Ed 2d 189, 114 S Ct 1536 (1994), and we now affirm.

We start with first principles. The Constitution creates a Federal Government of enumerated powers. See US Const, Art I, § 8. As James Madison wrote, "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, pp 292-293 (C. Rossiter ed 1961). This constitutionally mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." *Gregory v Ashcroft*, 501 US 452, 458, 115 L Ed 2d 410, 111 S Ct 2395 (1991) (internal quotation marks omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serves to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Ibid.*

The Constitution delegates to Con-

gress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." US Const, Art I, § 8, cl 3. The Court, through Chief Justice Marshall, first defined the nature of Congress' commerce power in *Gibbons v Ogden*, 9 Wheat 1, 189-190, 6 L Ed 23 (1824):

"Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."

The commerce power "is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Id.*, at 196, 6 L Ed 23. The *Gibbons* Court, however, acknowledged that limitations on the commerce power are inherent in the very language of the Commerce Clause.

"It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient, and is certainly unnecessary.

"Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. . . . The enumeration presup-

---

1. The term "school zone" is defined as "in, or on the grounds of, a public, parochial or private school" or "within a distance of 1,000 feet from the grounds of a public, parochial or private school." § 921(a)(25).

poses something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State." *Id.*, at 194-195, 6 L Ed 23.

For nearly a century thereafter, the Court's Commerce Clause decisions dealt but rarely with the extent of Congress' power, and almost entirely with the Commerce Clause as a limit on state legislation that discriminated against interstate commerce. See, *e.g.*, *Veazie v Moor*, 14 How 568, 573-575, 14 L Ed 545 (1853) (upholding a state-created steamboat monopoly because it involved regulation of wholly internal commerce); *Kidd v Pearson*, 128 US 1, 17, 20-22, 32 L Ed 346, 9 S Ct 6 (1888) (upholding a state prohibition on the manufacture of intoxicating liquor because the commerce power "does not comprehend the purely domestic commerce of a State which is carried on between man and man within a State or between different parts of the same State"); see also L. Tribe, American Constitutional Law 306 (2d ed 1988). Under this line of precedent, the Court held that certain categories of activity such as "production," "manufacturing," and "mining" were within the province of state governments, and thus were beyond the power of Congress under the Commerce Clause. See *Wickard v Filburn*, 317 US 111, 121, 87 L Ed 122, 63 S Ct 82 (1942) (describing development of Commerce Clause jurisprudence).

In 1887, Congress enacted the Interstate Commerce Act, 24 Stat 379, and in 1890, Congress enacted the Sherman Antitrust Act, 26 Stat 209, as amended, 15 USC § 1 *et seq.* [15 USC §§ 1 *et seq.*]. These laws ushered in a new era of federal regulation under the commerce power. When cases involving these laws first reached this Court, we imported from our negative Commerce Clause cases the approach that Congress could not regulate activities such as "production," "manufacturing," and "mining." See, *e.g.*, *United States v E. C. Knight Co.*, 156 US 1, 12, 39 L Ed 325, 15 S Ct 249 (1895) ("Commerce succeeds to manufacture, and is not part of it"); *Carter v Carter Coal Co.*, 298 US 238, 304, 80 L Ed 1160, 56 S Ct 855 (1936) ("Mining brings the subject matter of commerce into existence. Commerce disposes of it"). Simultaneously, however, the Court held that, where the interstate and intrastate aspects of commerce were so mingled together that full regulation of interstate commerce required incidental regulation of intrastate commerce, the Commerce Clause authorized such regulation. See, *e.g.*, *Houston, E. & W. T. R. Co. v United States*, 234 US 342, 58 L Ed 1341, 34 S Ct 833 (1914) (*Shreveport Rate Cases*).

In *A. L. A. Schechter Poultry Corp. v United States*, 295 US 495, 550, 79 L Ed 1570, 55 S Ct 837, 97 ALR 947 (1935), the Court struck down regulations that fixed the hours and wages of individuals employed by an intrastate business because the activity being regulated related to interstate commerce only indirectly. In doing so, the Court characterized the distinction between direct and indirect effects of intrastate transactions upon interstate commerce as "a fundamental one, essential to the maintenance of our constitutional system." *Id.*, at 548, 79 L Ed 1570, 55 S Ct 837. Activities that affected interstate commerce directly were within Congress' power; activities that affected interstate commerce indirectly were beyond Congress' reach. *Id.*, at 546, 79 L Ed 1570, 55 S Ct 837. The justification for this formal distinction was rooted in the fear that otherwise "there would be virtually no limit to the federal power and for all practical purposes we should have a completely centralized government." *Id.*, at 548, 79 L Ed 1570, 55 S Ct 837.

Two years later, in the watershed case of *NLRB v Jones & Laughlin Steel Corp.*, 301 US 1, 81 L Ed 893, 57 S Ct 615 (1937), the Court upheld the National Labor Relations Act against a Commerce Clause challenge, and in the process, departed from the distinction between "direct" and "indirect" effects on interstate commerce. *Id.*, at 36-38, 81 L Ed 893, 57 S Ct 615 ("The question [of the scope of Congress' power] is necessarily one of degree"). The Court held that intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" are within Congress' power to regulate. *Id.*, at 37, 81 L Ed 893, 57 S Ct 615.

In *United States v Darby*, 312 US 100, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430 (1941), the Court upheld the Fair Labor Standards Act, stating:

"The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." *Id.*, at 118, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430.

See also *United States v Wrightwood Dairy Co.*, 315 US 110, 119, 86 L Ed 726, 62 S Ct 523 (1942) (the commerce power "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power").

In *Wickard v Filburn*, the Court upheld the application of amendments to the Agricultural Adjustment Act of 1938 to the production and consumption of home-grown wheat. 317 US, at 128-129, 87 L Ed 122, 63 S Ct 82. The *Wickard* Court explicitly rejected earlier distinctions between direct and indirect effects on interstate commerce, stating:

"[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'" *Id.*, at 125, 87 L Ed 122, 63 S Ct 82.

The *Wickard* Court emphasized that although Filburn's own contribution to the demand for wheat may have been trivial by itself, that was not "enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.*, at 127-128, 87 L Ed 122, 63 S Ct 82.

*Jones & Laughlin Steel, Darby*, and *Wickard* ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously de-

fined authority of Congress under that Clause. In part, this was a recognition of the great changes that had occurred in the way business was carried on in this country. Enterprises that had once been local or at most regional in nature had become national in scope. But the doctrinal change also reflected a view that earlier Commerce Clause cases artificially had constrained the authority of Congress to regulate interstate commerce.

But even these modern-era precedents which have expanded congressional power under the Commerce Clause confirm that this power is subject to outer limits. In *Jones & Laughlin Steel*, the Court warned that the scope of the interstate commerce power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." 301 US, at 37, 81 L Ed 893, 57 S Ct 615; see also *Darby, supra*, at 119-120, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430 (Congress may regulate intrastate activity that has a "substantial effect" on interstate commerce); *Wickard, supra*, at 125, 121, 87 L Ed 122, 63 S Ct 82 (Congress may regulate activity that "exerts a substantial economic effect on interstate commerce"). Since that time, the Court has heeded that

warning and undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce. See, *e.g., Hodel v Virginia Surface Mining & Reclamation Assn., Inc.,* 452 US 264, 276-280, 69 L Ed 2d 1, 101 S Ct 2352 (1981); *Perez v United States*, 402 US 146, 155-156, 28 L Ed 2d 686, 91 S Ct 1357 (1971); *Katzenbach v McClung*, 379 US 294, 299-301, 13 L Ed 2d 290, 85 S Ct 377 (1964); *Heart of Atlanta Motel, Inc. v United States*, 379 US 241, 252-253, 13 L Ed 2d 258, 85 S Ct 348 (1964).[2]

Similarly, in *Maryland v Wirtz*, 392 US 183, 20 L Ed 2d 1020, 88 S Ct 2017 (1968), the Court reaffirmed that "the power to regulate commerce, though broad indeed, has limits" that "[t]he Court has ample power" to enforce. *Id.,* at 196, 20 L Ed 2d 1020, 88 S Ct 2017, overruled on other grounds, *National League of Cities v Usery*, 426 US 833, 49 L Ed 2d 245, 96 S Ct 2465 (1976), overruled by *Garcia v San Antonio Metropolitan Transit Authority*, 469 US 528, 83 L Ed 2d 1016, 105 S Ct 1005 (1985). In response to the dissent's warnings that the Court was powerless to enforce the limitations on Congress' commerce powers because "[a]ll activities affecting commerce, even in the minutest degree, *[Wickard]*, may be regulated and controlled by Congress," 392 US, at 204, 20 L Ed 2d 1020, 88 S Ct 2017 (Douglas, J., dissenting), the *Wirtz* Court replied that the dissent had misread precedent as "[n]either here nor in *Wickard* has the Court declared that

Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities," *id.,* at 197, n 27, 20 L Ed 2d 1020, 88 S Ct 2017. Rather, "[t]he Court has said only that where *a general regulatory statute bears a substantial relation to commerce*, the de minimis character of individual instances arising under that statute is of no consequence." *Ibid.* (first emphasis added).

[2a] Consistent with this structure, we have identified three broad categories of activity that Congress may regulate under its commerce power. *Perez v United States, supra,* at 150, 28 L Ed 2d 686, 91 S Ct 1357; see also *Hodel v Virginia Surface Mining & Reclamation Assn., supra,* at 276-277, 276-280, 69 L Ed 2d 1, 101 S Ct 2352. First, Congress may regulate the use of the channels of interstate commerce. See, *e.g., Darby*, 312 US, at 114, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430; *Heart of Atlanta Motel, supra*, at 256, 13 L Ed 2d 258, 85 S Ct 348 (" '[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.' " (quoting *Caminetti v United States*, 242 US 470, 491, 61 L Ed 442, 37 S Ct 192 (1917)). Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. See, *e.g., Shreveport Rate Cases*, 234 US 342 (1914); *Southern R. Co. v United States*, 222 US 20, 56 L Ed 72, 32 S Ct 2 (1911) (upholding amendments to Safety Appliance Act as applied to vehicles used in intrastate commerce); *Perez, supra,* at 150, 28 L Ed

2d 686, 91 S Ct 1357 ("[F]or example, the destruction of an aircraft (18 USC § 32 [18 USCS § 32]), or . . . thefts from interstate shipments (18 USC § 659 [18 USCS § 659])"). Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce. *Jones & Laughlin Steel*, 301 US, at 37, 81 L Ed 893, 57 S Ct 615, *i.e.,* those activities that substantially affect interstate commerce. *Wirtz, supra*, at 196, n 27, 20 L Ed 2d 1020, 88 S Ct 2017.

Within this final category, admittedly, our case law has not been clear whether an activity must "affect" or "substantially affect" interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause. Compare *Preseault v ICC*, 494 US 1, 17, 108 L Ed 2d 1, 110 S Ct 914 (1990), with *Wirtz, supra,* at 196, n 27, 20 L Ed 2d 1020, 88 S Ct 2017 (the Court has never declared that "Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities"). We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity "substantially affects" interstate commerce.

[1b] We now turn to consider the power of Congress, in the light of this framework, to enact § 922(q). The first two categories of authority may be quickly disposed of: § 922(q) is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce; nor can § 922(q) be justified as a regulation by which Congress has sought to protect an instrumentality

---

2. See also *Hodel*, 452 US, at 311, 69 L Ed 2d 1, 101 S Ct 2352 ("[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so") (Rehnquist, J., concurring in judgment); *Heart of Atlanta Motel*, 379 US, at 273, 13 L Ed 2d 258, 85 S Ct 348 ("[W]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court") (Black, J., concurring).

of interstate commerce or a thing in interstate commerce. Thus, if § 922(q) is to be sustained, it must be under the third category as a regulation of an activity that substantially affects interstate commerce.

**[2b]** First, we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce. Examples include the regulation of intrastate coal mining; *Hodel, supra,* intrastate extortionate credit transactions, *Perez, supra,* restaurants utilizing substantial interstate supplies, *McClung, supra,* inns and hotels catering to interstate guests. *Heart of Atlanta Motel, supra,* and production and consumption of home-grown wheat, *Wickard v Filburn,* 317 US 111, 87 L Ed 122, 63 S Ct 82 (1942). These examples are by no means exhaustive, but the pattern is clear. Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.

Even *Wickard,* which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not. Roscoe Filburn operated a small farm in Ohio, on which, in the year involved, he raised 23 acres of wheat. It was his practice to sow winter wheat in the fall, and after harvesting it in July to sell a portion of the crop, to feed part of it to poultry and livestock on the farm, to use some in making flour for home consumption, and to keep the remainder for seed-

ing future crops. The Secretary of Agriculture assessed a penalty against him under the Agricultural Adjustment Act of 1938 because he harvested about 12 acres more wheat than his allotment under the Act permitted. The Act was designed to regulate the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and shortages, and concomitant fluctuation in wheat prices, which had previously obtained. The Court said, in an opinion sustaining the application of the Act to Filburn's activity:

"One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and, if induced by rising prices, tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce." 317 US, at 128, 87 L Ed 122, 63 S Ct 82.

**[1c, 3a]** Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms.[3] Section 922(q) is not an es-

sential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

**[1d]** Second, § 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce. For example, in *United States v Bass,* 404 US 336, 30 L Ed 2d 488, 92 S Ct 515 (1971), the Court interpreted former 18 USC § 1202(a) [18 USCS § 1202(a)], which made it a crime for a felon to "receiv[e], posses[s], or transpor[t] in commerce or affecting commerce . . . any firearm." 404 US, at 337, 30 L Ed 2d 488, 92 S Ct 515. The Court interpreted the possession component of § 1202(a) to require an additional nexus to interstate commerce both because the statute was ambiguous and because "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *Id.,* at 349, 30 L Ed 2d 488, 92 S Ct 515. The *Bass* Court set aside

the conviction because although the Government had demonstrated that Bass had possessed a firearm, it had failed "to show the requisite nexus with interstate commerce." *Id.,* at 347, 30 L Ed 2d 488, 92 S Ct 515. The Court thus interpreted the statute to reserve the constitutional question whether Congress could regulate, without more, the "mere possession" of firearms. See *id.,* at 339, n 4, 30 L Ed 2d 488, 92 S Ct 515; see also *United States v Five Gambling Devices,* 346 US 441, 448, 98 L Ed 179, 74 S Ct 190 (1953) (plurality opinion) ("The principle is old and deeply imbedded in our jurisprudence that this Court will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative"). Unlike the statute in *Bass,* § 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.

Although as part of our independent evaluation of constitutionality under the Commerce Clause we of course consider legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce, see, *e.g., Pre-*

***

[3] **[3b]** Under our federal system, the "'States possess primary authority for defining and enforcing the criminal law.'" *Brecht v Abrahamson,* 507 US —, —, 123 L Ed 2d 353, 113 S

Ct 1710 (1993) (quoting *Engle v Isaac,* 456 US 107, 128, 71 L Ed 2d 783, 102 S Ct 1558 (1982)); see also *Screws v United States,* 325 US 91, 89 L Ed 1495, 65 S Ct 1031, 162 ALR 1330 (1945) (plurality opinion) ("Our national government is one of delegated powers alone. Under our federal system the administration of criminal justice rests with the States except as Congress, acting within the scope of those delegated powers, has created offenses against the United States"). When Congress criminalizes conduct already denounced as criminal by the States, it effects a "'change in the sensitive relation between federal and state criminal jurisdiction.'" *United States v Emmons,* 410 US 396, 411-412, 35 L Ed 2d 379, 93 S Ct 1007 (1973) (quoting *United States v Bass,* 404 US 336, 349, 30 L Ed 2d 488, 92 S Ct 515 (1971)). The Government acknowledges that § 922(q) "displace[s] state policy choices in . . . that its prohibitions apply even in States that have chosen not to outlaw the conduct in question." Brief for United States 29, n 18; see also Statement of President George Bush on Signing the Crime Control Act of 1990, 26 Weekly Comp of Pres Doc 1944, 1945 (Nov. 29, 1990) ("Most egregiously, section 922(q)] inappropriately overrides legitimate state firearms laws with a new and unnecessary Federal law. The policies reflected in these provisions could legitimately be adopted by the States, but they should not be imposed upon the States by Congress").

seault v ICC, 494 US 1, 17, 108 L Ed 2d 1, 110 S Ct 914 (1990), the Government concedes that "[n]either the statute nor its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." Brief for United States 5-6. We agree with the Government that Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce. See McClung, 379 US, at 304, 13 L Ed 2d 290, 85 S Ct 377; see also Perez, 402 US, at 156, 28 L Ed 2d 686, 91 S Ct 1357 ("Congress need [not] make particularized findings in order to legislate"). But to the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here.[4]

[4] The Government argues that Congress has accumulated institutional expertise regarding the regulation of firearms through previous enactments. Cf. Fullilove v Klutznick, 448 US 448, 503, 65 L Ed 2d 902, 100 S Ct 2758 (1980) (Powell, J., concurring). We agree, however, with the Fifth Circuit that importation of previous findings to justify § 922(q) is especially inappropriate here because the "prior federal enactments or Congressional findings [do not] speak to the subject matter of section 922(q) or its relationship

to interstate commerce. Indeed, section 922(q) plows thoroughly new ground and represents a sharp break with the long-standing pattern of federal firearms legislation." 2 F3d, at 1366.

The Government's essential contention, in fine, is that we may determine here that § 922(q) is valid because possession of a firearm in a local school zone does indeed substantially affect interstate commerce. Brief for United States 17. The Government argues that possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the functioning of the national economy in two ways. First, the costs of violent crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population. See United States v Evans, 928 F2d 858, 862 (CA9 1991). Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe. Cf. Heart of Atlanta Motel, 379 US, at 253, 13 L Ed 2d 258, 85 S Ct 348. The Government also argues that the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment. A handicapped educational process, in turn, will result in a less productive citizenry. That, in turn, would have an adverse effect on the Nation's economic well-being. As a result, the Government argues that Congress could rationally have

4. We note that on September 13, 1994, President Clinton signed into law the Violent Crime Control and Law Enforcement Act of 1994, Pub L 103-322, 108 Stat 1796. Section 320904 of that Act, id., at 2125, amends § 922(q) to include congressional findings regarding the effects of firearm possession in and around schools upon interstate and foreign commerce. The Government does not rely upon these subsequent findings as a substitute for the absence of findings in the first instance. Tr of Oral Arg 25 ("[W]e're not relying on them in the strict sense of the word, but we think that at a very minimum they indicate that reasons can be identified for why Congress wanted to regulate this particular activity").

concluded that § 922(q) substantially affects interstate commerce.

We pause to consider the implications of the Government's arguments. The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce. See Tr of Oral Arg 8-9. Similarly, under the Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard-pressed to posit any activity by an individual that Congress is without power to regulate.

Although Justice Breyer argues that acceptance of the Government's rationales would not authorize a general federal police power, he is unable to identify any activity that the States may regulate but Congress may not. Justice Breyer posits that there might be some limitations on Congress' commerce power such as family law or certain aspects of education. Post, at —— - ——, 131 L Ed 2d, at 679. These suggested limitations, when viewed in light of the dissent's expansive analysis, are devoid of substance.

Justice Breyer focuses, for the most part, on the threat that firearm possession in and near schools

poses to the educational process and the potential economic consequences flowing from that threat. Post, at —— ——, 131 L Ed 2d, at 676-678. Specifically, the dissent reasons that (1) gun-related violence is a serious problem; (2) that problem, in turn, has an adverse effect on classroom learning; and (3) that adverse effect on classroom learning, in turn, represents a substantial threat to trade and commerce. Post, at ——, 131 L Ed 2d, at 678. This analysis would be equally applicable, if not more so, to subjects such as family law and direct regulation of education.

For instance, if Congress can, pursuant to its Commerce Clause power, regulate activities that adversely affect the learning environment, then, a fortiori, it also can regulate the educational process directly. Congress could determine that a school's curriculum has a "significant" effect on the extent of classroom learning. As a result, Congress could mandate a federal curriculum for local elementary and secondary schools because what is taught in local schools has a significant "effect on classroom learning," cf. post, at ——, 131 L Ed 2d, at 678, and that, in turn, has a substantial effect on interstate commerce.

[5] Justice Breyer rejects our reading of precedent and argues that "Congress . . . could rationally conclude that schools fall on the commercial side of the line." Post, at ——, 131 L Ed 2d, at 682. Again, Justice Breyer's rationale lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial. Under the dissent's rationale, Congress could just as easily look at child rearing as "fall[ing] on the commercial

side of the line" because it provides a "valuable service—namely, to equip [children] with the skills they need to survive in life and, more specifically, in the workplace." *Ibid.* We do not doubt that Congress has authority under the Commerce Clause to regulate numerous commercial activities that substantially affect interstate commerce and also affect the educational process. That authority, though broad, does not include the authority to regulate each and every aspect of local schools.

[6] Admittedly, a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty. But, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the Commerce Clause always will engender "legal uncertainty." *Post,* at —, 131 L Ed 2d, at 683. As Chief Justice Marshall stated in *McCulloch* v *Maryland,* 4 Wheat 316, 4 L Ed 579 (1819):

"The [federal] government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it . . . is now universally admitted. But the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, as long as our system shall exist." *Id.,* at 405, 4 L Ed 579.

See also *Gibbons* v *Ogden,* 9 Wheat, at 195, 6 L Ed 23 ("The enumeration presupposes something not enumerated"). The Constitution mandates this uncertainty by withholding from Congress a plenary police power that would authorize enactment of every type of legislation. See US Const, Art I, § 8. Congress has operated within this framework of legal uncertainty ever since this Court determined that it was the judiciary's duty "to say what the law is." *Marbury* v *Madison,* 1 Cranch 137, 177, 2 L Ed 60 (1803) (Marshall, C. J.). Any possible benefit from eliminating this "legal uncertainty" would be at the expense of the Constitution's system of enumerated powers.

In *Jones & Laughlin Steel,* 301 US, at 37, 81 L Ed 893, 57 S Ct 615, we held that the question of congressional power under the Commerce Clause "is necessarily one of degree." To the same effect is the concurring opinion of Justice Cardozo in *Schechter Poultry:*

"There is a view of causation that would obliterate the distinction of what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.' " 295 US, at 554, 79 L Ed 1570, 55 S Ct 837, 97 ALR 947 (quoting *United States* v *A.L.A. Schechter Poultry Corp.,* 76 F2d 617, 624 (CA2 1935) (L. Hand, J., concurring)).

[1e] These are not precise formulations, and in the nature of things they cannot be. But we think they point the way to a correct decision of this case. The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce.

To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. See *supra,* at —, 131 L Ed 2d, at 636. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, cf. *Gibbons* v *Ogden, supra,* at 195, 6 L Ed 23, and that there never will be a distinction between what is truly national and what is truly local, cf. *Jones & Laughlin Steel, supra,* at 30, 81 L Ed 893, 57 S Ct 615. This we are unwilling to do.

For the foregoing reasons the judgment of the Court of Appeals is *affirmed.*

### SEPARATE OPINIONS

Justice **Kennedy,** with whom Justice **O'Connor** joins, concurring.

The history of the judicial struggle to interpret the Commerce Clause during the transition from the economic system the Founders knew to the single, national market still emergent in our own era counsels great restraint before the Court determines that the Clause is insufficient to support an exercise of the national power. That history gives me some pause about today's decision, but I join the Court's opinion with these observations on what I conceive to be its necessary though limited holding.

Chief Justice Marshall announced that the national authority reaches "that commerce which concerns more States than one" and that the commerce power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons* v *Ogden,* 9 Wheat 1, 194, 196, 6 L Ed 23 (1824). His statements can be understood now as an early and authoritative recognition that the Commerce Clause grants Congress extensive power and ample discretion to determine its appropriate exercise. The progression of our Commerce Clause cases from *Gibbons* to the present was not marked, however, by a coherent or consistent course of interpretation; for neither the course of technological advance nor the foundational principles for the jurisprudence itself were self-evident to the courts that sought to resolve contemporary disputes by enduring principles.

Furthermore, for almost a century after the adoption of the Constitution, the Court's Commerce Clause decisions did not concern the authority of Congress to legislate. Rather, the Court faced the related but quite distinct question of the authority of the States to regulate matters that would be within the commerce power

had Congress chosen to act. The simple fact was that in the early years of the Republic, Congress seldom perceived the necessity to exercise its power in circumstances where its authority would be called into question. The Court's initial task, therefore, was to elaborate the theories that would permit the States to act where Congress had not done so. Not the least part of the problem was the unresolved question whether the congressional power was exclusive, a question reserved by Chief Justice Marshall in *Gibbons v Ogden, supra,* at 209-210, 6 L Ed 23.

At the midpoint of the 19th century, the Court embraced the principle that the States and the National Government both have authority to regulate certain matters absent the congressional determination to displace local law or the necessity for the Court to invalidate local law because of the dormant national power. *Cooley v Board of Wardens of Port of Philadelphia,* 12 How 299, 318-321, 13 L Ed 996 (1852). But the utility of that solution was not at once apparent, see generally F. Frankfurter, The Commerce Clause under Marshall, Taney and Waite (1937) (hereinafter Frankfurter), and difficulties of application persisted, see *Leisy v Hardin,* 135 US 100, 122-125, 34 L Ed 128, 10 S Ct 681 (1890).

One approach the Court used to inquire into the lawfulness of state authority was to draw content-based or subject-matter distinctions, thus defining by semantic or formalistic categories those activities that were commerce and those that were not. For instance, in deciding that a State could prohibit the in-state manufacture of liquor intended for out-of-state shipment, it distinguished between manufacture and commerce. "No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactur[e] and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different." *Kidd v Pearson,* 128 US 1, 20, 32 L Ed 346, 9 S Ct 6 (1888). Though that approach likely would not have survived even if confined to the question of a State's authority to enact legislation, it was not at all propitious when applied to the quite different question of what subjects were within the reach of the national power when Congress chose to exercise it.

This became evident when the Court began to confront federal economic regulation enacted in response to the rapid industrial development in the late 19th century. Thus, it relied upon the manufacture-commerce dichotomy in *United States v E. C. Knight Co.,* 156 US 1, 39 L Ed 325, 15 S Ct 249 (1895), where a manufacturers' combination controlling some 98% of the Nation's domestic sugar refining capacity was held to be outside the reach of the Sherman Act. Conspiracies to control manufacture, agriculture, mining, production, wages, or prices, the Court explained, had too "indirect" an effect on interstate commerce. *Id.,* at 16, 39 L Ed 325, 15 S Ct 249. And in *Adair v United States,* 208 US 161, 52 L Ed 436, 28 S Ct 277 (1908), the Court rejected the view that the commerce power might extend to activities that, although local in the sense of having originated within a single state, nevertheless had a practical effect on interstate commercial activity. The Court concluded that there was not a "legal or logical connection . . . between an employé's membership in a labor organization and the carrying on of interstate commerce," *id.,* at 178, 52 L Ed 436, 28 S Ct 277, and struck down a federal statute forbidding the discharge of an employee because of his membership in a labor organization. See also *The Employers' Liability Cases,* 207 US 463, 497, 52 L Ed 297, 28 S Ct 141 (1908) (invalidating statute creating negligence action against common carriers for personal injuries of employees sustained in the course of employment, because the statute "regulates the persons because they engage in interstate commerce and does not alone regulate the business of interstate commerce").

Even before the Court committed itself to sustaining federal legislation on broad principles of economic practicality, it found it necessary to depart from these decisions. The Court disavowed *E. C. Knight's* reliance on the manufacturing-commerce distinction in *Standard Oil Co. of New Jersey v United States,* 221 US 1, 68-69, 55 L Ed 619, 31 S Ct 502 (1911), declaring that approach "unsound." The Court likewise rejected the rationale of *Adair* when it decided, in *Texas & New Orleans R. Co. v Railway Clerks,* 281 US 548, 570-571, 74 L Ed 1034, 50 S Ct 427 (1930), that Congress had the power to regulate matters pertaining to the organization of railroad workers.

In another line of cases, the Court addressed Congress' efforts to impede local activities it considered undesirable by prohibiting the interstate movement of some essential element. In the *Lottery Case,* 188 US 321, 47 L Ed 492, 23 S Ct 321 (1903), the Court rejected the argument that Congress lacked power to prohibit the interstate movement of lottery tickets because it had power only to regulate, not to prohibit. See also *Hipolite Egg Co. v United States,* 220 US 45, 55 L Ed 364, 31 S Ct 364 (1911); *Hoke v United States,* 227 US 308, 57 L Ed 523, 33 S Ct 281 (1913). In *Hammer v Dagenhart,* 247 US 251, 62 L Ed 1101, 38 S Ct 529, 3 ALR 649 (1918), however, the Court insisted that the power to regulate commerce "is directly the contrary of the assumed right to forbid commerce from moving," *id.,* at 269-270, 62 L Ed 1101, 38 S Ct 529, 3 ALR 649, and struck down a prohibition on the interstate transportation of goods manufactured in violation of child labor laws.

Even while it was experiencing difficulties in finding satisfactory principles in these cases, the Court was pursuing a more sustainable and practical approach in other lines of decisions, particularly those involving the regulation of railroad rates. In the *Minnesota Rate Cases,* 230 US 352, 57 L Ed 1511, 33 S Ct 729 (1913), the Court upheld a state rate order, but observed that Congress might be empowered to regulate in this area if "by reason of the interblending of the interstate and intrastate operations of interstate carriers" the regulation of interstate rates could not be maintained without restrictions on "intrastate rates which substantially affect the former." *Id.,* at 432-433, 57 L Ed 1511, 33 S Ct 729. And in the *Shreveport Rate Cases,* 234 US 342, 58 L Ed 1341, 34 S Ct 833 (1914), the Court upheld an ICC order fixing railroad rates with the explanation that congressional authority, "extending to these interstate carriers as instruments of interstate commerce, necessarily embraces the

right to control their operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to the security of that traffic, to the efficiency of the interstate service, and to the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance." *Id.*, at 351, 58 L Ed 1341, 34 S Ct 833.

Even the most confined interpretation of "commerce" would embrace transportation between the States, so the rate cases posed much less difficulty for the Court than cases involving manufacture or production. Nevertheless, the Court's recognition of the importance of a practical conception of the commerce power was not altogether confined to the rate cases. In *Swift & Co.* v *United States*, 196 US 375, 49 L Ed 518, 25 S Ct 276 (1905), the Court upheld the application of federal antitrust law to a combination of meat dealers that occurred in one State but that restrained trade in cattle "sent for sale from a place in one State, with the expectation that they will end their transit . . . in another." *Id.*, at 398, 49 L Ed 518, 25 S Ct 276. The Court explained that "commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business." *Id.*, at 398, 49 L Ed 518, 25 S Ct 276. Chief Justice Taft followed the same approach in upholding federal regulation of stockyards in *Stafford* v *Wallace*, 258 US 495, 66 L Ed 735, 42 S Ct 397, 23 ALR 229 (1922). Speaking for the Court, he rejected a "nice and technical inquiry," *id.*, at 519, 66 L Ed 735, 42 S Ct 397, 23 ALR 229, when the local transactions at issue could not "be separated

from the movement to which they contribute," *id.*, at 516, 66 L Ed 735, 42 S Ct 397, 23 ALR 229.

Reluctance of the Court to adopt that approach in all of its cases caused inconsistencies in doctrine to persist, however. In addressing New Deal legislation the Court resuscitated the abandoned abstract distinction between direct and indirect effects on interstate commerce. See *Carter* v *Carter Coal Co.*, 298 US 238, 309, 80 L Ed 1160, 56 S Ct 855 (1936) (Act regulating price of coal and wages and hours for miners held to have only "secondary and indirect" effect on interstate commerce); *Railroad Retirement Bd.* v *Alton R. Co.*, 295 US 330, 368, 79 L Ed 1468, 55 S Ct 758 (1935) (compulsory retirement and pension plan for railroad carrier employees too "remote from any regulation of commerce as such"); *A. L. A. Schechter Poultry Corp.* v *United States*, 295 US 495, 548, 79 L Ed 1570, 55 S Ct 837, 97 ALR 947 (1935) (wage and hour law provision of National Industrial Recovery Act had "no direct relation to interstate commerce").

The case that seems to mark the Court's definitive commitment to the practical conception of the commerce power is *NLRB* v *Jones & Laughlin Steel Corp.*, 301 US 1, 81 L Ed 893, 57 S Ct 615, 108 ALR 1352 (1937), where the Court sustained labor laws that applied to manufacturing facilities, making no real attempt to distinguish *Carter*, *supra*, and *Schechter*, *supra*. 301 US, at 40-41, 81 L Ed 893, 57 S Ct 615, 108 ALR 1352. The deference given to Congress has since been confirmed. *United States* v *Darby*, 312 US 100, 116-117, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430 (1941), overruled

*Hammer* v *Dagenhart*, *supra*. And in *Wickard* v *Filburn*, 317 US 111, 87 L Ed 122, 63 S Ct 82 (1942), the Court disapproved *E. C. Knight* and the entire line of direct-indirect and manufacture-production cases, explaining that "broader interpretations of the Commerce Clause [were] destined to supersede the earlier ones," *id.*, at 122, 87 L Ed 122, 63 S Ct 82, and "whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution," *id.*, at 123, n 24, 87 L Ed 122, 63 S Ct 82. Later examples of the exercise of federal power where commercial transactions were the subject of regulation include *Heart of Atlanta Motel, Inc.* v *United States*, 379 US 241, 13 L Ed 2d 258, 85 S Ct 348 (1964), *Katzenbach* v *McClung*, 379 US 294, 13 L Ed 2d 290, 85 S Ct 377 (1964), and *Perez* v *United States*, 402 US 146, 28 L Ed 2d 686, 91 S Ct 1357 (1971). These and like authorities are within the fair ambit of the Court's practical conception of commercial regulation and are not called in question by our decision today.

The history of our Commerce Clause decisions contains at least two lessons of relevance to this case. The first, as stated at the outset, is the imprecision of content-based boundaries used without more to define the limits of the Commerce Clause. The second, related to the first but of even greater consequence, is that the Court as an institution and the legal system as a whole have an immense stake in the stability of our Commerce Clause jurisprudence as it has evolved to this point. *Stare decisis* operates with great force in

counseling us not to call in question the essential principles now in place respecting the congressional power to regulate transactions of a commercial nature. That fundamental restraint on our power forecloses us from reverting to an understanding of commerce that would serve only an 18th-century economy, dependent then upon production and trading practices that had changed but little over the preceding centuries; it also mandates against returning to the time when congressional authority to regulate undoubted commercial activities was limited by a judicial determination that those matters had an insufficient connection to an interstate system. Congress can regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy.

In referring to the whole subject of the federal and state balance, we said this just three Terms ago:

"This framework has been sufficiently flexible over the past two centuries to allow for enormous changes in the nature of government. The Federal Government undertakes activities today that would have been unimaginable to the Framers in two senses: first, because the Framers would not have conceived that any government would conduct such activities; and second, because the Framers would not have believed that the Federal Government, rather than the States, would assume such responsibilities. Yet the powers conferred upon the Federal Government by the Constitution were phrased in language broad enough to allow for the expansion of the Federal Government's role." *New York* v *United States*, 505 US

——, ——, 120 L Ed 2d 120, 112 S Ct 2408 (1992) (emphasis omitted).

It does not follow, however, that in every instance the Court lacks the authority and responsibility to review congressional attempts to alter the federal balance. This case requires us to consider our place in the design of the Government and to appreciate the significance of federalism in the whole structure of the Constitution.

Of the various structural elements in the Constitution, separation of powers, checks and balances, judicial review, and federalism, only concerning the last does there seem to be much uncertainty respecting the existence, and the content, of standards that allow the judiciary to play a significant role in maintaining the design contemplated by the Framers. Although the resolution of specific cases has proved difficult, we have derived from the Constitution workable standards to assist in preserving separation of powers and checks and balances. See, e.g., Prize Cases, 2 Black 635, 17 L Ed 459 (1863); Youngstown Sheet & Tube Co. v Sawyer, 343 US 579, 96 L Ed 1153, 72 S Ct 863 (1952); United States v Nixon, 418 US 683, 41 L Ed 2d 1039, 94 S Ct 3090 (1974); Buckley v Valeo, 424 US 1, 46 L Ed 2d 659, 96 S Ct 612 (1976); INS v Chadha, 462 US 919, 77 L Ed 2d 317, 103 S Ct 2764 (1983); Bowsher v Synar, 478 US 714, 92 L Ed 2d 583, 106 S Ct 3181 (1986); Plaut v Spendthrift Farm, 514 US ——, 131 L Ed 2d 328, 115 S Ct —— (1995). These standards are by now well accepted. Judicial review is also established beyond question, Marbury v Madison, 1 Cranch 137, 2 L Ed 60 (1803), and though we may differ when applying its principles, see, e.g., Planned Parenthood of South-eastern Pennsylvania v Casey, 505 US ——, 120 L Ed 2d 674, 112 S Ct 2791 (1992), its legitimacy is undoubted. Our role in preserving the federal balance seems more tenuous.

There is irony in this, because of the four structural elements in the Constitution just mentioned, federalism was the unique contribution of the Framers to political science and political theory. See Friendly, Federalism: A Forward, 86 Yale L J 1019 (1977); G. Wood, The Creation of the American Republic, 1776-1787, pp 524-532, 564 (1969). Though on the surface the idea may seem counterintuitive, it was the insight of the Framers that freedom was enhanced by the creation of two governments, not one. "In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself." The Federalist No. 51, p 323 (C. Rossiter ed 1961) (J. Madison). See also Gregory v Ashcroft, 501 US 452, 458-459, 115 L Ed 2d 410, 111 S Ct 2395 (1991) ("Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front. . . . In the tension between federal and state power lies the promise of liberty"); New York v United States, supra, at ——, 120 L Ed 2d 120, 112 S Ct 2408 ("[T]he Con-stitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power' ") (quoting Coleman v Thompson, 501 US 722, 759, 115 L Ed 2d 640, 111 S Ct 2546 (1991) (Blackmun, J., dissenting)).

The theory that two governments accord more liberty than one requires for its realization two distinct and discernable lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States. If, as Madison expected, the federal and state governments are to control each other, see The Federalist No. 51, and hold each other in check by competing for the affections of the people, see The Federalist No. 46, those citizens must have some means of knowing which of the two governments to hold accountable for the failure to perform a given function. "Federalism serves to assign political responsibility, not to obscure it." FTC v Ticor Title Ins. Co., 504 US 621, 636, 119 L Ed 2d 410, 112 S Ct 2169 (1992). Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory. See New York v United States, supra, at ——; 120 L Ed 2d 120, 112 S Ct 2408; FERC v Mississippi, 456 US 742, 787, 72 L Ed 2d 532, 102 S Ct 2126 (1982) (O'Connor, J., concurring in judgment in part and dissenting in part). The resultant in-ability to hold either branch of the government answerable to the citizens is more dangerous even than devolving too much authority to the remote central power.

To be sure, one conclusion that could be drawn from The Federalist Papers is that the balance between national and state power is entrusted in its entirety to the political process. Madison's observation that "the people ought not surely to be precluded from giving most of their confidence where they may discover it to be most due," The Federalist No. 46, p 295 (C. Rossiter ed 1961), can be interpreted to say that the essence of responsibility for a shift in power from the State to the Federal Government rests upon a political judgment, though he added assurance that "the State governments could have little to apprehend, because it is only within a certain sphere that the federal power can, in the nature of things, be advantageously administered," ibid. Whatever the judicial role, it is axiomatic that Congress does have substantial discretion and control over the federal balance.

For these reasons, it would be mistaken and mischievous for the political branches to forget that the sworn obligation to preserve and protect the Constitution in maintaining the federal balance is their own in the first and primary instance. In the Webster-Hayne Debates, see The Great Speeches and Orations of Daniel Webster 227-272 (E. Whipple ed 1879), and the debates over the Civil Rights Acts, see Hearings on S 1732 before the Senate Committee on Commerce, 88th Cong, 1st Sess, pts 1-3 (1963), some Congresses have accepted responsibility to confront the great questions of the proper

federal balance in terms of lasting consequences for the constitutional design. The political branches of the Government must fulfill this grave constitutional obligation if democratic liberty and the federalism that secures it are to endure.

At the same time, the absence of structural mechanisms to require those officials to undertake this principled task, and the momentary political convenience often attendant upon their failure to do so, argue against a complete renunciation of the judicial role. Although it is the obligation of all officers of the Government to respect the constitutional design, see *Public Citizen v Department of Justice*, 491 US 440, 466, 105 L Ed 2d 377, 109 S Ct 2558 (1989); *Rostker v Goldberg*, 453 US 57, 64, 69 L Ed 2d 478, 101 S Ct 2646 (1981), the federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far.

In the past this Court has participated in maintaining the federal balance through judicial exposition of doctrines such as abstention, see, *e.g.*, *Younger v Harris*, 401 US 37, 27 L Ed 2d 669, 91 S Ct 746 (1971); *Railroad Comm'n of Texas v Pullman Co.*, 312 US 496, 85 L Ed 971, 61 S Ct 643 (1941); *Burford v Sun Oil Co.*, 319 US 315, 87 L Ed 1424, 63 S Ct 1098 (1943), the rules for determining the primacy of state law, see, *e.g.*, *Erie R. Co. v Tompkins*, 304 US 64, 82 L Ed 1188, 58 S Ct 817, 114 ALR 1487 (1938), the doctrine of adequate and independent state grounds, see, *e.g.*, *Murdock v City of Memphis*, 87 US 590, 22 L Ed 429 (1875); *Michigan v Long*, 463 US 1032, 77 L Ed 2d 1201, 103 S Ct 3469 (1983), the whole jurisprudence of pre-emption, see, *e.g.*, *Rice v Santa Fe Elevator Corp.*, 331 US 218, 91 L Ed 1447, 67 S Ct 1146 (1947); *Cipollone v Liggett Group, Inc.*, 505 US ——, 120 L Ed 2d 407, 112 S Ct 2608 (1992), and many of the rules governing our habeas jurisprudence, see, *e.g.*, *Coleman v Thompson, supra*; *McCleskey v Zant*, 499 US 467, 113 L Ed 2d 517, 111 S Ct 1454 (1991); *Teague v Lane*, 489 US 288, 103 L Ed 2d 334, 109 S Ct 1060 (1989); *Rose v Lundy*, 455 US 509, 71 L Ed 2d 379, 102 S Ct 1198 (1982); *Wainwright v Sykes*, 433 US 72, 53 L Ed 2d 594, 97 S Ct 2497 (1977).

Our ability to preserve this principle under the Commerce Clause has presented a much greater challenge. See *supra*, at —— - ——, 131 L Ed 2d, at 643-647. "This clause has throughout the Court's history been the chief source of its adjudications regarding federalism," and "no other body of opinions affords a fairer or more revealing test of judicial qualities." Frankfurter 66-67. But as the branch whose distinctive duty it is to declare "what the law is," *Marbury v Madison*, 1 Cranch, at 177, 2 L Ed 60, we are often called upon to resolve questions of constitutional law not susceptible to the mechanical application of bright and clear lines. The substantial element of political judgment in Commerce Clause matters leaves our institutional capacity to intervene more in doubt than when we decide cases, for instance, under the Bill of Rights even though clear and bright lines are often absent in the latter class of disputes. See *County of Allegheny v American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 US 573, 630, 106 L Ed 2d 472, 109 S Ct 3086 (1989) (O'Connor, J., concurring in part and concurring in judgment) ("We cannot avoid the obligation to draw lines, often close and difficult lines" in adjudicating constitutional rights). But our cases do not teach that we have no role at all in determining the meaning of the Commerce Clause.

Our position in enforcing the dormant Commerce Clause is instructive. The Court's doctrinal approach in that area has likewise "taken some turns." *Oklahoma Tax Comm'n v Jefferson Lines, Inc.*, 514 US ——, ——, 131 L Ed 2d 261, 115 S Ct 1331 (1995). Yet in contrast to the prevailing skepticism that surrounds our ability to give meaning to the explicit text of the Commerce Clause, there is widespread acceptance of our authority to enforce the dormant Commerce Clause, which we have but inferred from the constitutional structure as a limitation on the power of the States. One element of our dormant Commerce Clause jurisprudence has been the principle that the States may not impose regulations that place an undue burden on interstate commerce, even where those regulations do not discriminate between in-state and out-of-state businesses. See *Brown-Forman Distillers Corp. v New York State Liquor Authority*, 476 US 573, 579, 90 L Ed 2d 552, 106 S Ct 2080 (1986) (citing *Pike v Bruce Church, Inc.*, 397 US 137, 142, 25 L Ed 2d 174, 90 S Ct 844 (1970)). Distinguishing between regulations that do place an undue burden on interstate commerce and regulations that do not depends upon delicate judgments. True, if we invalidate a state law, Congress can in effect overturn our judgment, whereas in a case announcing that Congress has transgressed its author-ity, the decision is more consequential, for it stands unless Congress can revise its law to demonstrate its commercial character. This difference no doubt informs the circumspection with which we invalidate an Act of Congress, but it does not mitigate our duty to recognize meaningful limits on the commerce power of Congress.

The statute before us upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power, and our intervention is required. As the Chief Justice explains, unlike the earlier cases to come before the Court here neither the actors nor their conduct have a commercial character, and neither the purposes nor the design of the statute have an evident commercial nexus. See *ante*, at —— - ——, 131 L Ed 2d, at 637-638. The statute makes the simple possession of a gun within 1,000 feet of the grounds of the school a criminal offense. In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far. If Congress attempts that extension, then at the least we must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern.

An interference of these dimensions occurs here, for it is well established that education is a traditional concern of the States. *Milliken v Bradley*, 418 US 717, 741-742, 41 L Ed 2d 1069, 94 S Ct 3112 (1974); *Epperson v Arkansas*, 393 US 97, 104, 21 L Ed 2d 228, 89 S Ct 266 (1968). The proximity to schools, including of course schools owned and operated by the States or their subdivisions, is

the very premise for making the conduct criminal. In these circumstances, we have a particular duty to insure that the federal-state balance is not destroyed. Cf. *Rice, supra,* at 230, 91 L Ed 1447, 67 S Ct 1146 ("[W]e start with the assumption that the historic police powers of the States" are not displaced by a federal statute "unless that was the clear and manifest purpose of Congress"); *Florida Lime & Avocado Growers, Inc. v Paul,* 373 US 132, 146, 10 L Ed 2d 248, 83 S Ct 1210 (1963).

While it is doubtful that any State, or indeed any reasonable person, would argue that it is wise policy to allow students to carry guns on school premises, considerable disagreement exists about how best to accomplish that goal. In this circumstance, the theory and utility of our federalism are revealed, for the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear. See *San Antonio Independent School Dist. v Rodriguez,* 411 US 1, 49-50, 36 L Ed 2d 16, 93 S Ct 1278 (1973); *New State Ice Co. v Liebmann,* 285 US 262, 311, 76 L Ed 747, 52 S Ct 371 (1932) (Brandeis, J., dissenting)).

If a State or municipality determines that harsh criminal sanctions are necessary and wise to deter students from carrying guns on school premises, the reserved powers of the States are sufficient to enact those measures. Indeed, over 40 States already have criminal laws outlawing the possession of firearms on or near school grounds. See, *e.g.,* Alaska Stat Ann §§ 11.61.195(a)(2)(A), 11.61.220(a)(4)(A) (Supp 1994); Cal Penal Code Ann § 626.9 (West Supp 1994); Mass Gen Laws § 269:10(j) (1992); NJ Stat Ann § 2C:39-5(e)

(West Supp 1994); Va Code Ann § 18.2-308.1 (1988); Wis Stat § 948.605 (1991-1992).

Other, more practicable means to rid the schools of guns may be thought by the citizens of some States to be preferable for the safety and welfare of the schools those States are charged with maintaining. See Brief for National Conference of State Legislatures et al., as *Amici Curiae* 26-30 (injection of federal officials into local problems causes friction and diminishes political accountability of state and local governments). These might include inducements to inform on violators where the information leads to arrests or confiscation of the guns, see C. Lima, Schools May Launch Weapons Hot Line, L. A. Times, Jan. 13, 1995, part B, p 1, col 5; Reward for Tips on Guns in Tucson Schools, The Arizona Republic, Jan. 7, 1995, p B2; programs to encourage the voluntary surrender of guns with some provision for amnesty, see A. Zaidan, Akron Rallies to Save Youths, The Plain Dealer, Mar. 2, 1995, p 1B; M. Swift, Legislators Consider Plan to Get Guns Off Streets, Hartford Courant, Apr. 29, 1994, p A4; penalties imposed on parents or guardians for failure to supervise the child, see, *e.g.,* Okla Stat, Tit 21, § 858 (Supp 1995) (fining parents who allow students to possess firearm at school); Tenn Code Ann § 39-17-1312 (Supp 1992) (misdemeanor for parents to allow student to possess firearm at school); Straight Shooter: Gov. Casey's Reasonable Plan to Control Assault Weapons, Pittsburgh Post-Gazette, Mar. 14, 1994, p B2 (proposed bill); E. Bailey, Anti-Crime Measures Top Legislators' Agenda, L. A. Times, Mar. 7, 1994, part B, p 1, col 2 (same); G. Krupa, New Gun-

Control Plans Could Tighten Local Law, The Boston Globe, June 20, 1993, p 29; laws providing for suspension or expulsion of gun-toting students, see, *e.g.,* Ala Code § 16-1-24.1 (Supp 1994); Ind Code § 20-8.1-5-4(b)(1)(D) (1993); Ky Rev Stat Ann § 158.150(1)(a) (Michie 1992); Wash Rev Code § 9.41.280 (1994), or programs for expulsion with assignment to special facilities, see J. Martin, Legislators Poised to Take Harsher Stand on Guns in Schools, The Seattle Times, Feb. 1, 1995, p B1 (automatic-year-long expulsion for students with guns and intense semester-long reentry program).

The statute now before us foreclose the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise, and it does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term. The tendency of this statute to displace state regulation in areas of traditional state concern is evident from its territorial operation. There are over 100,000 elementary and secondary schools in the United States. See U.S. Dept. of Education, National Center for Education Statistics, Digest of Education Statistics 73, 104 (NCES 94-115, 1994) (Tables 63, 94). Each of these now has an invisible federal zone extending 1,000 feet beyond the (often irregular) boundaries of the school property. In some communities no doubt it would be difficult to navigate without infringing on those zones. Yet throughout these areas, school officials would find their own programs for the prohibition of guns in danger of displacement by the federal authority unless the State chooses to enact a parallel rule.

This is not a case where the etiquette of federalism has been violated by a formal command from the National Government directing the State to enact a certain policy, cf. *New York v United States,* 505 US ——, 120 L Ed 2d 120, 112 S Ct 2408 (1992), or to organize its governmental functions in a certain way, cf. *FERC v Mississippi,* 456 US, at 781, 72 L Ed 2d 532, 102 S Ct 2126 (O'Connor, J., concurring in judgment in part and dissenting in part). While the intrusion on state sovereignty may not be as severe in this instance as in some of our recent Tenth Amendment cases, the intrusion is nonetheless significant. Absent a stronger connection or identification with commercial concerns that are central to the Commerce Clause, that interference contradicts the federal balance the Framers designed and that this Court is obliged to enforce.

For these reasons, I join in the opinion and judgment of the Court.

Justice **Thomas,** concurring.

The Court today properly concludes that the Commerce Clause does not grant Congress the authority to prohibit gun possession within 1,000 feet of a school, as it attempted to do in the Gun-Free School Zones Act of 1990, Pub L 101-647, 104 Stat 4844. Although I join the majority, I write separately to observe that our case law has drifted far from the original understanding of the Commerce Clause. In a future case, we ought to temper our Commerce Clause jurisprudence in a manner that both makes sense of our more recent case law and is more faithful to the original understanding of that Clause.

We have said that Congress may regulate not only "Commerce . . . among the several states," US Const, Art I, § 8, cl 3, but also anything that has a "substantial effect" on such commerce. This test, if taken to its logical extreme, would give Congress a "police power" over all aspects of American life. Unfortunately, we have never come to grips with this implication of our substantial effects formula. Although we have supposedly applied the substantial effects test for the past 60 years, we *always* have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power; our cases are quite clear that there are real limits to federal power. See *New York v United States*, 505 US ——, ——, 120 L Ed 2d 120, 112 S Ct 2408 (1992) ("[N]o one disputes the proposition that '[t]he Constitution created a Federal Government of limited powers'") (quoting *Gregory v Ashcroft*, 501 US 452, 457, 115 L Ed 2d 410, 111 S Ct 2395 (1991); *Maryland v Wirtz*, 392 US 183, 196, 20 L Ed 2d 1020, 88 S Ct 2017 (1968); *NLRB v Jones & Laughlin Steel Corp.*, 301 US 1, 37, 81 L Ed 893, 57 S Ct 615, 108 ALR 1352 (1937). Cf. *Chisholm v Georgia*, 2 Dall 419, 435, 1 L Ed 440 (1793) (Iredell, J.) ("Each State in the Union is sovereign as to all the powers reserved. It must necessarily be so, because the United States have no claim to any authority but such as the States have surrendered to them"). Indeed, on this crucial point, the majority and Justice Breyer agree in principle: the Federal Government has nothing approaching a police power. Compare *ante*, at ——–——, 131 L Ed 2d, at 635-637 with *post*, at ——–——, 131 L Ed 2d, at 679.

While the principal dissent concedes that there are limits to federal power, the sweeping nature of our current test enables the dissent to argue that Congress can regulate gun possession. But it seems to me that the power to regulate "commerce" can by no means encompass authority over mere gun possession, any more than it empowers the Federal Government to regulate marriage, littering, or cruelty to animals, throughout the 50 States. Our Constitution quite properly leaves such matters to the individual States, notwithstanding these activities' effects on interstate commerce. Any interpretation of the Commerce Clause that even suggests that Congress could regulate such matters is in need of reexamination.

In an appropriate case, I believe that we must further reconsider our "substantial effects" test with an eye toward constructing a standard that reflects the text and history of the Commerce Clause without totally rejecting our more recent Commerce Clause jurisprudence.

Today, however, I merely support the Court's conclusion with a discussion of the text, structure, and history of the Commerce Clause and an analysis of our early case law. My goal is simply to show how far we have departed from the original understanding and to demonstrate that the result we reach today is by no means "radical," see *post*, at ——, 131 L Ed 2d, at 665 (Stevens, J., dissenting). I also want to point out the necessity of refashioning a coherent test that does not tend to "obliterate the distinction between what is national and what is local and create a completely centralized government." *Jones & Laughlin Steel Corp., supra*, at 37, 81 L Ed 893, 57 S Ct 615.

I

At the time the original Constitution was ratified, "commerce" consisted of selling, buying, and bartering, as well as transporting for these purposes. See 1 S. Johnson, A Dictionary of the English Language 361 (4th ed 1773) (defining commerce as "Intercour[s]e; exchange of one thing for another; interchange of any thing; trade; traffick"); N. Bailey, An Universal Etymological English Dictionary (26th ed 1789) ("trade or traffic"); T. Sheridan, A Complete Dictionary of the English Language (6th ed 1796) ("Exchange of one thing for another; trade, traffick"). This understanding finds support in the etymology of the word, which literally means "with merchandise." See 3 Oxford English Dictionary 552 (2d ed 1989) (com—"with"; merci—"merchandise"). In fact, when Federalists and Anti-Federalists discussed the Commerce Clause during the ratification period, they often used trade (in its selling/bartering sense) and commerce interchangeably. See The Federalist No. 4, p 22 (J. Jay) (asserting that countries will cultivate our friendship when our "trade" is prudently regulated by Federal Government);[1] *id.*, No. 7, at 39-40 (A. Hamilton) (discussing "competitions of commerce" between States resulting from state "regulations of trade"); *id.*, No. 40, at 262 (J. Madison) (asserting that it was an "acknowledged object of the Convention . . . that the regulation of trade should be submitted to the general government"); Lee, Letters of a Federal Farmer No. 5, in Pamphlets on the Constitution of the United States 319 (P. Ford ed 1888); Smith, An Address to the People of the State of New-York, in *id.*, at 107.

As one would expect, the term "commerce" was used in contradistinction to productive activities such as manufacturing and agriculture. Alexander Hamilton, for example, repeatedly treated commerce, agriculture, and manufacturing as three separate endeavors. See, *e.g.*, The Federalist No. 36, at 224 (referring to "agriculture, commerce, manufactures"); *id.*, No. 21, at 133 (distinguishing commerce, arts, and industry); *id.*, No. 12, at 74 (asserting that commerce and agriculture have shared interests). The same distinctions were made in the state ratification conventions. See *e.g.*, 2 Debates in the Several State Conventions on the Adoption of the Federal Constitution 57 (J. Elliot ed 1836) (hereinafter Debates) (T. Dawes at Massachusetts convention); *id.*, at 336 (M. Smith at New York convention).

Moreover, interjecting a modern sense of commerce into the Constitution generates significant textual and structural problems. For example, one cannot replace "commerce" with a different type of enterprise, such as manufacturing. When a manufacturer produces a car, assembly cannot take place "with a foreign nation" or "with the Indian Tribes." Parts may come from different States or other nations and hence may have been in the flow of commerce at one time, but manufacturing takes place at a discrete site. Agriculture and manufacturing involve the production of goods; commerce encompasses traffic in such articles.

The Port Preference Clause also suggests that the term "commerce" denoted sale and/or transport rather than business generally. According

---

1. All references to The Federalist are to the Jacob E. Cooke 1961 edition.

to that Clause, "[n]o Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." US Const, Art I, § 9, cl 6. Although it is possible to conceive of regulations of manufacturing or farming that prefer one port over another, the more natural reading is that the Clause prohibits Congress from using its commerce power to channel commerce through certain favored ports.

The Constitution not only uses the word "commerce" in a narrower sense than our case law might suggest, it also does not support the proposition that Congress has authority over all activities that "substantially affect" interstate commerce. The Commerce Clause[2] does not state that Congress may "regulate matters that substantially affect commerce with foreign Nations, and among the several States, and with the Indian Tribes." In contrast, the Constitution itself temporarily prohibited amendments that would "affect" Congress' lack of authority to prohibit or restrict the slave trade or to enact unproportioned direct taxation. US Const, Art V. Clearly, the Framers could have drafted a Constitution that contained a "substantially affects interstate commerce" clause had that been their objective.

In addition to its powers under the Commerce Clause, Congress has the authority to enact such laws as are "necessary and proper" to carry into execution its power to regulate commerce among the several States. US

Const, Art I, § 8, cl 18. But on this Court's understanding of congressional power under these two Clauses, many of Congress' other enumerated powers under Art I, § 8 are wholly superfluous. After all, if Congress may regulate all matters that substantially affect commerce, there is no need for the Constitution to specify that Congress may enact bankruptcy laws, cl 4, or coin money and fix the standard of weights and measures, cl 5, or punish counterfeiters of United States coin and securities, cl 6. Likewise, Congress would not need the separate authority to establish post offices and post roads, cl 7, or to grant patents and copyrights, cl 8, or to "punish Piracies and Felonies committed on the high Seas," cl 10. It might not even need the power to raise and support an Army and Navy, cls 12 and 13, for fewer people would engage in commercial shipping if they thought that a foreign power could expropriate their property with ease. Indeed, if Congress could regulate matters that substantially affect interstate commerce, there would have been no need to specify that Congress can regulate international trade and commerce with the Indians. As the Framers surely understood, these other branches of trade substantially affect interstate commerce.

Put simply, much if not all of Art I, § 8 (including portions of the Commerce Clause itself) would be surplusage if Congress had been given authority over matters that substantially affect interstate commerce. An

interpretation of cl 3 that makes the rest of § 8 superfluous simply cannot be correct. Yet this Court's Commerce Clause jurisprudence has endorsed just such an interpretation: the power we have accorded Congress has swallowed Art I, § 8.[3]

Indeed, if a "substantial effects" test can be appended to the Commerce Clause, why not to every other power of the Federal Government? There is no reason for singling out the Commerce Clause for special treatment. Accordingly, Congress could regulate all matters that "substantially affect" the Army and Navy, bankruptcies, tax collection, expenditures, and so on. In that case, the clauses of § 8 all mutually overlap, something we can assume the Founding Fathers never intended. Our construction of the scope of congressional authority has the additional problem of coming close to turning the Tenth Amendment on its head. Our case law could be read to reserve to the United States all powers not expressly *prohibited* by the Constitution. Taken together, these fundamental textual problems should, at the very least, convince us that the "substantial effects" test should be reexamined.

## II

The exchanges during the ratification campaign reveal the relatively limited reach of the Commerce Clause and of federal power generally. The Founding Fathers confirmed that most areas of life (even many matters that would have sub-

stantial effects on commerce) would remain outside the reach of the Federal Government. Such affairs would continue to be under the exclusive control of the States.

Early Americans understood that commerce, manufacturing, and agriculture, while distinct activities, were intimately related and dependent on each other—that each "substantially affected" the others. After all, items produced by farmers and manufacturers were the primary articles of commerce at the time. If commerce was more robust as a result of federal superintendence, farmers and manufacturers could benefit. Thus, Oliver Ellsworth of Connecticut attempted to convince farmers of the benefits of regulating commerce. "Your property and riches depend on a ready demand and generous price for the produce you can annually spare," he wrote, and these conditions exist "where trade flourishes and when the merchant can freely export the produce of the country" to nations that will pay the highest price. A Landholder No. 1, Connecticut Courant, Nov. 5, 1787, in 3 Documentary History of the Ratification of the Constitution 399 (M. Jensen ed 1978) (hereinafter Documentary History). See also The Federalist No. 35, at 219 (A. Hamilton) ("[D]iscerning citizens are well aware that the mechanic and manufacturing arts furnish the materials of mercantile enterprise and industry. Many of them indeed are immediately connected with the operations of commerce. They know that

---

2. Even to speak of "the Commerce Clause" perhaps obscures the actual scope of that Clause. As an original matter, Congress did not have authority to regulate all commerce; Congress could only "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." US Const, Art I, § 8, cl 3. Although the precise line between interstate/ foreign commerce and purely intrastate commerce was hard to draw, the Court attempted to adhere to such a line for the first 150 years of our Nation. See *infra*, at ——, 131 L Ed 2d, at

656

---

3. There are other powers granted to Congress outside of Art I, § 8 that may become wholly superfluous as well due to our distortion of the Commerce Clause. For instance, Congress has plenary power over the District of Columbia and the territories. See US Const, Art I, § 8, cl 15 and Art IV, § 3, cl 2. The grant of comprehensive legislative power over certain areas of the Nation, when read in conjunction with the rest of the Constitution, further confirms that Congress was not ceded plenary authority over the *whole* Nation.

the merchant is their natural patron and friend"); *id.*, at 221 ("Will not the merchant . . . be disposed to cultivate . . . the interests of the mechanic and manufacturing arts to which his commerce is so nearly allied?"); A Jerseyman: To the Citizens of New Jersey, Trenton Mercury, Nov. 6, 1787, in 3 Documentary History 147 (noting that agriculture will serve as a "source of commerce"); Marcus, The New Jersey Journal, Nov. 14, 1787, *id.*, at 152 (both the mechanic and the farmer benefit from the prosperity of commerce). William Davie, a delegate to the North Carolina Convention, illustrated the close link best: "Commerce, sir, is the nurse of [agriculture and manufacturing]. The merchant furnishes the planter with such articles as he cannot manufacture himself, and finds him a market for his produce. Agriculture cannot flourish if commerce languishes; they are mutually dependent on each other." 4 Debates 20.

Yet, despite being well aware that agriculture, manufacturing, and other matters substantially affected commerce, the founding generation did not cede authority over all these activities to Congress. Hamilton, for instance, acknowledged that the Federal Government could not regulate agriculture and like concerns:

"The administration of private justice between the citizens of the same State, the supervision of agriculture and of other concerns of a

similar nature, all those things in short which are proper to be provided for by local legislation, can never be desirable cares of a general jurisdiction." The Federalist No. 17, at 106.

In the unlikely event that the Federal Government would attempt to exercise authority over such matters, its effort "would be as troublesome as it would be nugatory. *Ibid.*[4]

The comments of Hamilton and others about federal power reflected the well-known truth that the new Government would have only the limited and enumerated powers found in the Constitution. See, *e.g.*, 2 Debates 267-268 (A. Hamilton at New York convention) (noting that there would be just cause for rejecting the Constitution if it would enable the Federal Government to "alter, or abrogate . . . [a state's] civil and criminal institutions [or] penetrate the recesses of domestic life, and control, in all respects, the private conduct of individuals"); The Federalist No. 45, at 313 (J. Madison); 3 Debates 259 (J. Madison) (Virginia convention); R. Sherman & O. Ellsworth, Letter to Governor Huntington, Sept. 26, 1787, in 3 Documentary History 352; J. Wilson, Speech in the State House Yard, Oct. 6, 1787, in 2 *id.*, at 167-168. Agriculture and manufacture, since they were not surrendered to the Federal Government, were state concerns. See The Federalist No. 34, at 212-213 (A. Hamilton) (observing that the

"internal encouragement of agriculture and manufactures" was an object of *state* expenditure). Before the passage of the Tenth Amendment, it was apparent that Congress would possess only those powers "herein granted" by the rest of the Constitution. US Const, Art I, § 1.

Where the Constitution was meant to grant federal authority over an activity substantially affecting interstate commerce, the Constitution contains an enumerated power over that particular activity. Indeed, the Framers knew that many of the other enumerated powers in § 8 dealt with matters that substantially affected interstate commerce. Madison, for instance, spoke of the bankruptcy power as being "intimately connected with the regulation of commerce." The Federalist No. 42, at 287. Likewise, Hamilton urged that "[i]f we mean to be a commercial people or even to be secure on our Atlantic side, we must endeavour as soon as possible to have a navy." *Id.*, No. 24, at 157 (A. Hamilton).

In short, the Founding Fathers were well aware of what the principal dissent calls " 'economic . . . realities.' " See *post*, at —— ——, 131 L Ed 2d, at 679 (Breyer, J.) (citing *North American Co. v SEC*, 327 US 686, 705, 90 L Ed 945, 66 S Ct 785 (1946)). Even though the boundary between commerce and other matters may ignore "economic reality" and thus seem arbitrary or artificial to some, we must nevertheless respect a constitutional line that does not grant Congress power over all that substantially affects interstate commerce.

### III

If the principal dissent's understanding of our early case law were correct, there might be some reason

to doubt this view of the original understanding of the Constitution. According to that dissent, Chief Justice Marshall's opinion in *Gibbons v Ogden*, 9 Wheat 1, 6 L Ed 23 (1824) established that Congress may control all local activities that "significantly affect interstate commerce," *post*, at ——, 131 L Ed 2d, at 673. And, "with the exception of one wrong turn subsequently corrected," this has been the "tradition[l]" method of interpreting the Commerce Clause. *Post*, at ——, 131 L Ed 2d, at 683 (citing *Gibbons* and *United States v Darby*, 312 US 100, 116-117, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430 (1941)).

In my view, the dissent is wrong about the holding and reasoning of *Gibbons*. Because this error leads the dissent to characterize the last 150 years of this Court's case law as a "wrong turn," I feel compelled to put the last 50 years in proper perspective.

#### A

In *Gibbons*, the Court examined whether a federal law that licensed ships to engage in the "coasting trade" pre-empted a New York law granting a 30-year monopoly to Robert Livingston and Robert Fulton to navigate the State's waterways by steamship. In concluding that it did, the Court noted that Congress could regulate "navigation" because "[a]ll America . . . has uniformly understood, the word 'commerce,' to comprehend navigation. It was so understood, and must have been so understood, when the constitution was framed." 9 Wheat, at 190, 6 L Ed 23. The Court also observed that federal power over commerce "among the several States" meant that Congress could regulate com-

---

4. Cf. 3 Debates 40 (E. Pendleton at the Virginia convention) (the proposed Federal Government "does not intermeddle with the local, particular affairs of the states. Can Congress legislate for the state of Virginia? Can [it] make a law altering the form of transferring property, or the rule of descents, in Virginia?"); *id.*, at 553 (J. Marshall at the Virginia convention) (denying that Congress could make "laws affecting the mode of transferring property, or contracts, or claims, between citizens of the same state"); The Federalist No. 33, at 206 (A. Hamilton) (denying that Congress could change laws of descent or could pre-empt a land tax); A Native of Virginia: Observations upon the Proposed Plan of Federal Government, Apr. 2, 1788, in 9 Documentary History 692 (States have sole authority over "rules of property").

merce conducted partly within a State. Because a portion of interstate commerce and foreign commerce would almost always take place within one or more States, federal power over interstate and foreign commerce necessarily would extend into the States. *Id.*, at 194-196, 6 L Ed 23.

At the same time, the Court took great pains to make clear that Congress could *not* regulate commerce "which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States." *Id.*, at 194, 6 L Ed 23. Moreover, while suggesting that the Constitution might not permit States to regulate interstate or foreign commerce, the Court observed that "[i]nspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State" were but a small part "of that immense mass of legislation . . . not surrendered to a general government." *Id.*, at 203, 6 L Ed 23. From an early moment, the Court rejected the notion that Congress can regulate everything that affects interstate commerce. That the internal commerce of the States and the numerous state inspection, quarantine, and health laws had substantial effects on interstate commerce cannot be doubted. Nevertheless, they were not "surrendered to the general government."

Of course, the principal dissent is not the first to misconstrue *Gibbons*. For instance, the Court has stated that *Gibbons* "described the federal commerce power with a breadth never yet exceeded." *Wickard v Filburn*, 317 US 111, 120, 87 L Ed 122, 63 S Ct 82 (1942). See also *Perez v*

*United States*, 402 US 146, 151, 28 L Ed 2d 686, 91 S Ct 1357 (1971) (claiming that with *Darby* and *Wickard*, "the broader view of the Commerce Clause announced by Chief Justice Marshall had been restored"). I believe that this misreading stems from two statements in *Gibbons*.

First, the Court made the uncontroversial claim that federal power does not encompass "commerce" that "does not extend to or affect other States." 9 Wheat, at 194, 6 L Ed 23 (emphasis added). From this statement, the principal dissent infers that whenever an activity affects interstate commerce, it necessarily follows that Congress can regulate such activities. Of course, Chief Justice Marshall said no such thing and the inference the dissent makes cannot be drawn.

There is a much better interpretation of the "affect[s]" language: because the Court had earlier noted that the commerce power did not extend to wholly intrastate commerce, the Court was acknowledging that although the line between intrastate and interstate/foreign commerce would be difficult to draw, federal authority could not be construed to cover purely intrastate commerce. Commerce that did not affect another State could *never* be said to be commerce "among the several States."

But even if one were to adopt the dissent's reading, the "affect[s]" language, at most, permits Congress to regulate only intrastate *commerce* that substantially affects interstate and foreign commerce. There is no reason to believe that Chief Justice Marshall was asserting that Congress could regulate *all* activities that affect interstate commerce. See *Ibid.*

The second source of confusion stems from the Court's praise for the Constitution's division of power between the States and the Federal Government:

"The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government." *Id.*, at 195, 6 L Ed 23.

In this passage, the Court was merely making the well understood point that the Constitution commits matters of "national" concern to Congress and leaves "local" matters to the States. The Court was *not* saying that whatever Congress believes is a national matter becomes an object of federal control. The matters of national concern are enumerated in the Constitution: war, taxes, patents, and copyrights, uniform rules of naturalization and bankruptcy, types of commerce, and so on. See generally US Const, Art I, § 8. *Gibbons*' emphatic statements that Congress could not regulate many matters that affect commerce confirm that the Court did not read the Com-

merce Clause as granting Congress control over matters that "affect the States generally."[5] *Gibbons* simply cannot be construed as the principal dissent would have it.

### B

I am aware of no cases prior to the New Deal that characterized the power flowing from the Commerce Clause as sweepingly as does our substantial effects test. My review of the case law indicates that the substantial effects test is but an innovation of the 20th century.

Even before *Gibbons*, Chief Justice Marshall, writing for the Court in *Cohens v Virginia*, 6 Wheat 264, 5 L Ed 257 (1821), noted that Congress had "no general right to punish murder committed within any of the States," *id.*, at 426, 5 L Ed 257, and that it was "clear that congress cannot punish felonies generally," *id.*, at 428, 5 L Ed 257. The Court's only qualification was that Congress could enact such laws for places where it enjoyed plenary powers—for instance, over the District of Columbia. *Id.*, at 426, 5 L Ed 257. Thus, whatever effect ordinary murders, or robbery, or gun possession might have on interstate commerce (or on any other subject of federal concern) was irrelevant to the question of congressional power.[6]

*United States v Dewitt*, 9 Wall 41, 19 L Ed 593 (1870), marked the first

---

5. None of the other Commerce Clause opinions during Chief Justice Marshall's tenure, which concerned the "dormant" Commerce Clause, even suggested that Congress had authority over all matters substantially affecting commerce. See *Brown v Maryland*, 12 Wheat 419, 6 L Ed 678 (1827); *Willson v Black Bird Creek Marsh Co.*, 2 Pet 245, 7 L Ed 412 (1829).

6. It is worth noting that Congress, in the first federal criminal Act, did not establish nationwide prohibitions against murder and the like. See Act of April 30, 1790, ch 9, 1 Stat 112. To be sure, Congress outlawed murder, manslaughter, maiming, and larceny, but only when those acts were either committed on United States territory not part of a State or on the high seas. *Ibid.* See US Const, Art I, § 8, cl 10 (authorizing Congress to outlaw piracy and felonies on high seas); Art IV, § 3, cl 2 (plenary authority over United States territory and property). When Congress did enact nationwide criminal laws, it acted pursuant to direct grants of

time the Court struck down a federal law as exceeding the power conveyed by the Commerce Clause. In a two-page opinion, the Court invalidated a nationwide law prohibiting all sales of naphtha and illuminating oils. In so doing, the Court remarked that the Commerce Clause "has always been understood as limited by its terms; and as a virtual denial of any power to interfere with the internal trade and business of the separate States." *Id.*, at 44, 19 L Ed 593. The law in question was "plainly a regulation of police," which could have constitutional application only where Congress had exclusive authority, such as the territories. *Id.*, at 44-45, 19 L Ed 593. See also *License Tax Cases*, 5 Wall 462, 470-471, 18 L Ed 497 (1867) (Congress cannot interfere with the internal commerce and business of a State); *Trade-Mark Cases*, 100 US 82, 25 L Ed 550 (1879) (Congress cannot regulate internal commerce and thus may not establish national trademark registration).

In *United States v E. C. Knight Co.*, 156 US 1, 39 L Ed 325, 15 S Ct 249 (1895), this Court held that mere attempts to monopolize the manufacture of sugar could not be regulated pursuant to the Commerce Clause. Raising echoes of the discussions of the Framers regarding the intimate relationship between commerce and manufacturing, the Court declared that "[c]ommerce succeeds to manufacture, and is not a part of it." *Id.*, at 12, 39 L Ed 325, 15 S Ct 249. The

Court also approvingly quoted from *Kidd v Pearson*, 128 US 1, 20, 32 L Ed 346, 9 S Ct 6 (1888):

"'No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufacture and commerce . . . . If it be held that the term [commerce] includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested . . . with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry.'" *E. C. Knight*, 156 US, at 14, 39 L Ed 325, 15 S Ct 249.

If federal power extended to these types of production "comparatively little of business operations and affairs would be left for state control." *Id.*, at 16, 39 L Ed 325, 15 S Ct 249. See also *Newberry v United States*, 256 US 232, 257, 65 L Ed 913, 41 S Ct 469 (1921) ("It is settled . . . that the power to regulate interstate and foreign commerce does not reach whatever is essential thereto. Without agriculture, manufacturing, mining, etc., commerce could not exist, but this fact does not suffice to subject them to the control of Con-

gress"). Whether or not manufacturing, agriculture, or other matters substantially affected interstate commerce was irrelevant.

As recently as 1936, the Court continued to insist that the Commerce Clause did not reach the wholly internal business of the States. See *Carter v Carter Coal Co.*, 298 US 238, 308, 80 L Ed 1160, 56 S Ct 855 (1936) (Congress may not regulate mine labor because "[t]he relation of employer and employee is a local relation"); see also *A. L. A. Schechter Poultry Corp. v United States*, 295 US 495, 543-550, 79 L Ed 1570, 55 S Ct 837 (1935) (holding that Congress may not regulate intrastate sales of sick chickens or the labor of employees involved in intrastate poultry sales). The Federal Government simply could not reach such subjects regardless of their effects on interstate commerce.

These cases all establish a simple point: from the time of the ratification of the Constitution to the mid-1930's, it was widely understood that the Constitution granted Congress only limited powers, including the Commerce Clause.[7] Moreover, there was no question that activities wholly separated from business, such as gun possession, were beyond the reach of the commerce power. If anything, the "wrong turn" was the Court's dramatic departure in the 1930's from a century and a half of precedent.

IV

Apart from its recent vintage and its corresponding lack of any grounding in the original understanding of the Constitution, the substantial effects test suffers from the further flaw that it appears to grant Congress a police power over the Nation. When asked at oral argument if there were *any* limits to the Commerce Clause, the Government was at a loss for words. Tr of Oral Arg 5. Likewise, the principal dissent insists that there are limits, but it cannot muster even one example. *Post*, at —— - ——, 131 L Ed 2d, at 678-679. Indeed, the dissent implicitly concedes that its reading has no limits when it criticizes the Court for "threaten[ing] legal uncertainty in an area of law that . . . seemed reasonably well settled." *Post*, at —— - ——, 131 L Ed 2d, at 683. The one advantage of the dissent's standard is certainty: it is certain that under its analysis everything may be regulated under the guise of the Commerce Clause.

The substantial effects test suffers from this flaw, in part, because of its "aggregation principle." Under socalled "class of activities" statutes, Congress can regulate whole categories of activities that are not themselves either "interstate" or "commerce." In applying the effects test, we ask whether the class of activities *as a whole* substantially affects interstate commerce, not whether

---

[7]. To be sure, congressional power pursuant to the Commerce Clause was alternatively described less narrowly or more narrowly during this 150-year period. Compare *United States v Coombs*, 12 Pet 72, 78, 9 L Ed 1004 (1838) (commerce power "extends to such acts, done on land, which interfere with, obstruct, or prevent the due exercise of the power to regulate [interstate and international] commerce" such as stealing goods from a beached ship) with *United States v E. C. Knight Co.*, 156 US 1, 13, 39 L Ed 325, 15 S Ct 249 (1895) ("Contracts to buy, sell, or exchange goods to be transported among the several States, the transportation and its instrumentalities . . . may be regulated, but this is because they form part of interstate trade or commerce"). During this period, however, this Court never held that Congress could regulate everything that substantially affects commerce.

---

authority found in the Constitution. Compare Act of April 30, 1790, *supra*, §§ 1 and 14 (prohibitions against treason and the counterfeiting of U. S. securities) with US Const, Art I, § 8, cl 6 (counterfeiting); Art III, § 3, cl 2 (treason). Notwithstanding any substantial effects that murder, kidnaping, or gun possession might have had on interstate commerce, Congress understood that it could not establish nationwide prohibitions.

Likewise, there were no laws in the early Congresses that regulated manufacturing and agriculture. Nor was there *any* statute which purported to regulate activities with "substantial effects" on interstate commerce.

any specific activity within the class has such effects when considered in isolation. See *Maryland v Wirtz*, 392 US, at 192-193, 20 L Ed 2d 1020, 88 S Ct 2017 (if class of activities is " 'within the reach of federal power,' " courts may not recise individual applications as trivial) (quoting *Darby*, 312 US, at 120-121, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430).

The aggregation principle is clever, but has no stopping point. Suppose all would agree that gun possession within 1,000 feet of a school does not substantially affect commerce, but that possession of weapons generally (knives, brass knuckles, nunchakus, etc.) does. Under our substantial effects doctrine, even though Congress cannot single out gun possession, it can prohibit weapon possession generally. But one *always* can draw the circle broadly enough to cover an activity that, when taken in isolation, would not have substantial effects on commerce. Under our jurisprudence, if Congress passed an omnibus "substantially affects interstate commerce" statute, purporting

to regulate every aspect of human existence, the Act apparently would be constitutional. Even though particular sections may govern only trivial activities, the statute in the aggregate regulates matters that substantially affect commerce.

V

This extended discussion of the original understanding and our first century and a half of case law does not necessarily require a wholesale abandonment of our more recent opinions.[8] It simply reveals that our substantial effects test is far removed from both the Constitution and from our early case law and that the Court's opinion should not be viewed as "radical" or another "wrong turn" that must be corrected in the future.[9] The analysis also suggests that we ought to temper our Commerce Clause jurisprudence.

Unless the dissenting Justices are willing to repudiate our long-held understanding of the limited nature of federal power, I would think that they too must be willing to recon-

8. Although I might be willing to return to the original understanding. I recognize that many believe that it is too late in the day to undertake a fundamental reexamination of the past 60 years. Consideration of *stare decisis* and reliance interests may convince us that we cannot wipe the slate clean.

9. Nor can the majority's opinion fairly be compared to *Lochner v New York*, 198 US 45, 49 L Ed 937, 25 S Ct 539 (1905) See *post*, at ——, 131 L Ed 2d, at 665-669 (Souter, J., dissenting). Unlike *Lochner* and our more recent "substantive due process" cases, today's decision enforces only the Constitution and not "judicial policy judgments." See *post*, at ——, 131 L Ed 2d, at 668. Notwithstanding Justice Souter's discussion, " 'commercial' character" is not only a natural but an inevitable "ground of *Commerce* Clause distinction." See *post*, at ——, 131 L Ed 2d, at 669 (emphasis added). Our invalidation of the Gun-Free School Zones Act therefore falls comfortably within our proper role in reviewing federal legislation to determine if it exceeds congressional authority as defined by the Constitution itself. As John Marshall put it: "If [Congress] were to make a law not warranted by any of the powers enumerated, it would be considered by the judges as an infringement of the Constitution which they are to guard . . . . They would declare it void." 3 Debates 553 (before the Virginia ratifying convention); see also The Federalist No. 44, at 305 (James Madison) (asserting that if Congress exercises powers "not warranted by [the Constitution's] true meaning" the judiciary will defend the Constitution); *id.*, No. 78, at 526 (A. Hamilton) (asserting that the "courts of justice are to be considered as the bulwarks of a limited constitution against legislative encroachments"). Where, as here, there is a case or controversy, there can be no "misstep", *post*, at ——, 131 L Ed 2d, at 673, in enforcing the Constitution.

---

sider the substantial effects test in a future case. If we wish to be true to a Constitution that does not cede a police power to the Federal Government, our Commerce Clause's boundaries simply cannot be "defined" as being " 'commensurate with the national needs' " or self-consciously intended to let the Federal Government " 'defend itself against economic forces that Congress decrees inimical or destructive of the national economy.' " See *post*, at —— ——, 131 L Ed 2d, at 680 (Breyer, J., dissenting) (quoting *North American Co. v SEC*, 327 US 686, 705, 90 L Ed 945, 66 S Ct 785 (1946)). Such a formulation of federal power is no test at all: it is a blank check.

At an appropriate juncture, I think we must modify our Commerce Clause jurisprudence. Today, it is easy enough to say that the Clause certainly does not empower Congress to ban gun possession within 1,000 feet of a school.

Justice Stevens, dissenting.

The welfare of our future "Commerce with foreign Nations, and among the several States," US Const, Art I, § 8, cl 3, is vitally dependent on the character of the education of our children. I therefore agree entirely with Justice Breyer's explanation of why Congress has ample power to prohibit the possession of firearms in or near schools—just as it may protect the school environment from harms posed by controlled substances such as asbestos or alcohol. I also agree with Justice Souter's

exposition of the radical character of the Court's holding and its kinship with the discredited, pre-Depression version of substantive due process. Cf. *Dolan v Tigard*, 512 US ——, ——, 129 L Ed 2d 304, 114 S Ct 2309 (1994) (Stevens, J., dissenting). I believe, however, that the Court's extraordinary decision merits this additional comment.

Guns are both articles of commerce and articles that can be used to restrain commerce. Their possession is the consequence, either directly or indirectly, of commercial activity. In my judgment, Congress' power to regulate commerce in firearms includes the power to prohibit possession of guns at any location because of their potentially harmful use; it necessarily follows that Congress may also prohibit their possession in particular markets. The market for the possession of handguns by school-age children is, distressingly, substantial.[*] Whether or not the national interest in eliminating that market would have justified federal legislation in 1789, it surely does today.

Justice Souter, dissenting.

In reviewing congressional legislation under the Commerce Clause, we defer to what is often a merely implicit congressional judgment that its regulation addresses a subject substantially affecting interstate commerce "if there is any rational basis for such a finding." *Hodel v Virginia Surface Mining & Reclamation Assn., Inc.*, 452 US 264, 276, 69 L Ed 2d 1, 101 S Ct 2352 (1981); *Preseault*

* Indeed, there is evidence that firearm manufacturers—aided by a federal grant—are specifically targeting school children as consumers by distributing, at schools, hunting-related videos styled "educational materials for grades four through 12," Herbert, Reading, Writing, Reloading, NY Times, Dec. 14, 1994, p A23, col 1.

v *ICC*, 494 US 1, 17, 108 L Ed 2d 1, 110 S Ct 914 (1990); see *Maryland v Wirtz*, 392 US 183, 190, 20 L Ed 2d 1020, 88 S Ct 2017 (1968), quoting *Katzenbach v McClung*, 379 US 294, 303-304, 13 L Ed 2d 290, 85 S Ct 377 (1964). If that congressional determination is within the realm of reason, "the only remaining question for judicial inquiry is whether 'the means chosen by Congress [are] reasonably adapted to the end permitted by the Constitution.' " *Hodel v Virginia Surface Mining & Reclamation Assn., Inc., supra*, at 276, 69 L Ed 2d 1, 101 S Ct 2352, quoting *Heart of Atlanta Motel, Inc. v United States*, 379 US 241, 262, 13 L Ed 2d 258, 85 S Ct 348 (1964); see also *Preseault v ICC, supra*, at 17, 108 L Ed 2d 1, 110 S Ct 914.[1]

The practice of deferring to rationally based legislative judgments "is a paradigm of judicial restraint." *FCC v Beach Communications, Inc.*, 508 US ——, ——, 124 L Ed 2d 211, 113 S Ct 2096 (1993). In judicial review under the Commerce Clause, it reflects our respect for the institutional competence of the Congress on a subject expressly assigned to it by the Constitution and our appreciation of the legitimacy that comes from Congress's political accountability in dealing with matters open to a wide range of possible choices. See *id.*, at —— ——, 124 L Ed 2d 211, 113 S Ct 2096; *Hodel v Virginia Surface Mining & Reclamation Assn., Inc., supra*, at 276, 69 L Ed 2d 1, 101 S Ct 2352; *United States v Carolene Products Co.*, 304 US 144, 147, 151-154, 82 L Ed 1234, 58 S Ct 778 (1938); cf. *Williamson v Lee Optical of Okla., Inc.*, 348 US 483, 488, 99 L Ed 563, 75 S Ct 461 (1955).

It was not ever thus, however, as even a brief overview of Commerce Clause history during the past century reminds us. The modern respect for the competence and primacy of Congress in matters affecting commerce developed only after one of this Court's most chastening experiences, when it perforce repudiated an earlier and untenably expansive conception of judicial review in derogation of congressional commerce power. A look at history's sequence will serve to show how today's decision tugs the Court off course, leading it to suggest opportunities for further developments that would be at odds with the rule of restraint to which the Court still wisely states adherence.

## I

Notwithstanding the Court's recognition of a broad commerce power in *Gibbons v Ogden*, 9 Wheat 1, 196-197, 6 L Ed 23 (1824) (Marshall, C. J.), Congress saw few occasions to exercise that power prior to Reconstruction, see generally 2 C. Warren, The Supreme Court in United States History 729-739 (rev ed 1935), and it was really the passage of the Interstate Commerce Act of 1887 that opened a new age of congressional reliance on the Commerce Clause for authority to exercise general police powers at the national level, see *id.*, at 729-730. Although the Court upheld a fair amount of the ensuing legislation as being within the commerce power, see, e.g., *Stafford v Wallace*, 258 US 495, 66 L Ed 735, 42 S Ct 397, 23 ALR 229 (1922) (upholding an Act regulating trade practices in the meat packing industry); *The Shreveport Rate Cases*, 234 US

342, 58 L Ed 1341, 34 S Ct 833 (1914) (upholding ICC order to equalize inter- and intrastate rail rates); see generally Warren, *supra*, at 729-739, the period from the turn of the century to 1937 is better noted for a series of cases applying highly formalistic notions of "commerce" to invalidate federal social and economic legislation, see, e.g., *Carter v Carter Coal Co.*, 298 US 238, 303-304, 80 L Ed 1160, 56 S Ct 855 (1936) (striking Act prohibiting unfair labor practices in coal industry as regulation of "mining" and "production," not "commerce"); *A. L. A. Schechter Poultry Corp. v United States*, 295 US 495, 545-548, 79 L Ed 1570, 55 S Ct 837, 97 ALR 947 (1935) (striking congressional regulation of activities affecting interstate commerce only "indirectly"); *Hammer v Dagenhart*, 247 US 251, 62 L Ed 1101, 38 S Ct 529, 3 ALR 649 (1918) (striking Act prohibiting shipment in interstate commerce of goods manufactured at factories using child labor because the Act regulated "manufacturing," not "commerce"); *Adair v United States*, 208 US 161, 52 L Ed 436, 28 S Ct 277 (1908) (striking protection of labor union membership as outside "commerce").

These restrictive views of commerce subject to congressional power complemented the Court's activism in limiting the enforceable scope of state economic regulation. It is most familiar history that during this same period the Court routinely invalidated state social and economic legislation under an expansive conception of Fourteenth Amendment substantive due process. See, e.g., *Louis K. Liggett Co. v Baldridge*, 278 US 105, 73 L Ed 204, 49 S Ct 57 (1928) (striking state law requiring pharmacy owners to be licensed as

pharmacists); *Coppage v Kansas*, 236 US 1, 59 L Ed 441, 35 S Ct 240 (1915) (striking state law prohibiting employers from requiring their employees to agree not to join labor organizations); *Lochner v New York*, 198 US 45, 49 L Ed 937, 25 S Ct 539 (1905) (striking state law establishing maximum working hours for bakers). See generally L. Tribe, American Constitutional Law 568-574 (2d ed 1988). The fulcrums of judicial review in these cases were the notions of liberty and property characteristic of laissez-faire economics, whereas the Commerce Clause cases turned on what was ostensibly a structural limit of federal power, but under each conception of judicial review the Court's character for the first third of the century showed itself in exacting judicial scrutiny of a legislature's choice of economic ends and of the legislative means selected to reach them.

It was not merely coincidental, then, that sea changes in the Court's conceptions of its authority under the Due Process and Commerce Clauses occurred virtually together, in 1937, with *West Coast Hotel Co. v Parrish*, 300 US 379, 81 L Ed 703, 57 S Ct 578, 108 ALR 1330, and *NLRB v Jones & Laughlin Steel Corp.*, 301 US 1, 81 L Ed 893, 57 S Ct 615, 108 ALR 1352. See Stern, The Commerce Clause and the National Economy, 1933-1946, 59 Harv L Rev 645, 674-682 (1946). In *West Coast Hotel*, the Court's rejection of a due process challenge to a state law fixing minimum wages for women and children marked the abandonment of its expansive protection of contractual freedom. Two weeks later, *Jones & Laughlin* affirmed congressional commerce power to authorize NLRB injunctions against unfair labor prac-

---

1. In this case, no question has been raised about means and ends; the only issue is about the effect of school zone guns on commerce.

tices. The Court's finding that the regulated activity had a direct enough effect on commerce has since been seen as beginning the abandonment, for practical purposes, of the formalistic distinction between direct and indirect effects.

In the years following these decisions, deference to legislative policy judgments on commercial regulation became the powerful theme under both the Due Process and Commerce Clauses, see *United States v Carolene Products Co.*, 304 US, at 147-148, 152, 82 L Ed 1234, 58 S Ct 778; *United States v Darby*, 312 US 100, 119-121, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430 (1941); *United States v Wrightwood Dairy Co.*, 315 US 110, 118-119, 86 L Ed 726, 62 S Ct 523 (1942), and in due course that deference became articulate in the standard of rationality review. In due process litigation, the Court's statement of a rational basis test came quickly. See *United States v Carolene Products Co., supra*, at 152, 82 L Ed 1234, 58 S Ct 778; see also *Williamson v Lee Optical Co.*, 348 US, at 489-490, 99 L Ed 563, 75 S Ct 461. The parallel formulation of the Commerce Clause test came later, only because complete elimination of the direct/indirect effects dichotomy and acceptance of the cumulative effects doctrine, *Wickard v Filburn*, 317 US 111, 125, 127-129, 87 L Ed 122, 63 S Ct 82 (1942); *United States v Wrightwood Dairy Co., supra*, at 124-126, 86 L Ed 726, 62 S Ct 523, so far settled the pressing issues of congressional power over commerce as to leave the Court for years without any need to phrase a test explicitly deferring to rational legislative judgments. The moment came, however, with the challenge to congressional Commerce Clause authority to prohibit racial

discrimination in places of public accommodation, when the Court simply made explicit what the earlier cases had implied: "where we find that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end." *Katzenbach v McClung*, 379 US 294, 303-304, 13 L Ed 2d 290, 85 S Ct 377 (1964), discussing *United States v Darby, supra*; see *Heart of Atlanta Motel, Inc. v United States*, 379 US 241, 258-259, 13 L Ed 2d 258, 85 S Ct 348 (1964). Thus, under commerce, as under due process, adoption of rational basis review expressed the recognition that the Court had no sustainable basis for subjecting economic regulation as such to judicial policy judgments, and for the past half-century the Court has no more turned back in the direction of formalistic Commerce Clause review (as in deciding whether regulation of commerce was sufficiently direct) than it has inclined toward reasserting the substantive authority of *Lochner* due process (as in the inflated protection of contractual autonomy). See, e.g., *Maryland v Wirtz*, 392 US. at 190, 198, 20 L Ed 2d 1020, 88 S Ct 2017; *Perez v United States*, 402 US 146, 151-157, 28 L Ed 2d 686, 91 S Ct 1357 (1971); *Hodel v Virginia Surface Mining & Reclamation Assn., Inc.*, 452 US, at 276, 277, 69 L Ed 2d 1, 101 S Ct 2352.

## II

There is today, however, a backward glance at both the old pitfalls, as the Court treats deference under the rationality rule as subject to gradation according to the commercial or noncommercial nature of the immediate subject of the challenged

regulation. See *ante*, at ——— – ———, 131 L Ed 2d, at 637-639. The distinction between what is patently commercial and what is not looks much like the old distinction between what directly affects commerce and what touches it only indirectly. And the act of calibrating the level of deference by drawing a line between what is patently commercial and what is less purely so will probably resemble the process of deciding how much interference with contractual freedom was fatal. Thus, it seems fair to ask whether the step taken by the Court today does anything but portend a return to the untenable jurisprudence from which the Court extricated itself almost 60 years ago. The answer is not reassuring. To be sure, the occasion for today's decision reflects the century's end, not its beginning. But if it seems anomalous that the Congress of the United States has taken to regulating school yards, the act in question is still probably no more remarkable than state regulation of bake shops 90 years ago. In any event, there is no reason to hope that the Court's qualification of rational basis review will be any more successful than the efforts at substantive economic review made by our predecessors as the century began. Taking the Court's opinion on its own terms, Justice Breyer has explained both the hopeless porosity of "commercial" character as a ground of Commerce Clause distinction in America's highly connected economy, and the inconsistency of this categorization with our rational basis precedents from the last 50 years.

Further glosses on rationality review. moreover, may be in the offing. Although this case turns on commercial character, the Court gestures

toward two other considerations that it might sometime entertain in applying rational basis scrutiny (apart from a statutory obligation to supply independent proof of a jurisdictional element): does the congressional statute deal with subjects of traditional state regulation, and does the statute contain explicit factual findings supporting the otherwise implicit determination that the regulated activity substantially affects interstate commerce? Once again, any appeal these considerations may have depends on ignoring the painful lesson learned in 1937, for neither of the Court's suggestions would square with rational basis scrutiny.

### A

The Court observes that the Gun-Free School Zones Act operates in two areas traditionally subject to legislation by the States, education and enforcement of criminal law. The suggestion is either that a connection between commerce and these subjects is remote, or that the commerce power is simply weaker when it touches subjects on which the States have historically been the primary legislators. Neither suggestion is tenable. As for remoteness, it may or may not be wise for the National Government to deal with education, but Justice Breyer has surely demonstrated that the commercial prospects of an illiterate State or Nation are not rosy, and no argument should be needed to show that hijacking interstate shipments of cigarettes can affect commerce substantially, even though the States have traditionally prosecuted robbery. And as for the notion that the commerce power diminishes the closer it gets to customary state concerns, that idea has been flatly rejected, and not long ago. The commerce power, we

have often observed, is plenary. *Hodel* v *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 US, at 276, 69 L Ed 2d 1, 101 S Ct 2352; *United States* v *Darby, supra,* at 114, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430; see *Garcia* v *San Antonio Metropolitan Transit Authority,* 469 US 528, 549-550, 83 L Ed 2d 1016, 105 S Ct 1005 (1985); *Gibbons* v *Ogden,* 9 Wheat., at 196-197, 6 L Ed 23. Justice Harlan put it this way in speaking for the Court in *Maryland* v *Wirtz:*

"There is no general doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other. . . . [I]t is clear that the Federal Government, when acting within a delegated power, may override countervailing state interests . . . . As long ago as [1925], the Court put to rest the contention that state concerns might constitutionally 'outweigh' the importance of an otherwise valid federal statute regulating commerce." 392 US, at 195-196, 20 L Ed 2d 1020, 88 S Ct 2017 (citations and internal quotation marks omitted).

See also *United States* v *Darby, supra,* at 114, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430; *Gregory* v *Ashcroft,* 501 US 452, 460, 115 L Ed 2d 410, 111 S Ct 2395 (1991); *United States* v *Carolene Products Co.,* 304 US, at 147, 82 L Ed 1234, 58 S Ct 778.

Nor is there any contrary authority in the reasoning of our cases imposing clear statement rules in some instances of legislation that would significantly alter the state-national balance. In the absence of a clear statement of congressional

design, for example, we have refused to interpret ambiguous federal statutes to limit fundamental state legislative prerogatives, *Gregory* v *Ashcroft, supra,* at 460-464, 115 L Ed 2d 410, 111 S Ct 2395, our understanding being that such prerogatives, through which "a State defines itself as a sovereign," are "powers with which Congress does not readily interfere," 501 US, at 460, 461, 115 L Ed 2d 410, 111 S Ct 2395. Likewise, when faced with two plausible interpretations of a federal criminal statute, we generally will take the alternative that does not force us to impute an intention to Congress to use its full commerce power to regulate conduct traditionally and ably regulated by the States. See *United States* v *Enmons,* 410 US 396, 411-412, 35 L Ed 2d 379, 93 S Ct 1007 (1973); *United States* v *Bass,* 404 US 336, 349-350, 30 L Ed 2d 488, 92 S Ct 515 (1971); *Rewis* v *United States,* 401 US 808, 812, 28 L Ed 2d 493, 91 S Ct 1056 (1971).

These clear statement rules, however, are merely rules of statutory interpretation, to be relied upon only when the terms of a statute allow, *United States* v *Culbert,* 435 US 371, 379-380, 55 L Ed 2d 349, 98 S Ct 1112 (1978); see *Gregory* v *Ashcroft, supra,* at 470, 115 L Ed 2d 410, 111 S Ct 2395; *United States* v *Bass, supra,* at 346-347, 30 L Ed 2d 488, 92 S Ct 515, and in cases implicating Congress's historical reluctance to trench on state legislative prerogatives or to enter into spheres already occupied by the States, *Gregory* v *Ashcroft, supra,* at 461, 115 L Ed 2d 410, 111 S Ct 2395; *United States* v *Bass, supra,* at 349, 30 L Ed 2d 488, 92 S Ct 515; see *Rewis* v *United States, supra,* at 811-812, 28 L Ed 2d 493, 91 S Ct 1056. They are rules for determining

intent when legislation leaves intent subject to question. But our hesitance to presume that Congress has acted to alter the state-federal status quo (when presented with a plausible alternative) has no relevance whatever to the enquiry whether it has the commerce power to do so or to the standard of judicial review when Congress has definitely meant to exercise that power. Indeed, to allow our hesitance to affect the standard of review would inevitably degenerate into the sort of substantive policy review that the Court found indefensible 60 years ago. The Court does not assert (and could not plausibly maintain) that the commerce power is wholly devoid of congressional authority to speak on any subject of traditional state concern; but if congressional action is not forbidden absolutely when it touches such a subject, it will stand or fall depending on the Court's view of the strength of the legislation's commercial justification. And here once again history raises its objections that the Court's previous essays in overriding congressional policy choices under the Commerce Clause were ultimately seen to suffer two fatal weaknesses: when dealing with Acts of Congress (as distinct from state legislation subject to review under the theory of dormant commerce power) nothing in the Clause compelled the judicial activism, and

nothing about the judiciary as an institution made it a superior source of policy on the subject Congress dealt with. There is no reason to expect the lesson would be different another time.

B

There remain questions about legislative findings. The Court of Appeals expressed the view, 2 F3d 1342, 1363-1368 (1993), that the result in this case might well have been different if Congress had made explicit findings that guns in schools have a substantial effect on interstate commerce, and the Court today does not repudiate that position, see *ante,* at ——— ———, 131 L Ed 2d, at 639-640. Might a court aided by such findings have subjected this legislation to less exacting scrutiny (or, put another way, should a court have deferred to such findings if Congress had made them)?[2] The answer to either question must be no, although as a general matter findings are important and to be hoped for in the difficult cases.

It is only natural to look for help with a hard job, and reviewing a claim that Congress has exceeded the commerce power is much harder in some cases than in others. A challenge to congressional regulation of interstate garbage hauling would be easy to resolve; review of congressio-

2. Unlike the Court, (perhaps), I would see no reason not to consider Congress's findings, insofar as they might be helpful in reviewing the challenge to this statute, even though adopted in later legislation. See the Violent Crime Control and Law Enforcement Act of 1994, Pub L 103-322, § 320904, 108 Stat 2125 ("[T]he occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country; . . . this decline . . . has an adverse impact on interstate commerce and the foreign commerce of the United States; . . . Congress has power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection"). The findings, however, go no further than expressing what is obviously implicit in the substantive legislation, at such a conclusory level of generality as to add virtually nothing to the record. The Solicitor General certainly exercised sound judgment in placing no significant reliance on these particular afterthoughts. Tr of Oral Arg 24-25.

nal regulation of gun possession in school yards is more difficult, both because the link to interstate commerce is less obvious and because of our initial ignorance of the relevant facts. In a case comparable to this one, we may have to dig hard to make a responsible judgment about what Congress could reasonably find, because the case may be close, and because judges tend not to be familiar with the facts that may or may not make it close. But while the ease of re- view may vary from case to case, it does not follow that the standard of review should vary, much less that explicit findings of fact would even directly address the standard.

The question for the courts, as all agree, is not whether as a predicate to legislation Congress in fact found that a particular activity substantially affects interstate commerce. The legislation implies such a finding, and there is no reason to entertain claims that Congress acted ultra vires intentionally. Nor is the question whether Congress was correct in so finding. The only question is whether the legislative judgment is within the realm of reason. See *Hodel v Virginia Surface Mining & Reclamation Assn., Inc.,* 452 US, at 276-277, 69 L Ed 2d 1, 101 S Ct 2352; *Katzenbach v McClung,* 379 US, at 303-304, 13 L Ed 2d 290, 85 S Ct 377; *Railroad Retirement Bd. v Alton R. Co.,* 295 US 330, 391-392, 79 L Ed 1468, 55 S Ct 758 (1935) (Hughes, C. J., dissenting); cf. *FCC v Beach Communications,* 508 US, at ——, 124 L Ed 2d 211, 113 S Ct 2096 (in the equal protection context, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it; . . . it is

entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature") (citations and internal quotation marks omitted); *Ferguson v Skrupa,* 372 US 726, 731-733, 10 L Ed 2d 93, 83 S Ct 1028, 95 ALR2d 1347 (1963); *Williamson v Lee Optical Co.,* 348 US, at 487, 99 L Ed 563, 75 S Ct 461. Congressional findings do not, however, directly address the question of reasonableness; they tell us what Congress actually has found, not what it could rationally find. If, indeed, the Court were to make the existence of explicit congressional findings dispositive in some close or difficult cases something other than rationality review would be afoot. The resulting congressional obligation to justify its policy choices on the merits would imply either a judicial authority to review the justification (and, hence, the wisdom) of those choices, or authority to require Congress to act with some high degree of deliberateness, of which express findings would be evidence. But review for congressional wisdom would just be the old judicial pretension discredited and abandoned in 1937, and review for deliberateness would be as patently unconstitutional as an Act of Congress mandating long opinions from this Court. Such a legislative process requirement would function merely as an excuse for covert review of the merits of legislation under standards never expressed and more or less arbitrarily applied. Under such a regime, in any case, the rationality standard of review would be a thing of the past.

On the other hand, to say that courts applying the rationality standard may not defer to findings is not, of course, to say that findings are

pointless. They may, in fact, have great value in telling courts what to look for, in establishing at least one frame of reference for review, and in citing to factual authority. The research underlying Justice Breyer's dissent was necessarily a major undertaking; help is welcome, and it not incidentally shrinks the risk that judicial research will miss material scattered across the public domain or buried under pounds of legislative record.

Congressional findings on a more particular plane than this record illustrates would accordingly have earned judicial thanks. But thanks do not carry the day as long as rational possibility is the touchstone, and I would not allow for the possibility, as the Court's opinion may, *ante,* at ——, 131 L Ed 2d, at 640, that the addition of congressional findings could in principle have affected the fate of the statute here.

### III

Because Justice Breyer's opinion demonstrates beyond any doubt that the Act in question passes the rationality review that the Court continues to espouse, today's decision may be seen as only a misstep, its reasoning and its suggestions not quite in gear with the prevailing standard, but hardly an epochal case. I would not argue otherwise, but I would raise a caveat. Not every epochal case has come in epochal trappings. *Jones & Laughlin* did not reject the direct-indirect standard in so many words; it just said the relation of the regulated subject matter to commerce was direct enough. 301 US, at 41-43, 81 L Ed 893, 57 S Ct 615, 108 ALR 1352. But we know what happened.

I respectfully dissent.

Justice **Breyer**, with whom Justice Stevens, Justice Souter, and Justice Ginsburg join, dissenting.

The issue in this case is whether the Commerce Clause authorizes Congress to enact a statute that makes it a crime to possess a gun in, or near, a school. 18 USC § 922(q)(1)(A) (1988 ed, Supp V) [18 USCS § 922(q)(1)(A)]. In my view, the statute falls well within the scope of the commerce power as this Court has understood that power over the last half-century.

### I

In reaching this conclusion, I apply three basic principles of Commerce Clause interpretation. First, the power to "regulate Commerce . . . among the several States," US Const, Art I, § 8, cl 3, encompasses the power to regulate local activities insofar as they significantly affect interstate commerce. See, *e.g., Gibbons v Ogden,* 9 Wheat 1, 194-195, 6 L Ed 23 (1824) (Marshall, C. J.); *Wickard v Filburn,* 317 US 111, 125, 87 L Ed 122, 63 S Ct 82 (1942). As the majority points out, *ante,* at ——, 131 L Ed 2d, at 637-638, the Court, in describing how much of an effect the Clause requires, sometimes has used the word "substantial" and sometimes has not. Compare, *e.g., Wickard, supra,* at 125, 87 L Ed 122, 63 S Ct 82 ("substantial economic effect"), with *Hodel v Virginia Surface Mining and Reclamation Assn., Inc.,* 452 US 264, 276, 69 L Ed 2d 1, 101 S Ct 2352 (1981) ("affects interstate commerce"); see also *Maryland v Wirtz,* 392 US 183, 196, n 27, 20 L Ed 2d 1020, 88 S Ct 2017 (1968) (cumulative effect must not be "trivial"); *NLRB v Jones & Laughlin Steel Corp.,* 301 US 1, 37, 81 L Ed 893, 57 S Ct 615,

108 ALR 1352 (1937) (speaking of "close and substantial *relation*" between activity and commerce, not of "substantial effect") (emphasis added); *Gibbons, supra*, at 194, 6 L Ed 23 (words of Commerce Clause do not "comprehend . . . commerce, which is completely internal . . . and which does not . . . affect other States"). And, as the majority also recognizes in quoting Justice Cardozo, the question of degree (how *much* effect) requires an estimate of the effect that no verbal formulation can capture with precision. See *ante*, at ——, 131 L Ed 2d, at 642. I use the word "significant" because the word "substantial" implies a somewhat narrower power than recent precedent suggests. See, *e.g., Perez v United States*, 402 US 146, 154, 28 L Ed 2d 686, 91 S Ct 1357 (1971); *Daniel v Paul*, 395 US 298, 308, 23 L Ed 2d 318, 89 S Ct 1697 (1969). But, to speak of "substantial effect" rather than "significant effect" would make no difference in this case.

Second, in determining whether a local activity will likely have a significant effect upon interstate commerce, a court must consider, not the effect of an individual act (a single instance of gun possession), but rather the cumulative effect of all similar instances (i.e., the effect of all guns possessed in or near schools). See, *e.g., Wickard, supra*, at 127-128, 87 L Ed 122, 63 S Ct 82. As this Court put the matter almost 50 years ago:

"[I]t is enough that the individual activity when multiplied into a general practice . . . contains a threat to the interstate economy that requires preventative regulation." *Mandeville Island Farms, Inc. v American Crystal Sugar Co.*,

674

334 US 219, 236, 92 L Ed 1328, 68 S Ct 996 (1948) (citations omitted).

Third, the Constitution requires us to judge the connection between a regulated activity and interstate commerce, not directly, but at one remove. Courts must give Congress a degree of leeway in determining the existence of a significant factual connection between the regulated activity and interstate commerce—both because the Constitution delegates the commerce power directly to Congress and because the determination requires an empirical judgment of a kind that a legislature is more likely than a court to make with accuracy. The traditional words "rational basis" capture this leeway. See *Hodel supra*, at 276-277, 69 L Ed 2d 1, 101 S Ct 2352. Thus, the specific question before us, as the Court recognizes, is not whether the "regulated activity sufficiently affected interstate commerce," but, rather, whether Congress could have had "*a rational basis*" or so concluding. *Ante*, at ——, 131 L Ed 2d, at 636 (emphasis added).

I recognize that we must judge this matter independently. "[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Hodel, supra*, at 311, 69 L Ed 2d 1, 101 S Ct 2352 (Rehnquist, J., concurring in judgment). And, I also recognize that Congress did not write specific "interstate commerce" findings into the law under which Lopez was convicted. Nonetheless, as I have already noted, the matter that we review independently (*i.e.*, whether there is a "rational basis") already has considerable leeway built into it. And, the absence of findings, at most, deprives a statute of the benefit of

some *extra* leeway. This extra deference, in principle, might change the result in a close case, though, in practice, it has not made a critical legal difference. See, *e.g., Katzenbach v McClung*, 379 US 294, 299, 13 L Ed 2d 290, 85 S Ct 377 (1964) (noting that "no formal findings were made, which of course are not necessary"); *Perez, supra*, at 156-157, 28 L Ed 2d 686, 91 S Ct 1357; cf. *Turner Broadcasting System, Inc. v FCC*, 512 US ——, ——, 129 L Ed 2d 497, 114 S Ct 2445 (1994) (opinion of Kennedy, J.) ("Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review"); *Fullilove v Klutznick*, 448 US 448, 503, 65 L Ed 2d 902, 100 S Ct 2758 (1980) (Powell, J., concurring) ("After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate . . ."). And, it would seem particularly unfortunate to make the validity of the statute at hand turn on the presence or absence of findings. Because Congress did make findings (though not until after Lopez was prosecuted), doing so would appear to elevate form over substance. See Pub L 103-322, §§ 320904(2)(F), (G), 108 Stat 2125, 18 USC § 922(q)(1)(F), (G) [18 USCS § 922(q)(1)(F), (G)].

In addition, despite the Court of Appeals' suggestion to the contrary, see 2 F3d 1342, 1365 (CA5 1993), there is no special need here for a clear indication of Congress' rationale. The statute does not interfere with the exercise of state or local authority. Cf., *e.g., Dellmuth v Muth*, 491 US 223, 227-228, 105 L Ed 2d 181, 109 S Ct 2397 (1989) (requiring

clear statement for abrogation of Eleventh Amendment immunity). Moreover, any clear statement rule would apply only to determine Congress' intended result, *not* to clarify the source of its authority or measure the level of consideration that went into its decision, and here there is no doubt as to which activities Congress intended to regulate. See *ibid.; id.*, at 233, 105 L Ed 2d 181, 109 S Ct 2397 (Scalia, J., concurring) (to subject States to suits for money damages, Congress need only make that intent clear, and need not refer explicitly to the Eleventh Amendment); *EEOC v Wyoming*, 460 US 226, 243, n 18, 75 L Ed 2d 18, 103 S Ct 1054 (1983) (Congress need not recite the constitutional provision that authorizes its action).

II

Applying these principles to the case at hand, we must ask whether Congress could have had a *rational basis* for finding a significant (or substantial) connection between gun-related school violence and interstate commerce. Or, to put the question in the language of the *explicit* finding that Congress made when it amended this law in 1994: Could Congress rationally have found that "violent crime in school zones," through its effect on the "quality of education," significantly (or substantially) affects "interstate" or "foreign commerce"? 18 USC §§ 922(q)(1)(F), (G) [18 USCS §§ 922(q)(1)(F), (G)]. As long as one views the commerce connection, not as a "technical legal conception," but as "a practical one," *Swift & Co. v United States*, 196 US 375, 398, 49 L Ed 518, 25 S Ct 276 (1905) (Holmes, J.), the answer to this question must be yes. Numerous reports and studies—generated both inside and outside government—

675

make clear that Congress could reasonably have found the empirical connection that its law, implicitly or explicitly, asserts. (See Appendix, *infra* at ——, 131 L Ed 2d, at 684, for a sample of the documentation, as well as for complete citations to the sources referenced below.)

For one thing, reports, hearings, and other readily available literature make clear that the problem of guns in and around schools is widespread and extremely serious. These materials report, for example, that four percent of American high school students (and six percent of inner-city high school students) carry a gun to school at least occasionally, Centers for Disease Control 2342; Sheley, McGee, & Wright 679; that 12 percent of urban high school students have had guns fired at them, *ibid.*; that 20 percent of those students have been threatened with guns, *ibid.*; and that, in any 6-month period, several hundred thousand schoolchildren are victims of violent crimes in or near their schools, US Dept. of Justice 1 (1989); House Select Committee Hearing 15 (1989). And, they report that this widespread violence in schools throughout the Nation significantly interferes with the quality of education in those schools. See, *e.g.*, House Judiciary Committee Hearing 44 (1990) (linking school violence to dropout rate); U.S. Dept. of Health 118-119 (1978) (school-violence victims suffer academically); compare U.S. Dept. of Justice 1 (1991) (gun violence worst in inner city schools), with National Center 47 (dropout rates highest in inner cities). Based on reports such as these, Congress obviously could have thought that guns and learning are mutually exclusive. Senate Labor and Human Resources Committee Hearing 39 (1993); U.S. Dept. of Health 118, 123-124 (1978). And, Congress could therefore have found a substantial educational problem—teachers unable to teach, students unable to learn—and concluded that guns near schools contribute substantially to the size and scope of that problem.

Having found that guns in schools significantly undermine the quality of education in our Nation's classrooms, Congress could also have found, given the effect of education upon interstate and foreign commerce, that gun-related violence in and around schools is a commercial, as well as a human, problem. Education, although far more than a matter of economics, has long been inextricably intertwined with the Nation's economy. When this Nation began, most workers received their education in the workplace, typically (like Benjamin Franklin) as apprentices. See generally Seybolt; Rorabaugh; U.S. Dept. of Labor (1950). As late as the 1920's, many workers still received general education directly from their employers—from large corporations, such as General Electric, Ford, and Goodyear, which created schools within their firms to help both the worker and the firm. See Bolino 15-25. (Throughout most of the 19th century fewer than one percent of all Americans received secondary education through attending a high school. See *id.*, at 11.) As public school enrollment grew in the early 20th century, see Becker 218 (1993), the need for industry to teach basic educational skills diminished. But, the direct economic link between basic education and industrial productivity remained. Scholars estimate that nearly a quarter of America's economic growth in the early years of this century is traceable directly to increased schooling, see Denison 243; that investment in "human capital" (through spending on education) exceeded investment in "physical capital" by a ratio of almost two to one, see Schultz 26 (1961); and that the economic returns to this investment in education exceeded the returns to conventional capital investment, see, *e.g.*, Davis & Morrall 48-49.

In recent years the link between secondary education and business has strengthened, becoming both more direct and more important. Scholars on the subject report that technological changes and innovations in management techniques have altered the nature of the workplace so that more jobs now demand greater educational skills. See, *e.g.*, MIT 32 (only about one-third of hand-tool company's 1,000 workers were qualified to work with a new process that requires high-school-level reading and mathematical skills); Cyert & Mowery 68 (gap between wages of high school dropouts and better trained workers increasing); U.S. Dept. of Labor 41 (1981) (job openings for dropouts declining over time). There is evidence that "service, manufacturing or construction jobs are being displaced by technology that requires a better-educated worker or, more likely, are being exported overseas," Gordon, Ponticell, & Morgan 26; that "workers with truly few skills by the year 2000 will find that only one job out of ten will remain," *ibid.*; and that

> "[o]ver the long haul the best way to encourage the growth of high-wage jobs is to upgrade the skills of the work force. . . . [B]etter-trained workers become more productive workers, enabling a company to become more competitive and expand." Henkoff 60.

Increasing global competition also has made primary and secondary education economically more important. The portion of the American economy attributable to international trade nearly tripled between 1950 and 1980, and more than 70 percent of American-made goods now compete with imports. Marshall 205; Marshall & Tucker 33. Yet, lagging worker productivity has contributed to negative trade balances and to real hourly compensation that has fallen below wages in 10 other industrialized nations. See National Center 57; Handbook of Labor Statistics 561, 576 (1989); Neef & Kask 28, 31. At least some significant part of this serious productivity problem is attributable to students who emerge from classrooms without the reading or mathematical skills necessary to compete with their European or Asian counterparts, see, *e.g.*, MIT 28, and, presumably, to high school dropout rates of 20 to 25 percent (up to 50 percent in inner cities), see, *e.g.*, National Center 47; Chubb & Hanushek 215. Indeed, Congress has said, when writing other statutes, that "functionally or technologically illiterate" Americans in the work force "erod[e]" our economic "standing in the international marketplace," Pub L 100-418, § 6002(a)(3), 102 Stat 1469, and that "our Nation is . . . paying the price of scientific and technological illiteracy, with our productivity declining, our industrial base ailing, and our global competitiveness dwindling." HR Rep No. 98-6, pt 1, p 19 (1983).

Finally, there is evidence that, today more than ever, many firms base their location decisions upon the presence, or absence, of a work

force with a basic education. See MacCormack, Newman, & Rosenfield 73; Coffee 296. Scholars on the subject report, for example, that today, "[h]igh speed communication and transportation make it possible to produce most products and services anywhere in the world," National Center 38; that "[m]odern machinery and production methods can therefore be combined with low wage workers to drive costs down," ibid.; that managers can perform " 'back office functions anywhere in the world now,' " and say that if they " 'can't get enough skilled workers here' " they will " 'move the skilled jobs out of the country,' " id., at 41; with the consequence that "rich countries need better education and retraining, to reduce the supply of unskilled workers and to equip them with the skills they require for tomorrow's jobs," Survey of Global Economy 37. In light of this increased importance of education to individual firms, it is no surprise that half of the Nation's manufacturers have become involved with setting standards and shaping curricula for local schools, Maturi 65-68, that 88 percent think this kind of involvement is important, id., at 68, that more than 20 States have recently passed educational reforms to attract new business, Overman 61-62, and that business magazines have begun to rank cities according to the quality of their schools, see Boyle 24.

The economic links I have just sketched seem fairly obvious. Why then is it not equally obvious, in light of those links, that a widespread, serious, and substantial physical threat to teaching and learning also substantially threatens the commerce to which that teaching and learning is inextricably tied? That is

to say, guns in the hands of six percent of inner-city high school students and gun-related violence throughout a city's schools must threaten the trade and commerce that those schools support. The only question, then, is whether the latter threat is (to use the majority's terminology) "substantial." And, the evidence of (1) the extent of the gun-related violence problem, see supra, at ——, 131 L Ed 2d, at 675-676, (2) the extent of the resulting negative effect on classroom learning, see supra, at —— - ——, 131 L Ed 2d, at 675-676, and (3) the extent of the consequent negative commercial effects, see supra, at —— - ——, 131 L Ed 2d, at 676-678, when taken together, indicate a threat to trade and commerce that is "substantial." At the very least, Congress could rationally have concluded that the links are "substantial."

Specifically, Congress could have found that gun-related violence near the classroom poses a serious economic threat (1) to consequently inadequately educated workers who must endure low paying jobs, see, e.g., National Center 29, and (2) to communities and businesses that might (in today's "information society") otherwise gain, from a well-educated work force, an important commercial advantage, see, e.g., Becker 10 (1992), of a kind that location near a railhead or harbor provided in the past. Congress might also have found these threats to be no different in kind from other threats than this Court has found within the commerce power, such as the threat that loan sharking poses to the "funds" of "numerous localities," Perez v United States, 402 US, at 157, 28 L Ed 2d 686, 91 S Ct 1357, and that unfair labor practices pose

to instrumentalities of commerce, see Consolidated Edison Co. v NLRB, 305 US 197, 221-222, 83 L Ed 126, 59 S Ct 206 (1938). As I have pointed out, supra, at ——, 131 L Ed 2d, at 675, Congress has written that "the occurrence of violent crime in school zones" has brought about a "decline in the quality of education" that "has an adverse impact on interstate commerce and the foreign commerce of the United States." 18 USC §§ 922(q)(1)(F), (G) [18 USCS §§ 922(q)(1)(F), (G)]. The violence-related facts, the educational facts, and the economic facts, taken together, make this conclusion rational. And, because under our case law, see supra, at —— - - ——, 131 L Ed 2d, at 673-674; infra, at ——, 131 L Ed 2d, at 682, the sufficiency of the constitutionally necessary Commerce Clause link between a crime of violence and interstate commerce turns simply upon size or degree, those same facts make the statute constitutional.

To hold this statute constitutional is not to "obliterate" the "distinction of what is national and what is local," ante, at ——, 131 L Ed 2d, at 642 (citation omitted; internal quotation marks omitted); nor is it to hold that the Commerce Clause permits the Federal Government to "regulate any activity that it found was related to the economic productivity of individual citizens," to regulate "marriage, divorce, and child custody," or to regulate any and all aspects of education. Ante, at —— - - ——, 131 L Ed 2d, at 641. For one thing, this statute is aimed at curbing a particularly acute threat to the educational process—the possession (and use) of life-threatening firearms in, or near, the classroom. The empirical evidence that I have discussed above

unmistakably documents the special way in which guns and education are incompatible. See supra, at —— - ——, 131 L Ed 2d, at 676. This Court has previously recognized the singularly disruptive potential on interstate commerce that acts of violence may have. See Perez, supra, at 156-157, 28 L Ed 2d 686, 91 S Ct 1357. For another thing, the immediacy of the connection between education and the national economic well-being is documented by scholars and accepted by society at large in a way and to a degree that may not hold true for other social institutions. It must surely be the rare case, then, that a statute strikes at conduct that (when considered in the abstract) seems so removed from commerce, but which (practically speaking) has so significant an impact upon commerce.

In sum, a holding that the particular statute before us falls within the commerce power would not expand the scope of that Clause. Rather, it simply would apply pre-existing law to changing economic circumstances. See Heart of Atlanta Motel, Inc. v United States, 379 US 241, 251, 13 L Ed 2d 258, 85 S Ct 348 (1964). It would recognize that, in today's economic world, gun-related violence near the classroom makes a significant difference to our economic, as well as our social, well-being. In accordance with well-accepted precedent, such a holding would permit Congress "to act in terms of economic . . . realities," would interpret the commerce power as "an affirmative power commensurate with the national needs," and would acknowledge that the "commerce clause does not operate so as to render the nation powerless to defend itself

against economic forces that Congress decrees inimical or destructive of the national economy." *North American Co. v SEC*, 327 US 686, 705, 90 L Ed 945, 66 S Ct 785 (1946) (citing *Swift & Co. v United States*, 196 US, at 398, 49 L Ed 518, 25 S Ct 276 (Holmes, J.)).

### III

The majority's holding—that § 922 falls outside the scope of the Commerce Clause—creates three serious legal problems. First, the majority's holding runs contrary to modern Supreme Court cases that have upheld congressional actions despite connections to interstate or foreign commerce that are less significant than the effect of school violence. In *Perez v United States, supra*, the Court held that the Commerce Clause authorized a federal statute that makes it a crime to engage in loan sharking ("[e]xtortionate credit transactions") at a local level. The Court said that Congress may judge that such transactions, "though purely *intrastate*, . . . affect *interstate* commerce." 402 US, at 154, 28 L Ed 2d 686, 91 S Ct 1357 (emphasis added). Presumably, Congress reasoned that threatening or using force, say with a gun on a street corner, to collect a debt occurs sufficiently often so that the activity (by helping organized crime) affects commerce among the States. But, why then cannot Congress also reason that the threat or use of force—the frequent consequence of possessing a gun—in or near a school occurs sufficiently often so that such activity (by inhibiting basic education) affects commerce among the States? The negative impact upon the national economy of an inability to teach basic skills seems no smaller (nor less

680

significant) than that of organized crime.

In *Katzenbach v McClung*, 379 US 294, 13 L Ed 2d 290, 85 S Ct 377 (1964), this Court upheld, as within the commerce power, a statute prohibiting racial discrimination at local restaurants, in part because that discrimination discouraged travel by African Americans and in part because that discrimination affected purchases of food and restaurant supplies from other States. See *id.*, at 300, 13 L Ed 2d 290, 85 S Ct 377; *Heart of Atlanta Motel, supra*, at 274, 13 L Ed 2d 258, 85 S Ct 348 (Black, J., concurring in *McClung* and in *Heart of Atlanta*). In *Daniel v Paul*, 395 US 298, 23 L Ed 2d 318, 89 S Ct 1697 (1969), this Court found an effect on commerce caused by an amusement park located several miles down a country road in the middle of Alabama—because some customers (the Court assumed), some food, 15 paddleboats, and a juke box had come from out of State. See *id.*, at 304-305, 308, 23 L Ed 2d 318, 89 S Ct 1697. In both of these cases, the Court understood that the specific instance of discrimination (at a local place of accommodation) was part of a general practice that, considered as a whole, caused not only the most serious human and social harm, but had nationally significant economic dimensions as well. See *McClung, supra*, at 301, 13 L Ed 2d 290, 85 S Ct 377; *Daniel supra*, at 307, n 10, 23 L Ed 2d 318, 89 S Ct 1697. It is difficult to distinguish the case before us, for the same critical elements are present. Businesses are less likely to locate in communities where violence plagues the classroom. Families will hesitate to move to neighborhoods where students carry guns instead of books. (Congress expressly

found in 1994 that "parents may decline to send their children to school" in certain areas "due to concern about violent crime and gun violence." 18 USC § 922(q)(1)(E) [18 USCS § 922(q)(1)(E)]). And (to look at the matter in the most narrowly commercial manner), interstate publishers therefore will sell fewer books and other firms will sell fewer school supplies where the threat of violence disrupts learning. Most importantly, like the local racial discrimination at issue in *McClung* and *Daniel*, the local instances here, taken together and considered as a whole, create a problem that causes serious human and social harm, but also has nationally significant economic dimensions.

In *Wickard v Filburn*, 317 US 111, 87 L Ed 122, 63 S Ct 82 (1942), this Court sustained the application of the Agricultural Adjustment Act of 1938 to wheat that Filburn grew and consumed on his own local farm because, considered in its totality, (1) home-grown wheat may be "induced by rising prices" to "flow into the market and check price increases," and (2) even if it never actually enters the market, home-grown wheat nonetheless "supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market" and, in that sense, "competes with wheat in commerce." *Id.*, at 128, 87 L Ed 122, 63 S Ct 82. To find both of these effects on commerce significant in amount, the Court had to give Congress the benefit of the doubt. Why would the Court, to find a significant (or "substantial") effect here, have to give Congress any greater leeway? See also *United States v Women's Sportswear Manufacturers Assn.*, 336 US 460, 464, 93 L Ed 805, 69 S Ct 714 (1949) ("If it is interstate commerce

that feels the pinch, it does not matter how local the operation which applies the squeeze"); *Mandeville Island Farms, Inc. v American Crystal Sugar Co.*, 334 US, at 236, 92 L Ed 1328, 68 S Ct 996 ("[I]t is enough that the individual activity when multiplied into a general practice . . . contains a threat to the interstate economy that requires preventative regulation").

The second legal problem the Court creates comes from its apparent belief that it can reconcile its holding with earlier cases by making a critical distinction between "commercial" and noncommercial "transaction[s]." *Ante*, at ——— ———, 131 L Ed 2d, at 638-639. That is to say, the Court believes the Constitution would distinguish between two local activities, each of which has an identical effect upon interstate commerce, if one, but not the other, is "commercial" in nature. As a general matter, this approach fails to heed this Court's earlier warning not to turn "questions of the power of Congress" upon "formula[s]" that would give

"controlling force to nomenclature such as 'production' and 'indirect' and foreclose consideration of the actual effects of the activity in question upon interstate commerce." *Wickard, supra*, at 120, 87 L Ed 122, 63 S Ct 82.

See also *United States v Darby*, 312 US 100, 116-117, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430 (1941) (overturning the Court's distinction between "production" and "commerce" in the child labor case, *Hammer v Dagenhart*, 247 US 251, 271-272, 62 L Ed 1101, 38 S Ct 529, 3 ALR 649 (1918)); *Swift & Co. v United States*, 196 US, at 398, 49 L Ed 518, 25 S Ct

681

276 (Holmes, J.) ("[C]ommerce among the States is not a technical legal conception, but a practical one, drawn from the course of business"). Moreover, the majority's test is not consistent with what the Court saw as the point of the cases that the majority now characterizes. Although the majority today attempts to categorize *Perez*, *McClung*, and *Wickard* as involving intrastate "economic activity," *ante*, at ——— ———, 131 L Ed 2d, at 637-638, the Courts that decided each of those cases did *not* focus upon the economic nature of the activity regulated. Rather, they focused upon whether that activity *affected* interstate or foreign commerce. In fact, the *Wickard* Court expressly held that *Wickard*'s consumption of home grown wheat, "*though it may not be regarded as commerce*," could nevertheless be regulated—"*whatever its nature*"—so long as "it exerts a substantial economic effect on interstate commerce." *Wickard*, *supra*, at 125, 87 L Ed 122, 63 S Ct 82 (emphasis added).

More importantly, if a distinction between commercial and noncommercial activities is to be made, this is not the case in which to make it. The majority clearly cannot intend such a distinction to focus narrowly on an act of gun possession standing by itself, for such a reading could not be reconciled with either the civil rights cases *(McClung* and *Daniel)* or *Perez*—in each of those cases the specific transaction (the race-based exclusion, the use of force) was not itself "commercial." And, if the majority instead means to distinguish generally among broad categories of activities, differentiating what is educational from what is commercial, then, as a practical matter, the line becomes almost impossible to

draw. Schools that teach reading, writing, mathematics, and related basic skills serve *both* social and commercial purposes, and one cannot easily separate the one from the other. American industry itself has been, and is again, involved in teaching. See *supra*, at ———, ———, 131 L Ed 2d, at 676-677, 678. When, and to what extent, does its involvement make education commercial? Does the number of vocational classes that train students directly for jobs make a difference? Does it matter if the school is public or private, nonprofit or profit-seeking? Does it matter if a city or State adopts a voucher plan that pays private firms to run a school? Even if one were to ignore these practical questions, why should there be a theoretical distinction between education, when it significantly benefits commerce, and environmental pollution, when it causes economic harm? See *Hodel v Virginia Surface Mining & Reclamation Assn., Inc.*, 452 US 264, 69 L Ed 2d 1, 101 S Ct 2352 (1981).

Regardless, if there is a principled distinction that could work both here and in future cases, Congress (even in the absence of vocational classes, industry involvement, and private management) could rationally conclude that schools fall on the commercial side of the line. In 1990, the year Congress enacted the statute before us, primary and secondary schools spent $230 billion—that is, nearly a quarter of a trillion dollars—which accounts for a significant portion of our $5.5 trillion Gross Domestic Product for that year. See Statistical Abstract 147, 442 (1993). The business of schooling requires expenditure of these funds on student transportation, food and custodial services, books, and teachers'

salaries. See U.S. Dept. of Education 4, 7 (1993). And, these expenditures enable schools to provide a valuable service—namely, to equip students with the skills they need to survive in life and, more specifically, in the workplace. Certainly, Congress has often analyzed school expenditure as if it were a commercial investment, closely analyzing whether schools are efficient, whether they justify the significant resources they spend, and whether they can be restructured to achieve greater returns. See, *e.g.*, S Rep No. 100-222, p 2 (1987) (federal school assistance is "a prudent investment"); Senate Appropriations Committee Hearing (1994) (private sector management of public schools); cf. Chubb & Moe 185-229 (school choice); Hanushek 85-122 (performance based incentives for educators); Gibbs (decision in Hartford, Conn., to contract out public school system). Why could Congress, for Commerce Clause purposes, not consider schools as roughly analogous to commercial investments from which the Nation derives the benefit of an educated work force?

The third legal problem created by the Court's holding is that it threatens legal uncertainty in an area of law that, until this case, seemed reasonably well settled. Congress has enacted many statutes (more than 100 sections of the United States Code), including criminal statutes (at least 25 sections), that use the words "affecting commerce" to define their scope, see, *e.g.*, 18 USC § 844(i) [18 USCS § 844(I)] (destruction of buildings used in activity affecting interstate commerce), and other statutes that contain no jurisdictional language at all, see, *e.g.*, 18 USC § 922(o)(1) [18 USCS § 922(o)(1)] (possession of machine guns). Do these,

or similar, statutes regulate noncommercial activities? If so, would that alter the meaning of "affecting commerce" in a jurisdictional element? Cf. *United States v Staszcuk*, 517 F2d 53, 57-58 (CA7 1975) (en banc) (Stevens, J.) (evaluation of Congress' intent "requires more than a consideration of the consequences of the particular transaction"). More importantly, in the absence of a jurisdictional element, are the courts nevertheless to take *Wickard*, 317 US, at 127-128, 87 L Ed 122, 63 S Ct 82, (and later similar cases) as inapplicable, and to judge the effect of a single noncommercial activity on interstate commerce without considering similar instances of the forbidden conduct? However these questions are eventually resolved, the legal uncertainty now created will restrict Congress' ability to enact criminal laws aimed at criminal behavior that, considered problem by problem rather than instance by instance, seriously threatens the economic, as well as social, well-being of Americans.

## IV

In sum, to find this legislation within the scope of the Commerce Clause would permit "Congress . . . to act in terms of economic . . . realities." *North American Co. v SEC*, 327 US, at 705, 90 L Ed 945, 66 S Ct 785 (citing *Swift & Co. v United States*, 196 US, at 398, 49 L Ed 518, 25 S Ct 276 (Holmes, J.)). It would interpret the Clause as this Court has traditionally interpreted it, with the exception of one wrong turn subsequently corrected. See *Gibbons v Ogden*, 9 Wheat, at 195, 6 L Ed 23 (holding that the commerce power extends "to all the external concerns of the nation, and to those internal concerns which affect the States gen-

erally"); *United States v Darby*, 312 US, at 116-117, 85 L Ed 609, 61 S Ct 451, 132 ALR 1430 ("The conclusion is inescapable that *Hammer v Dagenhart* [the child labor case], was a departure from the principles which have prevailed in the interpretation of the Commerce Clause both before and since the decision . . . . It should be and now is overruled"). Upholding this legislation would do no more than simply recognize that Congress had a "rational basis" for finding a significant connection between guns in or near schools and (through their effect on education) the interstate and foreign commerce they threaten. For these reasons, I would reverse the judgment of the Court of Appeals. Respectfully, I dissent.

### APPENDIX

*Congressional Materials*

(in reverse chronological order)

Private Sector Management of Public Schools, Hearing before the Subcommittee on Labor, Health and Human Services, and Education and Related Agencies of the Senate Committee on Appropriations, 103d Cong, 2d Sess (1994) (Senate Appropriations Committee Hearing (1994)).

Children and Gun Violence, Hearings before the Subcommittee on Juvenile Justice of the Senate Committee on the Judiciary, 103d Cong, 1st Sess (1993) (Senate Judiciary Committee Hearing (1993)).

Keeping Every Child Safe: Curbing the Epidemic of Violence, Joint Hearing before the Subcommittee on Children, Family, Drugs and Alcohol-

ism of the Senate Committee on Labor and Human Resources and the House Select Committee on Children, Youth, and Families, 103d Cong, 1st Sess (1993).

Recess from Violence: Making our Schools Safe, Hearing before the Subcommittee on Education, Arts and Humanities of the Senate Committee on Labor and Human Resources, 103d Cong, 1st Sess (1993) (Senate Labor and Human Resources Committee Hearing (1993)).

Preparing for the Economy of the 21st Century, Hearings before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 102d Cong, 2d Sess (1992).

Children Carrying Weapons: Why the Recent Increase, Hearing before the Senate Committee on the Judiciary, 102d Cong, 2d Sess (1992).

Youth Violence Prevention, Hearing before the Senate Committee on Governmental Affairs, 102d Cong, 2d Sess (1992).

School Dropout Prevention and Basic Skills Improvement Act of 1990, Pub L 101-600, § 2(a)(2), 104 Stat 3042. § 2(a)(2).

Excellence in Mathematics, Science and Engineering Education Act of 1990, 104 Stat 2883, 20 USC § 5301(a)(5) (1988 ed, Supp V) [20 USCS § 5301(a)(5)].

Oversight Hearing on Education Reform and American Business and the Implementation of the Hawkins-Stafford Amendments of 1988, Hearing before the Subcommittee on Elementary, Secondary, and Vocational Training of the House Committee on Education and Labor, 101st Cong, 2d Sess (1990).

U.S. Power in a Changing World, Report Prepared for the Subcommittee on International Economic Policy and Trade of the House Committee on Foreign Affairs, 101st Cong, 2d Sess, 43-66 (1990).

Gun Free School Zones Act of 1990, Hearing before the Subcommittee on Crime of the House Committee on the Judiciary, 101st Cong, 2d Sess (1990) (House Judiciary Committee Hearing (1990)).

Restoring American Productivity: The Role of Education and Human Resources, Hearings before the Senate Committee on Labor and Human Resources, 101st Cong, 1st Sess (1989).

Children and Guns, Hearing before the House Select Committee on Children, Youth, and Families, 101st Cong, 1st Sess (1989) (House Select Committee Hearing (1989)).

Education and Training for a Competitive America Act of 1988, Pub L 100-418, Title VI, 102 Stat 1469.

S Rep No. 100-222, (1987).

Education and Training for American Competitiveness, Hearings before the House Committee on Education and Labor, 100th Cong, 1st Sess (1987).

Competitiveness and the Quality of the American Work Force, Hearings before the Subcommittee on Education and Health of the Joint Economic Committee, 100th Cong, 1st Sess, pts 1 and 2 (1987).

Oversight Hearing on Illiteracy, Joint Hearing before the Subcommittee on Elementary, Secondary, and Vocational Education of the House Committee on Education and Labor and the Subcommittee on Education, Arts and Humanities of the Senate Committee on Labor and Human Resources, 99th Cong, 2d Sess (1986).

Oversight on Illiteracy in the United States, Hearings before the Subcommittee on Elementary, Secondary, and Vocational Education of the House Committee on Education and Labor, 99th Cong, 2d Sess (1986).

Crime and Violence in the Schools, Hearing before the Subcommittee on Juvenile Justice of the Senate Committee on the Judiciary, 98th Cong, 2d Sess (1984).

HR Rep No. 98-6, pts 1 and 2 (1983).

S Rep No. 98-151, (1983).

Education for Economic Security Act, Hearings before the Subcommittee on Education, Arts and Humani-

ties of the Senate Committee on Labor and Human Resources, 98th Cong, 1st Sess (1983).

Pub L 93-380, § 825, 88 Stat 602 (1974).

I. Clarke, Art and Industry: Instruction in Drawing Applied to the Industrial and Fine Arts, S Exec Doc No. 209, 46th Cong, 2d Sess, pt 2 (1891).

*Other Federal Government Materials*

(in reverse chronological order)

U.S. Dept. of Education, Office of Educational Research and Improvement, First Findings: The Educational Quality of the Workforce Employer Survey (Feb. 1995).

Economic Report of the President 108 (Feb. 1994).

U.S. Dept. of Commerce, Statistical Abstract of the United States (1993) (Statistical Abstract (1993)).

U.S. Dept. of Education, Office of Educational Research and Improvement, Public School Education Financing for School Year 1989-90 (June 1993) (U.S. Dept. of Education (1993)).

Economic Report of the President 101 (Feb. 1992).

U.S. Dept. of Labor, Secretary's Commission on Achieving Necessary

Skills, Skills and Tasks For Jobs: A SCANS Report for America 2000 (1992).

U.S. Dept. of Labor, Employment and Training Administration, Beyond the School Doors: The Literacy Needs of Job Seekers Served by the U.S. Department of Labor (Sept. 1992).

U.S. Dept. of Justice, Bureau of Justice Statistics, School Crime: A National Crime Victimization Survey Report (Sept. 1991) (U.S. Dept. of Justice (1991)).

U.S. Dept. of Commerce, Bureau of Census, 1990 Census of Population: Education in the United States 474 (Jan. 1994).

U.S. Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention, Weapons in Schools, OJJDP Bulletin 1 (Oct. 1989) (U.S. Dept. of Justice (1989)).

U.S. Dept. of Labor, Bureau of Labor Statistics, Handbook of Labor Statistics 281, 561, 576 (Aug. 1989) (Handbook of Labor Statistics (1989)).

Bishop, Incentives for Learning: Why American High School Students Compare So Poorly to their Counterparts Overseas, in 1 U.S. Dept. of Labor, Commission on Workforce Quality & Labor Market Efficiency, Investing in People 1 (1989).

Rumberger & Levin, Schooling for the Modern Workplace, in 1 U.S.

Dept. of Labor, Commission on Workforce Quality and Labor Market Efficiency, Investing in People 85 (Sept. 1989).

U.S. Dept. of Education and U.S. Department of Labor, The Bottom Line: Basic Skills in the Workplace 12 (1988).

U.S. Dept. of Labor, Employment and Training Administration, Estimating Educational Attainment of Future Employment Demand for States (Oct. 1981) (U.S. Dept. of Labor (1981)).

U.S. Dept. of Health, Education, and Welfare, National Institute of Education, Violent Schools—Safe Schools: The Safe School Study Report to Congress (1978) (U.S. Dept. of Health (1978)).

U.S. Dept. of Labor, Bureau of Apprenticeship, Apprenticeship Past and Present (1950) (U.S. Dept. of Labor (1950)).

*Other Readily Available Materials*

(in alphabetical order)

Akin & Garfinkel, School Expenditures and the Economic Returns to Schooling, 12 J. Human Resources 462 (1977).

American Council on Education, Business-Higher Education Forum, America's Competitive Challenge: A Report to the President of the United States (Apr. 1983).

P. Applebome, Employers Wary of School System, NY Times, Feb. 20, 1995, p A1, col 1.

Are Real Estate Firms Ready to Ride on the Infobahn?: Information Highway of Technology, National Real Estate Investor, Oct. 1994, p 6.

Aring, What the 'V' Word is Costing America's Economy: Vocational Education, 74 Phi Delta Kappan 396 (1993).

G. Atkinson, The Economics of Education (1983).

Becker, The Adam Smith Address: Education, Labor Force Quality, and the Economy, Business Economics, Jan. 1992, p 7 (Becker (1992)).

G. Becker, Human Capital (3d ed 1993) (Becker (1993)).

I. Berg, Education and Jobs: The Great Training Robbery (1970).

Berryman, The Economy, Literacy Requirements, and At-Risk Adults, in Literacy and the Marketplace: Improving the Literacy of Low-Income Single Mothers 22 (June 1989).

Bishop, Is the Test Score Decline Responsible for the Productivity Growth Decline, 79 Am Econ Rev 178 (Mar. 1989).

Bishop, High School Performance and Employee Recruitment, 13 J. Labor Research 41 (1992).

Blackburn, What Can Explain the Increase in Earnings Inequality Among Males?, 29 Industrial Relations 441 (1990).

Boissiere, Knight & Sabot, Earnings, Schooling, Ability and Cognitive Skills, 75 Am Econ Rev 1016 (1985).

A. Bolino, A Century of Human Capital by Education and Training (1989) (Bolino).

Boyle, Expansion Management's Education Quotient, Economic Development Rev., Winter 1992, pp 23-25 (Boyle).

Brandel, Wake Up Get Smart, New England Business, May 1991, p 46.

Callahan & Rivara, Urban High School Youth and Handguns: A School-Based Survey, 267 JAMA 3038 (1992).

Card & Krueger, Does School Quality Matter? Returns to Education and the Characteristics of Public Schools in the United States, 100 J. Pol. Econ. 1 (1992).

A. Carnevale, America and the New Economy: How New Competitive Standards are Radically Changing American Workplaces (1991).

A. Carnevale and J. Porro, Quality Education: School Reform for the New American Economy 31-32 (1994).

Center to Prevent Handgun Violence, Caught in the Crossfire: A Report on Gun Violence in our Nation's Schools (Sept. 1990).

Centers For Disease Control, Leads from the Morbidity and Mortality Weekly Report, 266 JAMA 2342 (1991) (Centers for Disease Control).

Chubb & Hanushek, Reforming Educational Reform, in Setting National Priorities 213 (H. Aaron ed 1990) (Chubb & Hanushek).

J. Chubb & T. Moe, Politics, Markets, and America's Schools (1990) (Chubb & Moe).

Coffee, Survey: Worker Skills, Training More Important in Site Selection, Site Selection, April 1993, p 296 (Coffee).

E. Cohn, Economics of Education (1979).

Council on Competitiveness, Competitiveness Index 5 (July 1994).

Council on Competitiveness, Elevating the Skills of the American Workforce (May 1993).

Council on Competitiveness, Governing America: A Competitiveness

Policy Agenda for The New Administration 33-39 (1989).

R. Cyert & D. Mowery, Technology and Employment: Innovation and Growth in the U.S. Economy (1987) (Cyert & Mowery).

J. Cynoweth, Enhancing Literacy for Jobs and Productivity: Council of State Policy and Planning Agencies Report (1994).

J. Davis & J. Morrall, Evaluating Educational Investment (1974) (Davis & Morrall).

Denison, Education and Growth, in Economics and Education 237 (D. Rogers & H. Ruchlin eds 1971) (Denison).

M. Dertouzos, R. Lester, & R. Solow, MIT Commission on Industrial Productivity, Made In America: Regaining the Productive Edge (1989).

A. DeYoung, Economics and American Education: A Historical and Critical Overview of the Impact of Economic Theories on Schooling in the United States (1989).

Downs, America's Educational Failures Will Hurt Real Estate, National Real Estate Investor, Aug. 1988, p 34.

Doyle, The Role of Private Sector Management in Public Education, 76 Phi Delta Kappan 128 (1994).

Education and Economic Development (C. Anderson & M. Bowman eds 1965).

Education Commission of the States, Task Force on Education for Economic Growth, Action for Excellence (June 1983).

Educational Testing Service, Developing the Skills and Knowledge of the Workforce (1993).

Finding What Really Works in Education, Chief Executive, May 1994, p 48.

Ganderton & Griffin, Impact of Child Quality on Earnings: The Productivity-of-Schooling Hypothesis, 11 Contemporary Policy Issues 39 (July 1993).

Garver, "Success Story!": The Evolution of Economic Development in Broward County, Florida, 11 Economic Development Review 85 (Summer 1993).

Gibbs, Schools for Profit, Time, Oct. 17, 1994, p 48 (Gibbs).

Gintis, Education, Technology, and the Characteristics of Worker Productivity, 61 Am Econ Rev 266 (1971).

Glazer, A Human Capital Policy for the Cities, Public Interest, Summer 1993, p 27.

Glazer, Violence in Schools: Can Anything be Done to Curb the Growing Violence?, CQ Researcher, Sept. 11, 1992, pp 785-808.

E. Gordon, J. Ponticell & R. Morgan, Closing the Literacy Gap in American Business 23 (1991) (Gordon, Ponticell, & Morgan).

E. Hanushek, Making Schools Work: Improving Performance and Controlling Costs (1994) (Hanushek).

Henkoff, Where Will the Jobs Come From?, Fortune, Oct. 19, 1992, p 58 (Henkoff).

Herbert, Reading, Writing, Reloading, NY Times, Dec. 14, 1994, p A23, col 1.

Industry's New Schoolhouse, NY Times, Jan. 9, 1994, section 4A, p 22, col 3. Education Life Supp.

Introducing the EQ (Education Quotient), Expansion Management, Sept./Oct. 1991, pp 18-24.

Investment in Education: The Equity-Efficiency Quandary (T. Schultz ed 1972).

Itzkoff, America's Unspoken Economic Dilemma: Falling Intelligence Levels, 18 J. Social, Pol. & Econ. Studies 311 (1993).

Johnson, The Private Sector Should Help U.S. Schools, Financier, Sept. 1991, p 34.

Johnson & Stafford, Social Returns to Quantity and Quality of Schooling, 8 J. Human Resources 139 (1973).

W. Johnston & A. Packer, Workforce 2000: Work and Workers for the Twenty-first Century (1987).

Jorgenson, The Contribution of Education to U.S. Economic Growth, 1948-73, in Education and Economic Productivity 95 (E. Dean ed 1984).

Kirkland, Are Service Jobs Good Jobs?, Fortune, June 10, 1985, p 38.

J. Kozol, Illiterate America 13 (1985).

J. Kozol, Where Stands the Republic: Illiteracy: A Warning and a Challenge to the Nation's Press 9 (1986).

M. Levin & A. Shank, Educational Investment in an Urban Society: Costs, Benefits, and Public Policy (1970).

Link & Ratledge, Social Returns to Quantity and Quality of Education: A Further Statement, 10 J. Human Resources 78 (1975).

Lyne, The Skills Gap: U.S. Work-Force Woes Complicate Business-Location Equation, Site Selection, Aug. 1992, p 642.

MacCormack, Newman, & Rosenfield, The New Dynamics of Global Manufacturing Site Location, 35 Sloan Management Review, No. 4, p 69 (1994) (MacCormack Newman, & Rosenfield).

F. Machlup, Education and Economic Growth (1970).

Markey, The Labor Market Problems of Today's High School Dropouts, Monthly Labor Review, June 1988, p 36.

Marshall, The Implications of Internationalization for Labor Market Institutions and Industrial Relations Systems, in Rethinking Employment Policy 205 (D. Bawden & F. Skidmore eds 1989) (Marshall).

R. Marshall & M. Tucker, Thinking for a Living: Work, Skills, and the Future of the American Economy 33 (1992) (Marshall & Tucker).

Maturi, The Workforce Lure: Education/Training Carries More Weight in Siting Decisions, Industry Week, May 16, 1994, pp 65-68 (Maturi).

M. Maurice, F. Sellier, & J. Silvestre, The Social Foundations of Industrial Power: A Comparison of France and Germany (1986).

Mikulecky, Job Literacy: The Relationship Between School Preparation and Workplace Actuality, 17 Reading and Research Quarterly 400 (1982).

Mikulecky & Ehlinger, The Influence of Metacognitive Aspects of Literacy on Job Performance of Electronics Technicians, 18 J. Reading Behavior 41 (1986).

MIT Commission on Industrial Productivity, Education and Training in the United States: Developing the Human Resources We Need for Technological Advance and Competitiveness, in 2 Working Papers of the MIT Commission on Industrial Productivity (1989) (MIT).

Mitchell, The Impact of International Trade on U.S. Employment, in American Labor in a Changing World Economy 5 (W. Morehouse ed 1978).

Morgan & Sirageldin, A Note on the Quality Dimension in Education, 76 J. Pol. Econ. 1069 (1968).

National Academy of Education, Economic Dimensions of Education (1979).

National Center on Education and the Economy, America's Choice: High Skills or Low Wages! (1990) (National Center).

National Commission on Excellence in Education, A Nation at Risk 8-9 (Apr. 1983).

National Commission on Jobs and Small Business, Making America Work Again: Jobs, Small Business, and the International Challenge (1987).

National Governor's Association, Making America Work 35-36, 77-96 (1987).

National Institute of Justice, Research in Brief, J. Toby, Violence in Schools 3 (Dec. 1983).

National School Safety Center, Weapons in Schools (May 1989).

Neef & Kask, Manufacturing Productivity and Labor Costs in 14 Economies, Monthly Labor Review, Dec. 1991, p 24 (Neef & Kask).

Neff, Recharging U.S. Competitiveness: Perhaps We Should Use Germany's Education System as a Benchmark, Industry Week, Jan. 20, 1992, p 21.

O'Connor, Education's Significance as Quality-Of-Life Location Factor Parallels Nationwide Reformist Movement, Site Selection Handbook, Aug. 1988, p 846.

M. O'Donoghue, Economic Dimensions in Education (1971).

Organisation for Economic Co-operation and Development, Education and the Economy in a Changing Society (1989).

Overman, Skilled States Lure New Business, HRMagazine, Jan. 1994, pp 61-62 (Overman).

Packer, Taking Action on the SCANS Report, Educational Leadership, Mar. 1992, p 27.

R. Perlman, The Economics of Education: Conceptual Problems and Policy Issues (1973).

R. Price, Fighting Violence with 'All the Mushy Stuff,' USA Today, May 9, 1994, p 9A.

D. Prothrow-Stith, Deadly Consequences (1991).

G. Psacharopoulos, Returns to Education: An International Comparison (1973).

M. Rasell & E. Appelbaum, Investment in Learning: An Assessment of the Economic Return (1992).

Ray & Mickelson, Corporate Leaders, Resistant Youth, and School Reform in Sunbelt City: The Political Economy of Education, 37 Social Problems 178 (1990).

R. Reich, The Work of Nations (1991).

D. Riddle, Service-Led Growth: The Role of the Service Sector in World Development (1986).

W. Rorabaugh, The Craft Apprentice: From Franklin to the Machine Age in America (1986) (Rorabaugh).





Rumberger & Daymont, The Economic Value of Academic and Vocational Training Acquired in High School, in Youth and the Labor Market 157 (M. Borus ed 1984).

Ruttenberg, The Limited Promise of Public Health Methodologies to Prevent Youth Violence, 103 Yale L J 1885 (1994).

Ryscavage & Henle, Earnings Inequality Accelerates in the 1980's, Monthly Labor Review, Dec. 1990, p 3.

T. Schultz, Education and Productivity (Report Prepared for the National Commission on Productivity, 1971).

Schultz, Investment in Human Capital, American Economic Review, Mar. 1961, p 3, reprinted in 1 Economics of Education 13 (M. Blaug ed 1968) (Schultz (1961)).

S. Seninger, Labor Force Policies for Regional Economic Development: The Role of Employment and Training Programs (1989).

R. Seybolt, Apprenticeship & Apprenticeship Education in Colonial New England & New York (1917) (Seybolt).

Sheley, McGee, & Wright, Gun-Related Violence in and Around Inner-City Schools, 146 Am J Diseases in Children 677 (1992) (Sheley, McGee, & Wright).

Stone & Boundy, School Violence: The Need for a Meaningful Response, 28 Clearinghouse Review 453 (1994).

Strane, Locating in Rural America Could be a Competitive Advantage, Telemarketing, Oct. 1993, p 92.

R. Sturm, How Do Education and Training Affect a Country's Economic Performance? A Literature Survey. (1993).

A Survey of The Global Economy, The Economist, Oct. 1, 1994, p 70-37 (Survey of Global Economy).

Swaim & Podgursky, Do More-Educated Workers Fare Better Following Job Displacement?, Monthly Labor Review, Aug. 1989, p 43.

Tremblay, The Impact of School and College Expenditures on the Wages of Southern and Non-Southern Workers, 7 J. Labor Research 201 (1986).

J. Vaizey, The Economics of Education (1973).

J. Vaizey, The Political Economy of Human Capital (1973).

Vallens, Global Economy May Dictate More Spending for Training, Modern Plastics, Nov. 1993, p 19.

Wachtel, The Effect on Earnings of School and College Investment Ex-

penditures, 58 Review of Economics & Statistics 326, 330 (1976).

Wirth, Education and Work: The Choices We Face, Phi Delta Kappan, Jan. 1993, p 361.

Weiner & Siler, Trained to Order, Forbes, June 26, 1989, pp 73-78.

A. Wirth, Education and Work for the Year 2000 (1992).

L. Wheat, Urban Growth in the Non-metropolitan South 65 (1976).

L. Wise, Labor Market Policies and Employment Patterns in the United States 50 (1989).

694

STATE OF ALABAMA  V.  ZEPHYRINUS C. EGBUONU
APPEAL FROM JEFFERSON CIRCUIT COURT (CC-04-1422)
CR-05-0143

TODAY THE QUESTION IF FRAMED AS WHETHER THE STATE OF ALABAMA STATE STATUTE CODE
13-8-196 HAS A DIRECT CONFLICT, INCONSISTENT WITH ALABAMA STATE, FOREIGN STATES
FEDERAL LAWS AND CONSTITUTIONS, AND CONSTITUTION OF THE UNITED STATES OF AMERICA·

DEFENDANT(EGBUONU) HAVE NEVER BEEN TO, NOR HAD CONTACT WITH THE STATE OF ALABAMA.
EGBUONU RESIDES IN THE STATE OF CALIFORNIA.  NO CRIME OR ELEMENT OF CRIME
OCCURRED IN ALABAMA.  ALL CRIME COMMENCED, CONTINUED AND CONSUMMATED IN THE STATE
OF CALIFORNIA.

## UNITED STATES SUPREME COURT CONTROLLING CASES

UNITED STATES V. RODRIGUEZ-MORENO 526 US 275,119 S.CT. 1239,143 L. ED.2D 388(1999)

UNITED STATES V. CABRALES 524 US 1,118 S.CT. 1772, 141 L ED 2D 1(1998)

PLATT V. MINNESOTA MIN. & MFG. CO. 376 US 240, 5 L ED 340, 81 S.CT. 358(1964)

TRAVIS V. UNITED STATES 364 US 631, 5 L. ED.2D,340, 81 S. CT. 358 (1961)

UNITED STATES V. CORES 356 US 405, 785 S.CT.875, 2 L.ED.2D 873 (1958)

PARR V. UNITED STATES 351 US 513

UNITED STATES V. ANDERSON 328 US 699, 90 L.ED. 1529 (1946)

UNITED STATES V. JOHNSON 323 US 273, 65 S.CT. 249, 89 L.ED.236 (1944)

HYDE V. UNITED STATES 225 US 347, 32 S.CT.793, 56 L.ED. 1114 (1912)

## OTHER UNITED STATES SUPREME COURT CONTROLLING CASES

JOHNSTON V. UNITED STATES 351 US 215, 100 L.ED. 1097, 76 S.CT. 739 (     )

UNITED SATES V. LOMBARDO 241 US 73, 36 S.CT. 508, 60 L.ED. 897 (1916)

BROWN V. ELLIOTT 225 US 392, 56 L.ED.1136, 32 S.CT. 812

ARMOUR PACKING CO. V. UNITED STATES 209 US 56, 28 S.CT. 428, 52 L.ED. 681 (1908)

BURTON V. UNITED STATES 202 US 344, 26 S.CT. 688, 50 L.ED. 1057

EXHIBIT 18

IN RE PALLISER 136 US 257, 34 L.ED. 514, 10 S.CT. 1034

UNITED STATES V. BOWMAN 260 US 94

SALINGER V. LOISEL V. UNITED STATES 265 224, S.CT. 519, 68 L.ED. 989 (1924)

STRASSHEIM V. DAILY 221 US 280, 31 S.CT. 558, 55 L.ED. 735 (1911)

NOTE, NONE OF THE ABOVE MENTIONED CASE DECISIONS SUPPORTS ALABAMA STATE CHOICE OF VENUE IN EGBUONU'S CASE.


### FEDERAL CRIMINAL CIRCUIT COURT OF APPEALS CONTROLLING CASES

UNITED STATES V. BREITWEISER 357 F.3D 1249 (11TH CIRCUIT 2004)

UNITED STATES V. ROBERTS 308 F.3D 1147 (11TH CIRCUIT 2002)

UNITED STATES V. DIJAMES 731 F.2D 758 (11TH CIRCUIT 1984)

UNITED STATES V. MCCULLEY 673 F.2D 346 (11TH CIRCUIT 1982)

HEATH V. JONES 941 F.2D 1126 (11TH CIRCUIT 1991)


UNITED STATES V. STRAIN 396 F.3D 689 (5TH CIRCUIT 2005)

UNITED STATES V. STRATTON 649 F.2D 1066 (5TH CIRCUIT 1981)


UNITED STATES V. SILVERIO RAMIERZ ANGELICA VITUG (NO. 03-1262, 04-0762, 2ND CIRCUIT AUGUST 2005)

UNITED STATES V. BRENNAN 183 F.3D 139 (2ND CIRCUIT 1999)


NOTE, NONE OF THE ABOVE MENTIONED CASE DECISIONS SUPPORTS THE STATE OF ALABAMA CHOICE OF VENUE IN THE EGBUONU'S CASE.

ACRO369   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2004 001422.00
JUDGE ID: -AB

STATE OF ALABAMA                    VS        EGBUONU ZEPHYRIUS C

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| MAY-12-2004 | Motion for bond reduction filed — Denied |
| | Set for Trial before Judge Alfred Bahakel on 7-19-04 at 9:00am O'clock |
| 5/14/04 | B Subp. Issued |
| 5-13-04 | State's Notice of Intent To Use Prior Conviction |
| 5-13-04 | State's Request For Disclosure |
| 5-13-04 | Notice of State's Intention To Proceed Under Habitual offender statute |
| 5-13-04 | State's Notice of Intent To Introduce 404b evidence at trial |
| MAY 28 2004 | Motion for dismissal based on incorrect venue under Alabama Code section 15-2-2 set 6-14-04 at 9 am |
| | ATTORNEY NOTIFIED BY PHONE AND INFORMED TO NOTIFY CLIENT. |
| JUN 02 2004 | Deft declared to be indigent other than for atty's fees |
| JUN 14 2004 | Motion for reconsideration of bond and Petition for Habeus Corpus regarding alleged improper venue heard and denied |

**EXHIBIT 19**

ALABAMA     JUDICIAL     INFORMATION     CENTER

CASE ACTION SUMMARY
CONTINUATION

CASE: CC *04-1422*

JUDGE ID:

TE OF ALABAMA                                    VS

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|

UG 25 2005 | If appearing to the Court that the Defendant is without and unable to employ counsel and upon defendant's request that the Court appoint counsel to represent him in this cause, the Court hereby appoints Hon. *BID Hughes* Attorney at Law, to represent him herein and this cause is passed to the ___ 20__ at __ M for pretrial hearing.  *[signature] Circuit Judge* | *on appeal and a free transcript is hereby ordered.* *[signature]*

8-15-05 | *Oral Notice of Appeal*

8-16-05 | *Notice of Appeal mailed to the Ct of Criminal Appeals, the Atty.*

8-16-05 | *Letter mailed to the atty for dept*

9-1-05 | *Motion to Review all recorded exhibits*

9-1-05 | *Motion for a new trial*

9-1-05 | *Motion for Production of Grand Jury types evidence & Indictments*

9-2-05 | *Copy of Motion for new trial mailed to the Ct of Criminal Appeals, the Atty's General DA & Ct Reporter*

SEP 08 2005 | *Motion Hearing set 9-26-05 at 9am*  *[signature]*

*Case set for [trial] and Department of Corrections and Institutions ordered to have Deft. In court by 9-26-05 at 9am* *Judge*

*[signature]*

**EXHIBIT 20**

ACR371                    ALABAMA JUDICIAL DATA CENTER
          NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                          BY THE TRIAL COURT CLERK                    **198**
                  IN THE CIRCUIT COURT  OF  JEFFERSON COUNTY
STATE OF ALABAMA VS EGBUONU ZEPHYRIUNS C        JUDGE: ALFRED BAHAKEL

---

APPEAL DATE: 08/15/2005

---

INDIGENCY STATUS:
    GRANTED INDIGENCY STATUS AT TRIAL COURT:        __X__ YES   _____ NO
    APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:  _____ YES   __X__ NO
    INDIGENT STATUS REVOKED ON APPEAL:              _____ YES   __X__ NO
    INDIGENT STATUS GRANTED ON APPEAL:              __X__ YES   _____ NO

DEATH PENALTY: NO

APPEAL TYPE: STATE CONVICTION

---

THIS IS AN APPEAL FROM A CONVICTION.

DATE OF CONVICTION: 05/26/2005         DATE OF SENTENCE: 08/02/2005

YOUTHFUL OFFENDER STATUS: DENIED

CO/CASE NUMBER: 01/CC 2004 001422.00
CODE: IDT1   CONVICTION: IDENTITY THEFT 1   ACTION: CONVICTED
                                            STATUTE: 13A-008-192
CODE: IDT1   CONVICTION: IDENTITY THEFT 1   ACTION: CONVICTED
                                            STATUTE: 13A-008-192
SENTENCE:   CONF: 10 YRS 00 MOS 000 DAYS
SENTENCE:   PROB: 00 YRS 00 MOS 000 DAYS    LIFE: NO    LIFEWO: NO

---

POST-JUDGMENT MOTIONS FILED:      DT FILED      DT DENIED      CON BY AGREE
___ MOTION FOR NEW TRIAL          _____      _____      _____
___ MOTION FOR JUDG. OF ACQUIT    _____      _____      _____
___ MOTION TO W/D GUILTY PLEA     _____      _____      _____
___ MOTION FOR ATTY TO W/DRAW     _____      _____      _____
___ OTHER _____   _____      _____      _____

---

COURT REPORTER(S):                 FRAZIER, SUZANNE B.
ADDRESS:                           C/O HON. - AB BAHAKEL
                                   BIRMINGHAM       , AL  35203

APPELLATE COUNSEL #1:              HUGHES SIDNEY J
ADDRESS:                           2908 CRESCENT AVE

                                   HOMEWOOD         , AL  35209
PHONE NUMBER:                      205-871-7430

APPELLATE COUNSEL #2:              _____
ADDRESS:                           _____
                                   _____
                                   _____
PHONE NUMBER:                      _____

APPELLANT (PRO SE):                EGBUONU ZEPHYRIUNS C
ADDRESS:                           9622 GLASGOW PL AP 208
                                   LOS ANGELES      , CA  900450000
AIS #:                             000000

APPELLEE (IF CITY APPEAL):         _____
ADDRESS:                           _____
                                   _____

---

I CERTIFY THAT THE INFORMATION PROVIDED                    OPERATOR: PAS
ABOVE IS ACCURATE TO THE BEST OF MY              PREPARED: 08/16/2005
KNOWLEDGE AND I HAVE SERVED A COPY OF      _Anne Marie Adams_
THIS NOTICE OF APPEAL ON ALL PARTIES TO    _____
THIS ACTION ON THIS ___ DAY OF AUG 1 6 2005    CIRCUIT COURT CLERK



**EXHIBIT 21**

Case No. CR-05-0143

IN THE COURT OF CRIMINAL APPEALS
FOR THE STATE OF ALABAMA

---

PEOPLE OF THE STATE OF ALABAMA,

Plaintiff-Appellee,

-vs-

ZEPHYRINUS EGBUONU,

Defendant-Appellant.

---

Appeal from the Circuit Court
of Jefferson County, Alabama
Honorable Circuit Judge Alfred Bahakel
Circuit Court Case No. CC 04-1422

---

**OPENING APPELLATE BRIEF OF APPELLANT EGBUONU**

**ORAL ARGUMENT REQUESTED**

Sid Hughes, Esq.
2700 Highway 280
Suite 320 West
Birmingham, Alabama 35223
(205) 871-7430
Counsel for Appellant Egbuonu


EXHIBIT 22

## TABLE OF AUTHORITIES

*Cases*:

Apprendi v. New Jersey, 530 U.S. 466, 478, 120 S.Ct. 2348 (2000) . . . . . . . . . . . . . . . . . . . .

Blakely v. Washington, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) . . . . . . . . . . . . . . . . . . . .

Brady v. Maryland, 373 U.S. 83, 87 (1963) . . . . . . . . .

Chambers v. Mississippi, 410 U.S. 284, 302, 35 L.Ed.2d 297, 93 S.Ct. 1038 (1973) . . . . . . . . . . . . . . . . . . .

Chapman v. California, 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824 (1967) . . . . . . . . . . . . . . . . . . . . .

Cotto v. Herbert, 331 F.3d 217 (2d Cir. 2003) . . . . . .

Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1005, 39 L.Ed.2d 347 (1974) . . . . . . . . . . . . . . . . . . .

Delaware v. Van Arsdall, 475 U.S. 673, 681, 89 L.Ed.2d 674, 106 S.Ct. 1431 (1986) . . . . . . . . . . . . . . . . . .

Giglio v. United States, 405 U.S. 150, 153-54 (1972) . . .

Harris v. United States, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) . . . . . . . . . . . . . . . . . . . . . .

In re Winship, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970) . . . . . . . . . . . . . . . . . . . .

Kentucky v. Stincer, 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) . . . . . . . . . . . . . . . . . .

Kyles v. Whitley, 514 U.S. 419, 115, S.Ct. 1555, 131 L.Ed.2d 490 (1995) . . . . . . . . . . . . . . . . . . . .

Ladner v. United States, 358 169 L.Ed.2d 199, 79 S. Ct. 209 (1958) . . . . . . . . . . . . . . . . . . . . .

Pointer v. Texas, 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.

Ed.2d 923 (1985) . . . . . . . . . . . .

<u>Ring v. Arizona</u>, 536 U.S. 584 (2002) . . . . . . . . . .

<u>Rose v. Clark</u>, 478 U.S. 570, 92 L.Ed.2d 460, 106 S.Ct. 3101 (1986) . . . . . . . . . . . . . . . . .

<u>Solesbee v. Balkcom</u>, 339 U.S. 9, 16, 70 S. Ct. 457, 461, 94 L. Ed. 604 (1950) . . . . . . . . . . . . .

<u>Strickler v. Greene</u>, 527 U.S. 263, 281, 119. S.Ct. 629, 79. L.Ed. 1314 (1935) . . . . . . . . . . . . . .

<u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985) . . . . . .

<u>United States v. Beech-Nut Nutrition Corp.</u>, 871 F.2d 1181 (2nd Cir. 1989) . . . . . . . . . . . . . . . .

<u>United States v. Booker</u>, 125 S.Ct. 738 (2005) . . . . . . . .

<u>United States v. Cabrales</u>, 524 U.S. 1, 6-7 (1998) . . . . . .

<u>United States v. Lopez</u>, 115 S.Ct. 1624 (1995) . . . . . . .

<u>United States v. Rodriguez-Moreno</u>, 526 U.S. 275, 279 (1999).

<u>Washington v. Texas</u>, 388 U.S. 14, 19 (1967) . . . . . . . .


<u>Ballenger v. State</u>, 720 So.2d 1033, 1034 (Ala. Crim. App. 1998) . . . . . . . . . . . . . . . . . .

<u>Beard v. State</u>, 1992 Ala. Crim. App. LEXIS 1193, 612 So.2d 1335 (Ala. Crim App. 1992) . . . . . . . . . .

<u>Bynum v. Brewer</u>, 217 Ala. 52, 114 So. 577 (1927) . . . . . .

<u>Ex parte Carstens</u>, 1998 Ala. LEXIS 214, 7128 So.2d 128 (1998) . . . . . . . . . . . . . . . . .

<u>Faircloth v. State</u>, 471 So.2d 485, 488 (Ala. Crim. App. 1984)) . . . . . . . . . . . . . . . . . .

International Union, Etc. v. Russell, 264 Ala. 456, 88 So.2d
175 (1956) . . . . . . . . . . . . . . . . . . . . . . .

Jenkins v. State, 2004 Ala. Crim. App. LEXIS 30 (Ala. Crim.
App. 2004) . . . . . . . . . , . . . . . . . . . . . . .

King Homes, Inc. v. Roberts, 46 Ala. App. 257, 240 So.2d 679
(Ala. Civ. App. 1977) . . . . . . . . . . . . . . . . . .

Lane v. State, 644 So.12d 1318, 1321 (Ala. Crim. App. 1994)_

Miller v. State, 1996 Ala. Crim. App. LEXIS 303, 687 So.2d
1281 (Ala. Crim. App. 1996) . . . . . . . . . . . . . . .

Nunn v. State, 697 So.2d 497, 498 (Ala. Crim. App. 1997)  .

O'Donohue v. Citizens Bank, 350 So.2d 1049 (1977). . . . .

O'Neal v. State, 602 So.2d 462, 464 (Ala. Crim. App. 1992)

Scott v. State, 2005 Ala. Crim. App. LEXIS 36 (Ala. Crim.
App. 2005) . . . . . . . . . . . . . . . . . . . . . . .

Stallworth v. State, 2001 Ala. Crim. App. LEXIS 243, 868
So.2d 1128 (Ala. Crim. App. 2001) . . . . . . . . . . . .

The National Police Power Under the Commerce Clause of the
Constitution, 3 Minn. L. Rev. 289, 290 (1919) . . . . . .

Walker v. Mayer, 290 Ala. 233, 275 So.2d 662 (1973) . . . .

Wilson v. State, 2003, Ala. LEXIS 181, 874 So.2d 1145 (2003)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Statutes and Other Material:**

U.S. Const., Art. III, § 2 . . . . . . . . . . . . . . . .

U.S. Const., amend VI . . . . . . . . . . . . . . . . . . .

Ala. Code § 13A-8-192 . . . . . . . . . . . . . . . . . . .

Ala. Code § 13A-8-196  . . . . . . . . . . . . . . . . . .

Ala. Code § 15-2-2 . . . . . . . . . . . . . . . . . . . .

Ala. Code § 15-21-1 . . . . . . . . . . . . . . . . .

Alabama Constitution of 1901 §§ VI and VII . . . . . . . .

Alabama Constitution of 1901 Article I, section 6 . . . . .

Ala. R. Crim. Rule 16.1(c) . . . . . . . . . . . . . . . .

Ala. R. Evid. 404(b) . . . . . . . . . . . . . . . . . .

<u>Pleading and Evidence in Criminal Cases 51</u> (15th ed. 1862)).

## STATEMENT OF THE CASE

The Appellant was indicted by a Grand Jury for Jefferson County, Alabama on April 2, 2004. The Appellant was charged with first degree identity theft pursuant to Ala. Code § 13A-8-192, [with the resultant loss exceeding $250].

Prior to trial, defense counsel moved to dismiss the case against the Appellant for lack of a speedy trial. Counsel also objected to the introduction of prior bad act evidence pursuant to Ala.R.Evid. 404(b). Counsel also filed a motion to dismiss for lack of jurisdiction, as well as lack of venue. Counsel also filed a motion to test the sufficiency of the evidence. The Appellant also filed an affidavit of substantial hardship.

The Appellant filed a petition for writ of habeas corpus pursuant to Ala. Code § 15-21-1 with the trial court during the pendency of the Appellant's trial. The Appellant argued: (1) Ala. Code § 13A-8-192, *et seq.*, is unconstitutional in that it seeks to extend Alabama's jurisdiction beyond the territorial boundaries of Alabama; (2) Ala. Code §§ 13A-8-192 and 196 violate sections VI and VII of the Alabama Constitution of 1901 by not allowing a

1

criminal prosecution in the county where the crime was committed; (3) Ala. Code § 13A-8-192, et seq., are in violation of the Sixth, Ninth, and Tenth Amendments of the United States Constitution in that they deny the accused the right to a "speedy public trial by an impartial jury of the state and district wherein the crime shall have been committed." The issues were based upon the fact that the Appellant has never been to Alabama. In fact, the Appellant was arrested in California, and that a crime, if committed, was committed in California. Obviously, since the Appellant has never been to Alabama, he cannot be termed a fugitive from Alabama. Following a hearing, the petition was denied on June 23, 2004. A notice of appeal was filed on July 20, 2004 (appeal no. CR-03-1721). On appeal to the Court of Criminal Appeals, the Appellant argued the aforementioned issues, as well as the argument that the incorrect usage of "fugitive" voids the extradition which wrongfully brought the Appellant to Alabama. The appeal was denied on November 24, 2004. The Appellant thereafter filed a petition for writ of certiorari with the Supreme Court of Alabama. The writ was denied on April 22, 2005.

Following a jury trial which began on May 22, 2005, and

2

sentencing on August 2, 2005, the Appellant thereafter filed a motion for new trial. The Appellant argues that: (1) the verdict was contrary to law in that Ala. Code § 13A-8-192 unconstitutionally extended venue and jurisdiction beyond the boundaries of Alabama, thus depriving the Appellant of a trial by his peers; (2) the Appellant was denied his right to have witnesses appear in his behalf when he was forced to pay for the prosecution's witnesses to appear; (3) the Appellant was denied a fair trial when he was convicted using improperly admitted evidence; (4) the Appellant received an unduly harsh and unreasonable sentence; and (5) the evidence utilized in convicting the Appellant was insufficient.

## STATEMENT OF THE ISSUES

I.   Did the circuit court err in sustaining a verdict contrary to law, in that Ala. Code § 13A-8-192 unconstitutionally extended venue and jurisdiction beyond the boundaries of Alabama?

II.  Was the Appellant denied his right to have witnesses appear on his behalf when he was forced to pay for the prosecution's witnesses to appear?

III. Was the Appellant denied a fair trial when he was

3

convicted using improperly admitted evidence?

IV.   Was the Appellant was denied a fair trial when the
      prosecution failed to disclose exculpatory evidence?

V.    Did the circuit court err in issuing an unduly harsh
      and unreasonable sentence to the Appellant?

VI.   Did the circuit court err in sustaining the Appellant's
      convictions despite the lack of sufficient evidence?

### STATEMENT OF THE FACTS

The instant matter arises out of alleged identity theft
committed by the Appellant in 2003.  During the time that
the alleged identity theft occurred, the Appellant was a
resident of Los Angeles, California.  A mailbox owned and
registered to Jerome Bivens, James Roberson, and Rosemary
Roberson was being utilized during this time in conjunction
with the charged crimes.  The mailbox was located at a
Mailboxes, Etc., outlet, which required two forms of
identification to open the box. Neither were produced at
trial. Several open credit accounts were traced back to the
mailbox at issue. None were in the Appellant's name.  The
credit accounts were also in the names of James and Rosemary
Roberson.  The James Roberson at issue is a resident of
Jefferson County, Alabama.

4

The Appellant denied having any knowledge of James and Rosemary Roberson.  The Appellant also submitted that he had never been in the state of Alabama.

### STATEMENT OF THE STANDARD OF REVIEW

I.  **The circuit court erred in sustaining a verdict contrary to law, in that Ala. Code § 13A-8-192 unconstitutionally extended venue and jurisdiction beyond the boundaries of Alabama.**

This court reviews allegations that a defendant's constitutional rights have been deprived pursuant to the harmless error standard as enunciated in Chapman v. California, 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824 (1967).  Beard v. State, 1992 Ala. Crim. App. LEXIS 1193, 612 So.2d 1335 (Ala. Crim App. 1992); see also Rose v. Clark, 478 U.S. 570, 92 L.Ed.2d 460, 106 S.Ct. 3101 (1986). It is well settled that an otherwise valid conviction should not be set aside if, based upon the whole record, the constitutional error was harmless beyond a reasonable doubt. Beard, 612 So.2d at 1346(citing Delaware v. Van Arsdall, 475 U.S. 673, 681, 89 L.Ed.2d 674, 106 S.Ct. 1431 (1986)).

Both the Sixth Amendment and Federal Rule of Criminal Procedure 18 require that defendants be tried in the district where their crime was "committed." U.S. Const. amend. IV, Fed.R.Crim.P. 18; see also U.S. Const. art. iii,

5

§ 2, cl.3. When a federal statute defining an offense does not specify how to determine the location where the crime was committed, "[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." United States v. Cabrales, 524 U.S. 1, 6-7 (1998) (quoting United States v. Anderson, 328 U.S. 699, 703 (1946)). To carry out that task, we must "initially identify the conduct constituting the offense," and then "discern the location of the commission of the criminal acts." United States v. Rodriguez-Moreno, 526 U.S. 275, 279 (1999). In United States v. Silverio Ramirez and Angelica Vitug, the Second Circuit recently emphasized the four-pronged substantial contacts to determine proper venue. Whether the crime be continuing or non-continuing, "venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." (Id. at 11) "Since venue is proper only where a crime is committed (Id.), and United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181 (2nd Cir. 1989), precludes considering preparatory acts in determining the *locus delicti*, we vacate appellant's conviction."

II. **The Appellant was denied his right to have witnesses appear on his behalf when he was forced to pay for the**

prosecution's witnesses to appear.

This court reviews allegations that a defendant's constitutional rights have been deprived pursuant to the harmless error standard as enunciated in <u>Chapman v. California</u>, 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824 (1967). <u>Beard v. State</u>, 1992 Ala. Crim. App. LEXIS 1193, 612 So.2d 1335 (Ala. Crim App. 1992); see also <u>Rose v. Clark</u>, 478 U.S. 570, 92 L.Ed.2d 460, 106 S.Ct. 3101 (1986). It is well settled that an otherwise valid conviction should not be set aside if, based upon the whole record, the constitutional error was harmless beyond a reasonable doubt. <u>Beard</u>, 612 So.2d at 1346(citing <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 681, 89 L.Ed.2d 674, 106 S.Ct. 1431 (1986)).

**III. The Appellant was denied a fair trial when he was convicted using improperly admitted evidence.**

The standard of review regarding whether issues of an evidentiary nature are whether the trial court abused its discretion, as such matters are within the sound discretion of the trial court. <u>International Union, Etc. v. Russell</u>, 264 Ala. 456, 88 So.2d 175 (1956); <u>Walker v. Mayer</u>, 290 Ala. 233, 275 So.2d 662 (1973).

**IV. The Appellant was denied a fair trial when the prosecution failed to disclose exculpatory evidence.**

7

The standard of review regarding whether issues of an evidentiary nature are whether the trial court abused its discretion, as such matters are within the sound discretion of the trial court. <u>International Union, Etc. v. Russell</u>, 264 Ala. 456, 88 So.2d 175 (1956); <u>Walker v. Mayer</u>, 290 Ala. 233, 275 So.2d 662 (1973).

**V.    The circuit court erred in issuing an unduly harsh and unreasonable sentence to the Appellant.**

This court reviews sentences issued by the lower court according to a plain error standard of review. <u>Jenkins v. State</u>, 2004 Ala. Crim. App. LEXIS 30 (Ala. Crim. App. 2004). R. 458-459.

**VI.   The circuit court erred in sustaining the Appellant's convictions despite the lack of sufficient evidence.**

In determining the sufficiency of the evidence to sustain a conviction, this court must accept as true "all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution." <u>Ballenger v. State</u>, 720 So.2d 1033, 1034 (Ala. Crim. App. 1998)(quoting <u>Faircloth v. State</u>, 471 So.2d 485, 488 (Ala. Crim. App. 1984)). The test utilized in determining the sufficiency of the evidence is whether "viewing the evidence in the light

8

most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt." <u>Nunn v. State</u>, 697 So.2d 497, 498 (Ala. Crim. App. 1997)(quoting <u>O'Neal v. State</u>, 602 So.2d 462, 464 (Ala. Crim. App. 1992)).

### SUMMARY OF THE ARGUMENT

The Appellant submits that the state of Alabama unconstitutionally extended criminal jurisdiction in this matter to California. The Appellant did not have any contact with Alabama, nor did any part of the crime at issue occur in Alabama. However, the Appellant, residing at various times in California, was hailed before an Alabama tribunal.

The Appellant submits that he was denied the right to present a defense, namely in presenting witnesses on his behalf, when he was forced to pay for the State's witnesses to appear. As noted, the events at issue occurred in California. Therefore, the Appellant had to use his own money (restitution) to fly State's witnesses from California to testify against him. The Appellant was without sufficient means to fly his own witnesses in from California. Only two witnesses appeared in his behalf and

9

each paid their own way.

The Appellant's conviction was based largely upon hearsay evidence. The hearsay was in the form of testimony regarding the origin of the fake identification documents at issue, as the actual individuals who allegedly found the documents were not presented to testify. The Appellant's conviction also rested upon evidence that was not authentic, namely a copy of a handwriting sample, which caused a faulty result to be reached by the State's handwriting examiner in analyzing the sample, and an unauthenticated cell phone call.

The Appellant's conviction was also obtained due to the lack of exculpatory evidence that either was in the possession of the prosecution or should have been obtained by the prosecution. The evidence at issue was a surveillance videotape from the department store where the fake identification documents were used. Such evidence would have proved that someone else other than the Appellant was utilizing false identification. The suppression of evidential videotapes of cashier transactions clearly amounts to withholding and suppression of known evidence by Mervyn's Department Stores.

10

The Appellant's sentence was unconstitutional on two fronts. First, the Appellant was sentenced based upon factors that were not submitted to a jury for proof beyond a reasonable doubt. Second, the Appellant's sentence was disproportional to the crime that he committed. The crime at issue did not involve violence or illegal drugs, yet Appellant was sentenced as if these elements were present.

Finally, the Appellant submits that his conviction lacked sufficient evidentiary support. The mailbox linking the Appellant to the crime at issue did not belong to the Appellant. R. 168, 185. The State was unable to present a positive identification of the Appellant as the owner of the mailbox. R. 185, 190-192. There was not any proof offered concerning the "loss" suffered by a victim in this case. R. 410-411.

## LAW AND ARGUMENTS

I.    **The circuit court erred in sustaining a verdict contrary to law, in that Ala. Code § 13A-8-192 unconstitutionally extended venue and jurisdiction beyond the boundaries of Alabama.**

According to the Alabama Rules of Criminal Procedure, "[e]very person, whether an inhabitant of the State of Alabama or of any other state or country, is liable to punishment by the laws of Alabama for an offense committed

11

in the state." Ala. Code § 15-2-1.  Regarding the crime of
identity theft, jurisdiction is proper where any element of
the crime occurred or where the victim of the theft resides.
Ala. Code § 13A-8-196.  Venue is proper in the county where
the alleged offense occurred.  Ala. Code § 15-2-2.  Such
holds true regarding venue even if the offense is initiated
outside of Alabama, as long as the offense is consummated
within the boundaries of the state. Ala. Code § 15-2-4.
Such reasoning is in accord with the precepts of the United
States Constitution, which calls for criminal trials to
occur within the state where crimes have been committed.
U.S. Const., Art. III, § 2.

In Alabama, jurisdiction is broadly divided into two
categories: subject-matter jurisdiction and in personam
jurisdiction. Ex parte Carstens, 1998 Ala. LEXIS 214, 7128
So.2d 128 (1998).  Subject-matter jurisdiction is defined as
the power to hear and determine an issue.  Bynum v. Brewer,
217 Ala. 52, 114 So. 577 (1927).  In personam jurisdiction
refers to the necessity of the judgment to be personally
served on a party to the litigation; in other words, the
court must have the power to hale the party at issue before
it.  O'Donohue v. Citizens Bank, 350 So.2d 1049 (1977).

12

In the instant matter, the Appellant concedes that, as the subject-matter at issue is an alleged violation of the Alabama Criminal Code, that subject-matter jurisdiction exists. However, the Appellant submits that the trial court lacked in personam jurisdiction over the Appellant in this matter, thereby rendering venue improper as well. In determining the question of whether personal jurisdiction has properly been obtained, state law is not controlling. King Homes, Inc. v. Roberts, 46 Ala. App. 257, 240 So.2d 679 (Ala. Civ. App. 1977). Instead, the question is framed as a federal question of whether subjection of a particular defendant to the sovereignty of Alabama comports with federal due process. Id.

Prior to the ratification of the United States Constitution, Alexander Hamilton recognized that the several States of the union would retain many rights of sovereignty. The Federalist No. 32. However, State sovereignty would not be retained in cases where like power had been expressly granted to the federal government or where exercise of a power by both the state and federal governments would be contradictory and repugnant. Id. Specifically delegated to the federal Congress was the power to regulate commerce

13

among the states.  U.S. Const., Art. I, § 8.  In exercising

the commerce power, the federal government has expanded the

meaning of the commerce clause to allow for federal

regulation that "aims directly to secure and promote the

public welfare," which is a power known as the police power.

Robert Cushman, <u>The National Police Power Under the Commerce</u>

<u>Clause of the Constitution</u>, 3 Minn. L. Rev. 289, 290 (1919).

In exercising this police power through the commerce clause,

Congress has forced itself into the realm of criminal law,

as it has carved itself the power to regulate criminal

conduct that has a substantial relation to interstate

commerce.  <u>United States v. Lopez</u>, 115 S.Ct. 1624 (1995).

Pursuant to such power, the federal government has enacted a

prohibition against the commission of identity theft.  See

18 U.S.C. § 1028.

In the instant matter, despite the existence of federal

law regulating the act of identity theft, the state of

Alabama has decided to enforce its own national regulatory

scheme regarding the crime of identity theft.  Consider, the

Appellant was a resident of California who also spent

significant time in Nigeria.  The Appellant has never

entered the boundaries of Alabama.  The mailbox that was

14

allegedly used in committing the instant crimes was located

in California.    The identification documents discovered in

this case in the Appellant's old apartment were found in

California.    The use of the identification documents at

issue was done at a Mervyn's Department Store in California.

Clearly, the crime at issue was committed in California.

Yet, the State of Alabama has extended its reach to regulate

such conduct via the enforcement of Ala. Code § 13A-8-192.

Of course, it will be argued that the victim in this

case, James Roberson, resided in Alabama, thereby satisfying

the jurisdictional requirements of Ala. Code § 13A-8-196.

However, this jurisdictional reach clearly places Alabama's

criminal enforcement scheme in competition with that of the

federal government and with the state of California.

Alabama has improperly exercised jurisdiction in a matter

that had no effect on the state of Alabama, as no "loss" was

proved in this matter.    As such, Alabama has exercised

jurisdiction over a criminal case that did not have any

impact or effect on the state of Alabama, thereby infringing

upon the prerogatives of both the federal government and the

state of California.    Further, as no part of the instant

crime occurred within Alabama, venue was also improper in

15

Alabama.

As the Appellant was improperly tried before an Alabama tribunal, the Appellant submits that his conviction and subsequent sentence must be dismissed.

**II.  The Appellant was denied his right to have witnesses appear on his behalf when he was forced to pay for the prosecution's witnesses to appear.**

Article I, section 6 of the Alabama Constitution (1901) states that in a criminal prosecution, the accused shall have the right to have witnesses appear on his behalf.  See also U.S. Const., amend VI.  Such is in keeping with the demands of due process of law.  As stated by Justice Frankfurter, due process

> embodies a system of rights based on moral
> principles so deeply imbedded in the traditions
> and feelings of our people as to be deemed
> fundamental to a civilized society as conceived
> by our whole history. Due process is that which
> comports with the deepest notions of what is
> fair and right and just.

Solesbee v. Balkcom, 339 U.S. 9, 16, 70 S. Ct. 457, 461, 94 L. Ed. 604 (1950).  There can be little doubt that the right to present a defense is fundamental to the American experience.

The right to offer the testimony of witnesses, is

> in plain terms the right to present a defense,
> the right to present the defendant's version of

16

the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14, 19 (1967). The right of the defendant to present evidence "stands on no lesser footing than the other Sixth Amendment rights that we have previously held applicable to the States." Id. at 18.

The right to present a defense is a right that "is an essential attribute of the adversary system itself," with few rights being "more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302, 35 L.Ed.2d 297, 93 S.Ct. 1038 (1973). According to Justice Joseph Story, the provision of the Sixth Amendment protecting said right was included in the Bill of Rights in reaction to a notorious common-law rule categorically excluding defense evidence in treason and felony cases. Washington, 388 U.S. at 19-20.

Unfortunately, in the instant case, the Appellant was denied the right to properly present his defense. R. 466, 163, 167, 169. The Appellant was burdened by the restitution order in this case in which he was forced to pay

17

for government witnesses to fly from California to present testimony in this matter. R. 455-456. Of course, the Appellant had already filed an affidavit regarding his financial hardship. The State of Alabama declared the Appellant a fugitive in March of 2004 and indigent on June 2, 2004. The Appellant was granted status of "financial hardship" in June of 2004, but was denied funds for defense witnesses on April 1, 2005. Being forced to bear the brunt of the prosecution's case, the Appellant was unable to pay for a proper defense. Such is unconstitutional *per se*, and must therefore result in the conviction and subsequent sentence in this case being vacated.

### III. The Appellant was denied a fair trial when he was convicted using improperly admitted evidence.

The Alabama Rules of Evidence state that their purpose is to "secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." A.R.E., Rule 102. However, such purpose was not met in the instant matter. The Appellant's conviction was obtained utilizing hearsay evidence. Further, the Appellant's conviction was obtained utilizing non-authentic

18

documentation. R. 118, 121, 123-125, 128-134, 148, 149, 169, 192, 193, 200, 204, 220, 230-233, 243-245, 256, 279, 281, 283, 288, 291, 294-296, 361, 364, 365.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A.R.E., Rule 801©). Hearsay is not admissible in a criminal trial. A.R.E., Rule 802. Testimonies by police officers showing the reasons for their actions and how an investigation focused upon a subject are not considered hearsay. <u>Miller v. State</u>, 1996 Ala. Crim. App. LEXIS 303, 687 So.2d 1281 (Ala. Crim. App. 1996). Similarly, testimony regarding an overheard phone conversation is not considered hearsay, as the evidence is not admitted to prove the truth of the matter asserted, but to show the listener's reaction to hearing the conversation. <u>Stallworth v. State</u>, 2001 Ala. Crim. App. LEXIS 243, 868 So.2d 1128 (Ala. Crim. App. 2001).

Further supporting the prohibition against hearsay is the Confrontation Clause. Enshrined in the Sixth Amendment to the United States Constitution is the Confrontation Clause, which states that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

19

the witnesses against him." The main purpose of this clause is to ensure the right of cross-examination. <u>Davis v. Alaska</u>, 415 U.S. 308, 315-16, 94 S.Ct. 1005, 39 L.Ed.2d 347 (1974); <u>Cotto v. Herbert</u>, 331 F.3d 217 (2d Cir. 2003). This procedure protects the "integrity of the fact-finding process." <u>Kentucky v. Stincer</u>, 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). As explained in <u>Pointer v. Texas</u>, 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1985), "there are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."

Defendant was denied the opportunity to confront and cross examine Dolly Guttirez, R. 286-288, Jerome Bivens, R. 168, 239-241, 285, Rosemary Robertson, R. 246, or Sean Altpeter, R. 1999.

Further, the identification documents were not properly proved to have satisfied the chain of custody. To prove a chain of custody, the State must sufficiently establish: (1) the receipt of the evidence; (2) the ultimate disposition of

the evidence; and (3) the safeguarding and handling of the evidence between receipt and disposition.  Ex parte Holton, 590 So.2d 918 (1991)(citing Imwinklereid, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973)). Evidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item.  Lane v. State, 644 So.l2d 1318, 1321 (Ala. Crim. App. 1994). In the instant case, an unsealed folder left in an office for fifteen (15) months open to at least seven (7) people would not satisfy the chain of custody requirement. R. 283, 288, 290-291.

Also, the Appellant was convicted upon evidence that was not properly authenticated.  In order for evidence to be authenticated, sufficient evidence must be presented to support a finding that the matter in question is what its proponent claims.  A.R.E., Rule 901. R. 363, 370, 383.

As the Appellant was convicted based upon inadmissible evidence, the Appellant submits that his conviction and subsequent sentence must be vacated and this matter remanded for rehearings.

**IV.  The Appellant was denied a fair trial when the prosecution failed to disclose exculpatory evidence.**

A criminal defendant is entitled to discover documents

21

and tangible things "(1) which are material to the preparation of defendant's defense; ... (2) which are intended for use by the state/municipality as evidence at the trial; or (3) which were obtained from or belong to the defendant." Rule 16.1(c), Ala. R. Crim.

To protect such basic discovery rights, the Supreme Court, in <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), put forth the requirement that the prosecution must turn over all evidence favorable to the accused upon request. The Court specifically held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process...." <u>Id.</u> at 87; see also <u>Wilson v. State</u>, 2003, Ala. LEXIS 181, 874 So.2d 1145 (2003). The Supreme Court has also held that the <u>Brady</u> rule requiring disclosure of favorable evidence extends to impeachment evidence in addition to purely exculpatory evidence. <u>Giglio v. United States</u>, 405 U.S. 150, 153-54 (1972); <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985).

The government's withholding of information may constitute a violation of a defendant's right to due process. In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that the government must disclose to the

22

defense evidence that is both favorable to the accused and "material either to guilt or to punishment." Id. at 87. In Giglio v. United States, 405 U.S. 150 (1972), the Court clarified that the Brady rule extends to impeachment evidence, as well as exculpatory evidence. See id. at 154-55. Evidence was clearly undisclosed and withheld, denying access by the Appellant. R. 201, 205, 206, 209-210, 214, 467.

The Supreme Court has clearly stated that the United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all and whose interest, therefore, in a criminal prosecution is not that it shall win a case but that justice shall be done. Strickler v. Greene, 527 U.S. 263, 281, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286(1999)(citing Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). Consequently, the duty to disclose such evidence as is requested herein is constitutionally required even if there would be no request by the accused. See United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Ex parte Wilson, 1997

23

Ala. LEXIS 20, 690 So.2d 477 (1997). In that light, an
individual prosecutor even has the obligation to learn of
any favorable evidence known to others acting on the
government's behalf and turn such evidence over to the
defendant. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555,
131 L.Ed.2d 490 (1995).

In the instant case, the prosecution failed to disclose
evidence despite motions for production from the Appellant
in the form of photographs and videotapes from Mervyn's
Department Store on the date that the Appellant allegedly
used the fraudulently obtained identification cards. R. 200.
Had such evidence been produced, as was the prosecution's
duty, it would have been evident that the person using the
identification cards was not the Appellant.  If the
Appellant was not the individual in possession of the
identification documents, then the government could not
prove that the Appellant violated Ala. Code § 13A-8-192.
Such conduct by the prosecution is not permitted, as it
undermines the public's confidence in the gears of justice,
as well as results in the conviction of those who may be
innocent.

As the prosecution failed to disclose exculpatory

24

evidence to the Appellant, the Appellant submits that his

conviction and subsequent sentence must be vacated and this

matter remanded for rehearings consistent with the findings

of this court.

**V.   The circuit court erred in issuing an unduly harsh and unreasonable sentence to the Appellant.**

The United States Constitution guarantees each

defendant a trial by jury wherein no punishment is imposed

until a jury determines the defendant guilty of particular

conduct beyond a reasonable doubt.  See U.S. Const. Amends.

V, VI.  At odds with that system is sentencing procedure as

employed by the state of Alabama which allows for a circuit

court to sentence or punish a defendant based upon conduct

that is not admitted or proved beyond a reasonable doubt.

In his dissent in Harris v. United States, 122 S.Ct.

2406, 153 L.Ed.2d 524 (2002), Justice Thomas reminded us

that due process requires that every fact necessary to

constitute a crime must be found beyond a reasonable doubt

by a jury if that right is not waived.  Id. at 2424 (Thomas,

J., dissenting), citing In re Winship, 397 U.S. 358, 364, 25

L. Ed. 2d 368, 90 S. Ct. 1068 (1970).  Society has long

recognized a necessary link between punishment and crime.

Harris, 122 S.Ct. at 2424 (Thomas, J., dissenting), citing

25

Apprendi v. New Jersey, 530 U.S. 466, 478, 120 S.Ct. 2348
(2000) ("The defendant's ability to predict with certainty
the judgment from the face of the felony indictment flowed
from the invariable linkage of punishment with crime").
"Why, after all, would anyone care if they were convicted of
murder, as opposed to manslaughter, but for the increased
penalties for the former offense, which in turn reflect the
greater moral opprobrium society attaches to the act?"
Harris, 122 S.Ct. at 2424 (Thomas, J., dissenting).

Recognizing this fundamental defect in the manner in
which criminal defendants were sentenced, the Supreme Court
sought to remedy the situation through its ruling in
Apprendi v. New Jersey. In Apprendi, the court stated that
if a statute annexes a higher degree of punishment based on
certain circumstances, exposing a defendant to that higher
degree of punishment requires that those circumstances be
charged in the indictment and proved beyond a reasonable
doubt. Apprendi, 530 U.S. at 480(quoting J. Archbold,
Pleading and Evidence in Criminal Cases 51 (15th ed. 1862)).
More succinctly, the Court stated that "other than the fact
of a prior conviction, any fact that increases the penalty
for crime beyond the prescribed statutory maximum must be

26

submitted to a jury, and proved beyond a reasonable doubt."
Apprendi, 530 U.S. at 490 (2000).   In Ring v. Arizona, 536
U.S. 584 (2002), the Supreme Court clarified and reaffirmed
this rule.   The Ring holding is straightforward and clear-
cut: The Apprendi rule applies to any aggravating fact
necessary to expose a defendant to punishment beyond an
otherwise mandatory, statutory limit.   Id.   As recently
observed by the United States District Court for the
District of Massachusetts, "the Sixth Amendment guarantee of
trial by jury has been eroded as never before in the history
of our nation, while the institutional judiciary
complacently slips into forms of expression and modes of
thought that unconsciously reinforce the Department agenda
in a powerfully Orwellian way.   United States v. Green, 2004
U.S.Dist. LEXIS 11292, *13 (D.Mass. 2004).

The Supreme Court's decision in Blakely v. Washington,
124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) further extended
the Apprendi decision, indicating that courts had been
incorrect in limiting Apprendi to merely mean that drug
amounts must be listed in an indictment and that the
statutory maximum does not refer to any guideline sentence
or any factor utilized by a sentencing judge to increase a

27

defendant's sentence, instead holding that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. * * * When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment." <u>Blakely v. Washington</u>, 124 S.Ct. at 2537(emphasis in original)

The Court noted that the rule announced in <u>Apprendi</u> reflected two longstanding tenets of common-law criminal jurisprudence: "that the truth of every accusation against the defendant should afterwards be confirmed by a unanimous [jury verdict], and that an accusation which lacks any particular fact which the law makes essential to the punishment is . . . no accusation within the requirements of the common law and it is no accusation in reason." <u>Id.</u> The Court then noted the principle in American jurisprudence that "'every fact which is legally essential to the punishment' must be charged in the indictment and proved to a jury." <u>Id.</u>

The Appellant submits that compliance with the Sixth Amendment requires "any fact that increases the penalty for

28

a crime beyond the prescribed statutory maximum" to be proved beyond a reasonable doubt. Apprendi, 530 U.S. at 490. The prescribed "'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 124 S. Ct. at 2536. The jury verdict alone - or the defendant's admission alone - "must authorize the sentence." Id.

The aforementioned argument based upon the Court's decision in Blakely was further bolstered by the recent decision issued in United States v. Booker, 125 S.Ct. 738 (2005). The Booker decision flowed from Justice Stevens' worry that as sentencing enhancements found only by a judge by a preponderance of the evidence became greater, "the jury's finding of the underlying crime became less significant." Id. at 751. As such, the Sixth Amendment right to a jury trial was being usurped, requiring change in order to preserve "Sixth Amendment substance." Id. Furthermore, the court again reiterated its commitment to the ideal that any fact other than a prior conviction which is necessary to support a sentence exceeding the statutory maximum authorized by the jury's finding must be proved to a

29

jury beyond a reasonable doubt. <u>Id.</u> at 754-55.

In Alabama, only a single decision has been issued to date dealing with the reassertion of due process and jury trial rights as espoused by the <u>Booker</u> and <u>Blakely</u> decisions. See <u>Scott v. State</u>, 2005 Ala. Crim. App. LEXIS 36 (Ala. Crim. App. 2005). In <u>Scott</u>, it was noted that arguments based upon the claim that factors utilized at sentencing must be proved to a jury beyond a reasonable doubt had been previously rejected by the Alabama judiciary. <u>Id.</u> at *57-8. However, each of the cases cited by the court in Scott occurred before the <u>Booker</u> decision was issued, thereby making the instant issue one of first impression. <u>Id.</u>

The Appellant submits that his sentence was unconstitutional, in that he was sentenced beyond the statutory maximum based upon factors that were not submitted to a jury for a finding beyond a reasonable doubt. R. 458-459.

The Appellant also points to the portion of the <u>Booker</u> decision dealing with the grounds upon which sentences were to be based. Aside form being based upon factors that are submitted to a jury for proof beyond a reasonable doubt,

sentences must also be based upon reasonableness grounds. <u>Booker</u>, 125 S.Ct. at 756. Such is in accord with the Eighth Amendment's prohibition against cruel and unusual punishment.

"Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment." <u>People v. Martinez</u>, (1999) 76 Cal. 4th 489, 496.

The Eighth Amendment succinctly prohibits "excessive" sanctions. <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S.Ct. 2242, 2246, 153 L.Ed.2d 335, 343 (2002). It provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." In <u>Weems v. United States</u>, 217 U.S. 349 (1910), the U.S. Supreme Court held that a punishment of 12 years jailed in irons at hard and painful labor for the crime of falsifying records was excessive. The Court explained "that it is a precept of justice that punishment for crime should be graduated and proportioned to the offense." <u>Id</u>. at 367.

The High Court has repeatedly applied the proportionality precept in later cases interpreting the Eighth Amendment. See <u>Harmelin v. Michigan</u>, 501 U.S. 957,

31

997-998 (1991) (Kennedy, J., concurring in part and concurring in judgment); see also id. at 1009-1011 (White, J., dissenting). In applying the proportionality test, three criteria will be examined: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions. Solem v. Helm, 436 U.S. 277, 292 (1983). Thus, even though "imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual," it may not be imposed as a penalty for "the 'status' of narcotic addiction," Robinson v. California, 370 U.S. 660, 666, 8 L.Ed.2d 758, 82 S.Ct. 1417 (1962), because such a sanction would be excessive. As Justice Stewart explained in Robinson: "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." Id. at 667.

The U.S. Supreme Court has read the text of the Eighth Amendment to prohibit "all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive." Atkins, 122 S.Ct. at 2247 n.7. A claim that punishment is excessive is judged not by the standards that

32

prevailed in 1685 when Lord Jeffreys presided over the "Bloody Assizes" or when the Bill of Rights was adopted, but rather by those that currently prevail. As Chief Justice Warren explained in his opinion in Trop v. Dulles, 356 U.S. 86 (1958): "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. * * * The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Id. at 100-101.

The Appellant submits that the sentence that he received is of a cruel and unusual nature, in that it is unduly harsh. The Appellant received a twenty-year term of incarceration for identity theft. The crime lacked violence. The crime did not involve illegal drugs. No evidence was presented that any loss accrued to the victim of the alleged offense. R. 156.

As the Appellant was sentenced in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, the Appellant submits that his sentence must be vacated and this matter remanded, for re-sentencing in accord with the findings of this court and the constitutional principles of fair play and substantial justice. Ladner v. United States, 358 169 L.Ed.2d 199, 79 S.

33

Ct. 209 (1958).

VI.  **The circuit court erred in sustaining the Appellant's conviction despite the lack of sufficient evidence.**

In order to be convicted of identity theft pursuant to Ala. Code 13A-8-192, it must be proved beyond a reasonable doubt that a person, without the authorization, consent, or permission of the victim, with the intent to defraud for his or her own benefit or the benefit of a third person, he or she does any of the following:

> (1) Obtains, records, or accesses identifying information that would assist in accessing financial resources, obtaining identification documents, or obtaining benefits of the victim.

> (2) Obtains goods or services through the use of identifying information of the victim.

> (3) Obtains identification documents in the victim's name.

Ala. Code § 13A-8-192.  Theft which has resulted in a financial loss of greater than $500 will be considered first degree identity theft.  Ala. Code § 13A-8-192(b).

As the Appellant was convicted utilizing insufficienct evidence, the Appellant submits that his conviction and subsequent sentence must be vacated, and this matter remanded for rehearings consistent with the findings of this court. R.199, 464.

34

## CONCLUSION

The proceedings against the Appellant have been rife with error from the outset.  The indictment against the Appellant extended the reach of Alabama law well beyond the borders of Alabama.  Once the Appellant was brought to Alabama for trial, he was denied the basic right to present a defense.  Further, the prosecution was permitted to utilize inadmissible evidence in obtaining a conviction, while it withheld exculpatory evidence.  Once an improper conviction was obtained, a conviction that lacked a sufficient evidentiary backing, the Appellant proceeded to be sentenced in violation of his constitutional rights.  The Appellant was sentenced to an unduly harsh sentence that was based upon factors that were not submitted to a jury for proof beyond a reasonable doubt.  For the above reasons, the Mr. Egbuonu respectfully requests that this court reverse his convictions and sentence.

Respectfully Submitted,

by: _Sid's Hughes_____

Sid Hughes, Esq.
2700 Highway 280
Suite 320 West
Birmingham, Alabama 35223
(205) 871-7430
Counsel for Appellant Egbuonu

35

## CERTIFICATE OF SERVICE

I hereby certify that, pursuant to Alabama Rules of Appellate Procedure 28(a)(12) and 31(b), a true copy of the foregoing was served this 9th day of January, 2006 by regular United States mail with sufficient postage affixed to ensure delivery to the Office of the District Attorney, Jefferson County, 801 Richard Arrington, Jr. Blvd. North, Birmingham, Alabama 35203-1021; and the Office of the Attorney General of Alabama, Alabama State House, 11 South Union Street, Third Floor, Montgomery, Alabama 36130.

Sid Hughes, Esq.
Attorney for Appellant Egbuonu

36

02/23/06  14:00 FAX 2058799229       L A W  O F F I C E S                      ☒002

No. CR-05-0143

In the COURT of CRIMINAL APPEALS
*of ALABAMA*

——————————— ♦ ———————————

ZEPHYRIUNS C. EGBUONU,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

——————————— ♦ ———————————

*On Appeal From the Circuit Court of*
*Jefferson County*
*(CC-04-1422)*

**BRIEF OF APPELLEE**

Troy King
*Attorney General*

Andy S. Poole *
*Assistant Attorney General*

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, Alabama   36130
(334) 242-7300*

February 21, 2006          Counsel of Record*

**EXHIBIT 23**

## STATEMENT REGARDING ORAL ARGUMENT

The State does not request oral argument.

i

02/23/06  14:00 FAX 2058799229          L A W   O F F I C E S                    ☑ 004

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT......................... i

TABLE OF CONTENTS....................................... ii

TABLE OF AUTHORITIES.................................... iv

STATEMENT OF THE CASE.................................... 1

STATEMENT OF THE ISSUES................................. 4

STATEMENT OF THE FACTS.................................. 5

STATEMENT OF THE STANDARD OF REVIEW..................... 13

SUMMARY OF THE ARGUMENT................................. 15

ARGUMENT................................................ 18

    I.   The Venue Provisions Of The Alabama Consumer
    Identity Protection Act Are Constitutional. ............ 18

    II.  Egbuonu Was Not Entitled To Funds To Pay Expenses
    For Non-Expert Witnesses; The Trial Court Properly
    Imposed Costs Of Prosecuting Him At Sentencing. ........ 22

    III.  The Trial Court Properly Exercised Its Discretion
    In Admitting Evidence. ................................ 24

    IV.  The State Did Not Suppress Evidence Favorable To
    Egbuonu's Defense .................................... 27

    V.   The Trial Court Properly Exercised Its Discretion
    In Sentencing Egbuonu. ............................... 29

VI.  The State Presented Sufficient Evidence To Establish
A Prima Facie Case Of First Degree Identity Theft That
Supports The Jury's Verdicts. ........................... 31

CONCLUSION............................................. 37

CERTIFICATE OF SERVICE................................. 38

# TABLE OF AUTHORITIES

**Cases**

Adler v. State, 591 So. 2d 133 (Ala. Crim. App. 1991).... 28

Brady v. Maryland, 373 U.S. 83 (1963).................... 27

Ex parte Bailey, 590 So. 2d 354 (Ala. 1991)............. 32

Ex parte Egbuonu, 911 So. 2d 748 (Ala. Crim. App. 2004).. 19

Ex parte Loggins, 771 So. 2d 1093 (Ala. 2000)........... 26

Ex parte Woodall, 730 So. 2d 652 (Ala. 1998)............ 33

Garner v. State, 606 So. 2d 177 (Ala. Crim. App. 1992)... 30

Giglio v. United States, 405 U.S. 150 (1972)............ 27

Humphrey v. State, 833 So. 2d 679 (Ala. Crim. App. 2002). 33

Johnson v. State, 555 So. 2d 818 (Ala. Crim. App. 1989).. 32

Marshall v. State, 629 So. 2d 766 (Ala. Crim. App.
  1993) ................................................. 32

Middlebrooks v. State, No. A06A0030, 2006 WL 305553 (Ga.
  App. Feb. 9, 2006) ................................... 21

Porter v. State, 520 So. 2d 235 (Ala. Crim. App. 1987)... 30

Quick v. State, 825 So. 2d 246 (Ala. Crim. App. 2001).... 23

State v. Mayze, 622 S.E. 2d 836 (Ga. 2005).............. 21

United States v. Muench, 153 F. 3d 1298 (11th Cir. 1998). 20

Ward v. State, 814 So. 2d 899 (Ala. Crim. App. 2000).. 33-34

White v. State, 546 So. 2d 1014 (Ala. Crim. App. 1989)... 33

02/23/06  14:01 FAX 2058799229          L A W   O F F I C E S                      ☒007

<u>Whitehead v. State</u>, 429 So. 2d 641 (Ala. Crim. App. 1982) 33

<u>Whitt v. State</u>, 733 So. 2d 463 (Ala. Crim. App. 1998).... 34

<u>Wright v. State</u>, 601 So. 2d 1141 (Ala. Crim. App. 1992).. 30

<u>Yeomans v. State</u>, 898 So. 2d 878 (Ala. Crim. App. 2004).. 26

<u>Zumbado v. State</u>, 615 So. 2d 1223 (Ala. Crim. App. 1993) ............................................... 23-24

**Other Authorities**

Ala. Code (1975)

  § 13A-5-6(a)(3) ......................................... 30

  § 13A-8-190 et. seq. ................................... 19

  §13A-8-192 ............................................. 19

  § 13A-8-192(a)(1) ...................................... 34

  § 13A-8-192(a)(2) ...................................... 34

  § 13A-8-192(b) ......................................... 29

  § 13A-8-196 ............................................ 19

Parker, Lori J, "Validity, Construction, and Application of State Statutes Relating to Offense of Identity Theft," 125 ALR 537, §2(b) (2005) ............................. 21

Title 28 U.S.C. § 1028.................................. 21

determined by the jury, "the verdicts rendered thereon are
conclusive on appeal."  <u>Johnson</u>, 555 So. 2d at 820.

### SUMMARY OF THE ARGUMENT

I.  The venue provisions of the Alabama Consumer
Identity Protection Act are constitutional.  This Court has
previously rejected Egbuonu's assertion that, because he
was a resident of California, he could not be prosecuted in
Jefferson County Alabama for this offense.  In <u>Ex parte
Egbuonu</u>, 911 So. 2d 748 (Ala. Crim. App. 2004), Egbuonu's
pre-trial prosecution of a petition for writ of habeas
corpus, this Court found that the Alabama Legislature had
authority to establish special venue and appropriately did
so by defining venue as including the resident county of
the victim because identity theft is a "continuing
offense."  <u>Id.</u> at 752-753.  This Court further found that
the sovereignty of the State of Alabama authorized it to
define this offense, even though a federal statute existed.
<u>Id.</u> at 754.

II.  Egbuonu was not denied a fair trial by the trial
court's denial of his request for expenses for out-of-state
witnesses or by the trial court's imposition at sentencing

15

of costs including the State's expenses for out-of-state
witnesses.  The State is not required to provide funds to a
defendant for non-expert witnesses.  See Zumbado v. State,
615 So. 2d 1223, 1235 (Ala. Crim. App. 1993).  The trial
court's order imposing costs is within its discretion for
sentencing.  See Rule 26.11(c), Alabama Rules of Criminal
Procedure.

     III.  The trial court properly exercised its discretion
in admitting evidence.  Ex parte Loggins, 771 So. 2d 1093,
1103 (Ala. 2000).  The hearsay documents complained of by
Egbuonu were properly identified under the business records
exception to hearsay of Rule 803(6), Alabama Rules of
Evidence.  (R. 116-118, 171-172)  Egbuonu's complaint about
chain of custody has no legal support, as his complaint is
addressed to the time before law enforcement took the items
into custody.  The question of chain of custody only begins
when evidence is initially obtained by law enforcement.
Yeomans v. State, 898 So. 2d 878, 893-894 (Ala. Crim. App.
2004).

     IV.  There was no suppression of evidence by the State
in violation of Brady v. Maryland, 373 U.S. 83 (1963).
Egbuonu made no objection at the time the evidence was

16

Egbuonu's cell phone to the fraudulent account.  Further
evidence established unpaid charges made on the fraudulent
account in excess of the statutory amount.  The State's
evidence established a prima facie case that supported the
jury's verdicts.  Ex parte Woodall, 730 So. 2d 652, 658
(Ala. 1998).  Jury verdicts rendered on a sufficient prima
facie case "are conclusive on appeal."  Johnson v. State,
555 So. 2d 818, 820 (Ala. Crim. App. 1989).

## ARGUMENT

### I.  The Venue Provisions Of The Alabama Consumer Identity Protection Act Are Constitutional.

Egbuonu initially argues the same assertion of
constitutional invalidity that this Court rejected in
denying his pre-trial petition for writ of habeas corpus.
Egbuonu argues that the trial court should not have
sustained the verdicts because the provisions of Alabama
Code Section 13A-8-192 and 196 are unconstitutional by
improperly expanding the sovereignty of the State of
Alabama beyond its authority.  The State avers that this
Court should again reject Egbuonu's contentions.

The Consumer Identity Protection Act, Alabama Code Section 13A-8-190 et. seq., was passed in 2001 and became effective April 26, 2001.  It defined identity theft at Section 13A-8-192.  Section 13A-8-196 defined the "situs of crime" under this enactment "shall be considered to be committed in any county in which any part of the crime took place, regardless of whether the defendant was ever actually present in that county, or in the county of residence of the person who is the subject of the identification documents or identifying information."  In his pre-trial petition for writ of habeas corpus, Egbuonu challenged the authority of the State of Alabama to establish such provision of law.  Egbuonu, a Nigerian citizen residing in California who stated he has never previously been in the State of Alabama before being arrested on this charge, asserted he could not be tried in Alabama.  In Ex parte Egbuonu, 911 So. 2d 748 (Ala. Crim. App. 2004), this Court rejected Egbuonu's assertion based on historical authority of the Alabama Legislature as well as the stated intent of the Consumer Identity Protection Act.  This Court noted that the Alabama Supreme Court had long recognized the Alabama Legislature had authority to

19

establish special venue.  Such legislative action was

appropriate under the present legislation.  _Id._ at 752-753.

By its very language, definition of the crime of identity

theft made by the Alabama Legislature was a continuing

offense; accordingly, venue would be appropriate in any

place where some part of the crime occurred.  This Court

approved the legislative intent that the victim impacted by

identity theft has had part of the continuing crime

committed on him.  Therefore, venue would be appropriate

for this continuing offense in the resident county of the

victim.  _Id._ at 753-754; Ala. Code § 13A-8-196.

This Court found support for its findings in the

opinion of the United States Court of Appeals for the

Eleventh Circuit in United States v. Muench, 153 F. 3d

1298, 1301-1302 (11th Cir. 1998).  The federal court there

approved a prosecution in Florida for failure for pay past

due child support against a defendant in Texas who had no

connection to Florida.  Egbuonu, 911 So. 2d at 754.  This

Court's previously stated reasoning is sound, and has

subsequently been acknowledged by the Georgia Supreme Court

and the Georgia Appellate Courts in interpreting their

identity theft statute containing similar provisions of

20

venue. "Therefore, under this provision, venue would be proper in the county in which the victim resides or in the county in which any part of the offense took place." Middlebrooks v. State, No. A06A0030, 2006 WL 305553, at *5 (Ga. App. Feb. 9, 2006); State v. Mayze, 622 S.E. 2d 836, 839-840 (Ga. 2005)(finding this Court's previous decision "compelling.")

Egbuonu also again asserts that the State of Alabama cannot prosecute him because the federal government has passed identify theft legislation. Referring to Title 28 U.S.C. § 1028, Egbuonu states that "despite the existence of federal law regulating the act of identity theft, the State of Alabama has decided to enforce its own national regulatory scheme regarding the crime of identity theft." (Appellant's brief, p. 14) Egbuonu fails to aver what is wrong with the State of Alabama, or any other State, having identity theft legislation. "[M]ost states have enacted some type of legislation criminalizing identity theft." Parker, Lori J, "Validity, Construction, and Application of State Statutes Relating to Offense of Identity Theft," 125 ALR 537, §2(b) (2005). As this Court noted previously in rejecting this identical claim, the State of Alabama as a

separate sovereign from the federal government has the
authority to punish offenses.  Nothing in the federal
legislation preempts Alabama's authority to enact and
enforce such legislation.  Egbuonu's argument is again
without merit.  See Egbuonu, 911 So. 2d at 754.

Alabama has properly enacted and enforced its Consumer
Identity Protection Act.  The evidence established that the
victim was a resident of Jefferson County; accordingly,
Egbuonu's case was properly brought there.  His assertions
are without merit and are due to be rejected.

## II.  Egbuonu Was Not Entitled To Funds To Pay Expenses For Non-Expert Witnesses; The Trial Court Properly Imposed Costs Of Prosecuting Him At Sentencing.

Egbuonu makes a claim of denial of a fair trial that he
couches in a manner that is initially misleading.  He
contends he was denied his right to have witnesses appear
for him because "he was forced to pay" for the State's
witnesses.  (Appellant's brief, p. 16, 17-18)  In fact,
Egbuonu presents two separate and unrelated issues, neither
of which entitle him to relief on appeal.  The first issue
is a pre-trial denial of his request for funds to pay
expenses for non-expert witnesses.  The second is the trial

22

## ORDER OF THE SUPREME COURT ADOPTING
## APPELLATE COURT TIME STANDARDS

WHEREAS, this Court is convinced that one of the major problems facing our nation's justice system is unnecessary delay in the administration of justice; and

WHEREAS, Alabama's appellate courts have had great success in reducing delay by setting goals for the timely resolution of cases; and

WHEREAS, the American Bar Association has adopted reference models of time standards for the timely disposition of cases, to assist appellate courts in setting goals to facilitate efficient, productive caseflow management that produces quality results; and

WHEREAS, this Court is convinced that it would be worthwhile to adopt the American Bar Association's reference model as the basis for time standards for Alabama's three appellate courts;

NOW, THEREFORE, IT IS ORDERED that, pending further order of this Court, the following schedule is set as a worthwhile, attainable goal for the Court of Civil Appeals and the Court of Criminal Appeals:

(1) That seventy-five percent (75%) of all cases be resolved within two hundred ninety (290) days from the date of the filing of the notice of appeal or other

filing that serves to bring the case before the Court of Appeals;

(2) That ninety-five percent (95%) of all cases be resolved within three hundred sixty-five (365) days from the date of the filing of the notice of appeal or other filing that serves to bring the case before the Court of Appeals; and

(3) That any case not resolved within three hundred sixty-five (365) days nevertheless be resolved as expeditiously as possible, given the length of the record, the complexity of the issues, and any peculiar or unusual circumstances.

IT IS FURTHER ORDERED that, pending further order of this Court, the following schedule is set as a worthwhile, attainable goal for this Court:

(1) That fifty percent (50%) of all cases before this Court be resolved within two hundred ninety (290) days from the date of the filing of the notice of appeal or other filing that serves to bring the case before the Court;

(2) That ninety percent (90%) of all cases before this Court be resolved within three hundred sixty-five (365) days from the date of the filing of the notice of

## APPELLATE COURT TIME STANDARDS

appeal or other filing that serves to bring the case before the Court; and

(3) That any case not resolved within three hundred sixty-five (365) days nevertheless be resolved as expeditiously as possible, given the length of the record, the complexity of the issues, and any peculiar or unusual circumstances.

(4) That the decision on whether to grant or deny certiorari review be announced within one hundred twenty-six (126) days from the filing of the petition.

IT IS FURTHER ORDERED that, pending further order of this Court, the following schedules are set as worthwhile, attainable goals for the three appellate courts:

### DECISIONS ON REMAND OR ON
### RETURN TO REMAND

The decision in a case before one of the three appellate courts on remand from another court or on the return to a prior remand should be released within one hundred twenty-six (126) days from the date the case is resubmitted on remand or on the return to the remand.

### RULINGS ON APPLICATIONS
### FOR REHEARING

A ruling on an application for rehearing should be released within one hundred twenty-six (126) days of the date of the filing of the application for rehearing.

[Dated April 10, 1995.]

# EXHIBIT 24

TABLE 4

## COURT OF CRIMINAL APPEALS
## TIME STANDARDS PERFORMANCE
### 2003 - 2007

| | 2003 Term | 2004 Term | 2005 Term | 2006 Term | 2007 Term |
|---|---|---|---|---|---|
| Percent of Cases Completed within 290 Days | 93% | 94% | 96% | 92% | 88% |
| Percent of Cases Completed within 365 Days | 97% | 98% | 98% | 98% | 95% |
| Days Required to Complete 50% of the Cases | 121 | 108 | 90 | 105 | 113 |
| Days Required to Complete 75% of the Cases | 190 | 175 | 152 | 196 | 214 |
| Days Required to Complete 95% of the Cases | 309 | 298 | 277 | 330 | 359 |
| Average No. of Days from Notice of Appeal to Decision | 134 | 125 | 109 | 127 | 140 |

TABLE 4

## COURT OF CRIMINAL APPEALS
## TIME STANDARDS PERFORMANCE
## 2002 - 2006

| | 2002 Term | 2003 Term | 2004 Term | 2005 Term | 2006 Term |
|---|---|---|---|---|---|
| Percent of Cases Completed within 290 Days | 95% | 93% | 94% | 96% | 92% |
| Percent of Cases Completed within 365 Days | 98% | 97% | 98% | 98% | 98% |
| Days Required to Complete 50% of the Cases | 119 | 121 | 108 | 90 | 105 |
| Days Required to Complete 75% of the Cases | 178 | 190 | 175 | 152 | 196 |
| Days Required to Complete 95% of the Cases | 290 | 309 | 298 | 277 | 330 |
| Average No. of Days from Notice of Appeal to Decision | 128 | 134 | 125 | 109 | 127 |

...tiveness of the representational unit. *Pratt-Farnsworth, Inc.*, 690 F.2d at 508–09.

[8] The employers raise one final defense to disclosure of the information. They argue that the only possible reason that the Union desired the information was for organizational purposes, i.e., for the purpose of "unionizing" the double breasted counterpart companies. The fact that the information might be helpful to the Union in an organizational campaign does not render it irrelevant for the purposes requested or otherwise excuse its nonproduction, however. *Associated General Contractors*, 633 F.2d at 772; accord *Utica Observer-Dispatch v. NLRB*, 229 F.2d 575, 577 (2d Cir. 1956).

In conclusion, we agree with the Board that the Union's request was one for relevant information, that the employers have not shown any persuasive reasons for nondisclosure, and that their failure to disclose constitutes an unfair labor practice under §§ 8(a)(1) and (5) of the National Labor Relations Act. Accordingly, it is ordered that the Board's order be in all respects ENFORCED.

GARWOOD, Circuit Judge, dissenting:

I respectfully dissent. As to seven of the ten respondents (e.g., all respondents other than Hebert, Farnsworth and Bob), it is plain to me that the complainant Carpenters Union wholly failed to discharge its admitted burden of "showing . . . relevance and need" and "failed to show that the information was actually relevant to the situation as it then existed," as its evidence amounted to no "more than mere 'suspicion or surmise'." *San Diego Newspaper Guild Local No. 95 v. N.L.R.B.*, 548 F.2d 863, 868 (9th Cir.1977). See also *N.L.R.B. v. Temple-Eastex, Inc.*, 579 F.2d 932, 937 n. 1 (5th Cir.1978).

With respect to these seven respondents, the Union relied primarily on the testimony of its business agent Laborde as to what Lemoine, an officer of Perrilliet, a contractor not a respondent herein, had told La-

borde in a conversation occurring more than a year before the Union sent the letters in question. According to Laborde, Lemoine said Perrilliet had formed a nonunion "double-breasted" company in order to "compete against" "the other contractors who had agreements with us" that had done so, "and he named a bunch of them that had the double-breasted companies." There is no indication that any of these respondents were among the companies named by Lemoine. As it was the Union's burden to show its entitlement to the information requested of these respondents, and as what Lemoine said was peculiarly within the knowledge of the Union officer and witness Laborde, the only fair assumption is that Lemoine did not include any of these respondents among the "bunch of" double-breasted contractors he identified. If this indicates anything, it is that these respondents were not engaged in the practice the Union sought to investigate.

The other "evidence" relied on by the Union respecting these seven respondents is that they, in common with the other respondents, were members of the New Orleans AGC, and that there were indications several of these seven respondents, not including any of these seven respondents, had "double-breasted" companies. There is not a shred of evidence, however, that the practices of AGC members in respect to a matter such as this were normally uniform. Indeed, there is no evidence whatever as to the degree of uniformity or diversity of practice in this or any similar regard among AGC members. The majority's statement (note 5) that "it is reasonable to suppose that the labor policies of the companies would be similar" (emphasis added) is without any support in the record, and is the kind of guilt-by-association approach which our courts have so long and so vigorously eschewed. If this is not "mere 'suspicion or surmise'," then what do these words mean?

Reliance in this respect on *N.L.R.B. v. Associated General Contractors*, 633 F.2d 766 (9th Cir.1980), cert. denied, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981), is wholly misplaced. In the *AGC* case, there

was a multiemployer bargaining unit, and the AGC was the party with which the Union contracted. Evidence indicating that some of the AGC members, who were covered by this contract, engaged in "double breasting" was held to justify the Union's request for information from the AGC. In other words, there was evidence of "double breasting" for which the party from whom the information was sought was contractually responsible to the Union requesting the information. Here, by contrast, the Board, in the order which the majority enforces, has found "insufficient evidence to establish the existence of a multiemployer bargaining unit." Moreover, none of the requests for information here in issue were made to the New Orleans AGC, and it is not even a respondent. Rather, the requests were made severally to the individual respondent companies, and they individually and severally are respondents in this unfair labor practice proceeding. So far as this record shows, we have treated General Motors and Chrysler just like Chevrolet and Pontiac.

There are other glaring deficiencies in the proof. Not only is there no evidence of any "double breasting" by these seven respondents, there is indeed no evidence whatever of any relation between them and their respective assumed siblings concerning whom the Union made inquiry. Nor is there any showing that the assumed siblings employ any carpenters or are even in the construction business.

The majority purports to recognize the settled distinction between information normally intrinsic to the employee-employer relationship, which is considered presumptively relevant, with the employer having the burden to show otherwise, and information, such as that here sought, which is not ordinarily pertinent to the Union's relationship with the employer from whom it is requested, but may be relevant due to the existence of particular special circumstances, as to which the Union has the initial burden of showing relevancy. However, if this distinction has any validity and subserves any purpose, then in the second class of case some character of showing, beyond "mere 'suspicion and surmise'," must be re-

quired of the Union in regard to the particular employer from whom the information is sought and who is made respondent on the unfair labor practice proceeding. Since no such showing has been made as to these seven respondents, I respectfully dissent.



Barrie Deon SHELTON,
Petitioner-Appellant,

v.

Jack B. HEARD, Respondent-Appellee.

No. 82-2226

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Feb. 3, 1983.

Opinion on Reconsideration
April 18, 1983.

Petitioner appealed from an order of the United States District Court for the Southern District of Texas, John V. Singleton, Jr., Chief Judge, which denied his petition for a writ of habeas corpus on ground that he failed to exhaust his state remedies. The Court of Appeals held that delay in processing petitioner's appeal, during which time petitioner had served more than half of his sentence, was sufficient to render the appellate remedy ineffective for his case and therefore he would not be required to exhaust his state remedies prior to seeking writ of habeas corpus.

Reversed and remanded.

1. Habeas Corpus ⟐ 45.3(7)

Prisoner being held in state confinement who seeks relief via habeas corpus must exhaust his state remedies unless there is either an absence of available state corrective process or the existence of circumstances rendering such process ineffec-



tive to protect the rights of the prisoner. 28 U.S.C.A. § 2254(b).

**2. Habeas Corpus ⟷45.3(1)**

Requirement to exhaust state remedies prior to seeking federal habeas corpus relief is not a jurisdictional limitation on the federal courts; rather, it is a matter of comity between federal and state courts. 28 U.S. C.A. § 2254(b).

**3. Habeas Corpus ⟷45.3(7)**

Delay in processing petitioner's appeal, during which time petitioner had served more than half of his sentence, was sufficient to render the appellate remedy ineffective for his case and therefore he would not be required to exhaust his state remedies prior to seeking writ of habeas corpus. 28 U.S.C.A. § 2254(b).

───────

Barrie Deon Shelton, pro se.

Joe Foy, Jr., Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Appeal from the United States District Court for the Southern District of Texas.

Before CLARK, Chief Judge, POLITZ and HIGGINBOTHAM, Circuit Judges.

PER CURIAM:

Barrie Deon Shelton was convicted May 16, 1979 of burglary. He was sentenced to six years in prison. Unable to post bond pending appeal, Shelton has remained in confinement while the appeal of his conviction languished in the Texas courts. His petition for writ of habeas corpus was denied by the federal district court on the ground that Shelton failed to exhaust his state remedies. We reverse the lower court's holding and direct the federal court to hear the merits of Shelton's petition.

Shelton was convicted May 16, 1979; his motion for new trial was denied and notice of appeal was given in the trial court July 23, 1979. On October 22, 1979, the record was completed. It was filed on February 14, 1981 in the Texas Court of Criminal Appeals.

Shelton has served more than half of his sentence and has yet to receive a ruling from the Texas appellate court on the validity of his conviction. His desperate petition to the federal court for collateral review was denied for failure to exhaust state remedies thus generating a classic Catch 22

situation in which Shelton finds himself caught between the gradual wheels of Texas justice and federal rules born of comity.

Shelton argues that the delay in the processing of his appeal has denied him due process of law. The district court erred, he contends, in dismissing his petition for he is not required to exhaust state remedies which are not efficacious.

The State of Texas argues that the delay in this case did not violate Shelton's due process rights. Shelton's appeal was filed during a period of change in the Texas appellate process which was attended by a substantial backlog of cases. Therefore, his case is not atypical. In addition, the state contends, the prejudice to Shelton is speculative since his conviction may be affirmed on appeal. This is not an answer.

[1] A prisoner being held in state confinement who seeks relief via habeas corpus must exhaust his state remedies unless "there is either an absence of available state corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254(b). On their face remedies were available here through the state appellate process. The question is whether the delay in processing Shelton's appeal may make that process ineffective to protect his rights within the meaning of the statute.

[2] The requirement to exhaust state remedies is not a jurisdictional limitation on the federal courts. Rather it is a matter of comity between the federal and state courts. *Fay v. Noia,* 372 U.S. 391, 420, 83 S.Ct. 822, 838, 9 L.Ed.2d 837 (1963); *Galtieri v. Wainwright,* 582 F.2d 348, 354 (5th Cir. 1978) (en banc). The forbearance of the federal courts is based upon the assumption that the state remedies available to petitioners are adequate and effective to vindicate federal constitutional rights. *Carter v. Estelle,* 677 F.2d 427, 445 (5th Cir.1982). When those state procedures become ineffective or inadequate, the foundation of the exhaustion requirement is undercut and the federal courts may take action. *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 1202 n. 7, 71 L.Ed.2d 379 (1982).

[3] This court has considered on a number of occasions whether delay may geld state procedures so as to render the exhaustion requirement meaningless. It is well settled that "exhaustion is not required

when the state procedures do not afford swift vindication." *Galtieri,* 582 F.2d at 354 n. 12. This court has held that a fifteen-month delay in the state appellate process, *Rheuark v. Wade,* 540 F.2d 1282, 1283 (5th Cir.1976) (per curiam), and a one-year delay in the consideration of a state habeas corpus petition, *Breazeale v. Bradley,* 582 F.2d 5 (5th Cir.1978), are sufficient delays to waive the exhaustion requirement. *See Rheuark v. Shaw,* 628 F.2d 297 (5th Cir. 1980), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981) (delay of nearly two years from notice of appeal to the date a statement of facts was prepared by court reporter for prisoner's appeal violates due process); *Reynolds v. Wainwright,* 460 F.2d 1026 (5th Cir.) (per curiam), *cert. denied,* 409 U.S. 950, 93 S.Ct. 294, 34 L.Ed.2d 221 (1972) (an "inordinate delay" in State post-conviction process may render the State remedy ineffective); *St. Jules v. Beto,* 462 F.2d 1365 (5th Cir.1972) (per curiam) (seventeen-month delay in consideration of habeas corpus petition by state court renders state remedy inadequate); *Dixon v. Florida,* 388 F.2d 424 (5th Cir.1968) (nineteen-month delay by state court in considering defendant's motion for review of his conviction renders state remedy ineffective).

While we have remanded cases so that fact matters bearing on the significance of delay could be considered, that procedure is not required here. The lengthy delay in considering Shelton's appeal is obviously sufficient to render the appellate remedy ineffective for his case. Delay is truly the deadliest form of denial for him. Thus he is not required to exhaust his state remedies before he may bring this habeas corpus petition. The district court erred in dismissing his petition for lack of exhaustion. The court is instructed to consider the merits of Shelton's petition.

REVERSED AND REMANDED.

ON SUA SPONTE RECONSIDERATION

PER CURIAM:

On *sua sponte* reconsideration, we write only to explain that the principal basis for our previous decision was the unexplained 16-month hiatus between the date the record was completed in *Shelton's* case and the date it was filed in the Texas Court of Criminal Appeals. This delay was sufficient for our reliance upon the principle from *Galtieri v. Wainwright,* 582 F.2d 348,

354 n.12 (5th Cir. 1978) (en banc), that "exhaustion is not required when the state procedures do not afford swift vindication. *Shelton v. Heard,* 696 F.2d 1127, 1129 (5th Cir. 1983).

Our prior order reversing the district court's decision is unaffected by this instant action. The mandate, thus revised, shall be issued instanter.



James OLIVER, Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent.

No. 82-4229

Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Feb. 3, 1983.

On petition for review of an order of the Merit Systems Protection Board, the Court of Appeals held that the United States Postal Service did not violate federal regulations by placing petitioner, a mail carrier, on "administrative leave" pending dismissal while continuing to pay him; the regulations did not require the Postal Service to retain petitioner in a "duty status" during the 30-day notice period of proposed agency action.

Denied.

**1. Officers and Public Employees ⟷72(1)**

United States Postal Service did not violate federal regulations by placing petitioner, a mail carrier, on "administrative leave" pending dismissal while continuing to pay him; the regulations did not require the Postal Service to retain petitioner in a "duty status" during the 30-day notice period of proposed agency action. 5 U.S.C.A. §§ 7513(b)(1), 7514.

```
CBR716-3              ALABAMA DEPARTMENT OF CORRECTIONS            INST:
                      INMATE SUMMARY AS OF 01/17/2006              CODE: CRSC

*************************************************************************

AIS: 00242109   INMATE: EGBUONU, ZEPHYRIUNS C          RACE: B  SEX: M

INST: 000 - KILBY CORRECTIONAL FACILITY       DORM:  00  JAIL CR: 001Y 10M 05D

JOB: ▓▓▓▓▓▓    SSN: ▓▓▓▓▓▓▓

ADM DT: 08/02/2005 DEAD TIME: 000Y 00M 00D

ADM TYP: NEW COMIT FROM CRT W/O REV OF      STAT: NEW COMIT FROM CRT W/O REV

CURRENT CUST: MED-2  CURRENT CUST DT: 09/14/2005  PAROLE REVIEW DATE: MAR 20

SECURITY LEVEL: (4) FOUR

SERVING UNDER ACT446 LAW IN CLASS I          CURRENT CLASS DATE:  08/02/2005
INMATE IS EARNING : EARNS 75 DAYS FOR EACH 30 SERVED

COUNTY      SENT DT  CASE NO  CRIME                  JL-CR      TERM
JEFFERSON   08/02/05 NO41422.1 THEFT OF IDENTITY I   067DD 010Y 00M 00D
            COURT COSTS  : $0000802    FINES : $0000000  RESTITUTION : $00090
JEFFERSON   08/02/05 NO41422.2 THEFT OF IDENTITY I   067DD 010Y 00M 00D

 TOTAL TERM       MIN REL DT      GOOD TIME BAL    GOOD TIME REV    LONG DATE
 010Y 00M 00D     11/30/2007      001Y 01M 23D     000Y 00M 00D     09/26/2013

INMATE LITERAL:
*************************************************************************

DETAINER WARRANTS SUMMARY
    INMATE CURRENTLY HAS NO DETAINER WARRANT RECORDS
*************************************************************************

ESCAPEE-PAROLE SUMMARY

    INMATE CURRENTLY HAS NO PAROLE RECORDS

    INMATE CURRENTLY HAS NO PROBATION 754 RECORDS

    INMATE HAS NO ESCAPES FROM ADOC SINCE OBSCIS RECORDING B
*************************************************************************

DISCIPLINARY/CITATION SUMMARY

    INMATE CURRENTLY HAS NO DISCIPLINARY/CITATION RECORDS
```

**EXHIBIT 26**

```
                         ALABAMA DEPARTMENT OF CORRECTIONS          INST:
CHR716-3                 INMATE SUMMARY AS OF 07/31/2006            CODE: CR!

******************************************************************************

AIS: 00242109    INMATE: EGBUONJ, ZEPHYRIUNS C          RACE: B   SEX: M

INST: 008 - KILBY CORRECTIONAL FACILITY      DORM: 00  JAIL CR: 001Y 10M 05

DOB: 0██████████    SSN: ███████████

ADM DT: 08/02/2005 DEAD TIME: 000Y 00M 000

ADM TYP: NEW COMIT FROM CRT W/O REV OF       STAT: NEW COMIT FROM CRT W/O REV

CURRENT CUST: MED-2   CURRENT CUST DT: 09/14/2005  PAROLE REVIEW DATE: SEP 2

SECURITY LEVEL: (4) FOUR

SERVING UNDER ACT446 LAW IN CLASS I          CURRENT CLASS DATE:   08/02/2005
INMATE IS EARNING : EARNS 75 DAYS FOR EACH 30 SERVED

COUNTY      SENT DT  CASE NO  CRIME                      JL-CR       TERM
JEFFERSON   08/02/05 N041422.1 THEFT OF IDENTITY I         06700 010Y 00M 000
            COURT COSTS   : $0000802    FINES : $0000000   RESTITUTION : $0000
JEFFERSON   08/02/05 N041422.2 THEFT OF IDENTITY I         06700 010Y 00M 000

 TOTAL TERM      MIN REL DT     GOOD TIME BAL     GOOD TIME REV    LONG DATE
 010Y 00M 000    11/30/2007     002Y 05M 280      000Y 00M 000     09/26/201

INMATE LITERAL:
******************************************************************************

DETAINER WARRANTS SUMMARY
******************************************************************************

ESCAPEE-PAROLE SUMMARY

    INMATE CURRENTLY HAS NO PAROLE RECORDS

    INMATE CURRENTLY HAS NO PROBATION 754 RECORDS

    INMATE HAS NO ESCAPES FROM ADOC SINCE OBSCIS RECORDING B
******************************************************************************

DISCIPLINARY/CITATION SUMMARY

    INMATE CURRENTLY HAS NO DISCIPLINARY/CITATION RECORDS
```

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

NO. BA244937                              PAGE NO.  1
THE PEOPLE OF THE STATE OF CALIFORNIA    VS.      CURRENT DATE 04/19/06
DEFENDANT 01:  ZEPHYRINUS C. EGBUONU
LAW ENFORCEMENT AGENCY EFFECTING ARREST: LASD - FUGITIVE DETAIL

BAIL: APPEARANCE  AMOUNT    DATE    RECEIPT OR  SURETY COMPANY   REGISTER
      DATE       OF BAIL   POSTED    BOND NO.                    NUMBER
      04/04/03  $50,000.00 03/28/03 AW28290     ALLEGHENY CASUAL. CO 13087026

CASE FILED ON 03/26/03.
 COMPLAINT FILED, DECLARED OR SWORN TO CHARGING DEFENDANT WITH HAVING
COMMITTED, ON OR ABOUT 03/26/03 IN THE COUNTY OF LOS ANGELES, THE FOLLOWING
OFFENSE(S) OF:
   COUNT 01: 1551.1 PC FEL -- FUGITVE FRM JUSTCE:WARRANTLESS.
   FUGITIVE FROM JEFFERSON, ALABAMA
NEXT SCHEDULED EVENT:
   03/26/03  1000 AM  EXTRADITION PROCEEDING   DIST CRIM JUSTICE CTR (LAC) DIV
    030


ON 03/26/03 AT 1000 AM  IN CRIM JUSTICE CTR (LAC) DIV  030

   CASE CALLED FOR EXTRADITION PROCEEDING
PARTIES: JEFFREY M. HARKAVY (JUDGE)  LINDA ACRIE  (CLERK)
              ELIZABETH SCHNEIDER      (REP)  LOREN NAIMAN  (DDA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY ROBERT REAMER PRIVATE COUNSEL
STIPULATED THAT A TEMPORARY JUDGE MAY HEAR THE CASE
BAIL SET AT $50,000
   MATTER CONTINUED FOR ID HEARING ON 04/04/03 IN DIVISION 30.
NEXT SCHEDULED EVENT:
   04/04/03  1000 AM  EXTRADITION PROCEEDING   DIST CRIM JUSTICE CTR (LAC) DIV
    030

CUSTODY STATUS: REMANDED TO CUSTODY


ON 04/04/03 AT 1000 AM  IN CRIM JUSTICE CTR (LAC) DIV  030

   CASE CALLED FOR EXTRADITION PROCEEDING

PARTIES: JEFFREY M. HARKAVY (JUDGE)  LINDA ACRIE  (CLERK)
              ELIZABETH SCHNEIDER      (REP)  LOREN NAIMAN  (DDA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY ROBERT REAMER PRIVATE COUNSEL
STIPULATED THAT A TEMPORARY JUDGE MAY HEAR THE CASE
BAIL SET AT $250,000
   MATTER CONTINUED FOR ARRAIGNMENT AND PLEA ON 05/21/03 IN DIV 30.
   PROBATION REVOKED ON KA044127.
   DEFENDANT REMANDED BOND IS EXONERATED.
 WAIVES STATUTORY TIME.
 EXT SCHEDULED EVENT:
   05/21/03  1000 AM  EXTRADITION PROCEEDING   DIST CRIM JUSTICE CTR (LAC) DIV
    030
 4/04/03 EXONERATED, # AW28290

 USTODY STATUS: BAIL EXONERATED
 USTODY STATUS: REMANDED TO CUSTODY

**EXHIBIT 27**

CASE NO. BA244937                          PAGE NO.   2
DEF NO.  01                                DATE PRINTED 04/19/06


ON 05/21/03 AT 1000 AM  IN CRIM JUSTICE CTR (LAC) DIV  030

   CASE CALLED FOR EXTRADITION PROCEEDING
PARTIES: MICHAEL K. KELLOGG (JUDGE)  LINDA ACRIE  (CLERK)
                ELIZABETH SCHNEIDER       (REP)  LOREN NAIMAN  (DDA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY ROBERT REAMER PRIVATE COUNSEL
 MATTER CONTINUES FOR A/P TO 6/4/03 DUE TO LOCAL CHARGES.
NEXT SCHEDULED EVENT:
  06/04/03  1000 AM  EXTRADITION PROCEEDING   DIST CRIM JUSTICE CTR (LAC) DIV
   030


ON 06/04/03 AT 1000 AM  IN CRIM JUSTICE CTR (LAC) DIV  030

   CASE CALLED FOR EXTRADITION PROCEEDING

PARTIES: JEFFREY M. HARKAVY (JUDGE)  LINDA ACRIE  (CLERK)
                ELIZABETH SCHNEIDER       (REP)  LOREN NAIMAN  (DDA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY CAROLE PETERSON PRIVATE
 COUNSEL
BAIL SET AT $250,000
 MATTER CONTINUES FOR A/P TO 7/7/03 IN DIVISION 30 DUE TO LOCAL
 CHARGES.
NEXT SCHEDULED EVENT:
  07/07/03  1000 AM  EXTRADITION PROCEEDING   DIST CRIM JUSTICE CTR (LAC) DIV
   030

CUSTODY STATUS: REMANDED TO CUSTODY


ON 07/07/03 AT 1000 AM  IN CRIM JUSTICE CTR (LAC) DIV  030

   CASE CALLED FOR EXTRADITION PROCEEDING
PARTIES: JEFFREY M. HARKAVY (JUDGE)  LINDA ACRIE  (CLERK)
                ELIZABETH SCHNEIDER       (REP)  MARY C. GANAHL  (DDA)
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY ROBERT REAMER PRIVATE COUNSEL
STIPULATED THAT A TEMPORARY JUDGE MAY HEAR THE CASE

BAIL SET AT $250,000
 MATTER CONTINUED FOR ARRAIGNMENT AND PLEA ON 10/16/03 IN DIV 30.
WAIVES STATUTORY TIME.
NEXT SCHEDULED EVENT:
  10/16/03  1000 AM  EXTRADITION PROCEEDING   DIST CRIM JUSTICE CTR (LAC) DIV
   030

CUSTODY STATUS: REMANDED TO CUSTODY


ON 09/26/03 AT 1000 AM  IN CRIM JUSTICE CTR (LAC) DIV  030

   CASE CALLED FOR EXTRADITION PROCEEDING
PARTIES: JEFFREY M. HARKAVY (JUDGE)  LINDA ACRIE  (CLERK)
                MICHELLE CARMODY  (REP)   LOREN NAIMAN  (DDA)
STIPULATED THAT JEFFREY M. HARKAVY (JUDGE) MAY HEAR THE CAUSE AS TEMPORARY
 JUDGE.
DEFENDANT IS PRESENT IN COURT, AND REPRESENTED BY ROBERT REAMER PRIVATE COUNSEL
 THE DEFENDANT HAS DISCUSSED WITH HIS / HER ATTORNEY AND WAIVES

CASE NO. BA244937                              PAGE NO.    3
DEF NO.  01                                    DATE PRINTED 04/19/06

    FORMAL EXTRADITION PROCEEDING.
    DEFENDANT SWORN FOR TESTIMONY.
    DEFENDANT ADVISED AND UNDERSTANDS THE CHARGES PENDING FROM THE
    FUGITIVE STATE.
    WAIVER OF EXTRADITION FORM READ, UNDERSTOOD AND VOLUNTARILY
    SIGNED BY THE DEFENDANT.
    THE COURT CERTIFIES THAT THE DEFENDANT SIGNED AND PERSONALLY,
    UNDER OATH, EXECUTED THE WAIVER FORM BEARING HIS / HER NAME.
    THE DEFENDANT IS HEREBY REMANDED TO THE CUSTODY OF THE SHERIFF.
    WITHOUT BAIL.  THE SHERIFF IS ORDERED TO DELIVER THE DEFENDANT
    TO THE AUTHORIZED AGENT OF THE DEMANDING STATE.
    COMPLIANCE HEARING SET.
    MATTER ADVANCED FROM 10/16/03 AND TAKEN OFF CALENDER
BAIL SET AT NO BAIL.
NEXT SCHEDULED EVENT:
10/10/03  1000 AM  EXTRADITION PROCEEDING   DIST CRIM JUSTICE CTR (LAC) DIV
030


CUSTODY STATUS: REMANDED TO CUSTODY


ON 10/10/03 AT 1000 AM  IN CRIM JUSTICE CTR (LAC) DIV  030

    CASE CALLED FOR EXTRADITION PROCEEDING
PARTIES: JEFFREY M. HARKAVY (JUDGE)  LINDA ACRIE  (CLERK)
                ELIZABETH SCHNEIDER  (REP)     LOREN NAIMAN  (DDA)
DEFENDANT IS NOT PRESENT IN COURT, AND NOT REPRESENTED BY COUNSEL
COUNT (01) : DISPOSITION: DISMISSAL IN FURTH OF JUSTICE PER 1385 PC
    DEFENDANT RELEASED TO DEMANDING STATE OF ALABAMA
    ON 09-30-03.  ON MOTION OF PEOPLE CASE DISMISSED PER 1385 PC.
NEXT SCHEDULED EVENT:
    PROCEEDINGS TERMINATED

ALABAMA DEPARTMENT OF CORRECTIONS - PROGRESS REVIEW FORM - MARCH 21, 2006
================================(COU122)================================
AIS #: 00242109    SSN: 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  RACE/SEX: B/M    DATE OF BIRTH: 03/04/1969
NAME: EGBUONU, ZEPHYRIUNS C    CUSTODY:    MED2  SECURITY LEVEL: 4
INST: KILBY CORRECTIONAL FACILITY    TIME SRVD:  02Y05M19 LAST DISC:
CRME: THEFT OF IDENTITY I    MIN REL DT: 11/30/2007 ACTIVE DET: 0

DISC: HAS RECEIVED NO DISCIPLINARIES PRL CONS:   03/01/2006 EDUCAT LEV: 17
WL/PGM: _____    PRIM OCCUP: ENGINEER

RECOMMENDED INSTITUTION: Staton CF    RECOMMENDED CUSTODY: M/C

JUSTIFICATION: SAR. S has 6 month clear record. S has not completed any programs & serving for using VP name & info. to obtain credit cards + then to purchase goods x2. Prices: Making false claims for payment x2, Grand Theft Property & fugitive from justice x2 (disposition not shown). Rec S for transfer to Staton for trade school + completion of Stress Mgmt.

3-21-06 NKEI

I CERTIFY ENEMY LIST WAS REVIEWED AND UPDATED: _____    APP. S/L: _____

_____ 3/21/06    ____well  5/21/06
CLASSIFICATION SPECIALIST    DATE    WARDEN OR DESIGNEE    DATE
Denise Carr-Okanu  3/21/06    Angie Baggett 3/23/06
PSYCHOLOGIST/PSYCHOLOGIST'S ASSOC.    DATE    CLASSIFICATION COORDINATOR DATE

CENTRAL REVIEW BOARD ACTION

___ APPROVED  X DENIED; DIVERTED TO: ____    REASONS: _____
_____    _____
    CRB MEMBER _____ DATE 3/30/06

___ APPROVED  X DENIED; DIVERTED TO: ____    REASONS: _____
    _____ 4-3-06
    CRB MEMBER    DATE

___ APPROVED ___ DENIED; DIVERTED TO: ____    REASONS: _____
_____    _____
    CRB MEMBER    DATE

FINAL DECISION: INST Kilby CUSTODY MED DATE 4-3-06
DATE INMATE INFORMED: 3/21/06 INMATE'S SIGNATURE: Refuse to sign

EXHIBIT 28

PR-9/05 Initial
DNA  9/07/05
D/L  CA-
Meds  INH for TB
(in Kitchen (Pots + Pans)

```
DETAIL REPORT FOR HARRIS COUNTY            CASE NO:  9102040593
        LAW ENFORCEMENT                    DATE: 05/05/05  TIME: 14:03
                                                          PAGE:  1
```

---

```
        TYPE OF OFFENSE:      THEFT FROM PERSON  MISC/LOSS $200+

DISPATCH LOCATION                    ALI    GRID  BEAT  DISTRICT  COMM
                                            9999                    S5

REPORTED LOCATION                    ALI    GRID  BEAT  DISTRICT  COMM
16015 CAIRNWAY                              448A  4B1    D4        S5

AT/BETWEEN              DATE/TIME                    DATE/TIME
  BETWEEN              02/03/91  15:30             02/03/91  16:00

PREMISES INVOLVED: POST OFFICE        METHOD OF ENTRY  :
POINT OF ENTRY   :                    POINT OF EXIT    :
INST/TOOL USED   :                    WEATHER CONDITION:  CLEAR
CAUSE OF FIRE    :                    LATENT PRINTS:   SCENE PHOTOS:
```

---

```
PERSONS INVOLVED INFORMATION:
TY/NO      NAME/ADDRESS          REL TO OFFENDER      AGE  RACE  SEX  HISP
C01 EGBUONU ZEPHYRINUS C                              25    B    M    N
    8200    SUNBURY LANE            818
    HOUSTON            TX 77095    713-463-8252

    DATE OF BIRTH :  ████     SOCIAL SECURITY NO :    ████████
    DRIVERS LICENSE : 12507527              STATE : TX
    CONDITION :     TAKEN TO :      TRANSPORTED BY :
    EMPLOYMENT : 8200    SUNBURY LANE
                 HOUSTON            TX   77095
        PHONE : 713-463-8252    EXT :

R01 EGBUONU, ZEPH

                              713-    -

    DATE OF BIRTH :          SOCIAL SECURITY NO :
    DRIVERS LICENSE :                    STATE :
    CONDITION :      TAKEN TO :      TRANSPORTED BY :
    EMPLOYMENT :

        PHONE :                EXT :
```

---

```
OFFICERS INVOLVED:
 P  NAME                    TDISP  TENRT  TARRD  TCLRD  DIS  CBY
 P                                               12:50  SCL  YR1
```

# EXHIBIT 30

```
DETAIL REPORT FOR HARRIS COUNTY            CASE NO:  9102040593
     LAW ENFORCEMENT                       DATE: 05/05/05  TIME: 14:03
                                                          PAGE:    2
```

```
STATUS / DISPOSITION     REPORT STATUS: APP      UCR CLEARANCE: OPN
              NAME                  DATE
         RANKIN,PATRIC         02/04/91      INITIAL ENTRY
         BATES, BECKY          04/24/91      REPORT APPROVAL
         BATES, BECKY          04/24/91      CASE APPROVAL

     RELATED CASES
```

```
DETAIL REPORT FOR HARRIS COUNTY                CASE NO:  9102040593
     LAW ENFORCEMENT                           DATE: 05/05/05  TIME: 14:03
                                                           PAGE:    3
```

```
PROPERTY INVOLVED:                                             VALUE/
PER/NO ITEM  ST BRAND     TYPE         NIC NUMBER  SERIAL NUMBER   LOSS

C01   016   S  AO
   MISC DESC:  (2) $100 BILLS/TOTAL $200                            200
   ARSON PROPERTY CLASS:
C01   015   S  US          SOCIAL SECURITY
   MISC DESC:  SOCIAL SECURITY CARD #455697827                       15
   ARSON PROPERTY CLASS:
C01   014   S  IMMIGR      CREDIT CARDS
   MISC DESC:  ALIEN REGISTRATION CARD/IMMIGRATION                   20
   ARSON PROPERTY CLASS:
C01   013   S  TEXAS       LICENSE DRIVER
   MISC DESC:  TEXAS DRIVERS LICENSE #12507527                       15
   ARSON PROPERTY CLASS:
C01   012   S  MACYS       CREDIT CARDS
   MISC DESC:  MACYS CREDIT CARD                                      0
   ARSON PROPERTY CLASS:
C01   011   S  DISCOV      CREDIT CARDS
   MISC DESC:  DISCOVER CREDIT CARD                                   0
   ARSON PROPERTY CLASS:
C01   010   S  SEARS       CREDIT CARDS
   MISC DESC:  SEARS CREDIT CARD                                      0
   ARSON PROPERTY CLASS:
C01   009   S  MERVYN      CREDIT CARDS
   MISC DESC:  MERVYNS CREDIT CARD                                    0
   ARSON PROPERTY CLASS:
C01   008   S  LEARNE      CREDIT CARDS
   MISC DESC:  LEARNERS CREDIT CARD                                   0
   ARSON PROPERTY CLASS:
```

```
DETAIL REPORT FOR HARRIS COUNTY          CASE NO:  9102040593
         LAW ENFORCEMENT                 DATE: 05/05/05  TIME: 14:03
                                                         PAGE:    4
```

```
C01   007  S  PALAIS      CREDIT CARDS
    MISC DESC:  PALAIS ROYAL CREDIT CARD                          0
    ARSON PROPERTY CLASS:
C01   006  S  ZALES       CREDIT CARDS
    MISC DESC:  ZALES CREDIT CARD                                 0
    ARSON PROPERTY CLASS:
C01   005  S  MOBIL       CREDIT CARDS
    MISC DESC:  MOBIL CREDIT CARD                                 0
    ARSON PROPERTY CLASS:
C01   004  S  TEXACO      CREDIT CARDS
    MISC DESC:  TEXACO CREDIT CARD                                0
    ARSON PROPERTY CLASS:
C01   003  S  MASTER      CREDIT CARDS
    MISC DESC:  (2) MASTERCARD/CREDIT CARDS                       0
    ARSON PROPERTY CLASS:
C01   002  S  VISA        CREDIT CARDS
    MISC DESC:  (3) VISA CREDIT CARDS                             0
    ARSON PROPERTY CLASS:
C01   001  S  UNK         WALLET
    MISC DESC:  SMALL BROWN WALLET                               40
    ARSON PROPERTY CLASS:


VEHICLE INVOLVED:
PER/NO  STATUS  MAKE  MODEL    LIT      VCO       LIC       LIS      VALUE/
                                                                    LOSS
SYNOPSIS OF OFFENSE:
```

ON 020491, THE COMPLAINANT, MR. EGBUONU, CAME TO THE REPORT SECTION TO ADVISE
THAT HIS WALLET AND IT'S CONTENTS WERE STOLEN BY AN UNKNOWN SUSPECT.  MR.
EGBUONU ADVISED THAT HIS WALLET WAS STOLEN FROM THE BEAR CREEK POST OFFICE.

PROPERTY TAKEN WITHOUT THE EFFECTIVE CONSENT OF THE OWNER.

DETAIL REPORT FOR HARRIS COUNTY
    LAW ENFORCEMENT

CASE NO:  9102040593
DATE: 05/05/05  TIME: 14:03
                    PAGE:    5

SUSPECTS INVOLVED:

DETAIL REPORT FOR HARRIS COUNTY
      LAW ENFORCEMENT

CASE NO:  9102040593
DATE: 05/05/05  TIME: 14:03
                  PAGE:    6

---

NARRATIVE:
  ENTERED BY:                    DATE: 02/04/91    TIME: 13:26

NO SCENE SUMMARY.
ON 020491, THE COMPLAINANT, MR. EGBUONU, CAME TO THE REPORT SECTION TO ADVISE
THAT HIS WALLET WAS STOLEN BY AN UNKNOWN SUSPECT.  MR. EGBUONU ADVISED THAT
HIS WALLET WAS STOLEN FROM THE BEAR CREEK POST OFFICE.

PROPERTY TAKEN WITHOUT THE EFFECTIVE CONSENT OF THE OWNER.

U.S. Department of Justice

Immigration and Naturalization Service

**Warrant for Arrest of Alien**

Case No: NOL0702000009

File No. A028 583 185

Date: **February 2, 2007**

**To any officer of the Immigration and Naturalization Service delegated authority pursuant to section 287 of the Immigration and Nationality Act:**

From evidence submitted to me, it appears that:

**Zephyrinus Chiedu EGBUONU**

<div style="text-align:center">(Full name of alien)</div>

an alien who entered the United States at or near **Dallas, Texas**                     on

<div style="text-align:center">(Port)</div>

**September 7, 1984**                     is within the country in violation of the immigration laws and is

<div style="text-align:center">(Date)</div>

therefore liable to being taken into custody as authorized by section 236 of the Immigration and Nationality Act.

By virtue of the authority vested in me by the immigration laws of the United States and the regulations issued pursuant thereto, I command you to take the above-named alien into custody for proceedings in accordance with the applicable provisions of the immigration laws and regulations.

<div style="text-align:center">(Signature of authorized INS official)</div>

**GERALD SMITH**

<div style="text-align:center">(Print name of official)</div>

**SDDO**

<div style="text-align:center">(Title)</div>

---

### Certificate of Service

Served by me at **Gadsden, Alabama**                     on **February 6, 2007**          at     **12:00 AM**                 .

I certify that following such service, the alien was advised concerning his or her right to counsel and was furnished a copy of this warrant.

**PERRY ZANER**

<div style="text-align:center">(Signature of officer serving warrant)</div>

**DEPORTATION OFFICER**

<div style="text-align:center">(Title of officer serving warrant)</div>

Form I-200 (Rev. 4-1-97)N

**EXHIBIT 31**

U.S. Department of Justice

Immigration and Naturalization Service

**Notice of Custody Determinatio**

Zephyrinus Chiedu EGBUONU

1010 EAST WHATLEY ROAD
OAKDALE, LA 71463

Case No: NOL0702000009
File No: A028 583 185

Date: 02/02/2007

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, I have determined that pending a final determination by the immigration judge in your case, and in the event you are ordered removed from the United States, until you are taken into custody for removal, you shall be:

- ☒ detained in the custody of this Service.
- ☐ released under bond in the amount of $_____.
- ☐ released on your own recognizance.

☒ You may request a review of this determination by an immigration judge.

☐ You may not request a review of this determination by an immigration judge because the Immigration and Nationality Act prohibits your release from custody.

GERALD SMITH _____
(Signature of authorized officer)

SDDO _____
(Title of authorized officer)

Gadsden, Alabama _____
(INS office location)

☒ I do   ☐ do not request a redetermination of this custody decision by an immigration judge.

☒ I acknowledge receipt of this notification.

_Egbuonu Zephyr_ _____
(Signature of respondent)

2/6/07 _____
(Date)

---

### RESULT OF CUSTODY REDETERMINATION

On _____, custody status/conditions for release were reconsidered by:

☐ Immigration Judge     ☐ District Director     ☐ Board of Immigration Appeals

The results of the redetermination/reconsideration are:

☐ No change - Original determination upheld.        ☐ Release-Order of Recognizance
☐ Detain in custody of this Service.                ☐ Release-Personal Recognizance
☐ Bond amount reset to _____              ☐ Other: _____

_____
(Signature of officer)

*COPY*

U.S. Department of Justice

Immigration and Naturalization Service

## Notice of Rights and Request for Dispositic

FIN #: _____

Case No: NOL0702000009
File No: _A028 583 185_

Name: _Zephyrinus Chiedu EGBUONU_

## NOTICE OF RIGHTS

You have been arrested because immigration officers believe that you are illegally in the United States. You have the right to a hearing before the Immigration Court to determine whether you may remain in the United States. If you request a hearing, you may be detained in custody or you may be eligible to be released on bond, until your hearing date. In the alternative, you may request to return to your country as soon as possible, without a hearing.

You have the right to contact an attorney or other legal representative to represent you at your hearing, or to answer any questions regarding your legal rights in the United States. Upon your request, the officer who gave you this notice will provide you with a list of legal organizations that may represent you for free or for a small fee. You have the right to communicate with the consular or diplomatic officers from your country. You may use a telephone to call a lawyer, other legal representative, or consular officer at any time prior to your departure from the United States.

## REQUEST FOR DISPOSITION

____☒____  I request a hearing before the Immigration Court to determine whether or not I may remain in the
Initials    United States.

____☐____  I believe I face harm if I return to my country. My case will be referred to the Immigration Court
Initials    for a hearing.

____☐____  I admit that I am in the United States illegally, and I believe I do not face harm if I return to my
Initials    country. I give up my right to a hearing before the Immigration Court. I wish to return to my
            country as soon as arrangements can be made to effect my departure. I understand that I may be
            held in detention until my departure.

_Egbuonu Zephyn_                                    _2/6/07_
Signature of Subject                                 Date

## CERTIFICATION OF SERVICE

☒  Notice read by subject
☒  Notice read to subject by **PERRY ZANER** _____, in the __English__ language.

**PERRY ZANER**
Name of Service Officer (Print)                      Name of Interpreter (Print)

_____                                     _February 6, 2007_
Signature of Officer                                 Date and Time of Service

*Alien Copy*

U. S. Department of Justice
Immigration and Naturalization Service

**Notice to Appear**

**In removal proceedings under section 240 of the Immigration and Nationality Act**

File No: **A028 583 185**
Case No: **NOL0702000009**

In the Matter of:

Respondent: **Zephyrinus Chiedu EGBUONU** _____ currently residing at:

**1010 EAST WHATLEY ROAD**
**OAKDALE LOUISIANA 71463** _____ **(318)335-0713**
<span style="font-size:smaller">(Number, street, city state and ZIP code)</span>          <span style="font-size:smaller">(Area code and phone number)</span>

☐ 1. You are an arriving alien.
☐ 2. You are an alien present in the United States who has not been admitted or paroled.
☒ 3. You have been admitted to the United States, but are deportable for the reasons stated below.

The Service alleges that you:

**See Continuation Page Made a Part Hereof**

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

**See Continuation Page Made a Part Hereof**

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to: ☐ 8 CFR 208.30(f)(2)   ☐ 8 CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at: _____
**Executive Office for Immigration Review P.O. Box 750 Oakdale LOUISIANA 71463**
<span style="font-size:smaller">(Complete Address of Immigration Court, Including Room Number, if any)</span>
on **a date to be set**    at **a time to be set**  to show why you should not be removed from the United States based on the
<span style="font-size:smaller">(Date)</span>          <span style="font-size:smaller">(Time)</span>
charge(s) set forth above.

GERALD SMITH
SDDO
<span style="font-size:smaller">(Signature and Title of Issuing Officer)</span>

Date: **February 6, 2007**          Gadsden, Alabama
<span style="font-size:smaller">(City and State)</span>

**See reverse for important information**

Form I-862 (Rev. 1/22/99)N

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CF 3.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provi with this Notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents which you desir to have considered in connection with your case. If any document is in a foreign language, you must bring the original and a certifie English translation of the document. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear and that you are inadmissible or deportable on the charges contained in the Notice to Appear. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge.

You will be advised by the immigration judge before whom you appear, of any relief from removal for which you may appear eligible including the privilege of departing voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the INS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the INS.

---

### Request for Prompt Hearing

To expedite a determination in my case, I request an immediate hearing. I waive my right to have a 10-day period prior to appearing before an immigration judge.

_____
(Signature of Respondent)

Before: _____    Date: _____
(Signature and Title of INS Officer)

---

### Certificate of Service

This Notice to Appear was served on the respondent by me on **February 6, 2007**, in the following manner and in
(Date)
compliance with section 239(a)(1)(F) of the Act:

☒ in person          ☐ by certified mail, return receipt requested          ☐ by regular mail
☐ Attached is a credible fear worksheet.
☒ Attached is a list of organizations and attorneys which provide free legal services. *Has Attorny on Record*
The alien was provided oral notice in the ___*English*___ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____    PERRY ZANER _____
(Signature of Respondent if Personally Served)          DEPORTATION OFFICER
                                                        (Signature and Title of Officer)

Form I-862 (Rev. 3/22/99)N



RELEASED

MAY 25 2007

CLERK
ALA COURT CRIMINAL APPEALS

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 242-4621), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# ALABAMA COURT OF CRIMINAL APPEALS

## OCTOBER TERM, 2006-2007

---

### CR-05-0143

---

### Zephyriuns C. Egbuonu

#### v.

### State of Alabama

### Appeal from Jefferson Circuit Court
### (CC-04-1422)

SHAW, Judge.

　　Zephyriuns C. Egbuonu was convicted of two counts of identity theft, violations of § 13A-8-192, Ala. Code 1975. He was sentenced to 10 years' imprisonment for each conviction, to run consecutively.

## EXHIBIT 32

CR-05-0143

The evidence adduced at trial indicated the following. In December 2002, James Roberson, deputy chief of operations with the Jefferson County Sheriff's Department, received a telephone call from the credit card division of Capital One, inquiring whether he had attempted to open an account at a TJ Maxx discount department store. He had not, and he was informed that someone had attempted to open an account using his name and his Social Security number, but using other identifying information, such as date of birth and address, that was false. Deputy Roberson then contacted other credit companies and learned that someone had opened an account with Mervyn's department store, owned at that time by Target Corporation, using his name and Social Security number, but otherwise false identifying information. Deputy Roberson further learned that other accounts had been opened using his name and Social Security number at La Redoute, Chadwick's, and Victoria's Secret, all clothing retailers, but again, with other identifying information that was false.

The State presented evidence indicating that the Mervyn's account in Deputy Chief Roberson's name was opened on October 1, 2002. The credit application submitted for the account

2

CR-05-0143

call came -- the call that added Jerome Bivens to the account

in the name of Rosemary Roberson -- was not captured by the

system.    Several charges were subsequently made to these two

accounts in one of Mervyn's stores in Westchester, California,

and multiple checks were sent as payment on the two accounts

in December 2002 and January 2003.    However, the checks were

written on an account in the name of Matthew Kittiko and the

account had been closed.

Expert testimony was presented indicating that the

handwriting on the credit applications for both of the

accounts at Mervyn's was Egbuonu's handwriting, and that the

handwriting on the checks signed with the name Matthew Kittiko

was Egbuonu's handwriting.    The State also presented evidence

indicating that the telephone call adding the name Jerome

Bivens to the account in Deputy Chief Roberson's name was

placed from the number of a cellular telephone later found in

Egbuonu's apartment.    In addition, the State presented

evidence that mailbox 268 at the Mailboxes, Etc., store at

4859 Slauson Boulevard in Los Angeles, California, had been

rented in the name of Jerome Bivens only two days before the

credit applications had been signed, and that the names James

4

CR-05-0143

Roberson and Rosemary Roberson were also listed on the mailbox-rental agreement as persons authorized to receive mail at mailbox 268. Although the handwriting on the mailbox-rental agreement was not found to be Egbuonu's writing,[2] the owner of the Mailboxes, Etc., store positively identified Egbuonu as the person he knew as Jerome Bivens and who picked up mail from mailbox 268.

I.

Egbuonu first contends that § 13A-8-192 and § 13A-8-196, Ala. Code 1975, are unconstitutional. Egbuonu makes several arguments in this regard, all of which he raised in a pretrial petition for a writ of habeas corpus that was denied by the circuit court. Egbuonu appealed that denial, and this Court, treating Egbuonu's appeal as an original petition for a writ of habeas corpus, addressed and rejected Egbuonu's claims. See Ex parte Egbuonu, 911 So. 2d 748 (Ala. Crim. App. 2004). For the reasons stated in that opinion, Egbuonu's claims are meritless.

---

[2]The State's handwriting expert testified that only one portion of the handwriting on the paperwork associated with the mailbox was Egbuonu's -- the address listed under the signature.

CR-05-0143

II.

Egbuonu contends that he was "denied his right to have witnesses appear on his behalf when he was forced to pay for the prosecution's witnesses to appear." (Egbuonu's brief at p. 16.) Specifically, he argues, as he did in his motion for a new trial, that the trial court's ordering him, at his sentencing hearing in August 2005, to pay for the travel and lodging costs of the State's out-of-state witnesses rendered him "unable to pay for a proper defense" at his trial in May 2005 and thereby denied him the right to present a defense. (Egbuonu's brief at p. 18.) The record does not indicate, and Egbuonu does not allege, that he was aware, or even that he had the belief, before or during his trial that, if convicted, he would be ordered to pay for the costs of the State's witnesses. He merely alleges that the trial court's order at sentencing made "him unable to afford to bring his own witnesses from California." (Egbuonu's reply brief at p. 4.) However, we fail to see how the trial court's order at sentencing in August 2005 could have possibly had any retroactive effect on Egbuonu's right to present a defense at his trial, which occurred three months earlier in May 2005,

6

CR-05-0143

and Egbuonu's argument that it did have such a retroactive
effect is specious at best.[3]  Therefore, we find no merit to
this claim.

### III.

Egbuonu contends that he was denied a fair trial because,
he says, "he was convicted using improperly admitted
evidence." (Egbuonu's brief at p. 18.)  In his initial brief,
Egbuonu appears to make three arguments in this regard.  One
of these arguments Egbuonu concedes in his reply brief is
meritless; thus, that argument will not be addressed by this
Court.  The remaining two arguments fail to comply with Rule
28(a)(10), Ala.R.App.P.

Rule 28(a)(10), Ala.R.App.P., requires that an argument
contain "the contentions of the appellant/petitioner with
respect to the issues presented, and the reasons therefor,
with citations to the cases, statutes, other authorities, and
parts of the record relied on."  "Recitation of allegations
without citation to any legal authority and without adequate

---

[3]Within this issue in his brief, Egbuonu states that he
"was denied funds for defense witnesses." (Egbuonu's brief at
p. 18.)  However, in his reply brief, Egbuonu specifically
states that he is not challenging the trial court's denial of
his pretrial request for funds.

CR-05-0143

recitation of the facts relied upon has been deemed a waiver

of the arguments listed." Hamm v. State, 913 So. 2d 460, 486

(Ala. Crim. App. 2002).  "Authority supporting only 'general

propositions of law' does not constitute a sufficient argument

for reversal." Beachcroft Props., LLP v. City of Alabaster,

901 So. 2d 703, 708 (Ala. 2004), quoting Geisenhoff v.

Geisenhoff, 693 So. 2d 489, 491 (Ala. Civ. App. 1997).

> "We have stated that it is not the function of this
> court to do a party's legal research.  See
> Henderson[ v. Alabama A & M University], 483 So. 2d
> [392,] 392 [(Ala. 1986)].  Similarly, we cannot
> create legal arguments for a party based on
> undelineated general propositions unsupported by
> authority or argument. Ala.R.App.P. 28(a)(5) [now
> Rule 28(a)(10), Ala.R.App.P.]; Brittain v. Ingram,
> 282 Ala. 158, 209 So. 2d 653 (1968) (analyzing the
> predecessor to Ala.R.App.P. 28); Ex parte Riley, 464
> So. 2d 92 (Ala. 1985)."

Spradlin v. Spradlin, 601 So. 2d 76, 78-79 (Ala. 1992).  To

obtain review of an argument on appeal, an appellant must

provide record citations to indicate where the allegedly

improper evidence was admitted over a proper and timely

objection, citations to relevant cases or other legal

authorities, and an analysis of why those cases or other

authorities support an argument that an error occurred and

that the alleged error should result in reversal.

8

CR-05-0143

First, Egbuonu argues that his conviction "was obtained using hearsay evidence." (Egbuonu's brief at p. 18.) After citing and quoting general propositions of law regarding hearsay and the right to confrontation, Egbuonu argues:

> "[Egbuonu] was denied the opportunity to confront and cross-examine Dolly Guttirez, R. 268-88, Jerome Bivens, R. 168, 239-241, 285, Rosemary Robertson, R. 246, or Sean Altpeter, R. 1999."

(Egbuonu's brief at p. 20.) Egbuonu provides a list of names and citations to pages in the record, but fails to actually identify what hearsay evidence he believes was improperly admitted. Citations to the record without any recitation of facts or any indication as to what occurred during trial that forms the basis for the argument on appeal is not sufficient to comply with Rule 28(a)(10). Nor does Egbuonu provide an explanation of how the general principles of law he cites support his claim of error. Therefore, as to this issue Egbuonu has failed to comply with Rule 28(a)(10), and the issue deemed to be waived.

Egbuonu also argues:

> "Also, [Egbuonu] was convicted upon evidence that was not properly authenticated. In order for evidence to be authenticated, sufficient evidence must be presented to support a finding that the

9

CR-05-0143

> matter in question is what its proponent claims.
> A.R.E. 901. R. 363, 370, 383."

(Egbuonu's brief at p. 21). Again, although Egbuonu provides citations to the record, he fails to identify what evidence he believes was not authenticated, and he does not make any argument as to why he believes the unidentified evidence was not properly authenticated. Although Egbuonu cites to Rule 901, Ala.R.Evid., he makes no argument regarding how Rule 901 supports his claim of error, and he does not provide any other authority in support of his claim. Therefore, this issue also fails to comply with Rule 28(a)(10), and is deemed to be waived.

IV.

Egbuonu next contends that he was denied a fair trial because, he says, the State withheld exculpatory evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). Specifically, he argues that the State failed to disclose videotapes from the security cameras at the Mervyn's store in Westchester, California, where the falsified Mervyn's account in Deputy Chief Roberson's name was used. He maintains that these videotapes would have shown that the person using the falsified Mervyn's card was not, in fact, him.

CR-05-0143

The record indicates that the first mention that there may have been videotapes of the person who made the purchases at the Mervyn's store in Westchester, California, was during the testimony of the State's first witness, a financial investigations coordinator for Target Corporation who began the investigation into the fraudulent Mervyn's accounts. The information regarding the videotapes was brought out on cross-examination by defense counsel. However, counsel lodged no objection at that time. The next mention of the existence of videotapes was during the testimony of the State's fourth witness, a detective with the Los Angeles, California, police department, who testified that he had viewed videotapes from the Mervyn's store in Westchester, California, but that "based on the angle and the graininess" of the videotapes, he could not identify anyone in the videotapes, including Egbuonu. (R. 207.) Egbuonu lodged no objection. The final mention of the videotapes came during the testimony of the State's fifth witness, a detective with the Los Angeles County Sheriff's Department, who testified that, he too, had viewed the videotapes, but was unable to identify anyone. Specifically, he said that during one of the transactions the camera had

11

CR-05-0143

been moved from focusing on the cash register to focusing on

another area of the store and thus did not capture the person

who had used the falsified Mervyn's account.  Again, Egbuonu

did not object.  Egbuonu raised this claim for the first time

in his motion for a new trial.

In <u>Mitchell v. State</u>, 706 So. 2d 787(Ala. Crim. App.

1997), this Court addressed a similar issue, stating:

> "Mitchell contends that he is entitled to an
> acquittal or a new trial because of alleged
> prosecutorial misconduct.  He argues that the State
> breached a discovery agreement between the parties
> by not producing certain material evidence he
> requested and that the State actively misled him as
> to the existence of that evidence, in violation of
> <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10
> L.Ed.2d 215 (1963).  According to Mitchell, the
> prosecution failed to disclose information gotten as
> a result of an interview with Isaac Ruffin contrary
> to the State's representation in open court before
> trial that the information did not exist.  Mitchell
> contends that Ruffin's testimony was prejudicial
> because it contradicted Mitchell's version of the
> events of that night, thus casting doubt on
> Mitchell's credibility.  Also, Mitchell contends
> that defense counsel would have changed the way they
> prepared and presented the case had they been made
> aware of this information.

> "In a tape-recorded statement given to police on
> July 23, 1993, Ruffin stated that no one was with
> Mitchell when Mitchell borrowed and then returned
> Ruffin's car.  However, according to the defense,
> later that same day Ruffin told Detective Long that
> someone had been with Mitchell when he borrowed the
> car.  'The knowledge of government agents working on

12

CR-05-0143

the case, including a deputy sheriff, as to the existence of exculpatory evidence will be imputed to the prosecutor. <u>Sexton v. State</u>, 529 So. 2d 1041, 1045 (Ala. Cr. App. 1988).' <u>Savage v. State</u>, 600 So. 2d 405, 407 (Ala. Cr. App. 1992), cert. denied, 600 So. 2d 409 (Ala. 1992).

"Mitchell contends that he was first made aware of the Ruffin's upcoming testimony when the State alluded to it during opening statements. No objection was made at this time. At trial, Ruffin testified that a short, skinny, dark-skinned male was with Mitchell when Mitchell borrowed and then returned Ruffin's car. R. 368-69, 580. No objection was raised when Ruffin offered this testimony at trial. The defense thoroughly cross-examined Ruffin concerning his statements. The first time an objection was made on the ground that the State had failed to disclose this statement before trial was in Mitchell's motion for a judgment of acquittal made after the State rested. '[T]he appellant failed to properly preserve this issue for our review. No objection was made by the appellant when the admission of this testimony was proposed to the court by the State.... The appellant also failed to object when the <u>testimony</u> concerning the ... statement was first introduced.' <u>Brown v. State</u>, 516 So. 2d 882, 887 (Ala. Cr. App. 1987) (the appellant argued that the State had violated a discovery order entered pursuant to his motion for production) (emphasis in <u>Brown</u>).

> "'"'If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this [<u>Brady</u>] rule, or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection; grant a continuance if requested by the

13

CR-05-0143

> aggrieved party; prohibit the
> party from introducing evidence
> not disclosed; or enter such
> other order as the court deems
> just under the circumstances.'"'

"Robinson v. State, 528 So. 2d 343, 346 (Ala. Cr.
App. 1986) (quoting Young v. State, 494 So. 2d 862
(Ala. Cr. App. 1986)). Instead of bringing this
alleged violation to the attention of the trial
court, the defense proceeded to trial without
requesting any relief. Therefore, the appellant has
waived any objection on this ground."

Mitchell v. State, 706 So. 2d 787, 804 (Ala. Crim. App. 1997).

Similarly, here, Egbuonu failed to bring this alleged

Brady violation to the trial court's attention, despite

several opportunities to do so, until after he had been

convicted and sentenced.    Therefore, this issue is not

properly before this Court for review.

V.

Egbuonu contends that the evidence was insufficient to

sustain his convictions.    Egbuonu quotes the identity-theft

statute, § 13A-8-192, Ala. Code 1975, and then states:

"As [Egbuonu] was convicted utilizing
insufficient evidence, [Egbuonu] submits that his
conviction[s] and subsequent sentence[s] must be
vacated, and this matter remanded for rehearings
consistent with the findings of this Court. R. 199,
464."

14

CR-05-0143

(Egbuonu's brief at p. 34.)  Egbuonu makes no other argument in this regard.  He cites no other authority, includes no facts, and fails even to explain why he believes the evidence was insufficient to sustain his convictions.  Clearly then, this argument fails to comply with Rule 28(a)(10) and is, therefore, deemed to be waived.  See, e.g., <u>L.J.K. v. State</u>, 942 So. 2d 854 (Ala. Crim. App. 2005), and the cases cited therein.

<div align="center">VI.</div>

Although Egbuonu does not make this argument on appeal, we are obligated to take notice that his convictions for two counts of identity theft violate double-jeopardy principles. This type of double-jeopardy transgression implicates the jurisdiction of the trial court and, thus, must be noticed by this Court.  See, e.g., <u>Ex parte Robey</u>, 920 So. 2d 1069 (Ala. 2004); <u>Johnson v. State</u>, 950 So. 2d 371 (Ala. Crim. App. 2006); and <u>McPherson v. State</u>, 923 So. 2d 1114 (Ala. Crim. App. 2005).

Egbuonu was charged as follows:

> "The grand jury of said county charge that, before the finding of this indictment, ZEPHYRIUNS C EGBUONU, alias ZEPHYRINUS C EGBUONU, alias ZEPHYRINUS CHIEDU EGBUONU, whose name is to the

<div align="center">15</div>

CR-05-0143

grand jury otherwise unknown, with the intent to
defraud for his own benefit or the benefit of a
third person, and without the authorization, consent
or permission of JAMES ROBERSON, did obtain, record,
or access identifying information that would assist
in accessing financial resources, obtaining
identification documents, or obtaining benefits of
JAMES ROBERSON, resulting in a financial loss of
greater than $250, in violation of Section 13A-8-192
of the Alabama Criminal code, against the peace and
dignity of the State of Alabama.

"The grand jury of said county further charge
that before the finding of this indictment,
ZEPHYRIUNS C EGBUONU, alias ZEPHYRINUS C EGBUONU,
alias ZEPHYRINUS CHIEDU EGBUONU, whose name is to
the grand jury otherwise unknown, with the intent to
defraud for his own benefit or the benefit of a
third person, and without the authorization, consent
or permission of JAMES ROBERSON, did obtain goods or
services through the use of identifying information
of JAMES ROBERSON resulting in a financial loss of
greater than $250 in violation of Section 13A-8-192
of the Alabama Criminal Code, against the peace and
dignity of the State of Alabama."

(C. 27.) At the time of the crime in this case,[4] § 13A-8-192,

Ala. Code 1975, provided, in pertinent part:

"(a) A person commits the crime of identity
theft if, without the authorization, consent, or
permission of the victim, and with the intent to
defraud for his or her own benefit or the benefit of
a third person, he or she does any of the following:

_____

[4]"It is well settled that the law in effect at the time
of the commission of the offense controls the prosecution."
Minnifield v. State, 941 So. 2d 1000, 1001 (Ala. Crim. App.
2005).

16

CR-05-0143

"(1) Obtains, records, or accesses identifying information that would assist in accessing financial resources, obtaining identification documents, or obtaining benefits of the victim.

"(2) Obtains goods or services through the use of identifying information of the victim.

"(3) Obtains identification documents in the victim's name.

"(b) Identity theft in which there is a financial loss of greater than two hundred fifty dollars ($250) or the defendant has previously been convicted of identity theft constitutes identity theft in the first degree.  Identity theft in the first degree is a Class C felony.[5]

In Ex parte Robey, supra, the Alabama Supreme Court faced an identical issue:

"Robey was convicted of two counts of assault in the first degree arising out of the injuries to McNabb.  On appeal, Robey argues that these two convictions, which are based on separate subsections of § 13A-6-20(a), [Ala. Code 1975,] violate his double-jeopardy rights.  With good reason, the State concedes this issue.

"In Ex parte Rice, 766 So. 2d 143, 148 (Ala. 1999), we recognized the long-standing proposition that 'the Double Jeopardy Clause, as a general rule,

_____

[5]Section 13A-8-192 was amended effective September 1, 2003, to increase the amount of loss for first-degree identity theft to $500.  It was amended again effective April 5, 2006, to remove the requirement that a loss be suffered and to abolish the degrees of the crime.

17

CR-05-0143

prohibits the State from subjecting a defendant to multiple punishments for the same offense.' In Blockburger v. United States, 284 U.S. 299, 304 (1932), the United States Supreme Court stated, '[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.'

"However, in Rice we stated, 'Because we are dealing here with a single statute ... that defines a single offense, the Blockburger test is not applicable.' 766 So. 2d at 150 (citing Sanabria v. United States, 437 U.S. 54, 70 n.24 (1978)). We also stated in Rice that 'when a statute provides alternative or different methods of committing the same offense, each alternative method is not to be treated as a separate offense.' 766 So. 2d at 150 (citing Sisson v. State, 528 So. 2d 1159 (Ala. 1988)). In the instant case, Robey was convicted of two counts of first-degree assault under two subsections of the same Code section. The pertinent subsections of § 13A-6-20(a), Ala. Code 1975, provide:

> "'(a) A person commits the crime of assault in the first degree if:

> > "'....

> > "'(3) Under circumstances manifesting extreme indifference to the value of human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to any person; or

> > "'....

18

CR-05-0143

> "'(5) While driving under
> the influence of alcohol or a
> controlled substance or any
> combination thereof in violation
> of Section 32-5A-191 he causes
> serious bodily injury to the
> person of another with a motor
> vehicle.'

> "We conclude that the offense of first-degree
> assault under § 13A-6-20(a) 'may be committed by
> several different methods, and the State may allege
> and prove any one or all of those various methods in
> its attempt to establish the defendant's guilt.'
> Rice, 766 So. 2d at 150. We have found no
> indication that the Legislature intended to impose
> multiple punishments under the separate subsections
> of § 13A-6-20(a) when the actions described in each
> of those subsections are based on the same conduct
> of the accused, as well as the same injuries to the
> same victim. Therefore, punishing Robey twice for
> the same offense -- first-degree assault -- violated
> his double-jeopardy rights."

920 So. 2d at 1070.

Similarly, here, the offense of identity theft may be

committed by several different methods, and the State may

allege and prove any one or all of those methods in its

attempt to establish the defendant's guilt. We have found no

indication that the legislature intended to impose multiple

punishments under the separate subsections of § 13A-8-192(a)

when the actions described in each of those subsections are

based on the same conduct of the accused against the same

19

CR-05-0143

victim.  In this case, it is clear that both of the charges

against Egbuonu stemmed from the same theft -- the theft of

Deputy Chief Roberson's identity -- and that the two charges

were merely based on alternative methods of proving that

single theft.  Therefore, Egbuonu's convictions and sentences

for two counts of identity theft for a single theft violate

double-jeopardy principles, and we must remand this case for

the entry of a new judgment.

As the Alabama Supreme Court explained in Ex parte Rice,

766 So. 2d 143 (Ala. 1999):

> "We note that merely ordering that Rice's sentences
> run concurrently is not a constitutionally
> acceptable option.  The Supreme Court stated in Ball
> v. United States, 470 U.S. 856, 864-65, 105 S.Ct.
> 1668, 84 L.Ed.2d 740 (1985):
>
>> "'The remedy of ordering one of the
>> sentences to be served concurrently with
>> the other cannot be squared with Congress'
>> intention.  One of the convictions, as well
>> as its concurrent sentence, is unauthorized
>> punishment for a separate offense.  See
>> Missouri v. Hunter, 459 U.S. 359, 368[, 103
>> S.Ct. 673, 74 L.Ed.2d 535] (1983).
>>
>> "'The second conviction, whose
>> concomitant sentence is served
>> concurrently, does not evaporate simply
>> because of the concurrence of the sentence.
>> The separate conviction, apart from the
>> concurrent sentence, has potential adverse
>> collateral consequences that may not be

CR-05-0143

> ignored. For example, the presence of two
> convictions on the record may delay the
> defendant's eligibility for parole or
> result in an increased sentence under a
> recidivist statute for a future offense.
> Moreover, the second conviction may be used
> to impeach the defendant's credibility and
> certainly carries the societal stigma
> accompanying any criminal conviction. See
> Benton v. Maryland, 395 U.S. 784, 790-91[,
> 89 S.Ct. 2056, 23 L.Ed.2d 707] (1969);
> Sibron v. New York, 392 U.S. 40, 54-56 [,
> 88 S.Ct. 1889, 20 L.Ed.2d 917] (1968).
> Thus, the second conviction, even if it
> results in no greater sentence, is an
> impermissible punishment.'

"See, also, Rolling v. State, [673 So. 2d 812 (Ala.
Crim. App. 1995)].

> "Neither is it an acceptable option to merely
> vacate one of Rice's convictions and its
> corresponding sentence. The jury specifically found
> that Rice had violated § 13A-6-2(a)(3) in two
> different ways -- by participating in a kidnapping
> and causing Taylor's death and by participating in
> a robbery and causing Taylor's death. Based on the
> record before us, an appellate court's vacating one
> of Rice's convictions and its corresponding sentence
> would have the effect, albeit unintended, of
> nullifying a part of the jury's verdict. We think
> the better approach is for the Court of Criminal
> Appeals to remand the case to the trial court for
> the entry of a new order -- an order that adjudges
> Rice guilty of Taylor's murder and sentences him for
> that single offense."

766 So. 2d at 152-53.

Accordingly, we remand this case for the trial court to

enter a new order that adjudges Egbuonu guilty of the single

CR-05-0143

offense of identity theft and sentences him for that single offense.[6] Due return shall be filed with this Court within 35 days of the date of this opinion.

REMANDED WITH DIRECTIONS.

Baschab, P.J., and McMillan, Wise, and Welch, JJ., concur.

_____

[6]We pretermit discussion of Egbuonu's remaining issue pending the trial court's return to our remand.

22

THE STATE OF ALABAMA - - JUDICIAL DEPARTMENT

THE ALABAMA COURT OF CRIMINAL APPEALS

CR-05-0143

Zephyriuns C. Egbuonu, Appellant

vs.

State of Alabama, Appellee

Appeal from Jefferson Circuit Court No. CC-04-1422

## ORDER

### On Return to Remand

 Zephyrius C. Egbuonu was convicted of two counts of identity theft, violations of § 13A-8-192(a)(1) and (a)(2), Ala. Code 1975, for stealing the identity of James Roberson, deputy chief of operations with the Jefferson County Sheriff's Department.[1]  He was sentenced to 10 years' imprisonment for each conviction, to run consecutively.

 In an opinion issued on May 25, 2007, this Court held that Egbuonu's convictions for two counts of identity theft violated the principles of double jeopardy because both convictions arose from a single theft -- the theft of Deputy Chief Roberson's identity -- and were merely based on alternative methods of proving that single theft.  Therefore, we remanded this case "for the trial court to enter a new order that adjudges Egbuonu guilty of the single offense of identity theft and sentences him for that single offense." Egbuonu v. State, [Ms. CR-05-0143, May 25, 2007] ___ So. 2d ___, ___ (Ala. Crim. App. 2007).

 On July 19, 2007, the trial court submitted its order on return to remand, stating, in pertinent part:

  "In accordance with the order heretofore issued by the Alabama Court of Criminal Appeals it is the Order of this court that the defendant is adjudicated guilty of Identity Theft in the First Degree of James Roberson, as charged in Count One of the indictment.  Inasmuch as the Alabama Court of Criminal Appeals has found that the charged under Count One and Count Two arise out of a single act or course of conduct and that both counts were merely based upon alternative methods of proving

---

 [1]Count One of the indictment charged Egbuonu with violating § 13A-8-192(a)(1), and Count Two of the indictment charged Egbuonu with violating § 13A-8-192(a)(2).



EXHIBIT 33

a single violation of 13A-8-192(a), <u>Code of Alabama</u>, 1975, the previous adjudication of guilt and sentence heretofore imposed under Count Two of the indictment is ordered set aside. The defendant stands sentenced only under Count One of the indictment."

The court then nol-prossed Count Two of the indictment. The trial court's actions did not comply with this Court's instructions.

As noted in our May 2007 opinion, in <u>Ex parte Rice</u>, 766 So. 2d 143 (Ala. 1999), in addressing this same type of double-jeopardy violation, the Alabama Supreme Court held:

> "<u>Neither is it an acceptable option to merely vacate one of Rice's convictions and its corresponding sentence</u>. The jury specifically found that Rice had violated § 13A-6-2(a)(3) in two different ways -- by participating in a kidnapping and causing Taylor's death and by participating in a robbery and causing Taylor's death. Based on the record before us, an appellate court's <u>vacating one of Rice's convictions and its corresponding sentence would have the effect, albeit unintended, of nullifying a part of the jury's verdict. We think the better approach is for the Court of Criminal Appeals to remand the case to the trial court for the entry of a new order -- an order that adjudges Rice guilty of Taylor's murder and sentences him for that single offense</u>."

766 So. 2d at 152-32 (emphasis added).

Based on <u>Ex parte Rice</u>, the trial court's order setting aside Egbuonu's conviction and corresponding sentence under Count Two of the indictment had the effect of nullifying a part of the jury's verdict. Therefore, we must again remand this case to the trial court with directions that the court set aside its order on remand, and enter a new order that adjudges Egbuonu guilty of the single offense of identity theft and sentences him for that single offense. Due return shall be filed within 21 days of the date of this order.

Done this 4th day of January, 2008.

*Pamela W. Baschab*

PAMELA W. BASCHAB, PRESIDING JUDGE

cca/

cc:     Hon. Alfred Bahakel, Judge
        Hon. Anne-Marie Adams, Clerk
        Suzanne Frazier, Court Reporter
        Sidney J. Hughes, Esq.
        Office of the Attorney General

2

# Court of Criminal Appeals

PAMELA W. BASCHAB
Presiding Judge
H. W. "BUCKY" McMILLAN
GREG SHAW
A. KELLI WISE
SAMUEL HENRY WELCH
Judges

State of Alabama
Judicial Building, 300 Dexter Avenue
P. O. Box 301555
Montgomery, AL 36130-1555

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 229-0751
Fax (334) 229-0521

January 29, 2008

Hon. Alfred Bahakel
Circuit Judge
801 21st Street North, Room 606
Birmingham AL 35203

Re: CR-05-0143

 Zephyrtuns C. Egbuonu v. State of Alabama  (Appeal from Jefferson  Circuit Court:
 CC04-1422)

Dear Judge Bahakel:

 The above referenced appeal was remanded on January 4, 2008, with directions that the
return to remand be filed within 21 days (by January 25, 2008).  To date, the return has not been
filed.

 If you have not already completed the action directed on remand, the Court of Criminal
Appeals respectfully requests that you please do so in time to permit filing of the return by
February 19, 2008.  If, for some reason, the return cannot by filed by this date, the Court
requests that you notify this Court and the parties of the date by which the return will be filed.

 In the event you have already completed the action directed on remand, I am, by copy of this
letter to the Circuit Clerk, requesting that the return to remand be filed forthwith.

 Your attention and assistance will be appreciated.  Please let me know if you have any
questions.

 Sincerely yours,

 *Pamela W. Baschab*

 Pamela W. Baschab, Presiding Judge
 Court of Criminal Appeals

cc: Hon. Anne-Marie Adams, Circuit Clerk
 Suzanne Frazier, Court Reporter
 Sidney J. Hughes, Attorney
 Andy Scott Poole, Asst. Atty. Gen.

# EXHIBIT 34

# IN THE CIRCUIT COURT OF JEFFERSON COUNTY
## ALABAMA
## CRIMINAL DIVISION

ZEPHYRIUNS C. EGBUONU

        Appellant/Defendant

Vs.

STATE OF ALABAMA

        Respondent/Prosecutor

Case No: CC 04 1422
(On Appeal – CR-05-0413)

## **ORDER ON REMAND**

This cause comes before this court upon the Order of Remand heretofore issued by the Alabama Court of Criminal Appeals directing this court to enter a new order that adjudges Egbuonu guilty of the single offense of identity theft and sentences him for that single offense and to set aside this Court's prior Order entitled "Return on Remand" dated June 18, 2007.

In accordance with the order heretofore issued by the Alabama Court of Criminal Appeals it is the Order of this court that the previous order of this Court dated June 18, 2007 adjudicating the defendant guilty under Count One of the indictment and the setting

**EXHIBIT 35**

aside of the adjudication of guilt and sentence imposed under Count Two of the indictment is ordered set aside.

Inasmuch as the charges under Count One and Count Two arise out of a single act or course of conduct and that both counts were merely based upon alternative methods of proving a single violation of 13A-8-192 (a) Code of Alabama, 1975, and in accordance with the decision rendered in Ex parte Rice, 766 So.2d 143 (Ala. 1999) the record is amended to reflect that the defendant is adjudicated guilty of the single offense of Identity Theft in the First Degree of James Roberson and the defendant stands sentenced to a term of Ten (10) years in the Alabama Department of Corrections for that single offense. By entering this Amended Order this Court does not intend to nullify any part of the jury's verdict but this Order would have the effect of setting aside the previous sentence heretofore imposed under Count Two of the indictment.

The Clerk of this Court is directed to amend the record to reflect the adjudication of the defendant guilty of the single offense of identity theft and a single sentence for that single offense and to

provide the Alabama Court of Criminal Appeals with a copy of this

Order on Remand, forthwith.

Done and Ordered, this 31st day of January, 2008.

ALFRED BAHAKEL
Circuit Judge

Cc:   DDA Joe Roberts
        Attorney Sid Hughes
        Andy Poole, Asst. A.G.

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall-not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals
### State of Alabama
### Judicial Building, 300 Dexter Avenue
### P. O. Box 301555
### Montgomery, AL 36130-1555



RELEASED

FEB 22 200?

CLERK
ALA COURT CRIMINAL APPEALS

**PAMELA W. BASCHAB**
**Presiding Judge**
**H.W."BUCKY" McMILLAN**
**GREG SHAW**
**A. KELLI WISE**
**SAMUEL HENRY WELCH**
**Judges**

**Lane W. Mann**
**Clerk**
**Gerri Robinson**
**Assistant Clerk**
**(334) 229-0751**
**Fax (334) 229-0521**

## MEMORANDUM

CR-05-0143                    Jefferson Circuit Court CC-04-1422

### Zephyriuns C. Egbuonu v. State of Alabama

### On Return to Remand

SHAW, Judge.

Zephyriuns C. Egbuonu was convicted of two counts of identity theft, violations of § 13A-8-192(a)(1) and (a)(2), Ala. Code 1975, for stealing the identity of James Roberson, deputy chief of operations with the Jefferson County Sheriff's Department. He was sentenced to 10 years' imprisonment for each conviction, to run consecutively.

In an opinion issued on May 25, 2007, this Court held that Egbuonu's convictions for two counts of identity theft violated the principles of double jeopardy because both convictions arose from a single theft -- the theft of Deputy



**EXHIBIT 36**

Chief Roberson's identity -- and were merely based on alternative methods of proving that single theft, and we remanded this case "for the trial court to enter a new order that adjudges Egbuonu guilty of the single offense of identity theft and sentences him for that single offense." Egbuonu v. State, [Ms. CR-05-0143, May 25, 2007] ___ So. 2d ___, ___ (Ala. Crim. App. 2007). In addition, we addressed and rejected five of the six issues Egbuonu raised in his brief on appeal; we pretermitted discussion of the sixth issue pending the trial court's return to our remand.

On July 19, 2007, the trial court submitted an order on return to remand in which it set aside Egbuonu's conviction and sentence under Count II of the indictment, and nol-prossed that count of the indictment. This order did not comply with our remand instructions; therefore, by order dated January 4, 2008, we again remanded this case with instructions that the trial court set aside its July 19, 2007, order on remand and enter a new order adjudging Egbuonu guilty of the single offense of identity theft and sentencing him for that single offense. On February 5, 2008, the trial court submitted its second order on return to remand in which it vacated its July 19, 2007, order setting aside Egbuonu's conviction and sentence under Count II of the indictment, and it adjudged Egbuonu guilty of the single offense of identity theft based on the jury's verdict finding Egbuonu guilty of both alternatives charged in the indictment, and sentenced Egbuonu to 10 years' imprisonment for that single offense. This order complies with this Court's remand instructions.

The remaining issue Egbuonu raised in his brief on appeal that was not addressed by this Court in our original opinion is whether Egbuonu's sentences were "unduly harsh and unreasonable." (Egbuonu's brief at p. 25.) Egbuonu argues that his 10-year sentences exceeded the statutory maximum and were based on factors that were not found to exist by a jury, in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny, and that a total of 20 years' imprisonment -- two consecutive 10-year sentences -- for identity theft, a crime that did not involve violence or illegal drugs is unduly harsh and excessive. Egbuonu's Apprendi claim was never presented to the trial court. Egbuonu did not object during the sentencing hearing and, although Egbuonu did challenge his sentences in his motion for a new trial, he did not do so

based on <u>Apprendi</u>.  Therefore, this argument is not properly
before this Court for review.[1]  See <u>Poole v. State</u>, 846 So. 2d
370, 381 (Ala. Crim. App. 2001) ("[B]efore this Court will
review an alleged <u>Apprendi</u> violation, the defendant must
object in the trial court.").  Moreover, because this Court
has already determined that Egbuonu's convictions and
sentences for two counts of identity theft violated double-
jeopardy principles and the trial court has amended its
judgment to adjudge Egbuonu guilty of the single offense of
identity theft and to sentence Egbuonu to a single 10-year
sentence for that offense, Egbuonu's argument that a total of
20 years' imprisonment for his crime is excessive is moot.

Based on the foregoing, the judgment of the trial court
is now affirmed.

Affirmed by memorandum.

McMillan, Wise, and Welch, JJ., concur.  Baschab, P.J.
concurs in the result.

---

[1]Moreover, as the State correctly argues in its brief,
this argument is meritless.  At the time Egbuonu committed the
crime, § 13A-8-192(b), Ala. Code 1975, provided that identity
theft in the first degree was a Class C felony.  A Class C
felony is punishable by "not more than 10 years or less than
1 year and 1 day" in prison. § 13A-5-6(a)(3), Ala. Code 1975.
Clearly then, Egbuonu's sentence of 10 years' imprisonment did
not exceed the statutory maximum and there was no <u>Apprendi</u>
violation.

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

PAMELA W. BASCHAB
Presiding Judge
H. W. "BUCKY" McMILLAN
GREG SHAW
A. KELLI WISE
SAMUEL HENRY WELCH
Judges



Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 229-0751
Fax (334) 229-0521

## CR-05-0143

Zephyriuns C. Egbuonu v. State of Alabama   (Appeal from Jefferson  Circuit Court:
CC04-1422)

## ORDER

The motion to withdraw as counsel of record for the appellant filed by Hon. Sid Hughes
is granted.

Done this the 22nd day of February, 2008.

*Pamela W. Baschab*

**Pamela W. Baschab, Presiding Judge**
**Court of Criminal Appeals**

cc: Hon. Anne-Marie Adams, Circuit Clerk
    Sidney J. Hughes, Attorney
    Zephyrinus Egbuonu, Pro Se
    Andy Scott Poole, Asst. Atty. Gen.

# EXHIBIT 37

# Sidney J. Hughes
### Attorney at Law
#### P.O. Box 590072
#### Homewood, AL 35209

**Telephone**
(205) 871-7430
**FAX**
(205) 879-9229

2700 Highway 280
Suite 320 West
Homewood, AL 35223-2406
email: sidhugheslegal@bellsouth.net

February 4, 2008

Zephyrinus Egbuonu, #27041265
Federal Detention Center
Post Office Box 5010
Oakdale, Louisiana 71463

Valentine Egbuonu
(309) 216-1321

Dear Zephyr:

Enclosed is a copy of the second remand order from Judge Bahakel in regards to your case. Since overall this is a favorable decision for you, your presence is not required before the judge. Therefore, I do not feel that you have the right to appear. Also, since your sentence has been served, I do not feel that any adverse action has come to you because of this other than the delay caused by the appellate court.

I hope that you are soon released from custody.

Sincerely,

Sid Hughes

Sid Hughes

SJH/bb
Enclosures

# EXHIBIT 38

IN THE COURT OF CRIMINAL APPEALS

ZEPHYRINUS EGBUONU,          )
                             )
        Appellant,           )
                             )        CASE NUMBER:
v.                           )
                             )        CC 04-1422
STATE OF ALABAMA,            )
                             )
        Defendants.          )

---

ON APPEAL FROM THE CIRCUIT COURT
OF JEFFERSON COUNTY, ALABAMA
CASE NUMBER CC 04-1422

---

APPELLANT'S BRIEF AND ARGUMENT

ORAL ARGUMENT REQUESTED

---

ATTORNEY FOR APPELLANT:

Sid Hughes
2908 Crescent Avenue
Homewood, Alabama 35209
(205) 871-7430

# EXHIBIT 39

# TABLE OF CONTENTS

**Page**

Table of Authorities . . . . . . . ii

    a. Table of Cases . . . . . . ii

    b. Statutes and Other Authorities . . . v

Summary of the Argument. . . . . . . vii

Statement of the Standard of Review . . . . . viii

Statement of the Case . . . . . . . 1

Statement of Issues Presented. . . . . . . 4

Statement of the Facts . . . . . . . 5

Argument . . . . . . . . . 7

Discussion . . . . . . . . . 9

Prayer for Relief . . . . . . . . 26

Summary of Rulings and Actions Adverse to Appellant . . 29

Oral Argument Requested. . . . . . . 30

Certificate of Service . . . . . . . 31

## TABLE OF AUTHORITIES

**ALABAMA AND OTHER STATE CASES**                                    **Page**

<u>Allen v. State</u>, 374 So.2d 447 (Ala. Cr. App. 1979)    .    17

<u>Barrow v. Garrow</u>, Minor 1 (Ala. 1820) .    .    .    .    18

<u>Beggs v. State</u>, 55 Ala. 108 (Ala. 1876).    .    .    .    11

<u>Buffo v. State</u>, 415 So.2d 1146, 1154 (Ala. Cr. App.
            1980)    .    .    .    .    .    .    .    17, 18
            *rev'd on other grounds*, 415 So.2d
            1158 (Ala. 1982)    .    .    .    .    .    18

<u>Commonwealth v. Parker</u>, 165 Mass. 526, 43 N.E. 499
            (1896)    .    .    .    .    .    .    12

<u>Connor v. State</u>, 29 Fla. 455, 10 So. 891 (1892)    .    .    11

<u>De Graffenreid v. State</u>, 28 Ala. App. 291 182 So. 482
            (1938) at 483-484    .    .    11, 13

<u>Duncan v. Louisiana</u>, S.Ct. 1444, 1447, 20 L.Ed.2d 491,
            (1968)    .    .    .    .    .    .    16

<u>Ex parte Day</u>, 584 So.2d 493 (Ala. 1991) .    .    .    .    19

<u>Ex parte East</u>, 584 So.2d 496 (Ala. 1991)    .    .    .    19

<u>Ex parte James v. State</u>, 780 So.2d 693 (S.Ct. 2000)    .    13

<u>Ex parte Longmire</u>, 584 So.2d 503 (Ala. 1991).    .    .    19

<u>Ex parte Watts</u>, 485 So.2d 135, (Ala. Cr. App. 1980)    .    18

<u>Grace v. State</u>, 369 So.2d 318 (Ala. Cr. App. 1979)    .    18

<u>Hanks v. State</u>, 1882 W.L. 9357 (Tex. Ct. App. 1882)    .    18

<u>Heath v. State</u>, 536 So.2d 142 (Ala. Cr. App. 1988)    .    13

<u>Hickman v. State</u>, 548 So.2d 1077 (Ala. Cr. App. 1989) .    19

Ivey v. State, 821 So.2d 937 (Ala. 2001)    .    .    . 11, 16

Luckie v. State, 502 So.2d 870 (Cri. App. 1986)    .    . 22

Mobile S. Gulf Railroad Co. v. Crocker, 455 So.2d 829
                              (Ala 1984) .  .  22

Nelson v. State, 50 Ala. App. 285, 278 So.2d 734
            (Ct. App. 1973)    .    .    .    .    . 20

People v. Duyer, 397 III. 599, 74 N.E. 882 (Ill. 1947) .  12

People v. Govern, 307 166 373, 138 N.E. 632 (166)
                    (1823)    .    .    .    .    .    . 12

Pope v. State, 587 So.2d 1278 (Ala. Cr. App. 1991).    . 19

Rothchild v. State, 558 So.2d 981 (Ala Cr. App. 1989). 7,8,13

Shirley v. State, 363 So.2d 103 (Ala. Cr. App. 1978)    . 22

Singleton v. State, 144 Ala. 104, 149 Ala. 673,
                    42 So. 23 (Ala.1906) .    .    .    . 21

State v. Caylor, 111 So.2d 195 (Ala. App. 1927)    .    . 16

State v. Towery, 143 Ala. 48, 39 So. 309 (1904)    .    . 22

Stokes v. State, 373 So.2d 1218 (Ala. 1979)    .    . 8, 18

Sweat v. State, 90 Ga. 315, 17 S.E. 273 (1893)    .    . 12

Updike v. People, 18 P.2d 472, 92 Colo. 125, (1933)    . 11

Willcut v. State, 284 Ala. 547, 226 So.2d 328 (1969)    . 19

Williams v. State, 383 So.2d 547 (Ala. Cr. App. 1979) . 18
                    Aff'd, 383 So.2d 564 (Ala. 1980)    .    . 18

**FEDERAL CASES**

                                                        **Page**

<u>Cabberiza v. Moore</u>, 217 F.3rd 1329 13 Fla. L. Weekly
                    Fed. C 832 (11th Cir. Fla., 2000)  . 15

<u>Donnell v. U.S.</u>, F.2d 560 (5th Cir. Tex. 1956)      .     . 22

<u>Miller v. Connaly</u>, 354 F.2d 206 (5th Cir. Tex., 1965)  .  14

<u>U.S. v. Barnette</u>, 129 F.3rd 1179, 11 Fla. L. Weekly
                    Fed. C. 784 (11th Cir Ga., 1998).      .
        22

<u>U.S. v. DiJames</u>, 731 F.2d 758 (11th Cir. Ga., 1984)    . 15

<u>U.S. Gonzalez</u>, 122 F.3rd 1383, 11 Fla. L. Weekly
                Fed. C. 587 (11th Cir. Fla., 1997)  .   . 22

<u>U.S. v. London</u>, 714 F.2d 1558, 71 A.L.R. Fed.
                914 (11th Cir. Ga., 1983).     .     .     . 15

<u>U.S. v. Lutton</u>, 486 F.2d 1021, 1022-1023
                (5th Cir., 1973)    .     .     .     .     . 14

<u>U.S. v. Stratton</u>, 649 F.2d 1066 (5th Cir. La. 1981)    . 14

<u>U.S. v. White</u>, 611 F.2d 531, 5 Fed. R. Evid. Serv.
                896 (5th Cir Fla., 1980) .     .     .     . 14

## STATUTES AND OTHER AUTHORITIES

Amendment VI of the US Constitution. "In all criminal prosecutions, the accused shall enjoy the right to a speedy trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witness against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

Amendment VIII of the US Constitution. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Amendment X of the US Constitution. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states respectively, or to the people."

Article I. Section 6 of the Constitution of Alabama. "That in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either; to demand the nature and cause of the accusation;  and to have a copy thereof; to be confronted by the witnesses against him; to have compulsory process for obtaining witnesses in his favor; to testify in all cases, in his own behalf, if he elects so to do; and, in all prosecutions by indictment, a speedy, public trial, by an impartial jury of the county or district in which the offense was committed; and he shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property, except by due process of law; but the legislature may, by general law, provide for a change of venue at the instance of the defendant in all prosecutions by indictment, and such change of venue, on application of the defendant, may be heard and determined without the personal presence of the defendant so applying therefor; provided, that at the time of the application for the change of venue, the defendant is imprisoned in jail or some legal place of confinement."

Article I Section 7 of the Constitution of Alabama. "That no person shall be accused or arrested, or detained, except in cases ascertained by law, and according to the form which the same has prescribed; and no person shall be punished but by virtue of a law established and promulgated prior to the

offense and legally applied."

§13A-8-192 Identity theft - Elements.
(a)       "A person commits the crime of identity theft if,
          without the authorization,
consent, or permission of the victim, and with the intent to
defraud for his or her own benefit or the benefit of a third
person, he or she does any of the following:
     (1) Obtains, records, or accesses identifying information
that would assist in accessing financial resources, obtaining
information documents, or obtaining benefits of the victim.
     (2)  Obtains  goods  or  services  through  the  use  of
identifying information of the victim.
     (3)  Obtains  identification  documents  in  the  victim's
name.
(b)       Identity theft in which there is a financial loss of
          greater than five hundred
dollars ($500) or the defendant has been previously convicted
of identity theft constitutes identity theft in the first
degree.   Identity theft in the first degree is a Class C
felony.
(c)  Identity  theft  in  which  the  defendant  has  not  been
     previously convicted of
identity theft and there is no financial loss or the financial
loss is  five hundred dollars  ($500)  or  less constitutes
identity theft in the second degree.   Identity theft in,the
second degree is a Class A misdemeanor.
(d)       This section shall not apply when a person obtains
          the identity of another
person to misrepresent his or her age for the sole purpose of
obtaining alcoholic beverages, tobacco, or another privilege
denied to minors."

§ 13A-8-196.   Jurisdiction.   "In any criminal proceeding
brought  pursuant  to  this  article,  the  crime  shall  be
considered to be committed in any county in which any part of
the crime took place, regardless of whether the defendant was
ever actually present in that county, or in the county of
residence  of  the  person  who  is  the  subject  of  the
identification documents or identifying information."

## SUMMARY OF THE ARGUMENT

Zephyrinus Egbuonu has never been in Alabama. He was arrested in California pursuant to charges of identity theft. Zephyrinus waived extradition to Alabama in September, 2003. He has been denied bond for a property offense of less than $10,000.00

Under Alabama's Constitutional Amendments VI and VII, and U.S. Constitution Articles VI, VII and X, appellant insists that he can only be tried by a jury in the county where the crime was committed. This could only be Orange County, California. All of the elements of the identity theft occurred in California. None occurred in Alabama. Alabama lacks venue as well as jurisdiction.

Since Zephyrinus has never been to Alabama, he never fled from Alabama. Therefore, he is not a fugitive. Since he is not a fugitive, Jefferson County was wrong to issue a warrant for his arrest in California.

## STATEMENT OF THE STANDARD OF REVIEW

The standard of review for each issue is whether the trial court abused its discretion.

## STATEMENT OF THE CASE

Zephyrinus Egbuonu was a Civil Engineer for the City of Los Angeles for the last twelve years.  He was arrested in March, 2003 in Orange County, California on charges of identity theft.  The defendant was arrested pursuant to charges by a Jefferson County Sheriff Captain that incorrect charges had been made against his credit card account. Noticeably, the credit card account balance, a consolidated credit card, was effected in Texas.  The only connection between defendant and Alabama under the alleged crime of identity theft is that he allegedly received mail from a California mailbox, which was not rented to him.  And which upon trial examination in California, the one California witness was unable to connect the owner as being Zephyrinus Egbuonu.  California in effect dropped the charges against the defendant and allowed him to be extradited to Alabama in October, 2003.

The defendant has never been in Alabama, has never had any contacts with Alabama and no elements of the crime occurred in the State of Alabama.

Three bogus charge accounts were established in California using three different victims name.  None of the names or addresses used an Alabama address.  Noticeably, no

amount of loss has ever been named, even though the Alabama statute at that time, 13A-8-192 required a minimum loss of $250.00. The victim is a resident of Jefferson County, Alabama. This is the only connection that Alabama has with the crime that was committed.

The defendant waived extradition to Alabama in efforts to prove his innocence at an early trial. His contention is that under the Alabama Constitutional Amendments VI and VII and the United States Constitution Articles VI, VII and X, that he can only be tried by a jury in the county or district where the crime was committed. In the instant case, this could only be Orange County, California. Therefore, the State of Alabama is wrong in charging him in Jefferson County, Alabama. Jefferson County is the wrong venue and Alabama lacks jurisdiction in this case, which is being tried against the letter and spirit of the Alabama and the United States Constitutions. This precedent creates bad public policy in that it allows other states to enact similar laws that would allow individual citizens to be uprooted from their homes and tried in other states for crimes for which they have no connection.

Defendants final argument is that he was wrongfully

2

charged as a fugitive from the State of Alabama.  Since he had never been in Alabama and there was no basis for his classification as a fugitive, he clearly does not meet the definition of fugitive and should have never been extradited from California.

3

**STATEMENT OF THE ISSUES PRESENTED**

I.    Is 13A-8-192 et. seq. of the Alabama Code unconstitutional in that it seeks to extend Alabama's jurisdiction beyond the territorial boundaries of Alabama?

II.   Does 13A-8-192 and 196 violate sections VI and VII of the Alabama Constitution of 1901 by not allowing a criminal prosecution in the county where the crime was committed?

III.    Is 13A-8-192, et. seq. in violation of Amendments VI, VIII and X of the U.S. Constitution by denying the accused the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed?

IV.   Does the incorrect usage of "fugitive" void the extradition which wrongfully brought defendant to Alabama?

## STATEMENT OF THE FACTS

Zephyrinus Egbuonu worked as a civil engineer for the Bureau of Engineering City of Los Angeles, California for twelve years prior to his arrest in March, 2003.

He was arrested in March, 2003 in Los Angeles in connection with a mailbox at LA Mailboxes, Etc. located 23 miles from his place of employment.  The mailbox was owned and registered to Jerome Bivens, James Roberson and Rosemary Roberson.  All three had California addresses.  There is a uniform positive ID policy required by the Postal Service for all persons opening mail boxes at this LA Mailboxes, Etc. outlet.  Zephyrinus Egbuonu does not know any of the three people named owners of the mailbox.  None of the three people know Zephyrinus Egbuonu.  Several open credit accounts had the name James Roberson and Rosemary Roberson. None had the defendant's name.  Defendant did not open the mailbox.

The victim's only knowledge of the crime is that after a consolidation of credit, James Roberson had changed his credit card balance from one card to another in November and December 2002 .  No amount of loss has been established. The credit card company operations center is located in

5

Texas. The complainant in this case, James Robertson, is a captain in the Jefferson County Sheriff's Department. He was formerly in charge of the Jefferson County Jail.

Defendant was arrested in Los Angeles in March, 2003 and waived extradition to Alabama in September, 2003. He has since been in the Jefferson County Jail, charged under 13A-8-192, Identity Theft Elements.

None of the incidents or elements related to this ID fraud occurred in Alabama. No part of the alleged identity theft occurred in Alabama. Defendant has never before been in Alabama. He has lived in California for the past twelve years. He has no relatives here. He has never corresponded, conversed with or had any ties or connection with anyone in Alabama.

# **ARGUMENT**

## **Issue I**

IS 13A-8-192 ET. SEQ. OF THE ALABAMA CODE UNCONSTITUTIONAL IN THAT IT SEEKS TO EXTEND ALABAMA'S JURISDICTION BEYOND THE TERRITORIAL BOUNDARIES OF ALABAMA?

"In order for a court of this state to proceed in a criminal matter, it must have both jurisdiction and venue." Rothchild v. State, 558 So.2d 981 (Ala. Cr. App. 1989). Appellant contends that the State of Alabama lacks subject matter jurisdiction and personal (over the person) and in rem (over the property) jurisdiction.

The "subject matter" in a criminal setting is the crime itself. The crime of identity theft in this case, was committed outside Alabama. There were no contacts with the State of Alabama by either the crime or the defendant. Jurisdiction refers to the judicial power to hear and determine a criminal prosecution. 11 ALR 4th 704, 705 (1982). "Jurisdiction of the subject matter in a criminal case is the power to hear and determine cases of the general class which the particular case before the court belongs. Jurisdiction of the subject matter in a criminal case is conferred by law. Thus, if a court has jurisdiction of the

7

crime charged, it has jurisdiction of the subject matter."
22 C.J.S. Criminal Law § 108 (1961).

For a circuit court in Alabama to have subject matter
jurisdiction, the state must prove beyond a reasonable doubt
that a felony was committed in Alabama. Rothchild v. State,
Supra 984. Appellant contends that Alabama had neither
subject matter nor personal jurisdiction over the defendant.

The State has the burden of proving both venue and
jurisdiction Stokes v. State, 373 So.2d 1211, 1215-1216
(Ala. Cr. App.) , cert denied 373 So.2d 1218 (Ala.1979). No
element of this crime occurred in Alabama. The only
connection between the crime and the State of Alabama is
that the victim lives in Jefferson County, Alabama. The
indictment charges defendant only under §13A-8-192,
Elements. The jurisdictional and venue authority of the
statute is derived from §13A-8-196, which is not mentioned
in the indictment.

8

## **DISCUSSION**

The Code of Alabama section 13A-8-192 thru196 known as
the Consumer Identity Protection Act presumes to grant the
authority to the state and the county of residence of the
person who is the subject of the identification documents or
identifying information to prosecute in that county.  This
is in direct contravention of Article VI Alabama
Constitution which provides that a defendant must be
prosecuted in the county in which the offense occurred.
In any criminal proceeding brought pursuant to this article
13A-8-196  the crime shall be considered to be committed in
any county in which any part of the crime took place,
"regardless of whether the defendant was ever actually
present in that county of residence, or in the county of
residence of the person who is the subject of the
identification documents or identifying information."
Defendant submits that this portion of the act (13A-8-192
thru 13A-8-196) is unconstitutional as being in violation of
sections 6 and 7 of the Alabama Constitution and Articles
VI, VIII and X of the US Constitution.
Section 6 of the Alabama Constitution reads as follows:

"That in all criminal prosecutions, the accused has a

9

right to be heard by himself and counsel, or either; to
demand the nature and cause of the accusation; and to have a
copy thereof; to be confronted by the witnesses against him;
to have compulsory process for obtaining witnesses in his
favor, to testify in all cases, in his own behalf, if he
elects to do so; and, in all prosecutions by indictment, a
speedy, public trial, by an impartial jury *of the county or
district in which the offense was committed*; and he shall
not be compelled to give evidence against himself, nor be
deprived of life, liberty, or property, except by due
process of law; but the legislature may, by a general law,
provide for a change of venue at the instance of the
defendant in all prosecutions by indictment, and such change
of venue, on application of the defendant, may be heard and
determined without the personal presence of the defendant so
applying therefor; provided, that at the time of the
application for the change of venue, the defendant is
imprisoned in jail or some legal place of confinement."

The Constitution of Alabama limits the territorial

boundaries of the State to the conduct and results of

activities where they occur inside it's territory.   Article

II, Section 37 and 38 State and County Boundaries,

Constitution of Alabama of 1901 (Restatement of the Conflict

of Laws ¶ 425).   Because of this challenge to the

jurisdiction and venue of Alabama's Consumer Protection Act,

this case is believed to be a case of first impression in

Alabama.

Under the common law, the situs of the crime is the

place of the act if the crime is defined in these terms, and

the place of the result if the definition of the crime

10

includes such a result.  An example of this is bigamy.
Bigamy is committed where an illegal marriage ceremony takes
place, not where the parties thereafter cohabit.  <u>Beggs v.
State</u>, 55 Ala 108 (Ala. 1876).

The crime of false pretenses is committed where the
property is obtained not where the false pretenses are made.
In <u>Updike v. People</u>, 18 P.2d 472, 92 Colo 125, (1933), false
pretenses were made by a letter mailed in Idaho.  The check
was mailed to the victim in Colorado.  The court held that
Colorado is where the defendant obtained the check so
Colorado had the jurisdiction.  In a Florida case, <u>Connor v.
State</u>, 29 Fla. 455, 10 So. 891 (1892), the State information
was quashed because there was no allegation that the money
was obtained in Florida.   In Alabama, <u>Ivey v. State</u>, 821
So.2d 937 (Ala. 2001) the Supreme Court held that "where the
offense was complete was where the crime was committed."

Forgery is committed where the false instrument is made
or altered, not where it is uttered.  Thus, uttering a
forced instrument is committed where it is offered not where
it is made.  <u>De Graffenreid v. State</u>, 28 Ala. App. 291 182
So. 482 (1938) at 483-484.

11

Robbery is committed where the property is taken from the victim not where the victim was first intimidated. Sweat v. State, 90 Ga 315, 17 S.E. 273 (1893). An example similar to the instant case is receiving stolen goods. This is committed where the goods are received, not where they are stolen. The same role has been applied to embezzlement. Commonwealth v. Parker, 165 Mass. 526, 43 N.E. 499 (1896). People v. N. Govern, 307 166 373, 138 N.E. 632 (166) (1823); People v. Duyer, 397 Ill. 599, 74 N.E. 882 (Ill 1947). In the instant case, the goods were clearly received in California. The "goods" were never received in Alabama.

In all these cases, where the situs of the crime is, that is the state that has control and jurisdiction. In all these incidences, the Alabama statutes would not apply to protect an Alabama citizen.

Under the common law, the rule is that an accessory before the fact, who commits all his accessorial acts outside the state commits no crime within the state and is not subject to it's jurisdiction. In other words, one who is at all times outside the state, commits a crime outside the state, is not subject to the jurisdiction of the state.

12

(Restatement of the Conflict of Laws ¶ 428).

In <u>Ex parte James v. State</u>, 780 So.2d 693 (S.Ct. 2000), the Alabama Supreme Court held that the State failed to prove that the defendant exerted "unauthorized control" over a vehicle within the state, depriving the state of jurisdiction to convict James of first degree theft of property and that no element of the crime charged was committed within the state.  James had permission of the seller to drive the vehicle to Georgia.  The permission was later withdrawn.  Code 1975 §§ 13A-8-3, 15-2-3. "In order for a court of this state to proceed in a criminal matter, it must have both jurisdiction and venue."  In our present case, there were fewer contacts with Alabama than in the James case.  No element of the crime charged was committed with this state.

In the <u>Heath</u> case, <u>Heath v. State</u>, 536 So.2d 142 (Ala. Cr. App. 1988),  the kidnaping occurred in Alabama and provided Alabama jurisdiction.  As in <u>De Graffenreid v. State</u>, 28 Ala. App. 291, 182 So. 482, (Ala. App. 1938), which the Supreme Court held to be on point,  the unauthorized control occurred outside Alabama, therefor

Alabama was without jurisdiction.

Under Federal law, <u>Miller v. Connaly</u>, 354 F.2d 206 (5th Cir.Tex., 1965), the 5th Circuit held that under Article III, Section 2, Clause 3 and the Sixth Amendment of the Constitution, the defendant has a right to be tried in Connecticut since the indictment indicates that he committed the crime in Connecticut.  It as further held that the Trial Judge grossly abused his discretion vested in him by refusing to transfer the case from Texas to Connecticut.  In <u>U.S. v. White</u>, 611 F.2d 531, 5 Fed. R. Evid. Serv. 896 (5th Cir Fla., 1980), the Federal Court held that a criminal defendant had the right to be tried in the district in which the crime was committed and that this was guaranteed by the Sixth Amendment and Article III of the US Constitution and also Rule 18 of the Federal Rules of Criminal Procedure. The burden of proving that the crime occurred in the district of trial is squarely on the prosecution.  <u>U.S. v. Lutton</u>, 486 F.2d 1021, 1022-1023 (5th Cir.,1973).  In <u>U.S. v. Stratton</u>, 649 F.2d 1066 (5th Cir.La. 1981), the 5th Circuit held that the right of the accused under Article III, Section 2, Clause 3 of the United States Constitution

14

provides that the trial of all crimes shall be held in the
State where the crime was committed and "In all criminal
prosecutions, the accused shall enjoy the right to a speedy
and public trial by an impartial jury of the state and
district wherein the crime shall have been committed." U.S.
v. London, 714 F.2d 1558, 71 A.L.R. Fed. 914 (11th Cir. Ga.,
1983), a defendant is guaranteed to be tried in the district
in which the crime was committed under the Sixth Amendment
and Article III of the United States Constitution, and Rule
18 of the Federal Rules of Criminal Procedure.  The
prosecution has to show at least by a preponderance of the
evidence that the trial is in the same district as the
criminal offense.  In U.S. v. DiJames, 731 F.2d 758 (11th
Cir. Ga. 1984).  There the 11th Circuit held that where it
is the right of the accused, by providing that "in all
criminal prosecutions, the accused shall enjoy the right to
a speedy and public trial, by an impartial jury of the state
and district wherein the crime shall have been committed."
Also in accord is Cabberiza v. Moore, 217 F.3rd 1329 13 Fla.
L. Weekly Fed. C 832 (11th Cir. Fla. 2000), where the court
stated that under the Sixth Amendment of the Constitution in

15

all criminal prosecutions, the accused shall enjoy the right

to a speedy and public trial by an impartial jury of the

state and district wherein the crime shall have been

committed.  Also in accord is <u>Duncan v. Louisiana</u>, S.Ct.

1444, 1447, 20 L.Ed.2d 491, (1968).

**Issue II**

DOES 13A-8-192 AND 13A-8-196 VIOLATE SECTION VII OF THE
ALABAMA CONSTITUTION OF 1901?

Section 7 to the Alabama Constitution of 1901 provides
as follows:

"Unless otherwise provided by law, the venue of all

public offenses is in the county in which the offense

was committed."

"Criminal prosecution must be brought in a county where the

crime was committed" <u>State v. Caylor</u>, 111 So.2d 195 (Ala.

App. 1927). §15-2-1 Venue - County where offense committed

"In a criminal prosecution, the accused has a

constitutional right to a trial in the county or district in

which the offense was committed." U.S.C.A. Const. Amend 6;

Const. Art. 1 §6.  <u>Ivey v. State</u>, 821 So.2d 937 (Ala. 2001).

This defendant lived in Los Angeles.  All elements of the

16

alleged crime of fraudulent identification occurred in Los Angeles.

The Superior Court of Los Angeles actually conducted trial and three hearings of the identity theft allegations against this defendant in Los Angeles. The defendant nor any elements of the crime of identity theft had any contact with Alabama.

No proof has been offered that any element of the crime occurred in Alabama. "In criminal prosecution, venue is established by proof showing the county in which the crime occurred, while jurisdiction is the power of a given court to adjudicate merits of given case." Rothchild v. State, Supra.

Unless otherwise provided by law, venue of all public offenses is in the county in which the offense was committed. Buffo v. State, 415 So.2d 1146 (Ala. Cr. App. 1980). Allen v. State, 374 So.2d 447 (Ala. Cr. App. 1979). Code of AL, 1975 §15-2-2. By enacting 13A-8-196, the legislature seeks to expand the ability of the state to enforce crime beyond it's territorial boundaries.

"Cooley in his great work on Constitutional Limitation,

17

treating of territorial limitation to legislative authority,
says: 'The legislative authority of every state must spend
it's force within the territorial limits of the
state........It cannot provide for the punishment as crime
of acts committed beyond the state boundary, because such
acts, if offenses at all, must be offenses against the
sovereignty within whose limits they have been done.'"
Cooley's Const. Lim., 4th ed. pp 154-155.  <u>Hanks v. State</u>,
1882 W.L. 9357 (Tex. Ct. App. 1882).

In <u>Ex parte Watts</u>, 435 So.2d 135, (Ala. 1983) the
Supreme Court held "proof of venue is jurisdictional and
without such proof a conviction cannot be sustained."

In <u>Buffo v. State</u>, 415 So.2d 1146, 1154 (Ala. Cr. App.
1980), *rev'd on other grounds*, 415 So.2d 1158 (Ala. 1982),
the Court of Criminal Appeals stated:

> "In a criminal prosecution the accused has a
> constitutional right to a trial 'in
> the country or district in which the offense was
> committed.'  U.S. Const. Amend. VI; Ala. Const. of 1901
> Art. I, § 6, <u>Williams v. State</u>, 383 So.2d 547 (Ala. Cr.
> App. 1979), aff'd, 383 So.2d 564 (Ala. 1980).  Proof of
> venue is necessary to sustain a conviction, <u>Grace v.
> State</u>, 369 So.2d 318 (Ala. Cr. App. 1979), and 'must be
> properly laid to give jurisdiction.'  <u>Barrow v. Garrow</u>,
> Minor 1 (Ala. 1820).  Unless otherwise provided by law,
> venue of all public offenses is in the county in which
> the offense was committed.  <u>Stokes v. State</u>, 373 So.2d
> 1211 (Ala. Cr. App.), cert. denied, 373 So.2d 1218

(Ala. 1979).  The burden of establishing venue is on
the state.  <u>Willcutt v. State</u>, 284 Ala. 547, 226 So.2d
328 (1969)."

"The Constitution of Alabama states that 'the circuit
court shall exercise general jurisdiction in all cases
except as may otherwise be provided by law.'  Ala. Const.
Amend. 328, § 6.04(b)(1901).  Code of Alabama states that,
in criminal matters, 'the circuit court shall have exclusive
original jurisdiction of all felony prosecutions...'" Ala.
Code §12-11-30(10)(1975).

The constitutional right to be tried in the county

where the offense occurred is a substantial constitutional

right.  Constitution of AL. Art. I §6., <u>Ex parte Longmire</u>,

584 So. 2d 503 (Ala. 1991).

Proof of venue is jurisdictional to the extent that

without such proof, where the question is properly raised,

conviction cannot be sustained on appeal.  Code 1975, §§12-

11-30(2), <u>Ex parte Day</u>, 584 So.2d 493 (Ala. 1991), 15-2-2,

<u>Ex parte East</u>, 584 So.2d 496 (Ala. 1991), <u>Pope v. State</u>, 587

So.2d 1278 (Ala. Cr. App. 1991), <u>Hickman v. State</u>, 548 So.2d

1077 (Ala. Cr. App. 1989).

**<u>Issue III</u>**

IS §13A-8-192 ET. SEQ. IN VIOLATION OF AMENDMENTS VI,

VIII AND X OF THE US CONSTITUTION?

The Constitutional Amendments are as follows:

Article VI.   <u>Right to a Speedy Trial, Witnesses, etc.</u>

19

"In all criminal prosecutions, the accused shall enjoy the
right to a speedy and public trial, by an impartial jury of
the _state and district wherein the crime shall have been
committed_, which district shall have been previously
ascertained by law, and to be informed of the nature and
cause of the accusation; to be confronted with the witnesses
against him; to have compulsory process for obtaining
witnesses in his favor, and to have the assistance of
counsel for his defense."

A.    Appellant contends his federal constitutional

rights are denied under Article VI of the US Constitution in

that he is denied a jury trial of the "state and district

wherein the crime shall have been committed." Appellant

restates his arguments under Issues I and II as previously

outlined as his basis under Article VI of the US

Constitution. Defendant contends the present indictment is

void under Article VI of the Constitution because it is

vague and does not name the monetary amount of which he is

accused of falsely obtaining. As proof, appellant further

points out that the indictment does not name a specific

amount but states an amount "in excess of $250.00 worth of

goods and services was fraudulently misappropriated."

Nelson v. State, 50 Ala. App. 285, 278 So.2d 734 (Ct. App.

1973).

Article VIII. Bails, Fines, Punishments. "Excessive

bails shall not be required, nor excessive fines imposed,

20

nor cruel and unusual punishments inflicted."

B.   Defendant submits that the posting of a
$100,000.00 bond in violation of a Class C felony is
violative of a reasonable bond under Amendment VI.
Noticeably, §13A-8-192 has been amended to state $500.00.
No proof has been submitted to establish that the victim was
deprived of any amount.

Article X.    <u>Powers Reserved to States or People</u>.
"The powers not delegated to the United States by the
Constitution, nor prohibited by it to the states, are
reserved to the states respectively, or to the people."

C.   Appellant points out at least four acts of Federal
regulations and control over identity theft which clearly
usurps any and all state statutes governing conduct outside
the State of Alabama.  Beginning with the Federal Identity
Theft and Assumption Act.  This act known as ITAD was passed
by Congress in November 1998.  It makes it unlawful if a
person "knowingly transfers or uses, without lawful
authority a means of identification of another person with
the intent to commit, or to aid or abet, any unlawful
activity that constitutes a violation of Federal law, or

21

that constitutes a felony under any applicable state or local law." Appellant submits that the Federal Act is controlling and through the regulation of the US Postal Service, Interstate Commerce and Immigration and Naturalization (INS), Alabama's Identity Theft Law is unconstitutional. <u>Mobile S. Gulf Railroad Company v. Crocker</u>, 455 So.2d 829 (Ala. 1984).

For the same reasons and by the same cases that the appellant argued Issue II, the defendant asserts all cases, statutes, amendments and the US and Alabama Constitution as asserted on pages 11 thru 15 of this Brief.

**Issue IV**

DOES THE INCORRECT USAGE OF "FUGITIVE" VOID THE EXTRADITION WHICH WRONGFULLY BROUGHT DEFENDANT TO ALABAMA?

Appellant's final contention is that his extradition from California was incorrectly obtained on false premises. The District Attorney's Office incorrectly labeled the defendant as a fugitive in requesting retention and extradition to Alabama. Black's Law Dictionary defines "fugitive" as "one who flees; always used in law with the implication of a flight, evasion, or escape from some duty

22

or penalty or from the consequences of a misdeed."

In order to be a "fugitive", appellant must have been in the State of Alabama.  Zephyrinus Egbuonu had never previously been in Alabama, had not passed through, visited or known anyone from the State of Alabama.  Since the appellant was arrested in California as a "fugitive" which he clearly was not, his habeas corpus petition makes out a prima facie case of irregularity and he should be allowed to show that the process on which he was arrested is void and that he has never been a fugitive from Alabama.  He never fled, neither from Alabama nor California.  His extradition should therefore be declared void.  Singleton v. State, 144 Ala. 104, 149 Ala. 673, 42 So. 23 (Ala. 1906).

Zephyrinus Egbuonu is not a fugitive from justice.  A warrant of extradition must not be issued unless the documents presented by the executive authority making the demand show that the accused was present in the demanding state at the time of the commission of the alleged crime and that he thereafter fled from that state and is now in this state, and that he is lawfully charged by indictment or by any information filed by a prosecuting officer and supported

by affidavit to the facts, or by affidavit.   Shirley v.
State, 363 So.2d 103 (Ala. Cr. App. 1978), 363 So.2d 104
(Ala. Cr. App. 1978), 363 So.2d 107 (Ala. Cr. App. 1978).

Appellant's detention in California and extradition as
a mis-classified "fugitive" and the unlawful accusation of
property allegedly attributed to the defendant without due
process allowed a writ of habeas corpus to be granted.  Ala.
Const. Art. I §17, Ala. Code §15-21-1 through 34.  Luckie v.
State, 502 So.2d 870 (Cri. App. 1986).  "When this right to
a habeas corpus writ is accorded, appellant has the right to
demand that his case be investigated and that justice be
administered without sale, denial or delay."  State v.
Towery, 143 Ala. 48, 39 So. 309 (1904).  In U.S. v.
Barnette, 129 F.3rd 1179, 11 Fla. L. Weekly Fed. C. 784
(11th Cir. Ga, 1998), the 11th Circuit held that a fugitive
from justice has been defined as "a person who, having
committed a crime, flees from the jurisdiction of the
court".  Further, in U.S. v.Gonzalez, 122 F.3rd 1383, 11
Fla. L. Weekly Fed. C. 587 (11th Cir, Fla. 1997), the court
similarly defined fugitive from justice.  In Donnell v.
U.S., 229 F.2d 560 (5th Cir. Tex. 1956), the court stated

24

that it was unnecessary that a person have in mind avoiding
the justice of any particular court in order to be a
fugitive within the meaning of the statute.  In Donnell, the
defendant left the jurisdiction of the court.  In the
instant case, the defendant was never in Alabama, however,
he waived extradition to return to Alabama and clear his
name of the false charges against him.

## **PRAYER FOR RELIEF**

Based on the issues and authorities cited, appellant
requests this Honorable Court to declare the bail
requirements in this case be declared as excessive and
direct a reasonable bail in line with statutory guidelines
be set.  Appellant further requests that the Consumer
Protection Act, 13A-8-192 through 196 be declared
unenforceable as applied outside the territorial boundaries
of Alabama in this case.  As its final consideration,
appellant requests that the Court declare the provisions of
§13A-8-192 et. seq. unconstitutional and unenforceable as
void as violative of section VI, and VII of the Alabama
Constitution and Amendments VI, VIII, and X to the
Amendments to the US Constitution.  In this case, Zephyrinus
Egbuonu was a California citizen who has been tried in the
State of California and found in violation of a probation
requirement.  Alabama has wrongfully titled him as a
fugitive from justice which he has never been and by this
mislabeling has obtained his extradition to Alabama on a
statute which has been amended and through an indictment
which unconstitutionally fails to name the amount of the

victim's loss.  Clearly, Alabama Consumer Protection Act of

Sections 192 as it's long-arm jurisdiction is wrongfully

enforced has reached out across the country to obtain a

citizen who has absolutely no contacts with the State of

Alabama, and either directly or indirectly, had no affect on

Interstate Commerce or Intrastate Commerce of the State of

Alabama.  As a matter of public policy, Alabama would not

allow for one of it's citizens to be seized by another

jurisdiction and extradited if the circumstances of this

case were reversed.  Clearly, public policy allows a state

to regulate criminal acts within it's territorial borders

and in such instances as where both jurisdiction and venue

are clearly established.  In the instant case, Alabama has

neither jurisdiction nor venue to obtain, by an improperly

worded warrant, extradition of a California citizen and try

him in Alabama where all the incidents occurred outside the

territorial limits and jurisdiction of the State of Alabama.

The clear impact of this action renders every citizen of

every state liable for unnecessary and unlawful seizures and

forfeitures by every other state because of public policy

reason, this act should be declared null and void as it

27

attempts to reach out and unfairly seek to punish citizens of other states.  In view of the foregoing, the defendant should be immediately released from the Jefferson County Jail, where he has been wrongfully detained for almost a year.  As a very minimum, his bond should be reset in accordance with clearly established statutory bond limits.

## SUMMARY OF RULINGS AND ACTIONS
## ADVERSE TO APPELLANT

### Circuit Court Action

April 6, 2004 - Defendant's Bond Set at $100,000.00

May 12, 2004 - Motion for Bond Reduction Denied

May 28, 2004 - Motion for Dismissal Based on Incorrect Venue Denied

June 16, 2004 - Motion for Reconsideration of Bond and Petition for Habeas Corpus Denied

### District Court Action DC 2003-12005

October 20, 2003 - Motion for Bond Reduction Denied

December 9, 2003 - Motion to Dismissed Denied

29

## ORAL ARGUMENT REQUESTED

The Appellant in this case believes that oral argument will be beneficial in detailing the benefits of making certain defenses available, in certain situations where peril exists, for public welfare offenses.

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing
Appellant's Appeal Brief on <u>Court of Criminal Appeals, Clerk</u> by placing same in the U.S. Mail, Certified Mail # <u>7099 3400 0007 7795 0478</u>, postage prepaid and properly addressed on this the *25th* day of August, 2004.

To:  Court of Criminal Appeals
     State of Alabama
     P.O. Box 301555
     Montgomery, Alabama 36130-1555

I hereby certify that I have served a copy of the above and foregoing Appellant's Appeal Brief on <u>Office of Attorney General</u> by placing same in the U.S. Mail, Certified Mail # <u>7099 3400 0007 7795 0461</u>, postage prepaid and properly addressed on this the *25th* day of August, 2004.

To:  Attorney General
     State of Alabama
     State Capitol
     600 Dexter Avenue
     Montgomery, Alabama 36130

                                        *Sid Hughes*
                                        Sid Hughes
                                        2908 Crescent Avenue
                                        Homewood, Alabama 35209
                                        (205) 871-7430

31

## COMPLAINANT's BIO

**NAME:**

Zephyrinus Egbuonu

**BORN:**

March 4, 1965,  Onitsha, Anambra State, Nigeria.

**USA ADMISSION:**

Admitted into U.S.A. in 1984 with a Student Visas
Became a United States Lawful Permanent Resident in 1988.

**EDUCATION:**

Bachelor of Science in Civil Engineering, 1991
Bachelor of Sicence in Electrical Engineering, 1991.
From Prairie A & M University, Prairie View, Texas.

**CAREER:**

Began Engineering Career at former Compaq Computer;
Houston, Texas.  Internship at Texas State Department of
Transportation, San Augustine, Texas, before moving to
San Luis Obispo in California State in 1991 for work.
Work for California State Department of Transportation
(Caltran's) as a Civil Engineer in 1991.  Later moved to
Los Angeles to work as Project Engineer for Bureau of
Engineering, City of Los Angeles for over eleven (11)
years; from August 1991 till his fugitive falsely arrest
in March 2003.

**OUTSIDE CAREER:**

International Business, Architecture, Engineering
Drafting, Designer and Management.

**FAMILY:**

Married, No Children.

**EXHIBIT 40**

**INMATE REQUEST SLIP**

Name _Zephyrinus Egbuonu_    Quarters _KCB125_  Date _10/9/05_

AIS # _242109_

( ) Telephone Call      ( ) Custody Change      ( ) Personal Problem

( ) Special Visit       ( ✓ ) Time Sheet        (☒) Other _Time Conflict_

_FIRST SHIFT CREW REQUEST_

Briefly Outline Your Request - **Then Drop In Mail Box**

Sir, my current job assignment are from 8:30AM-5:30PM M to Sunday I am writing pray pleading to you to place me in your FIRST SHIFT CREW starting 2AM to enable me after work, to have an access to Law Library which normally opening hours are from 8:00AM to 4:00PM Monday to Fri, Sat 3:00PM-6:00PM, Close Sun, to enable me work, research, write, appeal my conviction to State and Federal Court of Criminal Appeals within allowable time; 60 days from final judgement, to enable me go to Roman Catholic Religion Service on Saturday 9:30AM-10:00AM. In addition, I would be glad to assist you in any of your

<u>Do Not Write Below This Line</u> - **For Reply Only** Computer needs, I have over 12 years Experience in Engineering Computer Softwares.

_____

_____

_____

_____

_____

_____

| Approved | Denied | Pay Phone | Collect Call |
|----------|--------|-----------|--------------|

Request Directed To: (<u>Check One</u>)

( ) Warden                    ( ) Deputy Warden       ( ) Captain

( ) Classification Supervisor ( ) Legal Officer - Notary  ( ) Record Office
                                  Public

→(☒) Kitchen
     Chief Warren

# EXHIBIT 41

## INMATE REQUEST SLIP

Name **Zephyrinus Egbuonu** Quarters **KCB125** Date **10/17/05**

AIS # **242109**

( ) Telephone Call    ( ) Custody Change    ( ) Personal Problem

( ) Special Visit    ( ) Time Sheet    (X) Other **Kitchen Job Time Conflict with Law Library & Religion.**

**Briefly Outline Your Request - Then Drop In Mail Box**

Sir, my current job assignment from 8:30am-5:30pm Mon to Sun I am writing pray pleading to you to place me in your First Shift Crew starting time of 2am Mon to Fri to enable me after work to have an access to Law Library which opening hours are from 8:00am to 4:00pm Mon to Fri, Sat 3:00pm-6:00pm, Close on Holyday Sunday, to enable me work, research, write, appeal my Conviction to State and Federal Court of Criminal Appeals within allowable time; 60 days from final judgement, to enable me go to Roman Catholic Religion Service on Saturday 9:00am-10:00am, Stay off on Holyday Sunday, In addition I would be glad to make up

**Do Not Write Below This Line - For Reply Only** working hours as needed but now I need daytime to go to Law Library research appeal my Conviction of a Crime I did not Committed. Your's response is highly needed.

| Approved | Denied | Pay Phone | Collect Call |
|----------|--------|-----------|--------------|

**Request Directed To: (Check One)**

( ) Warden    ( ) Deputy Warden    (X) Captain **Bamon**

( ) Classification Supervisor    ( ) Legal Officer · Notary Public    ( ) Record Office

N176

# EXHIBIT 42

**INMATE REQUEST SLIP**

Name _Zephyrinus Egbuonu_   Quarters _KCB 125_   Date _10/13/05_

AIS # _242109_

( ) Telephone Call     ( ) Custody Change     (✗) Personal Problem

( ) Special Visit     (✓) Time Sheet     (✗) Other _Job Time Conflict with Appear & Religion_

Briefly Outline Your Request - **Then Drop In Mail Box**

Sir, my current job assignment are from 8:30am-5:30pm Sun to Fri, I am writing piecy pleading to you to place me in your First Shift Crew starting time of 2am Mon to Fri to enable me after work, to have an access to law library which opening hours are from 8:00am to 4:00pm Mon to Fri, Sat 2:00pm-6:00pm, Close on Holyday Sunday, to enable me work for you, research, write, appeal my conviction to State and Federal Court of Criminal Appeals within allowable time; 60 days from final judgement, to enable me practise my Roman Catholic Religion; Observe Holyday Sunday, attend Services on Saturday 9:00am-10:00am. I would be glad to make up my working hours as needed

Do Not Write Below This Line - **For Reply Only**

_____

_____

_____

_____

_____

_____

| Approved | Denied | Pay Phone | Collect Call |
|----------|--------|-----------|--------------|

Request Directed To: (Check One)

( ) Warden     ( ) Deputy Warden     ( ) Captain

( ) Classification Supervisor     ( ) Legal Officer - Notary Public     ( ) Record Office

(✗) Kitchen Chief

N176

**EXHIBIT 43**

NOTIFICATION OF REJECTED MAIL

INSTITUTION: Kilby                    DATE: 10\18\05

FROM: Ms Leak
**Institutional Mail Room**

TO: INMATE Zephyrinus Egbuonu
    AIS # ~~242109~~        CELL/DORM  KCB        BED # 125

CORRESPONDENCE/PUBLICATION: Kimberly Armstrong

Date received at this institution: 10\14\05 . This correspondence/publication
is being returned to the sender due to the following reason(s): Uch uccin
unsanctioned internet material tha
is not allowed. it was returne
to sender with guidlines on what
allowed.

___  Inmate has the option to return mail to sender at his/her own expense within 30 days
property will be destroyed.

_____

☒    Inmate has 72 hours from above date of this notice to protest this return by stating his
reasons below and returning this form to the Mail Room.  Reason(s) for protest:
If inmates allow to photocopies of materials, read newspapers, watch
television, call telephone, then exclusion of internet materials
may be contrary, ~~please recconsider~~

___ Publisher has 20 days from receipt of this notice to appeal this decision and obtain an
independent review of this rejection by sending its objections to the warden of this facility.

        Egbuonu Zephyr              242109
    Inmate Signature              AIS #
        10\29\05
        Date

(INMATE PROTEST ~~DENIED~~)          INMATE PROTEST GRANTED

PUBLISHER PROTEST DENIED          PUBLISHER PROTEST GRANTED

_____          _____
Printed Name/Authorized Signature          Printed Name/Authorized Signature

_____

Date Returned to Sender          Date Returned to Inmate          Annex C

# EXHIBIT 44

## NOTIFICATION OF REJECTED MAIL

INSTITUTION: Kilby                    DATE: 10|28|05

FROM: Mrs Yeah
Institutional Mail Room

TO: INMATE  Zephyrius Egbuonu
AIS #  242109     CELL/DORM  KCB     BED #  125

CORRESPONDENCE/PUBLICATION: Mrs Egbuonu

Date received at this institution: 10|28|05 . This correspondence/publication
is being returned to the sender due to the following reason(s): _upon receive
unauthorized internet material that
is not allowed. it was returned
to blender with guidlines on what
allowed._

___ Inmate has the option to return mail to sender at his/her own expense within 30 days
property will be destroyed.

X    Inmate has 72 hours from above date of this notice to protest this return by stating his
reasons below and returning this form to the Mail Room. Reason(s) for protest:
Material you returned constitute inmate essential legal material for preparatu
of his appeal brief to State, Federal in violation of his constitution rights, which
your law library are not permitted to provide to inmate for his personal use

___ Publisher has 20 days from receipt of this notice to appeal this decision and obtain an
independent review of this rejection by sending its objections to the warden of this facility.

Egbuonu Zephyr              242109
Inmate Signature            AIS #
10/29/05
Date

(INMATE PROTEST DENIED)        INMATE PROTEST GRANTED

PUBLISHER PROTEST DENIED       PUBLISHER PROTEST GRANTED
Capt. Barrett
Printed Name/Authorized Signature    Printed Name/Authorized Signature

10-31-05
Date Returned to Sender        Date Returned to Inmate    Annex C

EXHIBIT 45

you can get it off the computer in the law library

In addition, note that your law library are not equip to receive the lastest US Supreme Court case rule caselaw and only way an inmate to receive it immediately...

NOTIFICATION OF REJECTED MAIL

INSTITUTION: _Kilby_____    DATE: _11/1/05_____

FROM: _Ms. Yeah_____
Institutional Mail Room

TO: INMATE _Zephyrinus Egbuonu_____
AIS # _242109_____  CELL/DORM _KCB_  BED # _125_

CORRESPONDENCE/PUBLICATION: _Mrs. Egbuonu_____

Date received at this institution: _10/30/04_____. This correspondence/publication
is being returned to the sender due to the following reason(s): _Item contains_
_unauthorized internet material that_
_is not allowed, it was returned_
_to sender with guidelines on what_
_allowed._

___  Inmate has the option to return mail to sender at his/her own expense within 30 days
property will be destroyed.

_X_  Inmate has 72 hours from above date of this notice to protest this return by stating his
reasons below and returning this form to the Mail Room.  Reason(s) for protest: _no_
_Sir, I cannot get the Federal Supplements, US Supreme Court 2005 recent ruled case_
_rendered nor other Circuit case laws from your law library, denying me receiving internet_
_legal material as relate to my case will render appealing my case with difficulties_
_therefor, please reconsider all my legal internet print out, thanks._
Publisher has 20 days from receipt of this notice to appeal this decision and obtain an
independent review of this rejection by sending its objections to the warden of this facility.

_Egbuonu Zephyr_____    _242109_____
Inmate Signature                    AIS #

_11/2/05_____
Date

(INMATE PROTEST DENIED)        INMATE PROTEST GRANTED

PUBLISHER PROTEST DENIED        PUBLISHER PROTEST GRANTED

_Cpt. Barrett_____    _____
Printed Name/Authorized Signature    Printed Name/Authorized Signature

_11-7-05_____    _____
Date Returned to Sender    Date Returned to Inmate    Annex C

send thru
your
lawyer

**EXHIBIT 46**

May 30, 2000

NOTIFICATION OF REJECTED MAIL

INSTITUTION: _Kilby_     DATE: _12/6/05_

FROM: _Ms Yeak_
Institutional Mail Room

TO: INMATE _Zephyrinus Egbuonu_
AIS # _242109_    CELL/DORM _KCB_    BED # _125_

CORRESPONDENCE/PUBLICATION: _Kimberly Armstrong_

Date received at this institution: _11/3/05_. This correspondence/publication
is being returned to the sender due to the following reason(s): _you received_
_some unauthorized publication it was_
_returned to sender per Capt Barrett, ell_
_was Identity Theft._

___     Inmate has the option to return mail to sender at his/her own expense within 30 days or
property will be destroyed.

✓     Inmate has 72 hours from above date of this notice to protest this return by stating his/her
reasons below and returning this form to the Mail Room. Reason(s) for protest:
_Victim of Identity theft, convicted of Identity theft in a State I has not cont_
_the article you about to return would have assist me to prepare my appe_
_please I need the article, if already returned, furnish me the addre_

___     Publisher has 20 days from receipt of this notice to appeal this decision and obtain an
independent review of this rejection by sending its objections to the warden of this facility.
_you returned the article and date._

_Egbuonu Zephyr_ . _242209_
Inmate Signature             AIS #

_____
Date

(INMATE PROTEST DENIED)        INMATE PROTEST GRANTED

PUBLISHER PROTEST DENIED       PUBLISHER PROTEST GRANTED

_Dailen Yeak mail clerk_
Printed Name/Authorized Signature      Printed Name/Authorized Signature

_12/8/05_
Date Returned to Sender        Date Returned to Inmate    Annex C

_Go to the law of the library to get your inf_

EXHIBIT 47

3

## INMATE REQUEST SLIP

Name _Zephyrinus Egbuonu_    Quarters _K(B 212_    Date _12/24/05_

AIS # _____

( ) Telephone Call        ( ) Custody Change        ( ) Personal Problem
( ) Special Visit          ( ) Time Sheet            (X) Other _legal document_
                                                          _Problem_

**Briefly Outline Your Request - Then Drop In Mail Box**

Dear Captain, I would be glad if your office
can assist me by having your mailroom
deliver my legal documents trial transcript,
mailed to me by my sister-in-law on about Dec
17, 2005, received in Mount Meigs on about Dec. 23,
2005. Note my Court of Criminal Appeal briefs due
date is January 6, 2006 and my time to review
research prepare the brief is running out. Thanks.
CC: Attorney Mahmood, Attorney Sid Hughes.

**Do Not Write Below This Line - For Reply Only**

_____
_____
_____
_____
_____
_____
_____

| Approved | Denied | Pay Phone | Collect Call |
|----------|--------|-----------|--------------|

**Request Directed To: (Check One)**

( ) Warden                        ( ) Deputy Warden        (X) Captain
( ) Classification Supervisor     ( ) Legal Officer - Notary  ( ) Record Office
                                      Public

N176

# EXHIBIT 48

## INMATE REQUEST SLIP

Name _Zephyrinus Egbuonu_  Quarters _K/B 212_  Date _12/24/05_

AIS # _242109_

( ) Telephone Call     ( ) Custody Change     ( ) Personal Problem

( ) Special Visit     ( ) Time Sheet     (X) Other _Trial Transcript_
_Mail Issue_

Briefly Outline Your Request - Then Drop In Mail Box

Ms Leak, please do not have any information
about my court legal transcripts which were
mailed to me in a box by my sister-in-
law on December 17, 2005 from Texas.
Note the papers contained in the box are
all trial transcripts of my trial in Alabama
and I need it to enable me complete my
Appeal briefs due January 6, 2006 in Alabama
Court of Criminal Appeals. CC: Attorney Sid Hughes

Do Not Write Below This Line - For Reply Only

_____

_____

_____

_____

_____

_____

| Approved | Denied | Pay Phone | Collect Call |

Request Directed To: (Check One)

( ) Warden     ( ) Deputy Warden     ( ) Captain

( ) Classification Supervisor     ( ) Legal Officer - Notary     ( ) Record Office
Public

(X) Mail Room
Ms Leak.

N176

# EXHIBIT 49

KCB-212

**INMATE REQUEST SLIP**

Name _Zephyrinus Egbuonu_    Quarters _KCB 212_ Date _01/22/06_

AIS # _242109_

( ) Telephone Call        ( ) Custody Change        ( ) Personal Problem

( ) Special Visit          ( ) Time Sheet             (X) Other _Law Library_

Briefly Outline Your Request - <u>Then Drop In Mail Box</u>

Your KCF inmate Law Library does not have 2005 US Supreme Court, Federal Circuit and Alabama Supreme Court ruled established Statutory Case Laws to adequately enable inmates prepare their post-conviction, appeals, remedies in both State and Federal level. Thereof, I am hereby seek immediate assist that your office or KCF furnish me with following Cases Laws listed in the back to enable me research proceed as a Pro Se. Thanks, you response to this request is highly needed.

<u>Do Not Write Below This Line</u> - **For Reply Only**

| Approved | Denied | Pay Phone | Collect Call |

Request Directed To: (<u>Check One</u>)

( ) Warden                              ( ) Deputy Warden        (X) Captain

( ) Classification Supervisor    ( ) Legal Officer - Notary    ( ) Record Office
                                             Public

↓176

**EXHIBIT 50**

## INMATE REQUEST SLIP

Name Zephyrinus Egburorui    Quarters HCB212    Date 01/25/06
AIS # 242109

( ) Telephone Call      ( ) Custody Change      ( ) Personal Problem
( ) Special Visit       ( ) Time Sheet          (X) Other Law Library

**Briefly Outline Your Request - Then Drop In Mail Box**

Your HCF inmate law library does not have 2005 US Supreme Court, Federal Circuit and Alabama Supreme Court ruled established statutory case laws to adequately enable inmates prepare their post conviction, appeals, remedies in both State and Federal level. I am hereby seeking an assist from your office to furnish me with following cases laws as I listed in the back to enable me conduct thorough research process as a Pro Se. Thank you response solution to the above is/are highly needed.

**Do Not Write Below This Line - For Reply Only**

Approved        Denied        Pay Phone        Collect Call

**Request Directed To: (Check One)**
( ) Warden          (X) Deputy Warden          ( ) Captain
( ) Classification Supervisor  ( ) Legal Officer - Notary Public  ( ) Record Office

N176

**EXHIBIT 51**

## INMATE REQUEST SLIP

Name Zephyrinus Egbuoni    Quarters K1B212    Date 02/08/06

AIS # 242109

( ) Telephone Call        ( ) Custody Change        ( ) Personal Problem

( ) Special Visit          ( ) Time Sheet            (X) Other Law Librarian Relate.

**Briefly Outline Your Request - Then Drop In Mail Box**

Goodday Captain, this is a follow-up of yesterday incident at your KCF law library whereby an inmate law librarian did not want to assist me adequately in locating some case laws in your law library computer and was not given an opportunity to tell my side of story to you at your office on 2/07/06. Sir, I would be glad if your office can further assist me locating case laws I needed to enable me conduct thorough research on my post conviction remedies to federal level. Your reply is needed. See back.

**Do Not Write Below This Line - For Reply Only**

I have been advised the computer (Lexis-Nexis) has not been updated w/ these particular cases. Futhermore, you will not have access to the computers. This is the clerks job. Capt. Barnett

Approved        Denied        Pay Phone        Collect Call

**Request Directed To: (Check One)**

( ) Warden              ( ) Deputy Warden        (X) Captain

( ) Classification Supervisor    ( ) Legal Officer - Notary    ( ) Record Office
                                 Public

CC: Capt, inmate

N176

# EXHIBIT 52

**INMATE REQUEST SLIP**

Name _Zephyrinus Egbuonu_ Quarters _KCB212_ Date _02/28/06_
AIS # _242109_

( ) Telephone Call       ( ) Custody Change       ( ) Personal Problem
( ) Special Visit        ( ) Time Sheet           (✗) Other _Legal Material_

Briefly Outline Your Request - Then Drop In Mail Box

Goodday, the Attorney General of Alabama
proffered these cases:
* 1) Middlebrooks V. State, No. A06A0030, 2006 WL
    305553 (GA App Feb. 6, 2006)
* 2) State V. Mayze 622 S.E. 2d 836 (GA. 2005)
in their Appellee Brief, and your law library
did not have it. Please can you assist me to
get it, I have a deadline of March 6, 2006
to response back. Thanks.

Do Not Write Below This Line - **For Reply Only**

| Approved | Denied | Pay Phone | Collect Call |

Request Directed To: (Check One)

( ) Warden                      ( ) Deputy Warden        (✗) Captain
( ) Classification Supervisor   ( ) Legal Officer - Notary  ( ) Record Office
                                    Public

N176

**EXHIBIT 53**

**INMATE REQUEST SLIP**

Name Zephynmus Egbuony Quarters KCB 212 Date 02/28/06

AIS # 242109

( ) Telephone Call        ( ) Custody Change        ( ) Personal Problem

( ) Special Visit          ( ) Time Sheet            (X) Other Legal Material

---

Briefly Outline Your Request - Then Drop In Mail Box

Goodday, the Attorney General of Alabama
proffered these cases in their Appelle
brief for Appellant to rebuttal:
1)Middlebrooks V. State, No A06A0030, 2006 WL
305553 (GA App Feb. 6, 2006)
2)State V. Mayze 622 S.E. 2d 836 (GA 2005)
and your KCF Law library did not have it neither
on book or computer database. Please, your assist
to furnish me with these documents are urgently needed.
                                                    thanks

---

Do Not Write Below This Line - For Reply Only

The above has been forwarded to
our legal division. You should
have a response soon.
                    Capt. Barrett

| Approved | Denied | Pay Phone | Collect Call |

---

Request Directed To: (Check One)

( ) Warden              (X) Deputy Warden        ( ) Captain

( ) Classification Supervisor    ( ) Legal Officer - Notary    ( ) Record Office
                                     Public

CC: Inmate

N176

EXHIBIT 54 (54)

**INMATE REQUEST SLIP**

Name **Zephynius Eabruary** Quarters **KCB2/2** Date **3/1/06**

AIS # **242109**

( ) Telephone Call    ( ) Custody Change    ( ) Personal Problem

( ) Special Visit    ( ) Time Sheet    (X) Other **Legal Material**

Briefly Outline Your Request - Then Drop In Mail Box

Goodday, as per your instruction during my visit to your office dated 2/28/06 5:20pm, below are names of cases that I needed: 1) Middlebrooks v. State, No. A06A0030, 2006 WL 305553 (Ga. App. Feb. 9, 2006) 2) State v. Manzo 622 S.E. 2d 836 (Ga 2005) 3) Georgia Identity theft Statute: Situs. Thanks, I look forward to receive it to enable me meet Deadline both State and Federal.

Do Not Write Below This Line - **For Reply Only**

Approved        Denied        Pay Phone        Collect Call

Request Directed To: (Check One)

( ) Warden

( ) Classification Supervisor    ( ) Deputy Warden    (X) Captain

( ) Legal Officer - Notary    ( ) Record Office
    Public

N176



(55)

**EXHIBIT 55**

## INMATE REQUEST SLIP

Name _Zephyrinus Egbuon_ _____ Quarters _KCB 212_ Date _3/7/06_

AIS # _242109_

( ) Telephone Call                  ( ) Custody Change          ( ) Personal Problem
( ) Special Visit                   ( ) Time Sheet              (X) Other _Legal_
                                                                         _Material_

Briefly Outline Your Request - Then Drop In Mail Box

Delays to Punish an inmate with Attorney General cites
Case laws in appeal brief are making it difficulty
for an inmate to review comment advice reply to the
Attorney General brief to the Court of Criminal Appeal
with the Statute of limitation thereof I am hereby
pleading to you to obtain the detail Case law opinions:
1) State v. Mayze 622 S.E. 2d 836 (Jour Ga. 2005)
2) Middlebrooks v. State case No. A06A0030, 2006 WL 30553 (GA-2006)
from Lexis Nexus and West law internet or intranet Database.
                                                              Thanks

Do Not Write Below This Line - For Reply Only

I faxed a copy of your last req to
ADOC Legal Div last week. I
have not heard anything back
from them yet.

                                          Warden Price

Approved _____   Denied _____   Pay Phone _____   Collect Call _____

Request Directed To: (Check One)

( ) Warden
( ) Classification Supervisor   (X) Deputy Warden
                                ( ) Legal Officer - Notary    ( ) Captain
                                    Public                    ( ) Record Office

N176

(56)

# EXHIBIT 56

March 8, 2006

Legal Division
Alabama Department of Correction
301 S. Ripley Street
Montgomery, Alabama 36104

Dear Sir:

I would be glad if your office can assist further and provide me with the followings, in addition to the cases as per attached documents

Identity Theft Statute Venue of Georgia State; Code Ann. Sect.121
Identity Theft Statute Venue of Mississippi State; Code Ann. Sect. 97-19-85
Identity Theft Statute Venue of Tennessee State; Code Ann. Sect. 39-14-150
Identity Theft Statute Venue of Texas State Penal Code Sect. 32-51
Identity Theft Statute Venue of Arkansas State; Code Ann. Sect. 5-37-227
Identity Theft Statute Venue of California State; Penal Code Sect. 530.5
Identity Theft Statute Venue of Louisiana State
Identity Theft Statute Venue of Florida State
~~Ex Parte Egbuonu _____ So.2d _____ 2005 (Ala. Supreme Court April 2005)~~ Received from M

These cases would enable me research and prepare Appeal my Writ of Habeas Corpus to Federal District Court as Pro-Se within Statute limitation.

Thanks, I look forward to your urgent assistance and response.

Sincerely,

Zephyrinus Egbuonu (Engr.)
AIS 242109
P O BOX 150
Mount Meigs, Alabama 36057

EXHIBIT 57

**INMATE REQUEST SLIP**

Name _Zephyrimus Egbuonu_ Quarters _KCB 212_ Date _4/6/06_

AIS # _242109_

( ) Telephone Call        ( ) Custody Change        ( ) Personal Problem

( ) Special Visit         ( ) Time Sheet            (X) Other _Legal_
                                                          _Materials_

Briefly Outline Your Request - <u>Then Drop In Mail Box</u>

Goodday, this is a follow up of my last request,
was it error for not providing inmate an
adequate legal materials pertaining to his case
nor allow the inmates to receive sent the internet
West Law, Lexus Nexis legal materials print out to
enable him response purse an available State and
Federal post-conviction remedies of State of Alabama
First Impression Case of Alabama Code 13A-8-192.
Your response is highly needed. Thanks.

<u>Do Not Write Below This Line</u> - **For Reply Only**

_Your legal needs have been_
_met to the best of our ability._
_Doc legal is aware of your requests._
_We can only approve what we have._

Approved        Denied _Capt. Barnett_ Pay Phone        Collect Call

Request Directed To: (<u>Check One</u>)

(X) Warden                    ( ) Deputy Warden          ( ) Captain

( ) Classification Supervisor  ( ) Legal Officer · Notary  ( ) Record Office
                                   Public

N176        CC: Inmate.

**EXHIBIT 58**

**INMATE REQUEST SLIP**

Name _Zephyrinus Egbuonu_ Quarters _KCB 212_ Date _4/10/06_

AIS # _242109_

( ) Telephone Call          ( ) Custody Change          ( ) Personal Problem

( ) Special Visit           ( ) Time Sheet              (X) Other _Transfer Denied_

Briefly Outline Your Request - Then Drop In Mail Box

Goodday, I will be glad to know whether ADOC and your office verified the accuracy of inmates' informations obtained before applying it.

Pursuant to 1975 Alabama Law Code Section 13A-5-9, was it errors using State of California Plead of Nolo Contendere and dismissed cases as a justification on inmates' progress review dated March 21, 2006. Thanks, your earliest response to the above is needed.

Do Not Write Below This Line - **For Reply Only**

What information are you referring to?

Ms. Baggett, Classification Supervisor

| Approved | Denied | Pay Phone | Collect Call |
|----------|--------|-----------|--------------|

Request Directed To: (Check One)

( ) Warden                        ( ) Deputy Warden              ( ) Captain

(X) Classification Supervisor     ( ) Legal Officer - Notary     ( ) Record Office
                                      Public

N176

**EXHIBIT 59**

**INMATE REQUEST SLIP**

Name _Zephyrinus Egbuonu_ Quarters _KCB 212_ Date _4/13/06_

AIS # _242709_

( ) Telephone Call     ( ) Custody Change     ( ) Personal Problem

( ) Special Visit     ( ) Time Sheet     (X) Other _Background Record Review_

Briefly Outline Your Request - **Then Drop In Mail Box**

As per your question of 4/12/06, the information I was referring to are the criminal background records, written on my progress review sheet dated 3/21/06 and or contained in my inmates' file in your office. Thanks, I look forward to your earliest response as relate to my 4/20/06 presented issues.

Do Not Write Below This Line - **For Reply Only**

All information in your institutional (green) jacket is DOC property. Also, mailed directly to you was the final decision for your progress review.

Approved     Denied     Pay Phone     Collect Call

Request Directed To: (Check One)

( ) Warden     ( ) Deputy Warden     ( ) Captain

(X) Classification Supervisor     ( ) Legal Officer - Notary Public     ( ) Record Office

_Ms Cott_

# EXHIBIT 60

STATE OF ALABAMA
DEPARTMENT OF CORRECTIONS

**Notification of Rejected Mail**

From: <u>Ms. Leak</u>                                    Date: <u>04/14/06</u>
_Institutional Mail Room_
To: Inmate <u>Zephyrinus Eghuonu</u>                     AIS#: <u>242109</u>
Cell/Dorm: <u>KCB</u>                    Bed #: <u>212</u>
Correspondence From: <u>Kimberly Armstrong</u>
Date received at this Institution: <u>4/13/06</u>
Is being returned to sender due to the following reason(s): <u>You received some</u>
<u>unauthorized Internet material in the mail it was refused and returned to sender Per Capt.</u>
<u>Barrett. Guidelines were sent to sender on what is allowed.</u>

The inmate has the option to return mail to sender at his/her own expense within thirty
(30) days or the property will be destroyed.

The inmate has seventy-two (72) hours from the above date to appeal this return. State
your reason(s) for appealing in writing below and return this form to the
Warden/designee:

_Was it an error to discriminate against an_
_internet publication material print out text_
_from internet. Your earliest ~ written response_
_is highly needed._

<u>Egbuonu Zephyr (242109) / 4/16/06</u>
Inmate Signature AIS#

Date <u>4-25-06</u>
**Appeal/Denied**              **Appeal/Upheld**

_Bobby Barrett_
Printed Name   Printed Name

_Internet material is_
_prohibited !_

_Capt. Barrett_

Authorized Signature Authorized Signature

Date returned to sender Date returned to inmate
ADOC Form 448 – December 19, 2005

**EXHIBIT 61**

**INMATE REQUEST SLIP**

Name _Zephaniah Edfienu_ Quarters _K(B212_ Date _4/15/06_

AIS # _242109_

( ) Telephone Call          ( ) Custody Change          ( ) Personal Problem
( ) Special Visit           ( ) Time Sheet              (X) Other _Law Library_
                                                            _access_

Briefly Outline Your Request - **Then Drop In Mail Box**

Pursuant to ADOC Administrative Regulation No. 207, was it error for your "Gate 3" duty officers to deny inmates who chooses not to eat lunch nor dinner, an access to law library prior to, during and immediate after feeding time. Your earliest review and response is are highly needed. Thanks.

**Do Not Write Below This Line - For Reply Only**

Approved          Denied          Pay Phone          Collect Call

Request Directed To: (**Check One**)
( ) Warden                        (X) Deputy Warden          ( ) Captain
( ) Classification Supervisor     ( ) Legal Officer · Notary ( ) Record Office
                                      Public

N176

**EXHIBIT 62**

**INMATE REQUEST SLIP**

Name _Zephyrinus Egbuonu_    Quarters _KCB 212_  Date _4/18/06_

AIS # _242109_

( ) Telephone Call    ( ) Custody Change    ( ) Personal Problem

( ) Special Visit    ( ) Time Sheet    (X) Other _Vocational School denied_

Briefly Outline Your Request - Then Drop In Mail Box

Goodday, I will be glad to know if it was an error under equal protection clause to denied foreign national California permanet resident access to Vocational trade since October 2005 pending review of his appeal.

Your earliest respone is highly needed. Thanks.

Do Not Write Below This Line - **For Reply Only**

| Approved | Denied | Pay Phone | Collect Call |

Request Directed To: (Check One)

( ) Warden    (X) Deputy Warden    ( ) Captain

( ) Classification Supervisor    ( ) Legal Officer - Notary    ( ) Record Office
    Public

N176

# EXHIBIT 63

April 20, 2006

Mr. Rowell, Deputy Warden
Kilby Correctional Facility
12201 Wares Ferry Road
Montgomery, Alabama 36117

Dear Sir:

I would really appreciate your office looking it and helping address some of these
ongoing issues, under the clause of United States Constitution due process and State of
Alabama Correctional Facility Directives:

1. Penalizing an inmate for failure to take a Correctional Facility assigned Class,
   Stress Management, which the Classification Specialist never informed him of in
   over seven occasions.

2. Denying privileges and or benefit while there is still a pending State of Alabama
   Court of Criminal Appeal review & inmate has maintained his innocence.

3. Denying privileges and or benefits based on inaccurate criminal records. Using a
   Nolo Contendere plea that was dismissed by the State of California against an
   inmate.

An urgent attention & resolution to these issues will be greatly appreciated.

I look forward to hearing from you.

Sincerely,

Zephyrinus Egbuonu (Engr.)
AIS 242109
P. O. Box 150
Mount Meigs, Alabama 36057

CC: William Segrest, State of Alabama Board of Pardon and Parole
    Kathy Holt, ADOC – Classification
    Attorneys Sidney Hughes, G.R. Mahmood and Scholar Egbuonu

**EXHIBIT 64**

STATE OF ALABAMA
BOARD OF PARDONS AND PAROLES
301 S. RIPLEY STREET
P.O. BOX 302405
MONTGOMERY, ALABAMA  36130 - 2405
CENTRAL OFFICE (334) 242 - 8700
03-23-2006

ZEPHYRIUNS C EGBUONU
242109
KILBY CORRECTIONAL FACILI
P O BOX 150
MT MIEGS  AL  36057

YOUR CASE WAS REVIEWED BY THE BOARD OF PARDONS AND PAROLES AT
AN OPEN PUBLIC MEETING.  YOU WERE DENIED PAROLE AND RESET FOR
FURTHER CONSIDERATION DURING THE MONTH OF 09/2006.

REMARKS:
THE BOARD HOPES YOU WILL COOPERATE WITH THE PRISON AUTHORITIES
IN ORDER THAT YOU MAY RECEIVE THE BEST BENEFITS THAT CAN BE
ACCORDED.

YOURS VERY TRULY,

WILLIAM C. SEGREST
EXECUTIVE DIRECTOR

WCS/CRM

CC:  WARDEN
     CLASSIFICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ZEPHYRINUS EGBUONU, #27041-265 | * | |
| Plaintiff, | * | |
| v. | * | 2:07-CV-685-ID |
| KITCHEN STEWARD WILLIAM, et al., | * | |
| Defendants. | * | |

## ORDER ON MOTION

Before the court is Plaintiff's motion to compel filed on January 29, 2008. He requests that Defendants be directed to provide him with a copy of Defendant McDonnell's affidavit. A review of Defendants' special report reflects that Defendant McDonnell did not submit an affidavit. Accordingly, it is

ORDERED that the motion to compel (*Doc. No. 46*) be and is hereby DENIED. It is further

ORDERED that on or before February 13, 2008 Defendant McDonnell file an affidavit regarding his knowledge of the subject matter of the complaint filed in this case. Plaintiff is GRANTED an extension from February 1, 2008 to February 25, 2008 to file a response to Defendant McDonnell's affidavit in accordance with the directives contained in the court's December 10, 2007 order. (*See Doc. No. 35.*)


EXHIBIT 65

Done, this 30th day of January 2008.

            /s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ZEPHYRINUS EGBUONU, #27041-265 | * | |
| Plaintiff, | * | |
| v. | * | 2:07-CV-685-ID |
| KITCHEN STEWARD WILLIAM, et al., | * | |
| Defendants. | * | |

**ORDER ON MOTION**

Upon consideration of Plaintiff's second motion to compel requesting that Defendants
be directed to provide him with a copy of Defendant McDonnell's affidavit, and in light of
the court's January 30, 2008 order directing Defendant McDonnell file an affidavit regarding
his knowledge of the subject matter of the complaint filed in this case and further granting
Plaintiff an extension to file a response to Defendant McDonnell's affidavit (*see Doc. No.
47*), it is

ORDERED that the motion (*Doc. No. 49*) be and is hereby DENIED as moot.

Done, this 5th day of February 2008.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ZEPHYRINUS EGBUONU          )
                            )
        Plaintiff,          )
                            )
v.                          )
                            )   2:07-CV-685-ID
KILBY CORRECTIONAL          )
FACILITY, ET AL.            )
                            )
        Defendants.         )
                            )

## NOTICE OF COMPLIANCE WITH COURT ORDER

COME NOW the Defendants, Howard Williams, Kenneth Cash, Bobby Barrett, Leon Varner, Michael Warren, W.G. Rowell, and Terrance McDonnell, by and through undersigned counsel, and in accordance with this Honorable Court's January 30, 2008, (Doc. 47) Order, submit the affidavit of Terrance McDonnell, attached hereto as "Exhibit 7", in support of their previously filed Special Report.

Respectfully submitted,

TROY KING
ATTORNEY GENERAL

/s/ Benjamin H. Albritton
Benjamin H. Albritton (ASB-0993-R67B)
ASSISTANT ATTORNEY GENERAL

## CERTIFICATE OF SERVICE

I hereby certify that I have this 11th day of February, 2008, served a copy of the foregoing by first-class United States Mail, postage prepaid and addressed upon the following:

Zephyrinus Egbuonu
Reg. No. 27041-265
Federal Detention Center
PO Box 5010
Oakdale, LA 71463

<p style="text-align:right;">/s/ Benjamin H. Albritton<br>Benjamin H. Albritton<br>ASSISTANT ATTORNEY GENERAL</p>

**ADDRESS OF COUNSEL:**

Office of the Attorney General
Alabama State House
11 South Union Street
Montgomery, Alabama 36130-0152
334-242-7555
334-242-2433 (Fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Zephrinus Egbuonu, 242109
PLAINTIFF

CIVIL ACTION: 2:07 CV 685-ID

VS
Kilby Correctional Facility, et.al.
DEFENDANT

AFFIDAVIT

Before me, the undersigned authority, a Notary Public in and for said county and State of Alabama at large, personally appeared Terrance McDonnell, who being know to me and being by me first duly sworn, deposes and says on oath as follows:

My name is Terrance McDonnell, and I am presently employed as Associate Commissioner of Programs with the Alabama Department of Corrections, Montgomery, Alabama.  I am over nineteen (19) years of age.

I, Terrance McDonnell, was the Correctional Warden III at Kilby Correctional Facility at the time specified in this complaint.  I am responsible for the administrative operations of the prison.  The Kilby Food Services Division is operated and supervised by Chief Steward Michael Warren.  In the Chief Steward's absence Steward II's assumes this position.  The Chief Steward is responsible to insure all safety policies and procedures are implemented and adequate equipment is available for the inmate's use in performing their job duties.  The Chief Steward is responsible for presenting requests to the Business Manager to purchase needed items, supplies, equipment, and materials to include elbow length neoprene gloves.  Budgeted funds or Institutional Contingency Funds are available to provide for the safety and sanitary conditions in the kitchen regarding inmates health and safety.

I do not recall receiving any requests or complaints from Inmate Egbuonu regarding ny health problems or complaints concerning the Food Services Division.

The Chief Steward is responsible for training all Stewards in food preparation, pliance with Public Health Department safety requirements regarding dish washing eratures and detergent usage.  The Stewards Is & IIs are then required to train and

1

DEFENDANT'S
EXHIBIT
7
800-631-6989

monitor the inmate usage of detergent, water temperatures for washing, rinsing and sanitizing the pots and pans and utensils. The Chief Steward and Stewards I & II then monitor the proper usage of such to insure compliance throughout the day on each shift..

The Laundry Manager, Tommy Dawson, is responsible for ordering all brogans for inmate workers to use in the kitchen unless they request to wear their personal leather/vinyl tennis shoes. Any inmate who has worn out or torn brogans can report to the laundry manager to show him their brogans and more will be issued if they are determined to be defective or worn out.

My Plant Maintenance Supervisor III assigns I to 2 inmates to work full time in the kitchen to insure all minor mechanical problems are corrected immediately. If parts need to be ordered a Maintenance Supervisor will order the parts promptly and insure the repairs are properly done and as quickly as possible. A Maintenance Supervisor is contacted for assistance when anything more than minor repairs are needed. A Maintenance man inspects all repairs made by the inmate maintenance workers in the kitchen. Also, the Maintenance employee inspects the kitchen throughout each day for deficiencies.

All inmates have ample access to the Kilby Inmate Law Library Monday through Friday from 8:00 AM to 4:00 PM and on Saturdays from 3:00 PM to 6:00 PM regardless of job assignments and working hours. Inmate Egbuonu visited the Law Library 172 days from October, 2005 to July 31, 2006, according to the law library sign in roster.

The medical file on Inmate Egbuonu was reviewed by the Prison Health Services Health Services Administrator, Ms. Linda Lawrence, from the date he arrived at Kilby Correctional Facility on 9-6-05 until his transfer to Staton Correctional Facility on 8/1/07, to see if he signed up for sick call or sent any complaints concerning any type problems with his hands. The review found no requests for sick call related to any type problems with his hands or fingers.

Inmate kitchen workers are free from cruel and unusual punishment. They must follow the training instructions, institutional rules and regulations and safety guidelines given to them by the Stewards in the kitchen. Safety equipment and "gear" is provided to all inmates in accordance with their job assignments.

2

I have not violated Inmate Egbuonu's constitutional rights in any manner.

_Terrance 3. D___uf_
Terrance McDonnell, Assoc. Commissioner
Kilby Correctional Facility

State of Alabama
Montgomery, AL

Sworn to and subscribed before me and under my hand and official seal this the

_l0_ th day of December, 2007.

_Sandra M. McLure_
Notary Public
My comm. expires _3/27/2011_

3

## INMATE REQUEST SLIP

Name _Zephynimis Egbuonu_ Quarters _KCB 212_ Date _4/21/06_

AIS # _242109_

( ) Telephone Call     ( ) Custody Change     ( ) Personal Problem

( ) Special Visit          ( ) Time Sheet        (X) Other _Official_
_law library hours_

**Briefly Outline Your Request - Then Drop In Mail Box**

Pursuant to ADOC "Notice to All Inmates"
handout dated January 2003 signed by
ADOC Commissioner, I will be glad if your
office can provide me with your official
opening closing hours of your KCF law
library on daily basis. thank I look
forward for your earliest written
response.

**Do Not Write Below This Line - For Reply Only**

| Approved | Denied | Pay Phone | Collect Call |
|---|---|---|---|

**Request Directed To: (Check One)**

( ) Warden                (X) Deputy Warden       ( ) Captain

( ) Classification Supervisor    ( ) Legal Officer - Notary     ( ) Record Office
                                 Public

# EXHIBIT 66

May 02, 2006                          Certified Mail No. 7005 1820 0006 2224 5770

Richard Allen, Honorable Commissioner
**Alabama State Department of Corrections**
301 South Ripley Street
Montgomery, Alabama 36104

**Subject: Request for Legal Materials**

Dear Sir:

I would appreciate your assistance in providing me with adequate legal material needed
to research my appeal, Alabama State First Impression Case; Ex parte Egbuonu 911 So.
2d 755 (Ala. Apr. 22 2005) to United States District Court as PRO SE.


Please provide me with the following States Identity Theft Venues Statues, including
each of their precedent controlling Constitutional Case Laws opinions

    Arkansas State
    Florida State; West's F.S.A. Section 817.568 (15) (16)
    Louisiana State
    Minnesota State; M.S.A. Section 609. 527, SU6D. 6(1)
    Mississippi State
    North Carolina State; NC Sess. Laws 2005-44 Sec. 2
    South Carolina State
    Texas State

Also, I will to receive the following Case Laws detail opinions:

    Mary Cle LLC v. First Choice Internet, Inc. 2004 WL 2895955
    (Md. Cir. Ct. Dec. 2004)
    State v. Krejci 458 N.W. 2d 407 (Minn. 1990)
    United States v. William No. 05-11594 (11th Cir. Jan. 13, 2006)
    United States v. Havens No. 04-2956 (7th Cir. Sept. 12, 2005)
    United States v. Clark No. 05-4274 (4th Cir. Jan. 12, 2006)
    United States v. Adair No. 04-30859 (5th Cir. Jan. 13, 2006)
    Middlebrooks v. State No. A06A0030, 2006, WL 305553


Furthermore, note that despite the fact that Alabama Department of Corrections (ADOC)
Legal Division do not have West Laws & Lexis Nexis materials in the Law Library nor
database, they do not allow inmates to receive these legal materials via mail.
Your earliest attention to the above mentioned request and response are highly needed.



**EXHIBIT 67**

Sincerely,

Engr. Zephyrinus Egbuonu
(AIS 242109)
PO Box 150
Mount Meigs, Alabama 36057

**Enclosures**
**Letter from Law Library**
**Letter from ADOC Legal Division**

Appelle Brief - 2006
Alabama Court Of Criminal Appeals - 2004

*EGBUONU # 242109*
*KC B-213*

*Received in Law*
*Library 3-16-06*

*Return to Law Library*
*when finished with*
*this material*
*KILBY*

**From:** Kim Thomas, Legal Division

**To:** Institutional Law Library Supervisors

**Re:** Enclosed legal materials

Please be advised the enclosed materials have been requested by an inmate assigned to your facility. These materials <u>should</u> be made available to the requesting inmate for his/her use. However, they **<u>should not</u>** be given to the requesting inmate for his\her sole, exclusive use. These materials should be maintained in the Law Library so all inmates can have access.

*~ Remainder unavailable*

February 13, 2006

TO:        Egbuonu, Zephyriuns, AIS: 242109

FROM:      Law Library

This is a list of the cases you requested:

CLARK V UNITED STATES, US Supreme Statutory Case law Number 05-5491 (2005)
BEARD V BANKS, US Supreme Court Case Number 04X-1739 (2005)
UNITED STATES V HAVENS, Case Number 04-2956 (2005) Federal Circuit Case
UNITED STATES V. WILLIAM, No. 05-11594 (2006) Federal Circuit Case
UNITED STATES V CLARK No 05-4274 2006 (Federal Circuit Case)
MARY CLE, LLC V FIRST CHOICE INTERNET, INC. WL 2895955 (2004)
STATE V KREJCI, 458 NW 2d 407, 411

        We were not successful in finding any of the cases you requested. Our system is not geared to find
cases by case number alone which is all you are providing. These are the citation formats we need to search for
US Supreme Court cases:  141 led 2d 111  or  517 us 843.
        On the cases you requested from the federal circuits, we only have access to cases in the 11th Circuit
which includes Alabama, Georgia, and Florida, or the 5th Circuit which includes Texas, Louisiana, and Mississippi.
There are no circuits listed on any of the federal circuit cases unless you were requesting cases from the Federal
Circuit itself to which we do not have access. We have no access to federal district or circuit cases from the 1st,
2nd, 3rd, 4th, 6th, 7th, 8th, 9th, 10th, D.C. or Federal Circuits other than the hardback volumes currently in the
back room of the law library which ended with cases whose opinions were issued in approximately March of 2005.

        This is a copy of the results of our search.

        U.S. SUPREME COURT CASES
CLARK V U.S. No 04-8819, March 18, 2005
CLARK V U.S. No 04-9037, April 18, 2005
CLARK V U.S. No. 04-5169, January 24, 2005
CLARK V. U.S. No. 04-6340, January 24, 2005
CLARK V. U.S.  No. 04, 9864, June 6, 2005
CLARK V. U.S. No 04-7815, January 24, 2005

BEARD V. BANKS, No 02-1603, January 26, 2004

        FEDERAL CIRCUIT CASES
UNITED STATES V. WILLIAM, No. 05-11594 (2006) Federal Circuit Case
        This was the only hit  for the 5th or 11th Circuit.  US. V. WILLIAMS, No 02-12738, December 27, 2002.
UNITED STATES V CLARK No 05-4274 2006 (Federal Circuit Case)
        This was the only hit for the 5th or 11th Circuit.  U.S V. CLARK, No 02-10427, December 30, 2002.
U.S. V. HAVENS, 04-2956, 2005, no hits for the 5th or 11th Circuit
MARY CLE, LLC V FIRST CHOICE INTERNET, WL 2895955, 2004, no hits for the 5th or 11th Circuit

        CASES FROM OTHER STATES
STATE V KREJCI, 458 NW 2d 407, 411.
        This case is not a state case from the State of Alabama. It is from the Northwestern Reporter which we do
not have.

        I am attaching a copy of a form to be sent to the Alabama Department of Corrections Legal Division which
you may fill out requesting these materials and send to DOC Legal Division, 301 S. Ripley Street. Montgomery, AL
36104.

venue.   "Therefore, under this provision, venue would be

proper in the county in which the victim resides or in the

county in which any part of the offense took place."

Middlebrooks v. State, No. A06A0030, 2006 WL 305553, at *5

(Ga. App. Feb. 9, 2006); State v. Mayze, 622 S.E. 2d 836,

839-840 (Ga. 2005)(finding this Court's previous decision

"compelling.")

*[margin handwriting: Cited by Alabama Attorney General; out of State Case laws Supporting his brief but not available in prison law library for Appellant]*

    Egbuonu also again asserts that the State of Alabama

cannot prosecute him because the federal government has

passed identify theft legislation.   Referring to Title 28

U.S.C. § 1028, Egbuonu states that "despite the existence

of federal law regulating the act of identity theft, the

State of Alabama has decided to enforce its own national

regulatory scheme regarding the crime of identity theft."

(Appellant's brief, p. 14)   Egbuonu fails to aver what is

wrong with the State of Alabama, or any other State, having

identity theft legislation.   "[M]ost states have enacted

some type of legislation criminalizing identity theft."

Parker, Lori J, "Validity, Construction, and Application of

State Statutes Relating to Offense of Identity Theft," 125

ALR 537, §2(b) (2005).   As this Court noted previously in

rejecting this identical claim, the State of Alabama as a

21

CR-03-1721

information, a speedy public trial by an impartial jury of the county or district in which the offense shall have been committed ...." Clearly, the Legislature had knowledge of this constitutional provision at the time it enacted the special venue statutes.

Moreover, we believe that the Legislature had defined the crime of identity theft as a continuing offense. See § 13A-8-196, Ala. Code 1975. "By utilizing the doctrine of a continuing offense, Congress may ... provide that the locality of a crime shall extend over the whole area through which force propelled by an offender operates." United States v. Johnson, 323 U.S. 273, 275 (1944). "The legislature has the authority, within the confines of the constitution, to enact special venue statutes and has done so when special needs relating to venue have arisen." State v. Krejci, 458 N.W.2d 407, 411 (Minn. 1990). Section 13A-8-196 does not violate Art. I, § 6, Ala. Const. of 1901.[4]

*Cited Alabama & Federal Court out of St Case law Support his brief but not available in your law library for Appellan*

---

[4]The Minnesota Supreme Court, in State v. Krejci, 458 N.W.2d 407 (Minn. 1990), reviewing a special venue statute related to venue for a case involving child abuse, held that the child-abuse statute that provided that venue was proper in the county where the abuse occurred or the county where the child is found did not conflict with Minnesota's constitutional provision regarding venue, which is identical


RECEIVED
MAR 1 3 2006
ALABAMA DEPT. OF CORRECTIONS
LEGAL DIVISION

 **UNITED STATES POSTAL SERVICE**®

Home | Help | Sign In

Track & Confirm        FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: **7005 1820 0006 2224 5770**
Status: **Delivered**

Your item was delivered at 9:37 am on May 08, 2006 in MONTGOMERY, AL 36130. A proof of delivery record may be available through your local Post Office for a fee.

Additional information for this item is stored in files offline.

( Restore Offline Details > ) (?)    ( Return to USPS.com Home > )

---

**Track & Confirm**

Enter Label/Receipt Number.

( Go > )

---



Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

May 19, 2006

Kim Thomas                           CERTIFIED # 7005 1160 0000 5642 7044
Legal Division
Alabama Department of Correction
301 S. Ripley Street
Montgomery, Alabama 36104

**Subject:  Request for Legal Materials and access to California State Superior Court**

Dear Mr. Thomas:

Greetings. I will be glad if your office will provide me with the following legal books:

1.  Constitution of California State.
2.  California State Rules of Criminal Procedure.
3.  California State Criminal Penal Code.
4.  California State Rules of Appellate Procedure.
5.  California State Rules of Civil Procedure.
6.  California State Code of Civil Procedure.
7.  California State Rules of Evidence.
8.  Shepard's California Citations.

The above will enable me conduct legal research without restriction, file applicable good faith complaints, Motions, Writ to California State Governor, and California State Superior Court as PRO SE within the Statute of Limitation.

If your office is unable to provide the above mentioned, please explain to me in writing reason(s).

Your earliest attention to this request is appreciated.

Sincerely,

Zephyrinus Egbuonu
(AIS 242109)
P. O. BOX 150
Mount Meigs, Alabama 36057

**EXHIBIT 68**

 **UNITED STATES POSTAL SERVICE**

Home | Help | Sign In

Track & Confirm       FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: 7005 1160 0000 5642 7044
Status: **Delivered**

Your item was delivered at 9:04 am on May 23, 2006 in MONTGOMERY, AL 36130. A proof of delivery record may be available through your local Post Office for a fee.

Additional information for this item is stored in files offline.

*Restore Offline Details >*   *?*   *Return to USPS.com Home >*

Track & Confirm

Enter Label/Receipt Number.

*Go >*

May 23, 2006                              Certified # 7005 1160 0000 5642 7075

Mr. Rowell, Deputy Warden
**Kilby Correctional Facility**
12201 Wares Ferry Road
Montgomery, Alabama 36177

Dear Sir:

In response to your note dated April 25, 2006, attached are copies of my Alabama
Department of Corrections (ADOC) Inmate Progress Review Report signed by you on
March 21, 2006 and Alabama Board of Pardons and Paroles Pre-Sentencing Investigation
report dated July 18, 2005.

In respect to the attached, I would like to know if the Inmate Progress Review Report
Justification Statement was written contrary to the Pre-Sentencing Investigation (PSI)
report record arrest on page 2 of 5. Also, if the information your office and ADOC have
in the file that was sent to the Institutional Parole Officer in March, 2006 contains
misleading or inaccurate information as it relate to the dismissed plea of Nole
Contendere, which is inadmissible in State of Alabama; see Alabama code of 1975 law,
section 13A-5-9.

Your urgent attention and resolution to the above issues will be greatly appreciated.

I look forward to hearing from you.

Sincerely,

Zephyrinus Egbuonu
AIS 242109
PO BOX 150
Mount Meigs, Alabama 36057

**Encl: ADOC Inmates Progress Review Report**
**Alabama Board of Pardons and Paroles PSI Report**

**Cc:   Kathy Holt, ADOC – Classification**  - Certified # 7005 1160 0000 5642 7082
**Attorney Sidney Hughes**
**Attorney G.R. Mahmood**
**Attorney Scholar Egbuonu**



**EXHIBIT 69**

 **UNITED STATES POSTAL SERVICE** ®

Track & Confirm        FAQs

# Track & Confirm

### Search Results

Label/Receipt Number: **7005 1160 0000 5642 7075**
Status: **Delivered**

Your item was delivered at 8:34 am on May 31, 2006 in MOUNT MEIGS, AL 36057. A proof of delivery record may be available through your local Post Office for a fee.

Additional information for this item is stored in files offline.

Restore Offline Details >  (?)     Return to USPS.com Home >

Track & Confirm

Enter Label/Receipt Number.

Go >

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    NO FEAR Act EEO Data    FOIA

*Note*
*copy to the*
*Court &*
*Alabama Atty*
*General*
*Printed*
*01/13/08*

Ms Leak

## INMATE REQUEST SLIP

Name **Zephynnus Egbuonu** Quarters KCB 212 Date **5/23/06**
AIS # 242109

( ) Telephone Call        ( ) Custody Change        ( ) Personal Problem
( ) Special Visit         ( ) Time Sheet            (X) Other Inmate Mail

Briefly Outline Your Request - Then Drop In Mail Box

Greeting Ms Leak. Was an inmates sent mail from Ratliffs Law Review consider to be legal mail. If So, Was it an error to open the mail in absence of the inmate the mail was addressed to.

Your review and response is highly needed. Thanks

Do Not Write Below This Line - **For Reply Only**

This mail was not legal mail. It will be searched by the mail personnel. cpt - Barnett

| Approved | Denied | Pay Phone | Collect Call |

Request Directed To: (Check One)

( ) Warden                 ( ) Deputy Warden         ( ) Captain
( ) Classification Supervisor  ( ) Legal Officer - Notary Public  ( ) Record Office
(X) Mail Room; Ms Leak

N176

# EXHIBIT 70

## INMATE REQUEST SLIP

Name _Zephynimus Egberieny_ Quarters _____ Date 5/23/06

AIS # 242109

( ) Telephone Call    ( ) Custody Change    ( ) Personal Problem
( ) Special Visit     ( ) Time Sheet       (X) Other Law Library Access

Briefly Outline Your Request - <u>Then Drop In Mail Box</u>

To: MR Rowell, Deputy Warden

Greeting. Sir, this is a follow up of previous
inmate request:
1) Was it an error for your officers at Gate 3 to
deny inmate access to ingress egress of law
library between hours of 9:30Am to 11:30Am on
daily basis or their conducts or rules contrary to
depicted law library hours. Your review response is highly
needed.

<u>Do Not Write Below This Line</u> - **For Reply Only**

|  Approved  |  Denied  |  Pay Phone  |  Collect Call  |

**Request Directed To: (<u>Check One</u>)**

( ) Warden           (X) Deputy Warden       ( ) Captain
( ) Classification Supervisor  ( ) Legal Officer - Notary Public   ( ) Record Office

N176

# EXHIBIT 71

**INMATE REQUEST SLIP**

Name _Zephyrinus Egbuchul_ Quarters _KCB 212_ Date _5/24/06_

AIS # _242109_

( ) Telephone Call      ( ) Custody Change      ( ) Personal Problem

( ) Special Visit          ( ) Time Sheet        (X) Other _Law Library_

**Briefly Outline Your Request - Then Drop In Mail Box**

Greeting. Sir, was it an error to deny inmate ingress egress access to law library every wednesday early morning hours prior lunch hours. Your review response is highly needed

**Do Not Write Below This Line - For Reply Only**

| Approved | Denied | Pay Phone | Collect Call |

**Request Directed To: (Check One)**

( ) Warden          (X) Deputy Warden      ( ) Captain

( ) Classification Supervisor    ( ) Legal Officer - Notary    ( ) Record Office Public

N176

EXHIBIT 72

**INMATE REQUEST SLIP**

Name Zephyrinus Egbuonu Quarters KCB 212 Date 5/26/06

AIS # _____

( ) Telephone Call        ( ) Custody Change        ( ) Personal Problem

( ) Special Visit          ( ) Time Sheet            (X) Other Law
                                                          Library

Briefly Outline Your Request - Then Drop In Mail Box

Greeting. Sir was it an error to deny
inmates ingress egress access to
law library on May 26, 2006 between
the hours of 10:30 Am to 2:00pm. Second
Was it an error protecting providing
benefits to one class but not the other
class. Your review response is highly
needed.

Do Not Write Below This Line - **For Reply Only**

_____

_____

_____

_____

_____

_____

| Approved | Denied | Pay Phone | Collect Call |
|----------|--------|-----------|--------------|

Request Directed To: (Check One)

( ) Warden              (X) Deputy Warden          ( ) Captain

( ) Classification Supervisor   ( ) Legal Officer · Notary   ( ) Record Office
                                    Public

N176

EXHIBIT
73

EXHIBIT 73

*Capt or Mail Person*

**INMATE REQUEST SLIP**

Name _Zephynimus Egbruony_ Quarters _KCB 212_ Date _5/28/06_
AIS # _242109_

( ) Telephone Call     ( ) Custody Change     ( ) Personal Problem
( ) Special Visit       ( ) Time Sheet      (✗) Other _Reading Material_

Briefly Outline Your Request - Then Drop In Mail Box

Greeting, Pursuant to DOC and or ADOC Standard
Procedure VII - 6; Inmate Mail Privileges II(B)(I),
I will be glad if your office can delete
• Las Vegas Newspaper
from my previously approved newspaper and
magazine, then add and allow me to receive
• Architectural Record Magazine
Thanks.

Do Not Write Below This Line - **For Reply Only**

_____

_____

_____

_____

_Capt. Bell_
_5/17/06_

Approved     (Denied)     Pay Phone     Collect Call

Request Directed To: (Check One)

( ) Warden                (✗) Deputy Warden       ( ) Captain
( ) Classification Supervisor   ( ) Legal Officer · Notary   ( ) Record Office
                                    Public

N176

**EXHIBIT 74**

## INMATE REQUEST SLIP

Name **Zephyrinus Egbuonu**  Quarters **KCB 212**  Date **6/11/06**

AIS # **242109**

( ) Telephone Call     ( ) Custody Change     ( ) Personal Problem

( ) Special Visit     ( ) Time Sheet     (X) Other **Legal Mail**

**Briefly Outline Your Request - Then Drop In Mail Box**

Attached are copies of Ratliffs law document, United States Postal mailed envelopes, one of the envelopes has Kilbys' stamp the other has none. Sir, looking at these two envelopes ~~with a~~ without opening it, how can you determine content and or legal or non legal mail. Sir, was it an error for your personnel staff to open United States mail sent from a law firm to an inmate in his absence on May 22, 2006. Your review and response needed.

**Do Not Write Below This Line - For Reply Only**

---
---
---
---
---
---
---

| Approved | Denied | Pay Phone | Collect Call |

**Request Directed To: (Check One)**

( ) Warden     (X) Deputy Warden     ( ) Captain

( ) Classification Supervisor     ( ) Legal Officer - Notary Public     ( ) Record Office

N176

EXHIBIT 75



**INMATE REQUEST SLIP**

Name _Zephyrinus Egbuonu_ Quarters _K(B2/2_ Date _6/12/06_

AIS # _242109_

( ) Telephone Call     ( ) Custody Change     ( ) Personal Problem

( ) Special Visit     ( ) Time Sheet     (⊠) Other _Mail Related_

**Briefly Outline Your Request - Then Drop In Mail Box**

Greeting. One June 12, 2006 Cpl. Ballin handed me the following United States Postal Service Domestic Return Receipts PS form 3811 addressed to me. Article # 7005 1820 0006 2224 5732, #7005 0390 0001 9508 4742, # 7005 1160 0002 6130 8510, # 7005 1160 0000 5642 7037, #7005 1820 0006 2224 5720, #7005 1160 000 5642 7044, # 7005 1160 0002 6130 8497. Was it an error to withhold above mentioned for 3 weeks or more before given to inmate. Your attention to this matter is appreciated.

**Do Not Write Below This Line - For Reply Only**

| Approved | Denied | Pay Phone | Collect Call |
|----------|--------|-----------|--------------|

**Request Directed To:** (Check One)

( ) Warden     ( ) Deputy Warden     ( ) Captain

( ) Classification Supervisor     ( ) Legal Officer - Notary Public     ( ) Record Office

(⊠) Mail Room, Ms Leak

N176


EXHIBIT 76

**INMATE REQUEST SLIP**

Name Zephyrimis Egtucmi Quarters KCB 212 Date 6/19/06
AIS # 242109

( ) Telephone Call        ( ) Custody Change        ( ) Personal Problem
( ) Special Visit          ( ) Time Sheet            (X) Other Mails Withheld

**Briefly Outline Your Request - Then Drop In Mail Box**

Greeting. I would be glad to know whether
withheld of inmate's legal mails, United
States Postal Service Domestic Return Receipts
PS Form 3811 for 3 weeks and more before
given it to an inmate consistern with
ADoc Administrative Policy and United States
Postal Service Statutes and it was an
error. Your respond is highly needed.

**Do Not Write Below This Line - For Reply Only**

_____

_____

_____

_____

_____

| Approved | Denied | Pay Phone | Collect Call |
|----------|--------|-----------|--------------|

**Request Directed To: (Check One)**

( ) Warden              (X) Deputy Warden        ( ) Captain
( ) Classification Supervisor    ( ) Legal Officer - Notary    ( ) Record Office
                                     Public

N176

EXHIBIT
77

77

**INMATE REQUEST SLIP**

Name _Zephyrinus Egbuonu_ Quarters _KCB 212_ Date _6/19/06_

AIS # _242109_

( ) Telephone Call     ( ) Custody Change     ( ) Personal Problem

( ) Special Visit     ( ) Time Sheet     ( ) Other _____

---

Briefly Outline Your Request - <u>Then Drop In Mail Box</u>

I would be glad if your office deliver the following United States Postal Service Domestic Return Receipts PS form 3811 Article # 7005 1160 0000 5642 7075, # 7005 1160 0002 0130 8527, # 7005 1160 0002 6130 8503 to me. Thanks. I look forward to receive it.

---

<u>Do Not Write Below This Line</u> - **For Reply Only**

| Approved | Denied | Pay Phone | Collect Call |
|----------|--------|-----------|--------------|

---

Request Directed To: (<u>Check One</u>)

( ) Warden     ( ) Deputy Warden     ( ) Captain

( ) Classification Supervisor     ( ) Legal Officer - Notary     ( ) Record Office

(X) Mailroom Supervisor     Public

N176

EXHIBIT 78

EXHIBIT 78

June 24, 2006                    Certified: 7005 1160 0000 5642 7105

Kathy Holt, Director
**Alabama Department of Corrections**
**Central Record Division**
301 South Ripley Street
Montgomery, Alabama 36104

Dear Mrs. Holt:

I would be glad if your office can review whether a California Permanent Resident
defendant in State of Alabama could be punished twice for an offence entirely occurred
in California State soil and then deny him time served in California State jail *(see
attachment A)*.

**The Black Law Dictionary defines Fugitive as:**
   **"A person who flees or escapes; a refugee.**
   **A Criminal Suspect who flees evades or escapes arrest, prosecution**
   **or imprisonment, Esp. by fleeing the jurisdiction or by hiding".**


**The Constitution of the United States Article IV Sec. 2 CL.2 defines Fugitive as:**
   **"A person charged in any State with Treason, Felony, or other Crime,**
   **who shall flee from Justice, and be found in another State, shall on demand**
   **of the Executive Authority of the State from which he fled, be delivered up**
   **to be removed to the State having jurisdiction of the Crime.**


Thereof, I request that your office re-access & credit me with the jail time served in
California and grant me any applicable relief thereafter.

Your most attention to this matter is greatly appreciated.

Sincerely,

Zephyrinus Egbuonu
(AIS 242109)
P O Box 150
Mount Meigs, Alabama 36057

**Enclosure:  Alabama State Court Transcript; Prosecutor's Statement.**

**Cc: Mr. Rowell, Deputy Warden**
   **Attorneys Sid Hughes, Gulam Mahmood & Scholar Egbuonu**



EXHIBIT **79**



**UNITED STATES**
**POSTAL SERVICE**®

Home | Help | Sign In

Track & Confirm          FAQs

# Track & Confirm

### Search Results

Label/Receipt Number: **7005 1160 0000 5642 7105**
Status: **Delivered**

Your item was delivered at 9:07 am on June 28, 2006 in
MONTGOMERY, AL 36130. A proof of delivery record may be available
through your local Post Office for a fee.

Additional information for this item is stored in files offline.

( *Restore Offline Details >* ) ⑦     *Return to USPS.com Home >*

**Track & Confirm**

Enter Label/Receipt Number.

( *Go >* )

Site Map     Contact Us     Forms     Gov't Services     Jobs     Privacy Policy     Terms of Use     National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.     No FEAR Act EEO Data     FOIA

 

## INMATE REQUEST SLIP

Name _Zephyrinus Egbuna_  Quarters _K (B)12_  Date _6/28/06_

AIS # _242109_

( ) Telephone Call     ( ) Custody Change     ( ) Personal Problem

( ) Special Visit        ( ) Time Sheet       (X) Other _Mail Issue_

**Briefly Outline Your Request - Then Drop In Mail Box**

Greeting, follow up of my previously request dated 6/12/06, 6/19/06. Pursuant to Federal Laws guiding U.S Postal Service I hereby request for your office provide me with United States Postal Inspection Service Complain forms to enable me know reasons why my 7 USPS Domestic Return Receipts form 3811, were detain, delays or Obstruct passage for delivery for over 3 weeks and more. In addition to find out who is still in possession of remaining USPS Domestic Return Receipts Article No. 7005 1160 0000 5642 7075

→ See back

**Do Not Write Below This Line - For Reply Only**

| Approved | Denied | Pay Phone | Collect Call |
|---|---|---|---|

**Request Directed To: (Check One)**

( ) Warden             ( ) Deputy Warden       ( ) Captain

( ) Classification Supervisor    ( ) Legal Officer - Notary    ( ) Record Office
                             Public

(X) USPS/Mailroom Supervisor

N176

**EXHIBIT 80**

M. Leak

## INMATE REQUEST SLIP

Name _Zeohynnus Egbuonu_ Qua..... _KCB 212_ Date _7/24/06_

AIS # _242109_

( ) Telephone Call     ( ) Custody Change     ( ) Personal Problem

( ) Special Visit     ( ) Time Sheet     (X) Other _Mail_

Briefly Outline Your Request - Then Drop In Mail Box

Ms Leak, Greeting. As per our last week
Conversation at Captain's office regarding
my mail and Content. As of date, I have not
received "Notification of Rejected Mail"
nor my family received the returned
mail from your office. I would be glad if
your office provide me with status whether
the mail and Content has been returned.
I look forward for your response. Thanks.

Do Not Write Below This Line    For Reply Only

The Conversation in the Captains
office was your Notification of
Rejected mail it was oral not
written and it was sent back
that day or the next day when
I approved mail content Capt.

      Denied      Pay Phone      Collect Call

Request Directed To: (Check One)

( ) Warden     ( ) Deputy Warden     ( ) Captain

( ) Classification Supervisor     ( ) Legal Officer    Notary     ( ) Record Office
                      Public

(X) Mail Room

N176

## EXHIBIT 81

August 01, 2006                    Certified Mail No. 7005 1160 0000 5642 7150

Richard Allen, Honorable Commissioner
**Alabama State Department of Corrections**
301 South Ripley Street
Montgomery, Alabama 36104

Dear Sir:

I am writing to inform you that since September 2005 till present that the Central Review
Board Members have deliberately denied me access to Vocational Trade School
Education Program. I am at the Alabama Department of Correction – Kilby Correctional
Facility, this facility does not have any Vocational Trade School Education Program.

I would be glad if your office would review the aforementioned denial and approve a
Vocational Trade School Education for me, and transfer me to Station Correctional
Facility.

I look forward to receiving your earliest review and response.

Sincerely,

Engr. Zephyrinus Egbuonu
(AIS 242109)
PO Box 150
Mount Meigs, Alabama 36057

# EXHIBIT 82


## UNITED STATES
## POSTAL SERVICE

Home | Help | Sign In

Track & Confirm    FAQs

# Track & Confirm

### Search Results

**Label/Receipt Number: 7005 1160 0000 5842 7150**
**Status: Delivered**

Your item was delivered at 9:26 am on August 07, 2006 in
MONTGOMERY, AL 36130. A proof of delivery record may be available
through your local Post Office for a fee.

Additional information for this item is stored in files offline.

( Restore Offline Details > ) (?)    ( Return to USPS.com Home > )

**Track & Confirm**

Enter Label/Receipt Number.

( Go > )

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

August 01, 2006                     Certified Mail No. 7005 1160 0000 5642 7150

Richard Allen, Honorable Commissioner
**Alabama State Department of Corrections**
301 South Ripley Street
Montgomery, Alabama 36104

Dear Sir:

I would appreciate your office re-looking into allowing inmates access to printed
education Internet materials being sent to them via United States Postal Mail.

The Kilby Correctional Facility Law Library does not have a current database on court
ruled cases. Neither do they also have access to the Westlaw, Lexus Nexus Intranet nor
the Internet to enable inmates research law changes or new interpretations by the US
Supreme Court, Legislative and other Courts.

I look forward to your earliest response.

Sincerely,

Engr. Zephyrinus Egbuonu
(AIS 242109)
PO Box 150
Mount Meigs, Alabama 36057




**UNITED STATES**
**POSTAL SERVICE**

Home | Help | Sign In

Track & Confirm          FAQs

# Track & Confirm

### Search Results

Label/Receipt Number: 7005 1160 0000 5642 7150
Status: Delivered

Your item was delivered at 9:26 am on August 07, 2006 in
MONTGOMERY, AL 36130. A proof of delivery record may be available
through your local Post Office for a fee.

Additional information for this item is stored in files offline.

Restore Offline Details >   ?        Return to USPS.com Home >

**Track & Confirm**

Enter Label/Receipt Number.

Go >

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

http://trkcnfrm1.smi.usps.com/PTSInternetWeb/InterLabelInquiry.do          3/27/2008

August 01, 2006                    Certified Mail No. 7005 1160 0000 5642 7150

Richard Allen, Honorable Commissioner
**Alabama State Department of Corrections**
301 South Ripley Street
Montgomery, Alabama 36104

Dear Sir:

This is to inform you that my request to Alabama Department of Corrections; Kilby
Correctional Facility to receive non contact visit pursuant to Freedom of Association
under Constitution of the United States of America was denied.

I would be glad if your office will assist me by approving or making it possible for me to
receive a non-immediate Family Visitor through contact visit or Non Contact Visit (see
visitor via glass wall but communicate via phone. Please note that my immediate families
are in foreign countries or states hence are unable to visit.

I look forward for your earliest review and immediate response.

Sincerely,

Engr. Zephyrinus Egbuonu(Engr.)
(AIS 242109)
PO Box 150
Mount Meigs, Alabama 36057




UNITED STATES
POSTAL SERVICE®

Home | Help | Sign In

Track & Confirm    FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: 7005 1160 0000 5642 7150
Status: Delivered

Your item was delivered at 9:26 am on August 07, 2006 in
MONTGOMERY, AL 36130. A proof of delivery record may be available
through your local Post Office for a fee.

Additional information for this item is stored in files offline.

*Restore Offline Details >*  ( ? )  *Return to USPS.com Home >*

**Track & Confirm**

Enter Label/Receipt Number

*Go >*

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright © 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

August 01, 2006


Mr. Rowell, Deputy Warden
Kilby Correctional Facility
12201 Wares Ferry Road
Montgomery, Alabama 36117


Dear Sir:

I am writing to inform you that so far I have served over three years and six months in
remote State of Alabama for an alleged crime that occurred in State of California.

My incarceration journey and time already served began when I was arrested at Los
Angeles County, California and remanded to custody on March 20, 2003. I was unable to
make bail, and upon demand of Alabama State I was brought into State of Alabama on
about October 04, 2003. (See Attachment 11 of June 23, letter I sent you)
 The State of Alabama then declared that I fled from Jefferson County, Alabama at about
2003; I have never been before nor have any contact with the State of Alabama. (See
Attached A of June 24, 2006 letter I sent you).

Under the equal protection clause of fourteenth Amendment of the United States
Constitution as relate to convicted indigent defendant jail time served, I hereby request
for your office credit me with all my time served from March 2003 to present and grant
me immediate applicable relief.

Sincerely,

Zephyrinus Egbuonu
AIS 242109
P O BOX 150
Mount Meigs, Alabama 36057


CC:  Attorney Sidney Hughes
      Attorney G.R. Mahmood
      Attorney Scholar Egbuonu


**EXHIBIT 85**



Zephyrinus Eg
AIS 242109

STATON CORRECTIONAL FAC.
P.O. BOX 56
ELMORE, AL 36025-0056

CERTIFIED MAIL

5 1160 0000 5642 7112

U.S. POSTAGE
PAID
GRAND PRAIRIE, TX
75052
AUG 07 06
AMOUNT
$4.77
00069766-04

36117

RETURN RECEIPT REQUESTED

RETURN RECEIPT
REQUESTED

Mr. Rowell, Deputy Warden
Kilby Correctional Facility
12201 Wares Ferry Rd
Montgomery, AL 36117

36025/0056

USPS - Track & Confirm

Page 1 of 1


**UNITED STATES**
**POSTAL SERVICE.**

Home | Help | Sign In

Track & Confirm     FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: **7005 1160 0000 5642 7112**
Status: **Delivered**

Your item was delivered at 9:25 am on August 14, 2006 in MONTGOMERY, AL 36117. A proof of delivery record may be available through your local Post Office for a fee.

Additional information for this item is stored in files offline.

( Restore Offline Details > ) (?)    ( Return to USPS.com Home > )

**Track & Confirm**

Enter Label/Receipt Number.

( Go > )

Copyright© 1999-2007 USPS. All Rights Reserved.     No FEAR Act EEO Data     FOIA

August 02, 2006

**Certified No.: 7005 1160 0000 5654 8497**

Mr. Rowell, Deputy Warden
**Kilby Correctional Facility**
12201 Wares Ferry Road
Montgomery, Alabama 36117

Dear Sir:

Greetings. I would appreciate your office looking into the environmental conditions with particular attention to the tobacco smoke level that the inmates are exposed to at the Kilby Correctional Facility. Also if you can explain to me the possibility of future health problems resulting from such exposure.

Your Kilby Correctional Facility provides tobacco benefits to inmates but does not provide a designated smoking area for smoking inmates during lock down. This leaves non-smoking inmates like myself no choice but to inhale tobacco smoke, which according to research can create future slight deficiency of Alpha-I Antitrypsin (AAT) a blood protein that protect Liver and Lungs. This can lead to Emphysema and Cirrhosis of the Liver and other health problems.

I was at the Kilby Correctional Facility from September 2005 to August 2006 and was daily exposed to an inconsiderable amount of tobacco smoke due to this practice.

I look forward for your review and response as relates above mentioned.

Sincerely,

Zephyrinus Egbuonu
AIS 242109
P O BOX 150
Mount Meigs, Alabama 36057

CC: Department of Health, Washington, D.C.
      Department of Labor, Washington, D.C.

# EXHIBIT 86


**UNITED STATES**
**POSTAL SERVICE**®

Home | Help | Sign In

**Track & Confirm**    **FAQs**

# Track & Confirm

## Search Results

Label/Receipt Number: **7005 1160 0000 5654 8497**
Status: **Delivered**

Your item was delivered at 8:37 am on August 17, 2006 in ELMORE, AL 36025. A proof of delivery record may be available through your local Post Office for a fee.

Additional information for this item is stored in files offline.

( **Restore Offline Details >** ) ( ? )    ( **Return to USPS.com Home >** )

**Track & Confirm**

Enter Label/Receipt Number.

[                    ]

( **Go >** )

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS All Rights Reserved.    No FEAR Act EEO Data    FOIA



Zephyrinus Egbuonu
AIS 242109
P O Box 56
Elmore, AL 36025

CERTIFIED MAIL

7005 1160 0000 5654 8497

UNITED STATES POSTAL SERVICE

AUG 12. '06
$4.64
36117

Mr. Rowell, Deputy Warden
Kilby Correctional Facility
12201 Wares Ferry Road
Montgomery, AL 36117

August 04, 2006

Kim Thomas
Legal Division
Alabama Department of Correction
301 S. Ripley Street
Montgomery, Alabama 36104

Dear Mr. Thomas:

I am writing to inform you that the Alabama Department of Correction; Staton
Correctional Facility inmate's Law Library does not have the following within for
inmates use:

93 ALR 5TH 527
94 ARL 5TH 393
102 ARL 5TH 327

I hereby request that your office provide with me these above-mentioned legal materials
case laws write up.

I look forward to receive from you.

Sincerely,

Zephyrinus Egbuonu
AIS 242109
P O BOX 56
Elmore, Alabama 36025



EXHIBIT 87

August 21, 2006                                    **FAX & MAIL**
                                                   **334 215 0630**


Ms. Leak, Mailroom Supervisor
**Kilby Correctional Facility**
12201 Ware Ferry Road
Montgomery, Alabama 36177

Dear Ms. Leak:

I am writing to inform you that I have not received remaining three United Postal Service
(USPS) Domestic Return Receipt Form 3811 Article No:

> **7005 1160 0002 6130 8527**
> **7005 1160 0002 6130 8503**
> **7005 1160 0000 5642 7075**

The above were addressed and mailed to Mr. Rowell, Deputy Warden.

Enclosed are Three (3) USPS - Track & Confirm search results showing each time, date,
City, State where the mails were delivered to and names of the person who signed for it


I would appreciate your office investigate and retrieve the above mentioned then deliver
them to me

I look forward to your earliest response and receiving the aforementioned.

Sincerely,

Zephyrinus Egbuonu (242109)
P.O. Box 56
Elmore, Alabama 36025


Enclosures: Three (3) USPS – Track & Confirm Search Results





**UNITED STATES POSTAL SERVICE®**

Home | Help | Sign In

Track & Confirm          FAQs

# Track & Confirm

### Search Results

Label/Receipt Number: 7005 1160 0002 6130 8527
Status: **Delivered**

Your item was delivered at 8:36 am on April 27, 2006 in MOUNT MEIGS, AL 36057. A proof of delivery record may be available through your local Post Office for a fee.

Additional information for this item is stored in files offline.

( Restore Offline Details > ) (?)    ( Return to USPS.com Home > )

**Track & Confirm**

Enter Label/Receipt Number.

[                    ]

( Go > )

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA


**UNITED STATES POSTAL SERVICE®**

Home | Help | Sign In

**Track & Confirm**    **FAQs**

# Track & Confirm

## Search Results

Label/Receipt Number: 7005 1160 0002 6130 8503
Status: **Delivered**

Your item was delivered at 8:46 am on April 25, 2006 in MOUNT MEIGS, AL 36057. A proof of delivery record may be available through your local Post Office for a fee.

Additional information for this item is stored in files offline.

*Restore Offline Details >* (?)    *Return to USPS.com Home >*

**Track & Confirm**

Enter Label/Receipt Number.

( *Go >* )

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

USPS - Track & Confirm Case 2:07-cv-00998-WKW-TFM Document 39-82 Filed 04/07/2008 Page 4 of 6 Page 1 of 1

UNITED STATES POSTAL SERVICE

Home | Help | Sign In

Track & Confirm FAQs

# Track & Confirm

## Search Results

Label/Receipt Number: **7005 1160 0000 5642 7075**
Status: **Delivered**

Your item was delivered at 8:34 am on May 31, 2006 in MOUNT MEIGS, AL 36057. A proof of delivery record may be available through your local Post Office for a fee.

Additional information for this item is stored in files offline.

*Restore Offline Details >* ? *Return to USPS.com Home >*

Track & Confirm

Enter Label/Receipt Number.

Go >

Site Map Contact Us Forms Gov't Services Jobs Privacy Policy Terms of Use National & Premier Accounts

Copyright © 1999-2007 USPS. All Rights Reserved. No FEAR Act EEO Data FOIA

http://trkcnfrm1.smi.usps.com/PTSInternetWeb/InterLabelInquiry.do 1/12/2008

# FAX

DATE:   August 21, 2006

TO:   Ms. Leak - Mailroom

FAX NUMBER:  334 215 0630

FROM:   Zephyrinus Egbuonu

NUMBER OF PAGE(S)  5, including this.



October 17, 2006                          **VIA: FAX & MAIL**
                                          **334 215 0630**


Mr. Rowell, Deputy Warden,
Kilby Correctional Facility
Alabama Department of Corrections
12201 Wares Ferry Road
Montgomery, Alabama 36117


Dear Sir:

I am writing to request that your office provide me with Certificate of the Warden, or a
Correctional Officer showing my account balance from September 2005 to August 2006
to enable me file Writs to the Court.

If your office is not in a position to provide the above mentioned, please forward to the
appropriate office and provide me with forwarded officer's name and office address.

Thanks for your help and I look forward to receiving the information.

Respectfully Submitted,


Zephyrinus Egbuonu
AIS 242109
P O BOX 150
Mount Meigs, Alabama 36057



CC: Attorneys Sidney Hughes, G.R. Mahmood and Scholar Egbuonu



EXHIBIT 90

Zephyrinus Egbuonu
AIS 242109
P O Box 56
ELMore, AL 36025

NO MAIL RECEPTACLE
UMT

NORTH TEXAS P&DC
TX 750 6 T
18 OCT 2006 PM



Mr. Rowell, Deputy Warden
Kilby Correctional Facility
Alabama Department of Corrections
12201 Wares Ferry Rd
Montgome

August 28, 2006                          Certified #: 7005 1160 0000 5654 8503
                                         Fax #: 334 353 3891 - Legal

Kathy Holt, Director
**Central Record Division**
**Alabama Department of Corrections**
P.O. Box 301501
Montgomery, Alabama 36130-1501

Dear Madam:

I am writing to follow up of my previous letters to you regarding time served credit at
California jail. Till date I have not received any reply from your office, and like I stated
in my letter early, I would like to know why I will not receive credit for the time served at
the California jail under the Jefferson County, Alabama State Writ.

Please if your office is not in a position to provide this explanation please inform me
immediately and assist in sending my requests along with all the previous documents I
sent to your office to the appropriate office or authority that can issue this credit under
due process equal protection clause of Constitution of the United States.

Your attention to this matter is highly appreciated.


Respectfully Submitted,

Engr. Zephyrinus Egbuonu
AIS 242109
P.O. Box 56
Elmore, Alabama 36025




# EXHIBIT 90



UNITED STATES
POSTAL SERVICE®

Track & Confirm          FAQs

# Track & Confirm

### Search Results

Label/Receipt Number: 7005 1160 0000 5654 8503
Status: **Delivered**

Your item was delivered at 10:20 am on August 31, 2006 in
MONTGOMERY, AL 36130. A proof of delivery record may be available
through your local Post Office for a fee.

Additional information for this item is stored in files offline.

( Restore Offline Details > ) (?)    ( Return to USPS.com Home > )

**Track & Confirm**

Enter Label/Receipt Number.

( Go > )

---

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA



October 17, 2006                          **VIA: FAX & MAIL**
                                          **334 215 0630**

Mr. Rowell, Deputy Warden
Kilby Correctional Facility
Alabama Department of Corrections
12201 Wares Ferry Road
Montgomery, Alabama 36117


Dear Sir:

I am writing to request that your office provide me with Certificate of the Warden, or a
Correctional Officer showing my account balance from September 2005 to August 2006
to enable me file Writs to the Court.

If your office is not in a position to provide the above mentioned, please forward to the
appropriate office and provide me with forwarded officer's name and office address.

Thanks for your help and I look forward to receiving the information.

Respectfully Submitted,


Zephyrinus Egbuonu
AIS 242109
P O BOX 150
Mount Meigs, Alabama 36057



CC:  Attorneys Sidney Hughes, G.R. Mahmood and Scholar Egbuonu



Zephyrinus Egbuonu
AIS 242109
P O Box 56
Elmore, AL 36025

NO MAIL RECEPTACLE
JMP

NORTH TEXAS P&DC
TX 750 6 T
18 OCT 2006 PM



Mr. Rowell, Deputy Warden
Kilby Correctional Facility
Alabama Department of Corrections
12201 Wares Ferry Rd
Montgome

August 28, 2006                                Certified #: 7005 1160 0000 5654 8503
                                               Fax #: 334 353 3891 - Legal

Kathy Holt, Director
**Central Record Division**
**Alabama Department of Corrections**
P.O. Box 301501
Montgomery, Alabama 36130-1501

Dear Madam:

I am writing to follow up of my previous letters to you regarding time served credit at
California jail. Till date I have not received any reply from your office, and like I stated
in my letter early, I would like to know why I will not receive credit for the time served at
the California jail under the Jefferson County, Alabama State Writ.

Please if your office is not in a position to provide this explanation please inform me
immediately and assist in sending my requests along with all the previous documents I
sent to your office to the appropriate office or authority that can issue this credit under
due process equal protection clause of Constitution of the United States.

Your attention to this matter is highly appreciated.


Respectfully Submitted,

Engr. Zephyrinus Egbuonu
AIS 242109
P.O. Box 56
Elmore, Alabama 36025



**EXHIBIT 90**

 **UNITED STATES POSTAL SERVICE**₈

Home | Help | Sign In

Track & Confirm    FAQs

# Track & Confirm

## Search Results

**Label/Receipt Number: 7005 1160 0000 5654 8503**
**Status: Delivered**

Your item was delivered at 10:20 am on August 31, 2006 in
MONTGOMERY, AL 36130. A proof of delivery record may be available
through your local Post Office for a fee.

Additional information for this item is stored in files offline.

*Restore Offline Details >* ( ? )    *Return to USPS.com Home >*

**Track & Confirm**

Enter Label/Receipt Number.

( *Go >* )

---

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA    

August 30, 2006                          **Certified No: 7005 1160 0000 5654 8510**
                                         **Fax No:      334 353 3967**


Richard Allen, Honorable Commissioner
**Alabama State Department of Corrections**
301 South Ripley Street
Montgomery, Alabama 36104

Dear Sir:

I am writing to inform you that it has been over nine months since I started requesting for
my California Jail Time served from March 20, 2003 to October 04, 2003 under the State
of Alabama issued writ of "Fugitive from Justice Flee from Jefferson County, Alabama".
I was remanded to California State custody and was unable to make bail as a result of
detained hold.

I have in several occasions brought this California Jail Time Credit issue with Alabama
Department of Correction – Kilby Correctional Facility and Central Record Division
however, till date, I have received any response from them nor credit awarded as relates

I would be grateful if your office look into the above-mentioned issue, then credit me
with my California jail time served and grant other applicable relief.

Thanks for your help and I look forward to receiving your earliest review and response.

Sincerely,

Engr. Zephyrinus Egbuonu
(AIS 242109)
P O Box 56
Elmore, Alabama 36025

# EXHIBIT 91



UNITED STATES
POSTAL SERVICE®

Home | Help | Sign In

Track & Confirm    FAQs

# Track & Confirm

### Search Results

Label/Receipt Number: 7005 1160 0000 5654 8510
**Status: Delivered**

Your item was delivered at 2:04 pm on September 05, 2006 in
MONTGOMERY, AL 36104. A proof of delivery record may be available
through your local Post Office for a fee.

Additional information for this item is stored in files offline.

Restore Offline Details >   (?)    Return to USPS.com Home >

**Track & Confirm**

Enter Label/Receipt Number.

Go >



http://trkcnfrm1.smi.usps.com/PTSInternetWeb/InterLabelInquiry.do    1/12/2008

August 31, 2006                               **BY MAIL & FAX – 334 215 0630**

Ms. Leak, Mailroom Supervisor
**Kilby Correctional Facility**
12201 Wares Ferry Road
Montgomery, Alabama 36177

Dear Ms. Leak:

Good day. I am writing to inform you that on August 22, 2006, Ms. Hester of Staton
Correctional Facility delivered to me below two United States Postal Service Domestic
Return Receipt Form 3811 - Article No.: 7005 1160 0002 6130 8503 and
7005 1160 0000 5642 7075 out of requested three USPS Domestic Return Receipt
depicted on my August 21, 2006 letter to you.

I would appreciate your office retrieve the **remaining** USPS Domestic Return Receipt
Form 3811 – **Article No.: 7005 1160 0002 0130 8527** then deliver to me.

I look forward to your earliest response and receiving aforementioned.

Sincerely,

Zephyrinus Egbuonu (242109)
P O. Box 56
Elmore, Alabama 36025

**<u>EXHIBIT</u> 92**



SEPTEMBER 9, 2006


KIM THOMAS
LEGAL DIVISION
ALABAMA DEPARTMENT OF CORRECTION
301 SOUTH RIPLEY STREET
MONTGOMERY, ALABAMA 36104


DEAR SIR:


I AM WRITING TO INFORM YOU THAT CITED CASE LAWS IN ATTORNEY
GENERAL RESPONDED BRIEF AS RELATE TO MY CASE, THE ALABAMA DEPART-
MENT OF CORRECTION; STATON CORRECTION FACILITY INMATES'S LAW
LIBRARY DOES NOT HAVE THE FOLLOWING WITHIN FOR INMATES USE:

1.  STATE OF GEORGIA MAYZE 622 S.E. 2D 836 2005 GA LEXIS 825
    AND ITS ACCOMPANYING CASES.

2.  OTHER 50 STATES FRAUDULENT IDENTIFICATION ACTS STATUTE
    PROVISION AS INDICATED IN MAYZE'S CASE ABOVE.

3.  OTHER 50 STATES FRAUDULENT IDENTIFICATION ACTS CASE LAWS
    RENDERED OPINIONS WHERE VENUE WERE HELD IN EACH STATES TO
    BE AT VICTIM'S RESIDENCE INSTEAD OF WHERE ALLEGED
    ENTIRE CRIME WAS COMMITTED AS CITED IN MAYZ'S CASE ABOVE.


I WOULD APPRECIATE IF YOUR OFFICE PROVIDE ME WITH THESE ABOVE-
MENTIONED CASE LAWS OPINIONS AND STATUTE WRITE UPS TO ENBALE
ME DO CONCISE COMPARABLE FOR APPEAL.


I LOOK FORWARD TO RECEIVING FROM FROM YOUR OFFICE,


SINCERELY,

*Egbuonu Zephyr*

ZEPHYRINUS EGBUONU(242109)
P. O. BOX 56
ELMORE, ALABAMA 36025


ENCLOSURE:

ATTORNEY GENERAL RESPONDED BRIEF PAGE 21.



**EXHIBIT 93**





# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL  36130-1501
(334) 353-3883

**Bob Riley**
GOVERNOR

**Richard F. Allen**
COMMISSIONER

September 13, 2006

Inmate Zephyriuns Egbuonu
AIS# 242109
Staton Correctional Center
Post Office Box 56
Elmore, Al  36025

Dear Inmate Egbuonu:

Your letter to Commissioner Richard Allen has been received and reviewed.  The
following action has been taken pertaining to your letter.

__ __   Forwarded to the Warden for his action
_ _ __   Forwarded to the institutional classification/central classification office for their
action
____   Forwarded to the appropriate agency which is _____
____   Returned to you
____   No action required
____Forwarded to Associate Commissioner over Health Services

____**Other**:  **You have been awarded 670 days of jail credit.  If you feel this amount
is not correct, you will need to make contact with the Jefferson County Circuit
Clerk's Office to seek assistance.  We take all information, including jail credit, off
of the transcript sent in from the sentencing county.**

Comments:

Sincerely,

Janet E. Findley
Constituent Service Officer

**EXHIBIT 94**

October 02, 2006

Janet F. Findley, Constituent Service Officer
**State of Alabama Department of Correction**
301 South Ripley Street
P. O. Box 301501
Montgomery, Alabama 36130

Dear Madam:

Thank for your review and response. Please note that the awarded 170 days of Jail Credit was for the time I was in Jefferson County Jail waiting for trial sentence – **October 04, 2003 to August 02, 2005.**

For the Jail Credit in question, enclosed is the Los Angeles Superior Court Inmate Order showing the following:

   (1) **Date I was remanded to California Custody under the detain Writ issued by Jefferson County, State of Alabama on March 2003.**

   (2) **Date I was released to Jefferson County, Alabama State Extradition Agent on September 2003.**

The Jail Time Served in California was excluded from the 670 days Jail credit.

Presently, the Jefferson County Circuit Court probably is not in position to hear my Motion on this matter, due to Jurisdiction and my pending appeal before the Alabama Court of Criminal Appeals, thereof, I am requesting for reevaluation – thus, apply my Jail Time served in California consistent with Constitution.

Sincerely,

Engr. Zephyrinus Egbuonu
AIS 242109
P.O. Box 56
Elmore, Alabama 36025

**Enclosure: Los Angeles Court Minute Order – Case No. BA244937**



**EXHIBIT 95**

October 17, 2006                       **VIA: FAX & MAIL**
                                            334 215 0630


Mr. Rowell, Deputy Warden
Kilby Correctional Facility
Alabama Department of Corrections
12201 Wares Ferry Road
Montgomery, Alabama 36117


Dear Sir:

I am writing to request that your office provide me with Certificate of the Warden, or a
Correctional Officer showing my account balance from September 2005 to August 2006
to enable me file Writs to the Court.

If your office is not in a position to provide the above mentioned, please forward to the
appropriate office and provide me with forwarded officer's name and office address.

Thanks for your help and I look forward to receiving the information.

Respectfully Submitted,


Zephyrinus Egbuonu
AIS 242109
P O BOX 150
Mount Meigs, Alabama 36057



CC: Attorneys Sidney Hughes, G.R. Mahmood and Scholar Egbuonu



**EXHIBIT 96**

December 07, 2006                     **Certified No.: 7005 1160 0000 5649 0574**

Richard Allen, Commissioner
**State of Alabama Department of Correction**
301 South Ripley Street
P. O. Box 301501
Montgomery, Alabama 36130

**Subject: State of Alabama V. Zephyrinus Egbuonu**
        **Jefferson County, Birmingham – Case No. CC-2004-1422**

Dear Commissioner Allen:

Thank for the Constituent Service Officer review and response. However, note that the awarded 670 days of jail credit was for the time I was in Jefferson County Jail waiting for trial sentence – **October 04, 2003 to August 02, 2005.**

For the Jail Credit in question, enclosed is the Los Angeles Superior Court Inmate Order showing the following:

  **(1) Date I was remanded to California Custody under the detain Writ issued by Jefferson County, State of Alabama on March 2003.**

  **(2) Date I was released to Jefferson County, Alabama State Extradition Agent on September 2003.**

The jail time served in California was excluded from the 670 days jail credit. Is it constitutional fair to prosecute me in a State where no crime was committed then withhold my jail time served in the State where crime was committed? **(See attached Dissent Opinion on State of Georgia v. Mayze 622 S. E. 2d 836; 2005).**

Presently, the Jefferson County Circuit Court probably is not in position without jurisdiction to hear my motion on this matter, due to my pending appeal before the Alabama Court of Criminal Appeals since August 2005, thereof, I am requesting for reevaluation – thus, apply my Jail Time served in California consistent with Federal Laws and Constitution equal protection due process and or an early release.



EXHIBIT 97

**Letter to Commissioner Allen**
**Page Two**
**December 07, 2006**

Sincerely,

Engr. Zephyrinus Egbuonu
AIS 242109
P.O. Box 56
Elmore, Alabama 36025

**Enclosure: Los Angeles Court Minute Order – Case No. BA244937**
**State of Georgia v. Mayze 622 S.E. 2d 836; 2005**


**UNITED STATES**
**POSTAL SERVICE**®

Home | Help | Sign In

Track & Confirm        FAQs

# Track & Confirm

### Search Results

Label/Receipt Number: 7005 1160 0000 5649 0574
**Status: Delivered**

Your item was delivered at 9:07 am on December 15, 2006 in
MONTGOMERY, AL 36130. A proof of delivery record may be available
through your local Post Office for a fee.

Additional information for this item is stored in files offline.

( *Restore Offline Details >* ) (?)    *Return to USPS.com Home >*

**Track & Confirm**

Enter Label/Receipt Number.

( *Go >* )

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright© 1999-2007 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA

Case No. CR-05-0143

# IN THE COURT OF CRIMINAL APPEALS
# FOR THE STATE OF ALABAMA

---

## PEOPLE OF THE STATE OF ALABAMA,

Plaintiff-Appellee,

-vs-

## ZEPHYRINUS EGBUONU,

Defendant-Appellant.

---

Appeal from the Circuit Court
of Jefferson County, Alabama
Honorable Circuit Judge Alfred Bahakel
Circuit Court Case No. CC 04-1422

---

## APPLICATION FOR REHEARING AND BRIEF IN SUPPORT
## OF APPELLANT EGBUONU

Robert A. Ratliff, Esq.
713 Dauphin Street
Mobile, Alabama 36602
(251) 438-2250 (voice)
(251) 438-6180 (facsimile)
Counsel for Appellant Egbuonu

EXHIBIT 98

## APPLICATION FOR REHEARING

The Appellant herein applies for rehearing with this Court. The Appellant states that this Court erred in applying points of law to the facts of this case, and as such more fully explores such claims in the subsequent brief in support.

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant in this case does not request oral argument, as the Court has been well briefed on the issues and facts presented herein.

i

# TABLE OF CONTENTS

*Page #*

Application for Rehearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Law and Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.     The circuit court erred in sustaining a verdict contrary to law, in that
       Ala. Code § 13A-8-192 unconstitutionally extended venue and
       jurisdiction beyond the boundaries of Alabama . . . . . . . . . . . . . . . . . . . . . . . 5

II.    The Appellant was denied his right to have witnesses appear on his
       behalf when he was forced to pay for the prosecution's witnesses to
       appear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   The Appellant was denied a fair trial when he was convicted using
       improperly admitted evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.    The Appellant was denied a fair trial when the prosecution failed to
       disclose exculpatory evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.     The circuit court erred in issuing an unduly harsh and unreasonable
       sentence to the Appellant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ii

VI.  The circuit court erred in sustaining the Appellant's convictions
despite the lack of sufficient evidence .............................. 12

Conclusion ........................................................ 14

Certificate of Service .............................................. 15

iii

# TABLE OF AUTHORITIES

*Page #*

*Cases*:

Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000) . . . . . . . . . . . . . . 11

Beard v. State, 1992 Ala. Crim. App. LEXIS 1193, 612 So.2d 1335 (Ala. Crim
       App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Brady v. Maryland, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Chapman v. California, 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824 (1967) . . . . . 2

Egbuonu v. State, CR-05-0143, (Ala. Crim. App. February 22, 2008) . . . . . . . . 11

Egbuonu v. State, 2007 Ala. Crim. App. LEXIS 90 (May 25, 2007) . . . . . . . . . . 8

Ex parte Egbuonu, 911 So.2d 748 (Ala. Crim. App. 2004) . . . . . . . . . . . . . . . . . 7

Ex parte McGahee, 632 So.2d 981 (Ala. 1993) . . . . . . . . . . . . . . . . . . . . . . . 10,11

International Union, Etc. v. Russell, 264 Ala. 456, 88 So.2d 175 (1956) . . . . . . . 2

Jenkins v. State, 2004 Ala. Crim. App. LEXIS 30 (Ala. Crim. App. 2004) . . . . . . 3

King Homes, Inc. v. Roberts, 46 Ala. App. 257, 240 So.2d 679 (Ala. Civ. App.
       1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

O'Neal v. State, 602 So.2d 462 (Ala. Crim. App. 1992) . . . . . . . . . . . . . . . . . . . 3

The National Police Power Under the Commerce Clause of the Constitution, 3
       Minn. L. Rev. 289 (1919) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Lopez, 115 S.Ct. 1624 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Walker v. Mayer, 290 Ala. 233, 275 So.2d 662 (1973) . . . . . . . . . . . . . . . . . . . . 3

Washington v. Texas, 388 U.S. 14 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

iv

White v. State, 546 So.2d 1014 (Ala. Crim. App. 1989) . . . . . . . . . . . . . . . . . . . . 13

*Statutes and Other Material:*

Ala. Code § 13A-8-192 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Ala. Code § 13A-8-196 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Ala. Code § 15-2-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Ala. Code § 15-2-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Ala. Code § 15-2-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Article I, Section 6 of the Alabama Constitution (1901) . . . . . . . . . . . . . . . . . . . . 7

U.S. Const., Amend VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 1028 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## STATEMENT OF THE CASE

The Appellant was convicted of two counts of identity theft pursuant to Ala. Code § 13A-8-192. One of these convictions was later vacated, as having been obtained in violation of double jeopardy principles. The Appellant appealed to this Court, arguing the issues raised herein. The appeal was denied on February 22, 2008.

## STATEMENT OF THE ISSUES

I.   Did the circuit court err in sustaining a verdict contrary to law, in that Ala. Code § 13A-8-192 unconstitutionally extended venue and jurisdiction beyond the boundaries of Alabama?

II.  Was the Appellant denied his right to have witnesses appear on his behalf when he was forced to pay for the prosecution's witnesses to appear?

III. Was the Appellant denied a fair trial when he was convicted using improperly admitted evidence?

IV.  Was the Appellant denied a fair trial when the prosecution failed to disclose exculpatory evidence?

V.   Did the circuit court err in issuing an unduly harsh and unreasonable sentence to the Appellant?

VI.  Did the circuit court err in sustaining the Appellant's convictions despite the lack of sufficient evidence?

1

## STATEMENT OF THE STANDARD OF REVIEW

I.    **The circuit court erred in sustaining a verdict contrary to law, in that Ala. Code § 13A-8-192 unconstitutionally extended venue and jurisdiction beyond the boundaries of Alabama.**

This court reviews allegations that a defendant's constitutional rights have been deprived pursuant to the harmless error standard as enunciated in Chapman v. California, 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824 (1967). Beard v. State, 1992 Ala. Crim. App. LEXIS 1193, 612 So.2d 1335 (Ala. Crim App. 1992).

II.    **The Appellant was denied his right to have witnesses appear on his behalf when he was forced to pay for the prosecution's witnesses to appear.**

This court reviews allegations that a defendant's constitutional rights have been deprived pursuant to the harmless error standard as enunciated in Chapman v. California, 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824 (1967). Beard v. State, 1992 Ala. Crim. App. LEXIS 1193, 612 So.2d 1335 (Ala. Crim App. 1992).

III.    **The Appellant was denied a fair trial when he was convicted using improperly admitted evidence.**

The standard of review regarding whether issues of an evidentiary nature is whether the trial court abused its discretion, as such matters are within the sound discretion of the trial court. International Union, Etc. v. Russell, 264 Ala. 456, 88 So.2d 175 (1956).

2

**IV.    The Appellant was denied a fair trial when the prosecution failed to disclose exculpatory evidence.**

The standard of review regarding whether issues of an evidentiary nature is whether the trial court abused its discretion, as such matters are within the sound discretion of the trial court. Walker v. Mayer, 290 Ala. 233, 275 So.2d 662 (1973).

**V.    The circuit court erred in issuing an unduly harsh and unreasonable sentence to the Appellant.**

This court reviews sentences issued by the lower court according to a plain error standard of review. Jenkins v. State, 2004 Ala. Crim. App. LEXIS 30 (Ala. Crim. App. 2004).

**VI.    The circuit court erred in sustaining the Appellant's convictions despite the lack of sufficient evidence.**

The test utilized in determining the sufficiency of the evidence is whether "viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt." O'Neal v. State, 602 So.2d 462, 464 (Ala. Crim. App. 1992)).

## SUMMARY OF THE ARGUMENT

The Appellant submits that the state of Alabama unconstitutionally extended criminal jurisdiction in this matter to California. The Appellant did not have any contact with Alabama, nor did any part of the crime at issue occur in Alabama.

3

The Appellant submits that he was denied the right to present a defense, namely in presenting witnesses on his behalf, when he was forced to pay for the State's witnesses to appear. This left the Appellant without sufficient means to fly his own witnesses in from California.

The Appellant's conviction was based largely upon hearsay evidence. The hearsay was in the form of testimony regarding the origin of the fake identification documents at issue, as the actual individuals who allegedly found the documents were not presented to testify. The Appellant's conviction also rested upon evidence that was not authentic, namely a copy of a handwriting sample.

The Appellant's conviction was obtained due to the lack of exculpatory evidence that was either in the possession of the prosecution or should have been obtained by the prosecution. The evidence at issue was a surveillance videotape from the department store where the fake identification documents were used.

The Appellant's sentence was unconstitutional as he was sentenced based upon factors that were not submitted to a jury for proof beyond a reasonable doubt. Also, the Appellant's sentence was disproportional to the crime that he committed.

The Appellant submits that his conviction lacked sufficient evidentiary support. The mailbox linking the Appellant to the crime at issue did not belong to

4

the Appellant. The State was unable to present a positive identification of the

Appellant as the owner of the mailbox. There was not any proof offered

concerning the "loss" suffered by a victim in this case.

## LAW AND ARGUMENTS

I.     **The circuit court erred in sustaining a verdict contrary to law, in that Ala. Code § 13A-8-192 unconstitutionally extended venue and jurisdiction beyond the boundaries of Alabama.**

According to the Alabama Rules of Criminal Procedure, "[e]very person,

whether an inhabitant of the State of Alabama or of any other state or country, is

liable to punishment by the laws of Alabama for an offense committed in the

state." Ala. Code § 15-2-1. Regarding the crime of identity theft, jurisdiction is

proper where any element of the crime occurred or where the victim of the theft

resides. Ala. Code § 13A-8-196. Venue is proper in the county where the alleged

offense occurred. Ala. Code § 15-2-2. Such holds true as long as the offense is

consummated within the boundaries of the state. Ala. Code § 15-2-4.

The Appellant submits that the trial court lacked in personam jurisdiction

over the Appellant in this matter, thereby rendering venue improper as well. In

determining the question of whether personal jurisdiction has properly been

obtained, the question is framed as a federal question of whether subjection of a

particular defendant to the sovereignty of Alabama comports with federal due

5

process. King Homes, Inc. v. Roberts, 46 Ala. App. 257, 240 So.2d 679 (Ala. Civ. App. 1977).

Specifically delegated to the federal Congress was the power to regulate commerce among the states. U.S. Const., Art. I, § 8. In exercising the commerce power, the federal government enacts regulation that "aims directly to secure and promote the public welfare," which is a power known as the police power. Robert Cushman, The National Police Power Under the Commerce Clause of the Constitution, 3 Minn. L. Rev. 289, 290 (1919). In exercising this police power through the commerce clause, Congress has carved itself the power to regulate criminal conduct that has a substantial relation to interstate commerce. United States v. Lopez, 115 S.Ct. 1624 (1995). Pursuant to such power, the federal government has enacted a prohibition against the commission of identity theft. See 18 U.S.C. § 1028.

Alabama has decided to enforce its own national regulatory scheme regarding the crime of identity theft. The Appellant was a resident of California who also spent significant time in Nigeria. The Appellant has never entered the boundaries of Alabama. The mailbox that was allegedly used in committing the instant crimes was located in California. The identification documents discovered in this case in the Appellant's old apartment were found in California. The use of

6

the identification documents was done at a Mervyn's Department Store in

California. The crime at issue was committed in California. Yet the state of

Alabama has extended its reach to regulate such conduct via the enforcement of

Ala. Code § 13A-8-192. This Court merely noted the Alabama Constitution of

1901 does not limit venue in a criminal case to one state, hardly the restraint called

for by the federal constitution. See Ex parte Egbuonu, 911 So.2d 748 (Ala. Crim.

App. 2004).

As the Appellant was improperly tried before an Alabama tribunal, the

Appellant submits that this Court must re-hear and re-decide this issue and that his

conviction and subsequent sentence must be dismissed.

## II.    The Appellant was denied his right to have witnesses appear on his behalf when he was forced to pay for the prosecution's witnesses to appear.

Article I, section 6 of the Alabama Constitution (1901) states that in a

criminal prosecution, the accused shall have the right to have witnesses appear on

his behalf. See also U.S. Const., Amend VI.

> The right to offer the testimony of witnesses, is in plain
> terms the right to present a defense, the right to present
> the defendant's version of the facts as well as the
> prosecution's to the jury so it may decide where the truth
> lies. Just as an accused has the right to confront the
> prosecution's witnesses for the purpose of challenging
> their testimony, he has the right to present his own

7

> witnesses to establish a defense. This right is a
> fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14, 19 (1967).

The Appellant was denied the right to properly present his defense. The Appellant was burdened by the restitution order in this case in which he was forced to pay for government witnesses to fly from California to present testimony in this matter. The Appellant had already filed an affidavit regarding his financial hardship. Being forced to bear the brunt of the prosecution's case, the Appellant was unable to pay for a proper defense.

As the Appellant was denied the right to properly present his defense, the Appellant submits that this Court must re-hear and re-decide this issue and that his conviction and subsequent sentence must be dismissed.

### III.   The Appellant was denied a fair trial when he was convicted using improperly admitted evidence.

The instant issue was denied as this Court claimed that the Appellant failed to properly cite to the alleged errors. Egbuonu v. State, 2007 Ala. Crim. App. LEXIS 90 (May 25, 2007). However, the prosecution had no problem identifying the points of error claimed by the Appellant. Further, the Appellant notes that in his opening and reply briefs, precise citations were made to the record regarding the claimed errors.

8

The Appellant notes that, although the government offered a response to claims of improperly admitted evidence in the form of the credit accounts of James Roberson and the Appellant with Target Department Stores, this Court failed to offer any opinion as to the propriety of admitting such evidence. The Appellant submits that such evidence was inadmissible pursuant to Alabama Rule of Evidence 803(6), and this Court should have held as such.

As the Appellant was convicted based upon inadmissible evidence, the Appellant submits that this Court must re-hear and re-decide this issue and that his conviction and subsequent sentence must be dismissed.

## IV.    The Appellant was denied a fair trial when the prosecution failed to disclose exculpatory evidence.

A criminal defendant is entitled to discover documents and tangible things "(1) which are material to the preparation of defendant's defense; ... (2) which are intended for use by the state/municipality as evidence at the trial; or (3) which were obtained from or belong to the defendant." Rule 16.1(c), Ala. R. Crim.

To protect such basic discovery rights, the Supreme Court, in Brady v. Maryland, 373 U.S. 83, 87 (1963), put forth the requirement that the prosecution must turn over all evidence favorable to the accused upon request. The Court specifically held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process . . . ". Id. at 87.

9

In the instant case, this Court found that the Appellant failed to preserve the

Brady related issues. Egbuonu v. State, 2007 Ala. Crim. App. LEXIS 90 (May 25,

2007). However, the failure to preserve an issue for appeal merely relegates the

issue to review for plain error. Ala. R. App. P. 39(k); Ex parte McGahee, 632

So.2d 981 (Ala. 1993). As such, this Court should have reviewed the instant issue.

As the prosecution failed to disclose exculpatory evidence to the Appellant,

the Appellant submits that this Court must re-hear and re-decide this issue and that

his conviction and subsequent sentence must be dismissed.

**V.    The circuit court erred in issuing an unduly harsh and unreasonable
        sentence to the Appellant.**

The United States Constitution guarantees each defendant a trial by jury

wherein no punishment is imposed until a jury determines the defendant guilty of

particular conduct beyond a reasonable doubt. See U.S. Const. Amends. V, VI.

At odds with that system is sentencing procedure as employed by the state of

Alabama which allows for a circuit court to sentence or punish a defendant based

upon conduct that is not admitted or proved beyond a reasonable doubt.

Recognizing this fundamental defect in the manner in which criminal

defendants were sentenced, the Supreme Court sought to remedy the situation

through its ruling in Apprendi v. New Jersey, 530 U.S. 466, 478, 120 S.Ct. 2348

(2000). In Apprendi, the Court stated that "other than the fact of a prior

10

conviction, any fact that increases the penalty for crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Apprendi</u>, 530 U.S. at 490 (2000).

In the instant case, this Court found that the Appellant failed to preserve the instant sentencing issue. <u>Egbuonu v. State</u>, CR-05-0143, (Ala. Crim. App. February 22, 2008). However, the failure to preserve an issue for appeal merely relegates the issue to review for plain error. Ala. R. App. P. 39(k); <u>Ex parte McGahee</u>, 632 So.2d 981 (Ala. 1993). As such, this Court should have reviewed the instant issue.

Further, the mere fact that one of the convictions at issue was vacated, thus halving the sentence, does not change the crux of this argument. As a twenty-year term of incarceration was unduly harsh for two convictions, half the sentence is still unduly harsh for half the convictions, with each conviction having the same sentence length.

As the Appellant was sentenced in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution, the Appellant submits that this Court must re-hear and re-decide this issue and that his sentence must be vacated.

**VI.    The circuit court erred in sustaining the Appellant's convictions despite the lack of sufficient evidence.**

11

In order to be convicted of identity theft pursuant to Ala. Code 13A-8-192, it must be proved beyond a reasonable doubt that a person, without the authorization, consent, or permission of the victim, with the intent to defraud for his or her own benefit or the benefit of a third person, he or she does any of the following:

> (1) Obtains, records, or accesses identifying information that would assist in accessing financial resources, obtaining identification documents, or obtaining benefits of the victim.
>
> (2) Obtains goods or services through the use of identifying information of the victim.
>
> (3) Obtains identification documents in the victim's name.

Ala. Code § 13A-8-192. Theft which has resulted in a financial loss of greater than $500 will be considered first degree identity theft. Ala. Code § 13A-8-192(b).

The evidence against the Appellant did not meet these elements. The evidence against the Appellant included the fact that a fake credit application was taken out at Mervyn's department store in James Roberson's name, and that someone added "Jerome Bivens" as an authorized user of the credit account. An apartment that was at one time inhabited by the Appellant was found to possess a cellular telephone that had made charges to the credit account. Of course, the State's handwriting expert testified that the credit application and bad checks on

12

the Roberson account were made by the Appellant. Therefore, the prosecution failed to present an iota of non-biased evidence proving that the Appellant knew of or participated in the crimes at issue. The State must present a least one reasonable hypothesis supporting conviction. See White v. State, 546 So.2d 1014 (Ala. Crim. App. 1989).

This Court denied the issue, stating that the Appellant failed to cite to any facts in support to of his claim. Egbuonu v. State, 2007 Ala. Crim. App. LEXIS 90 (May 25, 2007). However, the Appellant submits that he could have cited every fact in the record. No matter what facts are examined by this Court, no combination of facts rose to the level sustaining a guilty verdict in this case.

As the Appellant was convicted utilizing insufficient evidence, the Appellant submits that this Court must re-hear and re-decide this issue and that his conviction and subsequent sentence must be dismissed.

13

## CONCLUSION

For the above reasons, Mr. Egbuonu respectfully requests that this court, upon rehearing, reverse his convictions and sentence.

Respectfully Submitted,

by:

Robert A. Ratliff, Esq.
713 Dauphin Street
Mobile, Alabama 36602
(251) 438-2250 (voice)
(251) 438-6180 (facsimile)
Counsel for Appellant Egbuonu

14

## CERTIFICATE OF SERVICE

I hereby certify that, pursuant to Alabama Rules of Appellate Procedure 28(a)(12) and 31(b), a true copy of the foregoing was served this 5 day of March 2008 by regular United States mail with sufficient postage affixed to ensure delivery to the Office of the District Attorney, Jefferson County, 801 Richard Arrington, Jr. Blvd. North, Birmingham, Alabama 35203-1021; and the Office of the Attorney General of Alabama, Alabama State House, 11 South Union Street, Third Floor, Montgomery, Alabama 36130.

by: _____
Robert A. Ratliff, Esq.
Counsel for Appellant Egbuonu

15



**Bob Riley**
GOVERNOR

### State of Alabama
# Alabama Department of Corrections
301 S. Ripley Street
P. O. Box 301501
Montgomery, AL 36130

**Donal Campbell**
COMMISSIONER

December 17, 2004

ADMINISTRATIVE REGULATION                    OPR: PERSONNEL
NUMBER                 009

### SMOKE/TOBACCO FREE POLICY

**I.    GENERAL**

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes responsibilities, policies, and procedures to provide a healthful, comfortable, and productive work/living environment for employees, inmates, visitors, and contractors.

**II.    POLICY**

It is the policy of the ADOC that all ADOC owned or leased buildings, facilities, and vehicles will be smoke-free.   Certain institutions shall be designated as tobacco free.

**III.    DEFINITION (S) AND ACRONYM (S)**

A.    Contract Person:  Person designated to be available to employees and inmates who would like to take the opportunity to quite smoking and/or stop using tobacco.

B.    Designated Smoking Area:  An area outside a building/institution where smoking is permitted pursuant to this regulation.

C.    Juvenile:  Individual who has not attained the age of eighteen (18) years.

D.    Non-smoking Area:  Inside area of all ADOC buildings and institutions.

E.    Smoke-free:  No use of tobacco products that produce smoke.

F.    Tobacco-free:  No use of tobacco products of any kind, to include smokeless tobacco.  Tobacco products are prohibited from entering the premises.

EXHIBIT 99

G. <u>Tobacco Products</u>:  Consists of all items as cigars, cigarettes, snuff, or similar goods prepared for smoking, chewing, dipping, or other personal use.

## IV.   <u>RESPONSIBILITIES</u>

It is the responsibility of all ADOC employees, inmates, visitors, and contractors to comply with the contents of this regulation.

## V.   <u>PROCEDURES</u>

A.   Smoking is strictly prohibited within all ADOC building/institutions including, but not limited to:

1.   Officers

2.   Hallways

3.   Waiting rooms

4.   Restrooms

5.   Lunch rooms

6.   Elevators

7.   Meeting Rooms

8.   All ADOC vehicles

B.   Smoking will be permitted outside all buildings/institutions only at designated smoking areas.  Designated smoking areas will not be closer than ten (10) feet to the entrance of the building/institution.  A fire resistant receptacle for cigarette butts will be available in this area.

C.   In accordance with Federal Statute 20 USCA 6082, regardless of any smoking policy, smoking by juvenile inmates shall not be permitted.

D.   "Non-smoking" signs shall be posted at all building entrances and throughout the building.

E.   A representative of each building/institution will be appointed to serve as a contact person for employees and inmates who would like to quite smoking and/or stop using tobacco.

AR 009 – December 17, 2004

VI.   **DISPOSITION**

Any forms will be disposed of and retained according to the Departmental Records Disposition Authority.

VII.  **FORMS**

There are no forms prescribed in this regulation.

VIII. **SUPERCEDES**

This regulation supercedes AR 009 dated April 7, 1995.

IX.   **PERFORMANCE**

   A.   Code of Alabama, 1975, Section 14-1-1

   B.   Federal statute 20 USCA 6082

   C.   ACA Standards 4-4214 and 4-4361


Donal Campbell, Commissioner

AR 009 – December 17, 2004



# State of Alabama
# Alabama Department of Corrections

301 S. Ripley Street
P. O. Box 301501
Montgomery, AL 36130



**Bob Riley**
GOVERNOR

**Donal Campbell**
COMMISSIONER

March 29, 2005

ADMINISTRATIVE REGULATION          OPR:  RESEARCH AND PLANNING
NUMBER                    018

## INSTITUTIONAL STANDARD OPERATING PROCEDURES

**I.      GENERAL**

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes responsibilities, policies, and procedures for developing Standard Operating Procedures (SOPs).

**II.     POLICY**

It is the policy of the ADOC that each institution/facility shall operate within the parameters specified and set forth by the laws of the State of Alabama in conjunction with the policies and directives of the ADOC Commissioner.

**III.    DEFINITION (S) AND ACRONYM(S)**

A.      Office of Primary Responsibility (OPR): The Office of Primary Responsibility is that Warden/Director, Deputy Commissioner staff unit, office, or activity having functional responsibility for the program, procedure, law, rule, or regulation matter.

B.      Staff Accountability Log: A record indicating an officer has read, and understands the SOPs for a security assignment.

C.      Standard Operating Procedure (SOP): Policies and procedures set forth by local orders and implemented by the Warden/Director of each institution/facility.

**IV.    RESPONSIBILITIES**

A.      It is the responsibility of the Warden of each institution to:

1.      Plan, direct, control, and otherwise manage his/her respective institution in such a manner as to ensure the effective accomplishment of its mission.

2.      Implement and promulgate local orders, procedures, and policies through the publication of Standard Operating Procedures (SOPs).

EXHIBIT 100

B.     All ADOC employees, contract personnel, and visitors are responsible for complying with each institution's SOPs.

C.     The Research and Planning Division shall maintain copies of all institutional SOPs and changes.

## V.     PROCEDURES

A.     SOPs shall be typed and placed in loose-leaf binders to facilitate the addition of new SOPs, and to make changes to existing SOPs.

B.     The SOP binders shall have an index, which provides a system for numbering the SOPs, identifying the institutional OPR, the date the SOP was published, and the annual review/update.

C.     SOPs shall include, but are not limited to the following:

   1.     ADOC/Institutional mission

   2.     Physical plant description and site location

   3.     Organizational chart with a brief description of key offices/institutional divisions

   4.     Staffing/manpower requirements

D.     Written policy shall establish a requirement that SOPs are current, complete, and available at each security post unless security would be compromised. SOPs are sensitive documents and shall be maintained in a secure area and not shown to inmates or other unauthorized persons.

E.     Written SOPs shall specify the duties of each post and the procedures to be followed for carrying out the assignment.

F.     Written policy shall establish a system to ensure that officers sign and date ADOC Form 018-A, Staff Accountability Log, prior to assuming a post to indicate they have read and understand the SOP for that assignment. This process shall be repeated every three months. ADOC Form 018-A shall be maintained for three years.

G.     Copies of SOPs shall be made available for all employees.

H.     SOPs shall contain the following instructions:

   1.     Any employee taken hostage or otherwise under duress is without authority, regardless of rank.

AR 018 – March 29, 2005

       2.     SOPs cannot cover every incident or eventuality. Employees assigned to any post shall use good judgement paying careful attention to the general and specific issues and details related to post assignments.

I.     SOPs shall follow the format of Annex A, Standard Operating Procedure Format.

J.     One copy of each SOP and all changes or revisions shall be provided to the Research and Planning Division.

K.     It is extremely important that SOPs be maintained up-to-date:

       1.     Changes to the document must be made as they occur.

       2.     Periodic reviews should be scheduled to ensure that practices and procedures are effective, and in agreement with laws, regulations, and established standards.

       3.     Review-input should be solicited throughout the staff.

L.     SOPs shall be updated annually.

M.     Each "retired" SOP shall be archived for a minimum of three years for reference in legal challenges.

## VI.   **DISPOSITION**

Any forms will be disposed of and retained according to the Departmental Records Disposition Authority (RDA).

## VII.  **FORMS**

ADOC Form 018-A, Staff Accountability Log

## VIII. **SUPERCEDES**

This regulation supercedes AR 018, dated March 19, 1985.

## IX.   **PERFORMANCE**

A.     Code of Alabama 1975, Section 14-1-1 and 14-1-2

B.     ACA Standards: 4-4178 and 4-4179

Donal Campbell, Commissioner

**ANNEX(S):**

Annex A – Standard Operating Procedure(s) Format

AR 018 – March 29, 2005

**ALABAMA DEPARTMENT OF CORRECTIONS**
**STANDARD OPERATING PROCEDURES**
**STAFF ACCOUNTABILITY LOG**

Institution: _____ Date:_____

Post: _____ Shift: _____

I certify that I have read and fully understand the Standard Operating Procedures, general and specific, for this post. I have also read and fully understand all ADOC Administrative Regulations and institutional operational memorandums affecting the operation of this post.

| DATE | STAFF SIGNATURE | SUPERVISOR INITIAL |
|------|-----------------|--------------------|
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |
|      |                 |                    |

Supervisors will initial that staff members have read the Standard Operating Procedures relating to the post.

**ADOC Form 018-A – March 29, 2005**
*Duplicate as Needed*

AR 018 – March 29, 2005

# STANDARD OPERATING PROCEDURE(S) FORMAT

**I.**    **GENERAL**

This section is a short paragraph of what the Standard Operating Procedure (SOP) is doing. The following will be used at the beginning of the first sentence in the "General" section: *"This Alabama Department of Corrections (ADOC) Institutional Standard Operating Procedure (SOP) establishes the responsibilities, policies, and procedures for..."*

**II.**    **POLICY**

This section provides a quick description of the policy statement. This statement should not exceed one or two sentences.

**III.**    **DEFINITION(S) and ACRONYM(S)**

This section identifies the terms and/or acronyms used throughout the SOP.

**IV.**    **RESPONSIBILITIES**

This section identifies who is responsible for performing specific tasks and/or ensuring other employees accomplish specific tasks.

**V.**    **PROCEDURES**

This section identifies the duties of each post and the procedures to be followed to carry out the assignment.

**VI.**    **DISPOSITION**

There are no forms used in the development and implementation of SOPs.

**VII.**    **FORMS**

Administrative Regulations are the sole authority for the development of forms.

**VIII.**    **SUPERCEDES**

This section is a statement that identifies what this SOP or change supercedes.

**IX.**    **PERFORMANCE**

This section identifies the AR(s), which provides the authority for the SOP.

Annex A to AR 018 – March 29, 2005

AR 018 – March 29, 2005



# State of Alabama
# Alabama Department of Corrections

301 S. Ripley Street
P. O. Box 301501
Montgomery, AL 36130



**BOB RILEY**
GOVERNOR

**DONAL CAMPBELL**
COMMISSIONER

March 21, 2005

ADMINISTRATIVE REGULATION                    OPR: LEGAL
NUMBER            026

## AVAILABILITY OF LEGAL ASSISTANCE

**I.    GENERAL**

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes the responsibilities, policies, and procedures to provide for the availability of legal assistance to the ADOC Commissioner and its employees.

**II.    POLICY**

Legal counsel shall be available, when needed, to advise and provide legal assistance to the ADOC Commissioner and its employees.

**III.    DEFINITION(S) AND ACRONYM(S)**

This section is not used.

**IV.    RESPONSIBILITIES**

All ADOC employees are responsible for complying with the contents of this regulation.

**V.    PROCEDURES**

A.    The ADOC Commissioner shall hire and designate a licensed, experienced attorney to be General Counsel for the ADOC.

B.    The General Counsel, after consulting with and receiving approval from the Commissioner, may employ additional attorneys, legal assistants, and paralegals to assist in advising the Commissioner and department employees.

C.    The General Counsel shall advise the Commissioner, and such other department employees as time and resources permit, of significant legislative and judicial developments which may affect the ADOC and its operation of correctional institutions.

D.    The General Counsel shall be a mandatory reviewer of all ADOC regulations to ensure their legality and shall advise the Office of Primary Responsibility (OPR), the appropriate



EXHIBIT 101

AR 026 – March 21, 2005

Deputy Commissioner, and the Commissioner of any potential legal problems that might result from promulgation of the regulation.

E.   The General Counsel shall be available and advise the Commissioner, or designee, when inmate grievances raise legal issues, which must be resolved prior to a response being made to the inmate.

F.   The General Counsel shall monitor all litigation filed against the ADOC and its employees who are sued as a result of the performance of their official duties. The General Counsel shall consult with the Office of the Attorney General concerning any lawsuits filed against the ADOC and its employees and shall provide assistance to the Office of the Attorney General in its defense of such lawsuits when necessary.

G.   The General Counsel, or attorney-designee, may be consulted for advice concerning legal issues relating to an employee's job duties and responsibilities as needed, either in writing or by telephone.

## VI.   DISPOSITION

Any forms used will be disposed of and retained according to the Departmental Records Disposition Authority (RDA).

## VII.   FORMS

There are no forms prescribed by this regulation.

## VIII.   SUPERCEDES

This being a new regulation it does not supercede any other regulation at this time.

## IX.   PERFORMANCE

A.   Code of AL 1975, Sections 14-1-1 and 14-1-2

B.   ACA Standards:  4-4023

Donal Campbell, Commissioner

AR 026 – March 21, 2005



## State of Alabama
## Alabama Department of Corrections

**BOB RILEY**
**GOVERNOR**

Research and Planning
P. O. Box 301501
Montgomery, AL 36130-1501



**Donal Campbell**
**COMMISSIONER**

June 29, 2004

ADMINISTRATIVE REGULATION                    OPR: OPERATIONS
NUMBER              214

### LAW LIBRARY SUPERVISORS

**I.    GENERAL**

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes responsibilities, policies, and procedures for those officers assigned to supervise the institutional law library.

**II.    POLICY**

The ADOC shall provide legal resource libraries and allow all inmates access to the materials available.

**III.    DEFINITION(S) AND ACRONYM(S)**

A.    Inmate Law Library Clerks:  Inmates that are assigned to assist the law library supervisor.

B.    Commissioners designee:    A person designated by the Commissioner to coordinate inmate legal matters that cannot be resolved at the institutional level.

C.    ICF (Institutional Contingency Fund):    A fund designed to provide certain materials and services for the benefit and welfare of the inmate population, not otherwise provided with appropriated funds.

**IV.    RESPONSIBILITIES**

Wardens/designees are responsible for the operation and maintenance of the library.

**V.    PROCEDURES**

A.    Each institution shall make legal materials available in a suitable location for access by inmates assigned to that institution.

1.    The Library Supervisor at the institution shall monitor the use of these materials.

EXHIBIT 102

    2.       Institutionally owned legal resource/reference materials shall be maintained only within the library, except for those accessed to inmates confined in segregation units or who do not have direct access to a centralized law library because of their assignment.

B.    Law library access shall be open to all inmates housed in general population of the institution.

C.    Inmates in segregation or otherwise restricted will be:

    1.       Allowed no physical access to the law library.

    2.       Provided a complete listing of materials available in the law library.

    3.       Allowed to request items from the law library and the request should be filled in a timely manner.

D.    The law library at all institutions shall be open a minimum of 20 hours per week.

    1.       Days and times for library use will be provided as long as security needs are maintained.

    2.       Law library services shall be provided during work hours to provide access to the greatest number of inmates that does not interfere with work assignments or other programs.

E.    The law library shall provide, as prescribed by legal, writing instruments, plain paper, and envelopes for inmate use in preparing legal correspondence and documents.

F.    Materials and equipment, as approved by the ADOC Legal Division, will be provided through the ICF of the respective institution.

G.    The Warden's designee will coordinate and supervise the law library services in the institution as follows:

    1.       The law library collections are maintained orderly and current.

    2.       Inmate law library clerks are supervised.

    3.       All materials, such as but not limited to pocket parts, advance sheets, and volumes, are logged.

    4.       Daily logs of the use of the law library, and those denied direct access, is maintained.

    5.       Law library hours are posted in inmate living areas.

    6.       All legal materials are inventoried and an inventory report is submitted to

the Commissioner's designee on or before the 10th day of September.

7. Ensure the availability of forms listed in Annex A (Institutional Law Library and Court Forms), submitting order requests as necessary to the institutional business manager.

8. Coordinate requests for legal materials with the Commissioner's designee.

9. Instruct inmate law library clerks that they are not to pretend to be licensed attorneys or in any way appear to be engaged in the unauthorized practice of law. Inmate law clerks should also be instructed that they **SHALL NOT** charge for legal services.

## VI. DISPOSITION

Any forms used will be disposed of and retained according to the Departmental Records Disposition Authority (RDA).

## VII. FORMS

There are no forms prescribed in this regulation.

## VIII. SUPERCEDES

This regulation supercedes AR 214, dated August 18, 1992.

## IX. PERFORMANCE

ACA Standards: 3-4256 and 3-4264

**ANNEX(S):**

Annex A, Institutional Law Library and Court Forms

Donal Campbell, Commissioner

AR214 – June 29, 2004

# INSTITUTIONAL LAW LIBRARY AND COURT FORMS

## LAW LIBRARY FORMS

| FORM NUMBER | FORM NAME |
|---|---|
| N942L | Material Received Log |
| N943L | Access to Law Library |
| N944L | Access to Legal Material |
| N946L | Photocopy Log Law Library |
| N947L | Notary Log |
| N949L | Law Library Sign-In Sheet |
| N950L | Law Library Inventory Sheet |

## COURT FORMS

| FORM NUMBER | FORM NAME |
|---|---|
| N937 | (42 USC 1983) U.S. District Court Northern District |
| N938 | (42 USC 1983) Civil Rights (Complaint) Middle District |
| N939 | (42 USC 1983) U.S. District Court Southern District (Motion to Proceed Without Prepayment of Fees and Costs Included with this form) |
| N941 | Petition for Relief from Conviction or Sentence (Pursuant to Rule 32) |
| N954 | (28 USC 2254) U.S. District Court Northern District |
| N955 | (28 USC 2254) U.S. District Court Mobile District |
| N956 | (28 USC 2254) U.S. District Court Southern District |
| N957 | Affidavit of Substantial Hardship Order (Form C10, Revised 6/88) |

**Annex A to AR 214**

AR214 – June 29, 2004





### *State of Alabama*
# *Alabama Department of Corrections*

**Bob Riley**
**GOVERNOR**

Research and Planning
P. O. Box 301501
Montgomery, AL 36130-1501

**Donal Campbell**
**COMMISSIONER**

August 11, 2004

ADMINISTRATIVE REGULATION                  OPR: TRAINING
NUMBER                      219

## TRAINING

## I.    GENERAL

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes responsibilities, policies, and procedures for the development and implementation of training programs that meet the requirements of the APOSTC and provide professional development of all ADOC personnel.

## II.    POLICY

Training programs shall be developed and implemented that will ensure all employees receive initial basic training (orientation, on-the-job training, academy training) and Advanced Training.

## III.    DEFINITION(S) AND ACRONYM(S)

A.    APOSTC (Alabama Peace Officers Standards and Training Commission):
Agency created to ensure that law enforcement officers in Alabama receive training in their vocation, thereby providing better service to the public. These goals are obtained by empowering the Commission with authority to promulgate rules in the selection, recruitment, and training of law enforcement officers and the work of law enforcement agencies in the State and to prescribe standards for law enforcement officers.

B.    OJT (On-The-Job-Training): Training conducted by an employer for an individual while he or she is working and learning the skills and information necessary for productive and satisfactory job performance.

C.    Cadet: A Correctional Officer (New Hire) undergoing training at the Alabama Corrections Academy or working at the institution during pre-academy assignment.



EXHIBIT 103    1 of 14    AR219 – August 11, 2004

D.    NIC (National Institute of Corrections): A federal agency created in 1974 established for correctional learning and provides assistance in information, education, and training towards achievements of state, local, and federal correctional goals and objectives.

E.    CERTIFICATION: A written statement issued by APOSTC testifying to the accreditation of an approved academy, instructor, or applicant.

F.    INSTRUCTOR: An individual possessing a certificate issued by APOSTC to instruct at an approved academy or other law enforcement-training establishment.

G.    APPLICANT: An individual seeking admittance to an approved academy for certification as a law enforcement officer.

H.    CEU (Continuing Education Unit): Hours of continuing education/training as required by APOSTC. Certified law enforcement officers in this state shall annually complete 12 hours of continuing education/training. This does not include annual re-certifications (ex. firearms, PPCT, CPR/First Aid).

I.    PPCT (Pressure Point Control Tactics): A research based use of force training that specializes in defensive tactics.

## IV.    RESPONSIBILITIES

A.    The Director of Training is responsible for:

1.    Exercising operational and administrative controls over the Basic Training Program (Alabama Corrections Academy) and the Regional Advanced Training Centers.

2.    Ensures that all law enforcement-training activities are conducted in accordance with APOSTC standards.

3.    Developing the ADOC Master Training Plan. This plan includes but is not limited to:

a.    An orientation program

b.    An annual Advanced Training plan for both law enforcement and support personnel, to include contracted personnel and volunteers.

4.    Providing for unique training requirements such as Correctional Emergency Response Team (CERT) and Wardens Training.

B.    The Wardens, Directors and Division heads are responsible for:

        1.       Developing their institutional/division Standard Operating Procedures (SOPs), as necessary, for the implementation of Administrative Regulation 219, Training.

        2.       Exercising operational control over institutional OJT and job orientation training for all assigned personnel.

C.    Regional Advanced Training Supervisors are responsible for:

        1.       Ensuring that the annual training plan is executed for the institutions/divisions that they support.

        2.       Ensuring that all assigned personnel meet annual training requirements and required documentation is maintained and forwarded to the Director of Training.

D.    Supervisors at all levels are responsible for:

        1.       Identifying training needs and ensuring that their personnel attend required training.

        2.       Ensuring that subordinate employees follow training policy and institutional policy pertaining to training.

## V.   **PROCEDURES**

A.    Training Personnel

        1.       Regional Advanced Training Centers and the Alabama Corrections Academy will be staffed with APOSTC certified instructors.

        2.       The Director of Training will oversee and supervise all Regional Advanced Training and Corrections Academy staff, to include interviewing and placement of employees into these positions.

        3.       There are no limitations on the amount of time an individual may remain in a training instructor/supervisor assignment.

        4.       The Director of Training shall make recommendation to the Commissioner to remove personnel, for cause, from training assignments.

B.    Regional Advanced Training

        1.       Annual in-service training will be conducted at regional advanced training centers located geographically around the state. Each advanced training center will support specific institutions/divisions.

a.  Region 01 – Located on the premises of St. Clair Correctional Facility, and provides training support to the following:

   1) St. Clair Correctional Facility
   2) Childersburg Work Release/Boot Camp
   3) Regional Support Staff

b.  Region 02 – Located on the premises of Kilby Correctional Facility and provides training support to the following:

   1) Kilby Correctional Facility
   2) Tutwiler Prison for Women
   3) Montgomery Work Center
   4) Red Eagle Honor Farm
   5) Alex City Work Release
   6) Central Office
   7) Regional Support Staff

c.  Region 03 – Located on the premises of Fountain Correctional Facility and provides training support to the following:

   1) Fountain Correctional Facility
   2) Holman Correctional Facility
   3) JO Davis Correctional Facility
   4) Atmore Work Release
   5) Loxley Work Release
   6) Mobile Work Release
   7) Camden Work Release
   8) Regional Support Staff

d.  Region 04 - Located on the premises of Limestone Correctional Facility and provides training support to the following:

   1) Limestone Correctional Facility
   2) Decatur Community Based Facility
   3) Hamilton A&I Facility
   4) Hamilton Community Based Facility
   5) Regional Support Staff

e.  Region 05 – Located on the premises of William E. Donaldson Correctional Facility and provides training support to the following:

   1) William E. Donaldson Correctional Facility
   2) Birmingham Work Release
   3) Regional Support Staff

AR219 – August 11, 2004

   f. Region 06 – Located on the premises of Ventress Correctional
    Facility and provides training support to the following:

     1) Bullock County Correctional Facility
     2) Easterling Correctional Facility
     3) Ventress Correctional Facility
     4) Bullock County Work Release
     5) Elba Work Release
     6) Regional Support Staff

   g. Region 07 – located on the premises of Draper Correctional
    Facility and provides training support to the following:

     1) Draper Correctional Facility
     2) Staton Correctional Facility
     3) Elmore Correctional Facility
     4) Frank Lee Youth Center
     5) Regional Support Staff

   h. Region 08 – Located on the premises of Bibb County Correctional
    Facility and provides training support to the following:

     1) Bibb County Correctional Facility
     2) Farquhar State Cattle Ranch
     3) Regional Support Staff

C. Basic Training

  1. Correctional Officer I (New Hires/Cadets) are appointed through the State
   Personnel hiring process and notified by the DOC Personnel Division of
   their employment date. The Director of Training will notify the Cadets of
   their reporting date to the Academy. The Personnel Division will forward
   to the Director of Training, copies of the following items at least five (5)
   days prior to the Cadet's reporting date:

   a. APOSTC application and affidavit

   b. Physical examination

   c. High School diploma or equivalent

   d. Background check results

  2. The Corrections Academy utilizes a 480-hour APOSTC approved
   corrections curriculum. The course curriculum is maintained on file at the
   Academy. Upon completion of the Academy, the Cadet will receive law
   enforcement status as a correctional officer and report for duty at their
   assigned institution.

3.  Cadets who do not achieve the required 70% overall score on written examinations will not graduate from the Academy nor receive law enforcement certification. Those scoring less than 70% but greater than 65% will be afforded one additional opportunity to return to the Academy.

4.  Cadets who do not receive the required 70% on the First Aid/CPR and/or Legal Exam will be dismissed from the Academy. These are "stand alone" exams that must be passed with a minimum score of 70%, in accordance with APOSTC requirements. Those who scored at least a 65% will be afforded one additional opportunity to return to the Academy. After two attempts at the Academy, applicants must wait two years before testing again for a Correctional Officer position.

5.  Cadets who do not pass the Physical Ability/Agility Test will be dismissed from the Academy. They will be afforded one additional opportunity to return the Academy. After two attempts at the Academy, applicants must wait two years before testing again for a Correctional Officer position.

6.  Cadets must pass firearms qualification in order to graduate the Academy and be certified.

7.  Cadets who are dismissed from the Academy for cheating, excess demerits, or any other disciplinary issues will not be considered for re-entry.

D.  Annual Master Training Plan Development

1.  The Director of Training will coordinate with Wardens, Directors, and Division heads for input and through a needs-assessment develop an annual Master Training Plan.

2.  The training plan will be subdivided into categories of personnel to be trained such as law enforcement supervisors, support supervisors, law enforcement officers, support personnel, contracted personnel and volunteers and will include subjects to be taught and required documentation procedures.

3.  The training plan will include all training mandated by APOSTC statutes and departmental requirements.

4.  The training plan will be submitted for approval to the Deputy Commissioner of Operations.

5.  The Training Division will arrange and/or facilitate special training programs such as but not limited to NIC videoconferences and State Personnel training programs during the year.

AR219 – August 11, 2004

6.    The Director of Training will design and implement evaluation instruments to assess the impact of training programs.

E.    Annual Training Plan Implementation

1.    The annual advanced training plan will be implemented by personnel assigned to the Regional Advanced Training Centers

2.    Training designated for all law enforcement supervisors and officers is mandatory to meet APOSTC re-certification and annual Continuing Education Unit (CEU) requirements. APOSTC requires twelve (12) hours of CEU's annually. In addition to any mandatory requirements, special training programs will be made available.

3.    Training for support supervisors, support personnel, contracted employees, and volunteers will be balanced between mandatory security and/or ADOC policy training and job-related, professional development training. Mandatory training for these employees will not exceed eight hours annually and will be announced in the annual training plan. In addition to any mandatory requirements, special training programs will be made available.

4.    Non-law enforcement personnel, who must meet mandatory re-certification and/or annual CEU requirements, such as but not limited to psychologists and accountants, will be granted administrative leave in order to meet their training requirements. Costs for such re-certification or CEU programs will be borne by the department.

5.    The Warden/Director will submit an annual list of personnel to be trained at the Regional Advanced Training Center in their region no later than January 5th of each calendar year. The advanced training supervisor will develop and coordinate a training schedule with the institutions/divisions.

6.    Based on the numbers supplied by each Warden/Director, the Regional Advanced Training Supervisor will submit a report at the end of each quarter to the Director of Training, listing at a minimum:

a.    The number of personnel scheduled for advanced training, by institution or division, during that quarter and the number of personnel actually trained.

b.    Number of personnel who attended annual weapons re-qualification during that quarter and the number who failed to qualify. (See Section V.H.3 for additional information on firearms qualification)

AR219 – August 11, 2004

        c.    Any other training activities that were conducted during the quarter (i.e. Videoconferences, OJT facilitation, Cadet training, and recruitment activities) will also be reported.

        d.    Any other information requested by the Director of Training.

7.    In addition to quarterly reporting requirements, Regional Advanced Training Centers will send a list of those completing annual training (to include their weapons scores, CPR and/or First Aid score, and their pass/fail score on PPCT, and other training related data) to the Director of Training at the conclusion of each class.

8.    Regional Advanced Training Supervisors will report training no-shows to the applicable Warden/Director and the Director of Training. Any weapon qualification failures will be reported to the applicable Warden/Director and the Director of Training. These notifications will be made on a weekly basis, at a minimum (contingent upon when the training is conducted).

9.    All training conducted at the Regional Advanced Training Centers will be documented and completed by November 30th of each calendar year.

10.    Training specific to individuals will be recorded in the individual's training record at the Regional Advanced Training Centers.

F.    Orientation Training and On-The-Job (OJT) Training

    1.    Correctional Officer I (New Hire)

        a.    The Warden at each institution/work release center will have an orientation session for each assigned Cadet. The orientation program will be conducted as part of the Cadet's pre-academy assignment at the institution. The orientation program will consist of, but not limited to:

            1)    Tour of the institution

            2)    Review of Administrative Regulations 206, 207, 208, 213, 217, 219, 220, and 227.

            3)    Cadet evaluation procedures/career progression

            4)    Institution mission/objectives

            5)    Cadet responsibilities

            6)    Introduction to key personnel

Documentation of the above training will be forwarded to the Corrections Academy Captain prior to the Cadet beginning basic training.

b.    Cadets will be assigned to the institution for a period of at least one week or a time frame not to exceed six months. Cadets must report to the Basic Training Academy prior to the six-month anniversary. During this pre-academy assignment, Cadets may perform routine tasks and duties, but must be under the direct control and supervision of a certified Correctional Officer or Supervisor while doing the task or duty. Cadets will not be assigned to a post to work independently because they are not certified law enforcement officers and have not been properly trained in accordance with APOSTC requirements.

c.    During the pre-academy assignment at the institutions, Cadets will participate in a physical fitness program that will be monitored by the Regional Advanced Training Centers. Since many Cadets are hired that have not successfully met the physical requirements, it is imperative that Cadets complete at least one hour of physical fitness training daily. This hour of training will be part of their eight-hour workday and will be organized by the Regional Advanced Training Supervisor.

d.    Cadets are not allowed to work overtime at any institution while enrolled at the Alabama Corrections Academy or in Cadet status.

e.    Upon graduation from the Academy, the new officer will enter a twelve- (12) day OJT training program at their institution of assignment. During the OJT period the new officer will perform assigned duties while under the supervision of a Correctional Officer I or Supervisor. After each block of training is completed, the Correctional Officer I/Trainer, the Supervisor, and the new officer will sign the appropriate block(s) of the training record. If twelve (12) days is not sufficient time for the new officer, the Warden may extend this time. Twelve- (12) day OJT should not be implemented during Pre-Academy assignments.

   1)    If the new officer cannot comprehend instructions or perform duties after being trained in a phase of instruction, the training record will not be signed as having been completed. The immediate supervisor will provide remedial training when determined necessary.

   2)    Supervisors and shift commanders will monitor the OJT program closely and take appropriate action to ensure high quality of training is achieved during this OJT period.

AR219 – August 11, 2004

3)  The Warden/Director or their designee will ensure completion of the OJT program and verify training by signing block 18, Certifying Official, of the Correctional Officer Training Record, ADOC Form 219-A. The record will then be sent to the Regional Advanced Training Center within 7 calendar days.

2.  Support Personnel, Contracted Personnel and Volunteers

a.  ADOC Support Personnel will receive an initial 40-hour orientation conducted by the Regional Advanced Training Center within the first six months of employment and an institution/division orientation as deemed appropriate by the Warden/Director. Institution/Division orientation training should be conducted within the first seven days of employment.

b.  Contracted Personnel and Volunteers will receive an initial 16-hour orientation conducted by the Regional Advanced Training Center within the first six months and an institution/division orientation as deemed appropriate by the Warden/Director within the first seven days.

c.  In addition, support personnel will receive forty (40) hours of OJT that is related to the employee's job specialty. This OJT will be conducted by personnel best qualified to train the new employee on their job responsibilities and will be documented in the training record that is signed by the trainer and the employee. The training record will be forwarded upon completion of training and maintained at the Regional Advanced Training Center.

3.  Law Enforcement Lateral Entry Candidates

a.  Candidates for ADOC Correctional Officer that have worked as a Correctional Officer or other law enforcement officer for another state agency may qualify for lateral entry.

b.  The Director of Training will screen all lateral entry candidates to ascertain whether the candidate meets the equivalency requirements of APOSTC for lateral entry. The equivalency criterion includes correctional officer or other law enforcement experience, basic correctional officer training or other law enforcement training, and post-secondary education. If a candidate meets the requirements:

1)  The Director of Training, in collaboration with Personnel, will prepare a series of documentation.

AR219 – August 11, 2004

2)    The Director of Training will draft a letter of recommendation for the Commissioner's signature.

3)    The Director of Training will then forward the series of documentation and the signed letter of recommendation to the APOSTC for lateral entry.

c.    Lateral Entry officers must complete the ADOC 80-Hour Lateral Entry Course at the Alabama Corrections Academy within the first six months of employment. After successful completion of the 80-Hour Lateral Entry Course, APOSTC certification will be granted. Upon completion of the 80-Hour Lateral Entry Course, the 12-day training will be facilitated at the institution of assignment.

d.    An institution orientation should be conducted within the first seven days of employment, as deemed appropriate by the Warden/Director.

G.    Records Maintenance

1.    Correctional Officer Graduate's completed training records and training documents will be forwarded to the Advanced Training Centers on the day of graduation from the Academy. The Correctional Officer Training Record, ADOC Form 219-A, will be initiated at the Academy, (Blocks 1-9 and Block 19) and forwarded to the Advanced Training Centers. The Training Supervisor will proceed with making the appropriate distribution of various records for OJT documentation purposes.

2.    After completion and verification of a new officer's OJT training, the completed record will be forwarded to the appropriate Regional Advanced Training Center within 7 calendar days.

3.    All training records for support personnel will be initiated at the new employee's work place by the supervisor. When the OJT training is completed the record will be forwarded to the appropriate Regional Advanced Training Center within 7 calendar days.

4.    A copy of the training records for each student attending the Alabama Corrections Academy will also be maintained at the Academy.

5.    The supervisor will document any institution/division training conducted and a copy of the documentation will be sent to the appropriate Regional Advanced Training Center for inclusion in the individual's training record.

6.    Should an employee transfer to another region, the Training Supervisor will forward the training record to the receiving Regional Advanced Training Center.

AR219 – August 11, 2004

7.   Employees that complete State Personnel training courses or any other recognized training courses should forward a copy of the certificate of completion to the Regional Advanced Training Center.

H.   Firearms Training

1.   All law enforcement personnel will receive appropriate firearms training on the use, safety, and care of firearms, conducted by APOSTC certified Firearm's Instructors.

2.   Cadets graduating from the Alabama Corrections Academy must be qualified with both the 12-Gauge Shotgun and the .38 caliber revolver.

3.   In accordance with APOSTC Rule 650-X-4.08, **Firearms Re-qualification**, APOSTC requires that all law enforcement officers, who have been certified by APOSTC, shall successfully pass an approved firearms course annually. ADOC personnel must qualify with the 12-Gauge Shotgun and a departmentally authorized handgun. Any officer who fails the annual re-qualification course after three attempts shall:

a.   Receive a written warning from the officer's supervisor for a demonstrated lack of proficiency with firearms and the consequences of failure to qualify. **A copy of the warning must be sent to the Director of Training.**

b.   The officer failing to qualify shall return to the Regional Advanced Training Center not later than 14 days after the reported failure to qualify. The officer shall receive individual instruction and shall be afforded three additional attempts to qualify with the assigned duty weapon. If the officer does not qualify after this additional period of instruction (a total of six attempts), the officer will be relieved of all law enforcement duties and shall be reassigned to administrative duties. The Warden shall initiate the approval process for imposing a written reprimand on the officer for non-compliance with policies, procedures, and regulations in accordance with AR 208, Employee Discipline. **A copy of the reprimand must be sent to the Director of Training and the Director of Personnel.**

c.   During the next 30-day period after the officer has been placed on administrative duty, he/she shall be transferred to the Alabama Corrections Academy and given intensive individual instruction on firearm proficiency and marksmanship. The officer shall be afforded three additional attempts to qualify. If the officer fails to qualify after the third attempt, the Director of Training will provide written documentation to the Warden with recommendation for further disciplinary action. The Warden shall initiate the approval process for imposing a suspension on the officer for non-

AR219 – August 11, 2004

compliance with policies, procedures, and regulations in accordance with AR 208, Employee Discipline. **A copy of the suspension will be forwarded to the Director of Personnel.**

    d.    Any officer who fails to pass an annual firearm re-qualification course shall be subject to his/her APOSTC certification being revoked, which could result in dismissal or reclassification to a non-sworn position, depending on departmental needs.

    e.    The department will supply all ammunition for the above attempts (Regional Advanced Training Center or Basic Training).

    4.    All law enforcement personnel will surrender their weapons card during Annual Regional Advanced Training or as directed by the Warden, Division Director, or Director of Training. Any law enforcement personnel who do not qualify with designated weapon(s) will not be issued the weapon until such time as they are fully qualified.

I.    The Training Division will ensure that all training objectives and goals are met on an annual basis and the Director of Training will forward documentation to APOSTC on all law enforcement personnel.

J.    When law enforcement employees fail to meet training requirements as required by APOSTC (Rule 650-X-12-.02), due to military activation or medical limitations, the Director of Training will forward a report to the APOSTC Executive Secretary. The employee will submit military activation or medical limitation documentation to the Regional Advanced Training Supervisor who will then forward it to the Director of Training.

K.    The certification of any law enforcement officer, not otherwise exempt, shall be suspended if the law enforcement officer's CEU's become twenty-four (24) or more hours delinquent (typically a 2-year timeframe). The law enforcement officer shall then be required to complete the APOSTC eighty- (80) hour refresher-training program before having his/her certification reinstated.

## VI. <u>DISPOSITION</u>

Any forms used will be disposed of and retained according to the Departmental Records Disposition Authority (RDA).

## VII. <u>FORMS</u>

A.    ADOC Form 219-A, Correctional Officers Training Record (Refer to the Training Division Standard Operating Procedures (SOPs))

B.    ADOC Form 219-B, Class Insert (Refer to the Training Division SOPs)

AR219 – August 11, 2004

**VIII.**  **SUPERCEDES**

This administrative regulation supercedes the one dated October 21, 1999, and Change #1 to AR 219 dated March 8, 2001.

**IX.**  **PERFORMANCE**

    A.    Code of Alabama 1975, Section 14-2-8

    B.    Alabama Peace Officers Standards and Training Commission mandates (Code of Alabama 1975, Section 36-21-40 through Section 36-21-51):

        1.    Chapter 650-X-3- Training Academies

        2.    Chapter 650-X-2- Admittance to Training Academy

        3.    Chapter 650-X-11- Certification of Correctional Officers

        4.    Chapter 650-X-12- Continuing Education Requirements

    C.    Code of Alabama 1975, Section 41-12-21

Donal Campbell, Commissioner

AR219 – August 11, 2004





**State of Alabama**

# Alabama Department of Corrections

301 S. Ripley Street
P. O. Box 301501
Montgomery, AL 36130

**Bob Riley**
GOVERNOR

**Donal Campbell**
COMMISSIONER

December 30, 2004

**ADMINISTRATIVE REGULATION**                    **OPR:  TRAINING**
**NUMBER            231**

## TRAINING FOR SUPERVISORS

**I.    GENERAL**

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes responsibilities, policies, and procedures to ensure that all new supervisors receive New Supervisor Training (NST) within the probationary period.

**II.    POLICY**

It is the policy of the ADOC to ensure that all supervisors shall receive training designed to develop and enhance supervision skills.

**III.    DEFINITION(S) AND ACRONYM(S)**

A.    New Supervisors Training (NST):  A standardized forty- (40) hour course designed to develop and/or enhance skills relevant to employee supervision.

B.    Performance Appraisal Training:  Standard three- (3) hour training program on the mechanics of the performance appraisal.

**IV.    RESPONSIBILITIES**

A.    The Deputy Commissioners, Wardens, and Division Directors are responsible for ensuring all newly appointed supervisors attend NST.

B.    The Director of Training is responsible for:

    1.    The development of an NST.

    2.    Ensuring that required training documentation is maintained.

**V.    PROCEDURES**

A.    Wardens/Directors will submit the names of all newly appointed supervisors to the Advanced Training Center in their region.

EXHIBIT 104



EXHIBIT 104

B.   Advanced Training Supervisors shall request the required supervisory training course through the Alabama Corrections Academy to enable the supervisor(s) to complete the training within their probationary period..

C.   Newly appointed executive level staff shall be trained at the discrection of the appointing authority.

## VI.   DISPOSITION

There are no forms prescribed by this regulation. Therefore, disposition procedures are not necessary.

## VII.   FORMS

There are no forms prescribed by this regulation.

## VIII.   SUPERCEDES

This being a new regulation, there are no other regulations at this time that will supercede.

## IX.   PERFORMANCE

Code of Alabama, 1975, Section 14-1-1

Donal Campbell, Commissioner

AR 231 – December 30, 2004



# State of Alabama
## Alabama Department of Corrections



**Bob Riley**
GOVERNOR

Research and Planning
P. O. Box 301501
Montgomery, AL 36130-1501

**Donal Campbell**
COMMISSIONER

January 30, 2003

ADMINISTRATIVE REGULATION
NUMBER                    403

OPR: INSTITUTIONS

## DISCIPLINARY HEARING PROCEDURES FOR MAJOR RULE VIOLATIONS

**I    GENERAL**

   A.    This regulation establishes policies/procedures governing the conduct and disposition of Disciplinary Hearings for inmates in the custody/control of the Alabama Department of Corrections (ALDOC). The Commissioner, his designee(s), Wardens and other ALDOC employees whose duties involve the Hearing or processing of disciplinary proceedings are responsible for following the provisions of this regulation. All procedures require final action by the Institutional Head or his/her designee. The Institutional Head will identify said designee in writing.

   B.    A Hearing Officer will hear evidence in cases of major violations of departmental administrative regulations, and institutional rules and regulations, for which punishments or sanctions may be imposed.

   C.    Sanctions or punishments may include, segregation, forfeiture of earned good time, custody review, and loss of privileges.

   D.    When an inmate with a serious mental illness receives a disciplinary report, the inmate's mental status will be considered in determining the inmate's competency to participate in the hearing process. When an inmate is found incompetent, the disciplinary hearing process will be delayed until the inmate's competence has been restored. The inmate's mental status will be considered in the disposition when as inmate with a mental illness is found guilty of a rule violation. The institutional psychologist will assess the inmate's competency and culpability, and provide relevant information to the disciplinary hearing officer.

   E.    Inmates will not be punished for symptoms of a serious mental illness. This is not to say that a mental health inmate should never receive a disciplinary. The intent of the mental status evaluation is to determine if the misconduct is symptomatic of the presence of a

**EXHIBIT 105** 1 of 24

AR 403 January 30, 2003



$\mathcal{S}$*tate of* $\mathcal{A}$*labama*

$\mathcal{A}$*labama* $\mathcal{D}$*epartment of* $\mathcal{C}$*orrections*

**Bob Riley**
GOVERNOR

Research and Planning
P. O. Box 301501
Montgomery, AL 36130-1501

**Donal Campbell**
COMMISSIONER

January 30, 2003

ADMINISTRATIVE REGULATION
NUMBER                    403

OPR: INSTITUTIONS

## DISCIPLINARY HEARING PROCEDURES FOR MAJOR RULE VIOLATIONS

**I    GENERAL**

   A.    This regulation establishes policies/procedures governing the conduct and disposition of Disciplinary Hearings for inmates in the custody/control of the Alabama Department of Corrections (ALDOC). The Commissioner, his designee(s), Wardens and other ALDOC employees whose duties involve the Hearing or processing of disciplinary proceedings are responsible for following the provisions of this regulation. All procedures require final action by the Institutional Head or his/her designee. The Institutional Head will identify said designee in writing.

   B.    A Hearing Officer will hear evidence in cases of major violations of departmental administrative regulations, and institutional rules and regulations, for which punishments or sanctions may be imposed.

   C.    Sanctions or punishments may include, segregation, forfeiture of earned good time, custody review, and loss of privileges.

   D.    When an inmate with a serious mental illness receives a disciplinary report, the inmate's mental status will be considered in determining the inmate's competency to participate in the hearing process. When an inmate is found incompetent, the disciplinary hearing process will be delayed until the inmate's competence has been restored. The inmate's mental status will be considered in the disposition when as inmate with a mental illness is found guilty of a rule violation. The institutional psychologist will assess the inmate's competency and culpability, and provide relevant information to the disciplinary hearing officer.

   E.    Inmates will not be punished for symptoms of a serious mental illness. This is not to say that a mental health inmate should never receive a disciplinary. The intent of the mental status evaluation is to determine if the misconduct is symptomatic of the presence of a

AR 403 January 30, 2003

serious mental illness. If such is the case, disciplinary action is deemed counterproductive and should not be completed.

## II    DUE PROCESS REQUIREMENTS

Any inmate charged with a violation of departmental administrative regulations, institutional rules and regulations must be given a due process hearing if the violation can result in the loss of earned good time and/or confinement to segregation. An inmate can be placed in disciplinary segregation for up to 45 days and upon reclassification from work release for up to 30 days.

Due Process requirements are:

A.    The inmate must be given written notice of the charges at least 24 hours prior to the Hearing.

B.    The inmate must be permitted to attend the hearing and testify or present documentary evidence, unless he refuses to attend or is disruptive.

C.    The inmate must be permitted to call a reasonable number of reasonably available witnesses to the hearing, normally no more than three (3) witnesses.

D.    The inmate must be permitted to prepare and submit to the Hearing Officer, prior to the hearing, pertinent written questions to be asked of witnesses at the hearing, or to ask another inmate to assist him in preparing these questions if he is incapable of doing so.

E.    The inmate must be informed of the decision of the Hearing Officer, and must be given a copy of the signed and approved Disciplinary Report which lists the findings of fact, the basis for the findings of fact, the decision of the Hearing Officer, and the punishment or sanction imposed.

F.    If the inmate has been identified as a mental health inmate, an evaluation of the inmate's competency to understand the disciplinary process must be conducted by the institutional psychologist.

## III    PROCEDURE BEFORE HEARING

### A.    Arrest or Charge of Inmate

The arrest or charge of an inmate for a rule violation may be made by any employee or contract medical employee of the ALDOC. The person making the arrest or charge is designated as the Arresting Officer. The Arresting Officer will appear as a witness at the Disciplinary Hearing. For the purpose of this regulation, an arrest is defined as the taking of an inmate into custody or making a charge by the authority of this regulation, federal law, Alabama law, or municipal law for the purpose of charging him/her with an offense or violation of a departmental administrative regulation or institutional rules and regulations or

charges. The arrest should be made within ten (10) calendar days after the violation is reported, discovered, or within ten (10) calendar days after an investigation has been completed, or within ten (10) calendar days after an escapee (in an escape charge) is back in custody of the ALDOC.

B.     Appointment of Hearing Officer

Wardens will appoint a ALDOC employee to serve as Hearing Officer of any charge(s) brought against an inmate pursuant to AR 403. Wardens, personnel who have formed an opinion of the innocence or guilt of the charged inmate, Arresting Officer, and witnesses may not serve as Hearing Officer.

C.     Investigation of Charges

The Wardens may, if he/she deems it necessary or advisable, order an investigation of the charges at the institutional level and a report to him/her or request an investigation by the Investigations and Intelligence (I & I) Division.

D.     Preparation of Charges

ALDOC Form 225B, Disciplinary Report (Annex C) items 1-4 must be completed when the inmate is charged. If the inmate's actions in one incident violates various major or minor rules, then the Arresting Officer may use his/her discretion in which charges to bring. All offenses growing out of the same incident may be charged at the same time, using separate 225B forms for each charge. The charge(s) should be filed and served within ten (10) calendar days after the inmate is arrested or charged. If the charge is escape, the writer of the incident report will complete an incident report which will be notarized (See AR 302). It will include therein additional information such as contacts for evidence and testimony including law enforcement officers, free world witnesses, and ALDOC personnel.

E.     Serving the Inmate with the Charge

The Form 225B completed through item five must be served by the Serving Officer on the inmate at least 24 hours before the schedule hearing. The Serving Officer will read the charges to the inmate. If the inmate refuses to sign for receipt of charges, then the Serving Officer will so indicate by "Refused to Sign" and sign Serving Officer's signature. The Serving Officer at this time will inform the accused inmate that he/she should prepare his/her testimony, in the form of a written statement, to be read by the inmate to the Hearing Officer during the hearing. After the inmate has been served a copy of 225B, a suspense copy will be placed in the inmate's institutional file.

F.     Obtain Name of Witnesses Inmate wants at Hearing

At the time of service of charges on an inmate, the Serving Officer will advise the inmate of his/her right to call witnesses whose testimony will be relevant and whose presence will not present a security threat. The Serving Officer will obtain those names at this time and will not refuse to list any witnesses desired by the inmate. The Hearing Officer will determine if the

witnesses' testimony could possibly be relevant and/or if bringing certain witness (es) would present a security threat. Normally no more than three (3) witnesses with relevant testimony are called. The Hearing Officer will be responsible for having the inmates and employees called as witnesses present at the hearing. Any free world witness the inmate wishes to testify, and whose testimony would be relevant, must be written or called by the inmate, and permission must be given to the inmate to write or call. Form 225B, Items 6 and 7, are to be completed by the Serving Officer when serving the inmate. If an inmate requests more than three witnesses, including free world witnesses, the Hearing Officer, prior to the hearing, may require the inmate to submit a summary of the witnesses' expected testimony. The Hearing Officer may refuse to allow any witness whose testimony is not relevant to testify.

G.    Provide Data on Inmate to Hearing Officer

At institutions where computer input, printer capability, and personnel are available, on the working day prior to the Disciplinary Hearing, a copy of the inmate's record display, CDINC may be produced and provided to the Hearing Officer along with the inmate's good time earning status and good time earned.

## IV    PROCEDURES DURING HEARING

The Hearing should be held within ten (10) working days after the inmate has been served with the charge(s), but cannot be held in less than 24 hours. If there is a need to postpone or reschedule the hearing, Form 225D, Notice of Postponement of Disciplinary Hearing (Annex D) should be completed advising the inmate of the rescheduled date and reason for delay. The Hearing Officer at the time the hearing is to begin will follow these procedures:

A.    Have the inmate present in the hearing room and identify him/her as the inmate charged. The inmate must be present in the hearing room unless he/she refuses to attend the hearing or is disruptive. You may proceed without him/her only for these two (2) reasons. If he/she is not present, explain in detail on an additional page and attach to the disciplinary report.

B.    Read the charges to the inmate and determine if he/she understands the charges.

C.    Determine if the inmate is capable of acting in his/her own defense. If the inmate has been identified as a "mental health" inmate, review the disciplinary report to ascertain if an assessment of the inmate's mental status has been performed by the institutional psychologist. If an assessment has been done, and the inmate has been deemed capable of understanding the disciplinary process, then determine if the inmate is capable of acting in his/her own defense. If the inmate is not capable of acting in his/her own defense, then appoint an on-duty ALDOC employee to assist the inmate. If the inmate is provided assistance, the hearing may be delayed up to five (5) working days if requested. Neither inmates nor free world counsel may represent an inmate in a disciplinary hearing. Complete item 10 on Form 225B.

D.  Ask the inmate how he/she pleads and record on Form 225B. If inmate pleads guilty, then go forward to procedural Step L.

E.  Swear the inmate and all witnesses under oath to testify truthfully.

F.  Hear the evidence brought by the Arresting Officer and all witnesses present at the hearing. Affidavits and written statements should not be used in lieu of testimony, except in extreme circumstances, which must be documented on additional page(s) and attached to the disciplinary report.

G.  Allow the inmate to read his/her prepared written statement to the Hearing Officer and allow the inmate to add his/her oral testimony if the inmate desires.

H.  Ask the questions, if relevant, prepared by the inmate, to the respective witness (es) and write the answers.

I.  Explain to the inmate why any witness (es) he/she has requested were not called and complete item 16 on Form 225B.

J.  Dismiss everyone from the hearing room, consider the evidence and make a finding of fact and finding of not guilty or guilty and determine the punishment or sanctions imposed. The Hearing Officer may determine that the violation charged has not been proven but that a lesser included similar offense has been proven. A lesser included violation is defined as being a violation in which some but not all of the elements of proof of the originally charged violations are present. With good justification the Hearing Officer has authority to find the inmate guilty of a lesser included offense, in which case, provisions of AR 414 may apply in order to complete disposition of appropriate disciplinary action.

K.  Call the inmate into the hearing room and inform him/her of the decisions reached.

L.  If the inmate has pled guilty, then omit procedures E through K, swear in the inmate only, require the inmate to explain the details of his/her violation to you, have the inmate sign the guilty plea, and then, make a finding of fact, and a finding of guilt or innocence. If the inmate's plea of guilty is accepted then inform him/her of the punishment or sanctions imposed. If the inmate refuses to sign the guilty plea this will be considered a "Not Guilty" plea and proceed with the hearing.

## V    PROCEDURES AFTER HEARING

The Hearing Officer, after the hearing will follow these procedures:

A.  Have a condensed version of all pertinent testimony typed on Form 225B using additional pages if necessary.

B.  Complete all spaces on Form 225B or put [N/A] (Not Applicable) in those appropriate spaces.

AR 403 January 30, 2003

C.  Complete, in the appropriate space, specifically the findings of fact made by the Hearing Officer.

D.  Complete, in the appropriate space, specifically the basis for the findings of fact.

E.  Obtain all necessary signatures on the Disciplinary Report Form 225B.

F.  The Warden or his/her designee will approve or disapprove the findings and/or recommendations within ten (10) working days after hearing. The Warden may not disapprove a finding of "not guilty". If the Warden disapproves of the recommended punishment, he/she may order the punishment to be reduced.

G.  A completed signed copy of the disciplinary report will be served on the inmate as soon as possible without undue delay after the Warden's determination, and all approved punishments will begin at this time or at the time the inmate is placed in the segregation cell to begin serving disciplinary segregation. If the Warden determines that a security threat will exist by a delay in the imposition of punishment, he/she may order such punishment to begin at any time after the hearing is conducted.

H.  If the Warden approves the recommendation of the Hearing Officer, or a lesser punishment, he/she will:

   1.  At units with computer terminal input capability: Coordinate with and forward or issue his/her comments and supporting documents to the institutional Social Service Coordinator. The Coordinator will insure the terminal operator takes the required action to effect the loss of good time in accordance with the Computer Terminal Operator's Manual, and implement classification procedures or other considerations. Institutional Social Services will forward/issue the completed and signed disciplinary report to the following:

      a.  One copy to the Board of Pardons and Parole.

      b.  One copy to the Director of Investigations and Intelligence in all cases where there has been a violation of Federal or State law.

      c.  Original to the Director of Central Records, stamped as "Entered" at the terminal, initialed by the operator, and dated on the date of entry.

      d.  One copy retained in the inmate's institutional file.

   2.  At units without computer terminal capability: Submit his/her comments and supporting documents to the Director of Central Records for any further action needed to effect the loss of good time or other consideration. The Director of Central Records will accept the action of the Warden for less severe punishment as final. Additionally, units without computer terminal capability, will furnish one copy to the Board of Pardons and Paroles, and one copy to the Director of Investigations and Intelligence in all cases where there has been a violation of federal or state law. The

AR 403 January 30, 2003

original will be retained in the inmate's Central Record file. The Warden will notify the inmate in writing of his/her approval or recommended disapproval, and one copy of the Warden's action will be forwarded to Social Services for classification purposes and the same copy retained in the inmate's institutional file.

## VI    MISCELLANEOUS PROVISIONS

A.    Arrest and Hearing Based on Information From Confidential Sources

If the arrest of an inmate is made upon information received from confidential source(s), the following procedures should be followed:

1.    The identity of a confidential source(s) of information will remain confidential. Precautions must be taken to insure the reliability of any information received from a confidential source(s).

2.    The facts obtained from confidential source(s) will be presented verbally at the hearing by the person receiving the information from the confidential source.

3.    No decision in a disciplinary proceeding may be based upon information from an undisclosed informant unless there is corroborating information or evidence or unless the reliability of the source satisfies the Hearing Officer that the information is true. The basis for accepting the source as reliable should be indicated in item 18 on Form 225B.

B.    Excusing Witnesses Called by Inmate

As the names of witnesses desired by the accused have been obtained during the notification and serving process, they (witnesses) are required to appear, unless excluded for specific reasons by the Hearing Officer. Reasons for not calling a witness may include, but are not limited to: inmate witness declining to appear voluntarily; the witness being repetitive in that such witness is expected to provide the same information as other witnesses; the witness not having personal knowledge of the circumstances of the incident; endangering the security of the institution; or an existing possibility of retribution which could harm an individual. The reason (s) for not calling any witness requested by an inmate will be explained to the inmate and item 16 on the Form 225B must be completed.

C.    Determine if the Inmate is capable of acting in his/her own defense. If the inmate has been identified as a "mental health" inmate, review the disciplinary report to ascertain if an assessment of the inmate's mental status has been performed by the institutional psychologist. If an assessment has been done, and the inmate has been deemed capable of understanding the disciplinary process, then determine if the inmate is capable of acting in his/her own defense. If the inmate is not capable of acting in his/her own defense, then appoint an on-duty ALDOC employee to assist the inmate. If the inmate is provided assistance, the hearing may be delayed up to five (5) working days, if requested. Neither other inmate's nor free-world counsel may represent an inmate in a disciplinary hearing. Complete item 10 on the Form 225B. In any case where a disciplinary or rule violation has

AR 403 January 30, 2003

been voided or otherwise overturned as a result of a technicality or due process violation, but where the behavior indicates the need for a more restrictive placement or custody, classification and/or the Central Review Board may classify the offender as deemed appropriate based upon the specific act or behavior itself.

D.    Adjudication - A major violation may be adjudicated with a behavioral citation in accordance with AR 414 provided the following conditions are met:

    1.    There is no injury to staff during the incident or as a result of the violation.

    2.    No consequences arise which result in the loss or destruction of property and security of the institution.

    3.    There is no serious injury to inmates as a result of the violation or incident.

    4.    The violator is not likely to receive disciplinary segregation.

    5.    With written justification any combination of the Citing Officer, Receiving Supervisor, or the Warden or his/her designee, determines that a behavioral citation is appropriate due to circumstances of the incident or violation.

E.    For mental health inmates deemed competent to participate in the disciplinary process, the disciplinary hearing officer will consider the mental health evaluation and any pertinent recommendations prior to determining the inmate's guilt or innocence in making a disposition of the case. The institutional psychologist will be contacted for clarification, if the hearing officer has questions about recommendations. If the inmate is found guilty, the hearing officer may impose punishment and/or refer the inmate for treatment.

F.    The disciplinary process will not proceed for an inmate deemed incompetent. The process will be suspended until the inmate has been restored to competency. The institutional psychologist will advise the disciplinary hearing officer when the inmate has been restored to competency, and the disciplinary hearing process can proceed. If the inmate has not been restored to competency within six months, information regarding the rule violation and the inmate's inability to proceed with the disciplinary hearing will be documented in an incident report. The incident report will be filed in the inmate's institutional file. The disciplinary report will be removed from the file and no further action will be taken.

G.    Referral for a mental health consultation to the disciplinary process may be made: 1) at the time of the rule violation, 2) when review of the disciplinary report identifies the inmate as having a serious mental illness, or 3) whenever an inmate not previously identified as having a serious mental illness demonstrates signs of compromised functioning during the hearing process.

## VII    SANCTIONS

A.    Annex A, Violations Table and Authorized Sanctions, contains a table listing by violation number and the violation type and sanctions. Annex B, Definitions and Examples of Rule Violations, contains definitions and examples of the violations listed in Annex A.

B.    Inmates removed from programs for conviction of a new crime will be permanently removed from eligibility for correctional incentive time by placement in Class IV CIT status permanently (See Administrative Regulation 427 and 432).

C.    Approved actions by the Warden or his/her designee is final and the sanctions will begin on the effective date shown on the charges.

**VIII    STANDARD OPERATING PROCEDURES**

Institutions may prepare a Standard Operating Procedure (SOP) to ensure compliance with provisions of this regulation.

**IX    APPEAL OF THE INMATE**

The inmate may not appeal the final action by the Warden or his/her designee.

**X    REFERENCE**

Administrative Regulation 414, "Behavior Citation Procedures for Informal Disciplinary Actions"

**XI    SUPERSESSION**

This regulation supersedes Administrative Regulation 403, dated October 3, 1996.


Donal Campbell, Commissioner

**ANNEXES**

Annex A - Violations Table and Authorized Sanctions

Annex B - Definitions and Examples of Rule Violations

Annex C - ALDOC Disciplinary Report (ALDOC Form 225B)

Annex D - Notice of Postponement of Disciplinary Hearing (ALDOC Form 225D)

## ALABAMA DEPARTMENT OF CORRECTIONS
## VIOLATIONS TABLE AND AUTHORIZED SANCTIONS
## ANNEX A

### VIOLATION AGAINST PERSONS

| MAJOR RULE VIOLATION | VIOLATION TYPE |
|---|---|
| 28 | HOMICIDE |
| 29 | ASSAULT ON PERSON(S) ASSOCIATED WITH THE ALDOC |
| 30 | ASSAULT ON PERSON(S) NOT ASSOCIATED WITH ALDOC |
| 31 | ASSAULT ON ANOTHER INMATE |
| 32 | SEIZING OR HOLDING HOSTAGES |
| 33 | UNLAWFULLY DETAINING ANY PERSONS |
| 34 | FIGHTING WITH A WEAPON |
| 35 | FIGHTING WITHOUT A WEAPON |
| 36 | SEXUAL ASSAULT (FORCIBLE) |
| 37 | SEXUAL OFFENSE (NON-FORCIBLE)/SOLICITING |
| 38 | INDECENT EXPOSURE/EXHIBITION |
| 39 | EXTORTION OR BLACKMAIL |
| 40 | ROBBERY |
| 41 | MAKING FALSE STATEMENT OR CHARGE TO A ALDOC EMPLOYEE WITH INTENT TO DECEIVE THE EMPLOYEE OR TO PREJUDICE ANOTHER PERSON |
| 42 | GATHERING AROUND AN EMPLOYEE IN A THREATENING OR INTIMIDATING MANNER |
| 44 | THREATS |

### SECURITY VIOLATION

| MAJOR RULE VIOLATION | VIOLATION TYPE |
|---|---|
| 45 | ESCAPE BY FORCE |

Annex A to AR 403 (page 1 of 4)

AR 403 January 30, 2003

**ALABAMA DEPARTMENT OF CORRECTIONS**
**VIOLATIONS TABLE AND AUTHORIZED SANCTIONS**
**ANNEX A (Continued)**

| 46 | ATTEMPT TO ESCAPE BY FORCE |
|---|---|
| 47 | ESCAPE WITHOUT FORCE |
| 48 | ATTEMPT TO ESCAPE WITHOUT FORCE |
| 49 | ABSENT WITHOUT LEAVE |
| 50 | BEING IN AN UNAUTHORIZED AREA |
| 51 | UNAUTHORIZED POSSESSION OF ESCAPE DEVICE |
| 52 | UNAUTHORIZED POSSESSION OF WEAPON OR DEVICE THAT COULD BE USED AS A WEAPON |
| 53 | INCITING TO RIOT OR RIOTING |
| 54 | REFUSING TO WORK/FAILING TO CHECK OUT FOR WORK/ENCOURAGING OR CAUSING OTHERS TO STOP WORK |
| 56 | FAILURE TO OBEY A DIRECT ORDER OF ALDOC OFFICIAL |
| 57 | INSUBORDINATION |
| 59 | DELAYING, HINDERING, OR INTERFERING WITH AN EMPLOYEE IN PERFORMANCE OF HIS/HER DUTY |
| 60 | BRIBERY OR ATTEMPTED BRIBERY |
| 61 | DISRUPTING THE COUNT |
| 62 | INTENTIONALLY CREATING A SECURITY, SAFETY, OR HEALTH HAZARD |
| 63 | DISORDERLY CONDUCT |
| 64 | POSSESSION OF CONTRABAND. INCLUDES POSSESSION OF CURRENCY UNLESS APPROVED BY THE WARDEN |
| 65 | POSSESSION OF UNAUTHORIZED OR UNPRESCRIBED DRUGS, INTOXICANTS, OR |

Annex A to AR 403 (page 2 of 4)

AR 403 January 30, 2003

**ALABAMA DEPARTMENT OF CORRECTIONS**
**VIOLATIONS TABLE AND AUTHORIZED SANCTIONS**
**ANNEX A (Continued)**

PARAPHERNALIA. ALSO, CONSUMPTION OR USE
OF, OR UNDER THE INFLUENCE OF ALCOHOL,
NARCOTICS, OR OTHER INTOXICANTS.

## PROPERTY VIOLATIONS

| MAJOR RULE VIOLATION | VIOLATION TYPE |
|---|---|
| 68 | THEFT, DAMAGE, OR DESTRUCTION OF ANOTHER'S PERSONAL PROPERTY |
| 69 | DESTROYING, STEALING, DISPOSING, ALTERING, DAMAGING, OR SELLING STATE PROPERTY |
| 70 | UNAUTHORIZED POSSESSION OF OTHER'S PROPERTY |
| 71 | ARSON |
| 72 | FORGERY |
| 73 | COUNTERFEITING |

## POLICY VIOLATIONS

| MAJOR RULE VIOLATION | VIOLATION TYPE |
|---|---|
| 78 | FAILURE TO COMPLY WITH THE AGREEMENT AND CONDITIONS OF LEAVE AND PASS |
| 86 | BEING FIRED FROM JOB |

## PERSONAL VIOLATIONS

| MAJOR RULE VIOLATION | VIOLATION TYPE |
|---|---|
| 90 | CONSUMPTION OR USE OF, OR UNDER THE INFLUENCE OF ALCOHOL, NARCOTICS OR OTHER INTOXICANTS |

## MISCELLANEOUS VIOLATIONS

| MAJOR RULE VIOLATION | VIOLATION TYPE |
|---|---|
| 91 | CONSPIRACY TO COMMIT A VIOLATION OF DEPARTMENTAL OR INSTITUTIONAL RULES |

Annex A to AR 403 (page 3 of 4)

AR 403 January 30, 2003

## ALABAMA DEPARTMENT OF CORRECTIONS
## VIOLATIONS TABLE AND AUTHORIZED SANCTIONS
### ANNEX A (Continued)

| | |
|---|---|
| 92 | AIDING AND ABETTING ANOTHER TO COMMIT A VIOLATION OF DEPARTMENTAL OR INSTITUTIONAL RULES |
| 93 | VIOLATION OF STATE OR FEDERAL LAW |
| 94 | SOLICITING SEXUAL ACT |
| PV | VIOLATION OF PAROLE (RECOMMENDED BY P&P) |

### WORK RELEASE AND SIR VIOLATIONS

| MAJOR RULE VIOLATION | VIOLATION TYPE |
|---|---|
| E8 | VIOLATION OF SIR CONTRACT |
| E9 | ABSCONDING FROM SUPERVISION, ABSENT WITHOUT PERMISSION |

NOTE: Inmates are subject to all Rule Violations (28 thru E9). Rules E1 through E3 (see AR 414) and E8 and E9 (this regulation) are designed primarily to manage/govern behavior of inmates. In addition to punishments authorized for major violations outlined in this Annex, inmates who violate, and are convicted of, any of these rules (28 thru E9) may also be removed from the Work Release or SIR Program.

### AUTHORIZED SANCTIONS

1. Loss of a portion or all good time the inmate has earned.

2. Confinement to Segregation.

3. Recommend custody review.

4. Loss of any and all privileges up to 90 days.

Annex A to AR 403 (Page 4 of 4)

AR 403 January 30, 2003

# ALABAMA DEPARTMENT OF CORRECTIONS
## DEFINITIONS AND EXAMPLES OF RULE VIOLATIONS
## ANNEX B

### VIOLATION AGAINST PERSONS

28    HOMICIDE - The death of a human being caused by another person's actions.

29    ASSAULT ON A PERSON (S) ASSOCIATED WITH THE ALDOC- Any willful attempt or threat to inflict injury upon an officer of ALDOC, employee, or other person associated with the ALDOC giving the victim reason to fear or expect immediate bodily harm.

30    ASSAULT ON A PERSON (S) NOT ASSOCIATED WITH ALDOC - See #29 above.

31    ASSAULT ON ANOTHER INMATE - See #28 or #29 above.

32    SEIZING OR HOLDING HOSTAGES IN ANY MANNER - Abducting any individual with the intent to hold him/her for ransom or reward, to use him/her as a shield, or to use him/her as an aid in the commission of a felony or escape.

33    UNLAWFULLY DETAINING ANY PERSON - Holding any person against his/her will, even though the intent to create a hostage situation was not present.

34    FIGHTING WITH A WEAPON - Two or more individuals engaging in a mutual combat with a weapon(s) or a device(s) used as a weapon(s) during which combat the principal aggressor cannot be determined.

35    FIGHTING WITHOUT A WEAPON - Similar to #34 above except that a weapon or device used as a weapon are not present.

36    SEXUAL ASSAULT (FORCIBLE) - See #29 above; assault with the intention to commit the crime of rape or other sexual offense.

37    SEXUAL OFFENSE (NON-FORCIBLE)/SOLICITING - Commission of any sexual act during which both participants act willingly. To include hugging, fondling, caressing, kissing, etc.

38    INDECENT EXPOSURE/EXHIBITIONISM - Exposure to sight of the private parts of the body in a lewd or indecent manner.

39    EXTORTION OR BLACKMAIL - Demanding or attempting to demand, or receiving money or anything of value in return for protection from others in order to avoid bodily harm, or under threat of any kind.

40    ROBBERY - The taking of property from another by the use of force, or the threat of the use of force with the intent to deprive that individual of the property.

41    MAKING FALSE STATEMENTS OR CHARGES –The speaking of slanderous, defamatory, or untrue words tending to prejudice another.

42    GATHERING IN A THREATENING OR INTIMIDATING MANNER - Self-explanatory.

Annex B to AR 403 (Page 1 of 4)

AR 403 January 30, 2003

## ALABAMA DEPARTMENT OF CORRECTIONS
## DEFINITIONS AND EXAMPLES OF RULE VIOLATIONS
## ANNEX B (Continued)

44    THREATS - A communicated intent to do bodily harm to another individual or group by verbal or written expression.

## SECURITY VIOLATIONS

45    ESCAPE BY FORCE - The departure out of the custody of the ALDOC or other legal agency by a lawfully detained inmate with the intent to avoid confinement by use of constraining power, compulsion, or force.

46    ATTEMPT TO ESCAPE BY FORCE - An endeavor to escape or conspire to escape by force (see #45 above) resulting in recapture prior to leaving state custody or other controlling agency.

47    ESCAPE WITHOUT FORCE - See #45 above, except hat there is no use of constraining power, compulsion, or force involved.

48    ATTEMPT TO ESCAPE (WITHOUT FORCE) - See #46 above, except that there is no use of constraining power, compulsion, or force involved.

49    ABSENT WITHOUT LEAVE - Not returning from leave or pass within two hours of the designated time.

50    BEING IN AN UNAUTHORIZED AREA - Also includes being ardent from assigned work area or place of employment and/or being absent from assigned quarters without permission.

51    UNAUTHORIZED POSSESSION OF ESCAPE DEVICE - Having in one's possession any device which could be used to attempt or effect an escape, such as, but not limited to, an instrument to pick a lock, a homemade key, a disguise, or a replica of a human being.

52    UNAUTHORIZED POSSESSION OF A WEAPON OR DEVICE THAT COULD BE USED AS A WEAPON - Any instrument which could be used in a violent manner, such as a device with a pointed and/or sharpened end, or a homemade club, or any item which appears to be a weapon.

53    INCITING TO RIOT OR RIOTING - To incite a riot is to solicit or urge other persons by speech or actions to engage in a conduct which would create a substantial risk to institutional security or public safety, whereas rioting is the action of five or more people engaging in such behavior.

54    REFUSING TO WORK/FAILURE TO CHECK OUT FOR WORK/ENCOURAGING OR CAUSING OTHERS TO STOP WORK - Self-explanatory.

56    FAILURE TO OBEY A DIRECT ORDER OF A ALDOC OFFICIAL - Not complying with an order issued by an ALDOC employee in the performance of duty.

57    INSUBORDINATION - Any act, gesture, remark or statement which obviously reflects disrespect to lawful authority.

Annex B to AR 403 (Page 2 of 4)

AR 403 January 30, 2003

# ALABAMA DEPARTMENT OF CORRECTIONS
## DEFINITIONS AND EXAMPLES OF RULE VIOLATIONS
### ANNEX B (Continued)

59    DELAYING, HINDERING, OR INTERFERING WITH AN EMPLOYEE IN PERFORMANCE OF HIS DUTY - Self-explanatory.

60    BRIBERY OR ATTEMPTED BRIBERY - Offering or conferring upon a public servant anything of value with the intent to affect or influence official action, or receiving anything of value for such a purpose.

61    DISRUPTING THE COUNT - Any action intended to which otherwise effects a miscount of inmates within the institution.

62    INTENTIONALLY CREATING A SECURITY, SAFETY OR HEALTH HAZARD – Creating a situation which could cause serious impairment to the operation of the institution, harm to individuals, or result in destruction of property.

63    DISORDERLY CONDUCT – Conduct or actions that would create risk, inconvenience, or alarm to normal institutional/facility security or routine operation.

64    POSSESSION OF CONTRABAND - The possession of any item not issued to the inmate by an ALDOC employee, sold in the Canteen Store or approved by the Warden, to include possession of U.S. currency in any amount, or items in excessive amounts.

65    POSSESSION OF UNAUTHORIZED OR UNPRESCRIBED DRUGS, INTOXICANTS, OR PARAPHERNALIA – To include anything used in the administration of drugs or for the manufacture of drugs: for example, a paper bag with traces of glue inside, or the ingredients to make home brew or an intoxicating substance, or storage by the inmate or possession by the inmate of any psychotropic medication unless a specific exception is made by the prescribing physician (the inmate must keep a copy of the physician's authorization with medication at all times).

## PROPERTY VIOLATIONS

68    THEFT, DAMAGE OR DESTRUCTION OF ANOTHER'S PERSONAL PROPERTY – The taking of the property of another person without threat, force, or coercion, with the intent to permanently deprive the owner of the property.

69    DESTROYING, STEALING, DISPOSING, ALTERING, DAMAGING, OR SELLING STATE PROPERTY - Self-explanatory.

70    UNAUTHORIZED POSSESSION OF OTHER'S PROPERTY - Self-explanatory.

71    ARSON - The malicious burning, either by fire or explosion, of state property or items belonging to the inmate or another person.

72    FORGERY - The altering, possession, or transfer of a written instrument or document with the intent to defraud or deceive.

# ALABAMA DEPARTMENT OF CORRECTIONS
## DEFINITIONS AND EXAMPLES OF RULE VIOLATIONS
### ANNEX B (Continued)

73    COUNTERFEITING - To copy or imitate, without authority, in order to deceive or defraud by passing the copy as the original; for example, altering postage stamps, money orders or other documents.

## POLICY VIOLATIONS

78    FAILURE TO COMPLY WITH THE AGREEMENT AND CONDITIONS OF LEAVE OR PASS - To include travel arrangements of the leave or pass plan.

86    BEING FIRED FROM A JOB - Being released from employment, or assigned job, because of sloppy work, insolent language, or other culpable behavior on the part of the inmate.

## PERSONAL VIOLATIONS

90    CONSUMPTION OR USE OF, OR UNDER THE INFLUENCE OF ALCOHOL, NARCOTICS OR OTHER INTOXICANTS - The use of unauthorized narcotic substance or other intoxicant by sniffing, injection, or orally ingesting.

## MISCELLANEOUS VIOLATIONS

91    CONSPIRACY TO COMMIT A VIOLATION OF DEPARTMENTAL OR INSTITUTIONAL RULES - A combination or confederacy between two or more inmates **or** one or more inmates and one or more free world persons for the purpose of violating same departmental or institutional rule, even though the act is not consummated or carried out.

92    AIDING AND ABETTING ANOTHER TO COMMIT A VIOLATION OF DEPARTMENTAL OR INSTITUTIONAL RULES - To help, assist or facilitate the violation of a departmental or institutional rule by encouragement of counsel as to its commission with words, acts, support, presence, or assistance rendered.

93    VIOLATION OF STATE OR FEDERAL STATUTE - Self-explanatory.

94    SOLICITING SEXUAL ACT - Self-explanatory.

PV    VIOLATION OF PAROLE - Violation to be determined by Pardons and Paroles Officer/Board.

## WORK RELEASE AND SIR VIOLATIONS

E8    VIOLATION OF SIR CONTRACT – Self-explanatory

E9    ABSCONDING FROM SUPERVISION, ABSENT WITHOUT PERMISSION – Self-explanatory

Annex B to AR 403 (Page 4 of 4)

AR 403 January 30, 2003

ALDOC Form 225B

## ALABAMA DEPARTMENT OF CORRECTIONS
## DISCIPLINARY REPORT

1.   Inmate: _____     Custody: _____     AIS _____

2.   Facility: _____

3.   The above inmate is being charged by _____ with a violation of Rule Number _____ specifically _____ from regulation #_____ which occurred on or about _____, 20 _____ at (time) _____(am/pm), Location: _____. A hearing on this charge will be held after 24 hours from service.

4.   Circumstances of the violation(s) are as follows: _____

     _____

     _____

     _____                    _____
     Date                                        Arresting Officer/Signature/Rank

5.   I hereby certify that I have personally served a copy of the foregoing upon the above named inmate and I informed inmate of his/her right to present a written or oral statement at the hearing and to present written questions for the witnesses on this the _____ day of _____20 _____ , at (time)_____ (am/pm).

     _____                    _____
     Serving Officer/Signature/Rank             Inmate's Signature/AIS Number

6.   Witnesses desired? NO_____          YES_____
                        Inmate's Signature                 Inmate's Signature

7.   If yes, list

     _____

     _____

8.   Hearing Date_____ Time _____Place _____

9.   Inmate must be present in Hearing Room. If he/she is not present explain in detail on a additional page and attach.

10.  A finding is made that inmate (is/is not) capable of representing him/herself.

                        _____
                        Signature/Hearing Officer
11.  Plea: _____ Not Guilty _____ Guilty

12.  The Arresting Officer, inmate, and all witnesses were sworn to tell the truth.

                        _____
                        Signature/Hearing Officer

                                                            Annex C to AR 403 (Page 1 of 5)

AR 403 January 30, 2003

Arresting Officers testimony (at the hearing): _____

_____

_____

_____

13.    Inmate's Testimony:_____

_____

_____

_____

    Witness: _____    Substance of Testimony:_____

_____

_____

    Witness: _____    Substance of Testimony:_____

_____

_____

    Witness: _____    Substance of Testimony: _____

_____

_____

14.    The inmate was allowed to submit written questions to all witnesses. Copy of questions and answers are
    attached.

                    _____
                           Signature/Hearing Officer

15.    The following witnesses were not called - Reason not called

    1. _____    _____

    2. _____    _____

    3. _____    _____

16.  After hearing all testimony, the Hearing Officer makes the following findings of fact: (Be Specific) the Hearing Officer finds that:

_____

_____

_____

_____

17.  Basis for Findings of Fact:

_____

_____

_____

_____

18.  Hearing Officer's Decision: _____ Guilty _____ Not Guilty

19.  Recommendation of Hearing Officer:

_____

_____

_____

_____

_____        _____
Signature/Hearing Officer                           Type Name and Title

20.  Warden's Action – Date

_____

Approved

_____

Disapproved

_____

Other (Specify)

_____

_____

21.  Reason if more than 30 calendar days delay in
     action._____

_____

22.  I hereby certify that a completed copy of the foregoing Disciplinary Report was served on the
     above named inmate on this _____ day of _____ 20 ___ , at
     time)_____(am/pm).

_____        _____
Signature/Serving Officer/Title                 Inmate's Signature/AIS Number

Annex C to AR 403 (Page 3 of 5)

AR 403 January 30, 2003

**ALABAMA DEPARTMENT OF CORRECTIONS**
**DISCIPLINARY REPORT (OPTIONAL)**

Inmate Name/AIS Number _____        Incident Report No._____

Facility: _____

CONTINUED ARRESTING OFFICER'S (AO) STATEMENT AND/OR QUESTIONS BY HEARING
OFFICER (QBHO) TO ARRESTING OFFICER: _____

_____

_____

_____

_____

CONTINUED INMATE'S STATEMENT AND/OR QUESTIONS BY HEARING OFFICER (QBHO)
TO INMATE: _____

_____

_____

_____

_____

CONTINUED WITNESS TESTIMONY (QBHO): _____

_____

_____

_____

_____

CONTINUED FINDINGS OF FACT: _____

_____

_____

_____

_____

Annex C to AR 403 (Page 4 of 5)

AR 403 January 30, 2003

CONTINUED BASIS FOR FINDINGS OF FACT: _____

_____

_____

_____

_____

CONTINUED HEARING OFFICER'S RECOMMENDATIONS: _____

_____

_____

_____

_____

OTHER: _____

_____

_____

_____

_____

Annex C to AR 403 (Page 5 of 5)

ALDOC Form 225D

AR 403 January 30, 2003

**ALABAMA DEPARTMENT OF CORRECTIONS**
**NOTICE OF POSTPONEMENT OF DISCIPLINARY HEARING**

Inmate's Name: _____ AIS #: _____

Violation(s): _____

Notice is hereby given that your Disciplinary hearing which was scheduled on _____has

been rescheduled for _____

Reason for rescheduling: _____

_____

_____          _____
Inmate's Signature                                      Serving Officer's Signature

---

**ALABAMA DEPARTMENT OF CORRECTIONS**
**NOTICE OF POSTPONEMENT OF DISCIPLINARY HEARING**

Inmate's Name: _____ AIS: _____

Violation (s): _____

Notice is hereby given that your Disciplinary hearing which was scheduled on _____ has been

rescheduled for _____

Reason for rescheduling: _____

_____

_____          _____
Inmate's Signature                                      Serving Officer's Signature

Annex D to AR 403

24 of 24

AR 403 January 30, 2003



**State of Alabama**

# Alabama Department of Corrections

301 S. Ripley Street
P. O. Box 301501
Montgomery, AL 36130

**Bob Riley**
GOVERNOR

**Donal Campbell**
COMMISSIONER

February 7, 2005

ADMINISTRATIVE REGULATION          OPR: LEGAL
NUMBER                    412

## INSTITUTIONAL LAW LIBRARIES

### I.    GENERAL

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR) establishes responsibilities, policies, and procedures for institutional law libraries.

### II.    POLICY

It is the policy of the ADOC to provide legal resource libraries and to permit all inmates access to the materials available.

### III.    DEFINITION(S) AND ACRONYM(S)

CD:  Compact Disk

### IV.    RESPONSIBILITIES

Wardens/designees are responsible for the operation and maintenance of institutional law libraries.

### V.    PROCEDURES

A.    Destruction of or damage to law library books, CDs or materials.

    1.    Any general population inmate who has been found guilty of violating Administrative Regulation 403, Disciplinary Hearing Procedures for Major Rule Violations, Rule #69 (destruction or damaging state Property) that involves the destruction or damaging of law library books, CDs or other materials, may be denied physical access to the law library for up to 30 days. During the time that physical access to the law library is denied, the inmate will be permitted to request and receive the same law library privileges as are afforded inmates confined to segregation.



EXHIBIT 106

2.  If an inmate confined to segregation fails or refuses to return checked-out Law library books or materials upon demand, correctional staff may enter that inmate's cell in order to retrieve the law library books or material.

3.  The institutional law library supervisor will document each incident of theft, damage, destruction or refusals to return law library books or materials.

B.  Missing books, pages, materials.

In the event that an inmate discovers that a book(s), or page(s) of a book, or other materials, are missing from the law library that are necessary to the inmate's legal research, the inmate should report this to the institutional law library supervisor by submitting Form N944L i, "Access to Legal Material".

## VI.  DISPOSITION

Any documents will be retained or disposed of according to the Departmental Records Disposition Authority (RDA).

## VII.  FORMS

Form N944L i – Access to Legal Material (Refer to AR 214)

## VIII.  SUPERCEDES

This Administrative Regulation supercedes AR 412 dated August 18, 1992.

## IX.  PERFORMANCE

A.  Administrative Regulation 214. "Law Library Supervisors"

B.  Administrative Regulation 403, "Disciplinary Hearing Procedures for Major Rule Violations."

Donal Campbell, Commissioner

AR 412– February 7, 2005



*State of Alabama*

## Alabama Department of Corrections

301 S. Ripley Street
P. O. Box 301501
Montgomery, AL 36130

**Bob Riley**
GOVERNOR

**Donal Campbell**
COMMISSIONER

December 19, 2005

ADMINISTRATIVE REGULATION                OPR: OPERATIONS
NUMBER                          448

### INMATE MAIL

## I.  **GENERAL**

This Alabama Department of Corrections (ADOC) Administrative Regulation (AR)
establishes responsibilities, policies, and procedures for inmate mail.

## II.  **POLICY**

It is the policy of the ADOC to allow inmate mail in accordance with the U.S. Postal
Service regulations and the guidelines set forth in this regulation.

## III.  **DEFINITIONS**

A.  Contraband: Any item that is not permitted by law or is either prohibited or not
specifically authorized by ADOC or institutional policy. Items not issued by the
ADOC, not sold on the institutional canteen, or not specifically authorized by the
Warden.

B.  Correspondence: Written communication to or from inmates (e.g., letters, post
cards, greeting cards) delivered by a postal service.

C.  Inmate Personal Property: The items and amounts of clothing, equipment, mail,
or supplies, which an inmate is allowed to have in his/her immediate possession.

D.  Mail: For the purpose of this regulation, the term "mail" includes but is not
limited to: items delivered by the U.S. Postal Service, inter-institutional mail, and
any private carrier servicing the ADOC.

E.  Mail Clerk: Staff member(s) assigned to the institutional mailroom.

F.  Printed Materials: Books, publications, magazines, newspapers, periodicals,
circulars, and catalogues delivered by the postal services.

G.  Legal Mail: Letters to and from attorneys, courts, judges, clerks, and other
officials of the courts and governmental agencies.



EXHIBIT 107

H.    Reasonable Suspicion: Rational inference that a reasonably prudent person could make from specific objective facts.

I.    Internet Materials: Downloaded copy from a web site.

J.    Religious Materials: Books, pamphlets, brochures, and religious study courses.

K.    Nudity: A pictorial depiction where genitalia or female breasts are exposed. Publications containing nudity illustrative of medical, educational, or anthropological content may be excluded from this definition.

L.    Sexually Explicit: A picture/illustration of actual or simulated sexual intercourse, and/or oral sex, masturbation, or materials depicting sex.

## IV.    RESPONSIBILITIES

A.    The Warden shall be responsible for developing their institution/division Standard Operating Procedure (SOP) in accordance with AR 448, *Inmate Mail*.

B.    The Mail Clerk is responsible for the collection, inspection, and distribution of incoming/outgoing mail and for the maintenance of the mailroom records.

C.    The Chaplain or the Warden's designee is responsible for reviewing all mail entering the institution for an inmate that has been marked in care of the chaplain as it refers to religious materials.

## V.    PROCEDURES

A.    General Guidelines

1.    The inmates shall be permitted to send and receive correspondence unless it can be determined that such correspondence may present a threat to the safety and security of the public, staff, inmates, and institution.

2.    There is no limit on the volume of letters the inmate can send or receive, or on the language, content, or source of mail except when there is reasonable belief that limitation is necessary to protect the public safety or maintain institutional order.

3.    The Warden shall designate a secure mail area and drop boxes for outgoing mail accessible to all inmates.

4.    Mail between inmates, whether state, county, city, out-of-state or federal may be allowed with the permission of the Wardens involved. It must be shown that there is a close personal relationship (immediate family) between such inmates.

5. Mail and packages addressed to an inmate, who has been transferred or released to another known address, should be mailed to the inmate within 48 hours, excluding weekends and holidays.

    a. If a forwarding address is not available, such mail and packages shall be returned to the sender.

    b. If neither a forwarding or return address is available, the mail shall be returned to the post office.

6. All inmate mail shall remain under the supervision of staff until it is distributed. Inmates are not allowed in the mail area without supervision.

7. At no time shall mail be distributed or handled by an inmate or be accessible to any inmate other than the addressee.

8. A staff person shall deliver incoming mail to the inmate(s) to whom it is addressed.

B. Incoming Mail

1. All incoming mail must be addressed so as to specify the inmate's name, inmate AIS number, and location within the institution.

2. An inmate who has legally changed their name and chooses to use the legal name, then dual names are required in the following format: Commitment Name, AIS # XXXXXX, Legal Name. (See AR 450, *Legal Name Changes)*

3. Promotional checks will not be accepted through the mail for deposit to inmate accounts.

4. Correspondence, printed material, inmate personal property, or money will not be hand delivered to inmates by visitors. The Warden/designee may allow attorneys to hand deliver "Legal Mail" directly to the inmate, subject to being searched for contraband.

5. Inmate will not receive mail stamped "Collect on Delivery (COD)."

C. Outgoing Mail

1. All mail being sent from the institution must have a return address which will include: inmate's full name, inmate AIS number, name of institution, dorm/cell number, street address or P. O. Box number as appropriate, city, state, and zip code. Additionally, the following stamped disclaimer will be included on every piece of outgoing mail sent by inmates.

AR 448 – December 19, 2005

"This correspondence if forwarded from Alabama State Prison. The contents have not been evaluated, and the ADOC is not responsible for the substance or content of the enclosed communication."

2.   An inmate who has legally changed their name and chooses to use the legal name, then dual names are required in the following format: Commitment Name, AIS # XXXXXX, Legal Name.  (See AR 450, *Legal Name Changes*)

3.   Designated staff should collect outgoing mail once each business day.

D.   Legal Mail

1.   Outgoing

a.   Inmates will be provided two (2) free stamps per week for **legal mail** only.

b.   Each Warden shall designate a box for "Legal Mail."

2.   Incoming

a.   A bound ledger shall be maintained by mailroom staff that lists each piece of legal mail received, the date inspected, delivered, and recipient's signature.

b.   The inmate will sign for all "Legal Mail" prior to receipt.

c.   All "Legal Mail" will be opened and inspected in the presence of the inmate.

E.   Limitations

1.   When abuses are found, the Warden may prohibit further correspondence by the inmate with the person to whom the offending material was directed.

2.   When the Warden receives a request to terminate correspondence with an inmate, the Warden shall notify the inmate of the request and inform the inmate that further correspondence with the individual shall cease.

3.   The Warden/designee will provide documentation that will be placed in the mail area and in the inmate's institutional file of persons with whom the inmate may no longer correspond.

AR 448 – December 19, 2005

F.    Inspection

    1.    Incoming mail, including "Legal Mail", shall be inspected for contraband and/or for abuse of the mail privilege. Outgoing mail may be inspected for contraband.

    2.    All contraband will be disposed of in accordance with AR 306, *Contraband and Evidence Management*.

    3.    Every effort should be made to ensure that all incoming letters and packages are delivered within 72 hours after receipt at the institution, other than weekends and holidays. Inmates will be notified of rejected mail in accordance with procedures contained in V.G.

G.    Rejection

    1.    In the event any incoming mail is rejected, the mail clerk will cite the policy violation and complete an ADOC Form 448, *Notification of Rejected Mail,* then forward to the inmate in a timely manner.

    2.    An inmate may appeal the rejection to the Warden/designee for review and final determination. (Refer to ADOC Form 448, *Notification of Rejected Mail*).

    3.    If the appeal is denied, the inmate will have the option of returning the mail to the sender at his/her own expense within 30 days, or the property will be destroyed at the end of the 30-day period.

    4.    Incoming mail may be determined to be a threat to the security of the institution and returned to the sender if, in the opinion of the Warden, it could reasonably be considered to:

        a.    Be an attempt to incite violence based on race, religion, sex, creed, or nationality.

        b.    Advocate, facilitate, or otherwise present a risk of lawlessness, violence, anarchy, and rebellion against government authority.

        c.    Be an attempt to incite disobedience toward law enforcement officials or correctional staff.

        d.    Be an attempt to give instructions for the manufacturing or use of intoxicants, weapons, explosives, drugs, drug paraphernalia, or other unlawful items or substance.

        e.    Contain obscene photographs, pictures, or drawings, including publications and advertisements from distributors.

AR 448 – December 19, 2005

f.    Contain plans to escape, unauthorized entry into the institution, or information or maps, which might aid an escape attempt.

g.    Contain information relating to security threat group activity or use of codes and/or symbols associated with security threat groups.

h.    Contain materials specifically found to be detrimental to inmate rehabilitation because it could encourage deviate criminal sexual behaviors.

i.    Publications that contain, nudity, graphic depictions of homosexuality, sadomasochism, bestiality, incest, or sex with children will be denied.

j.    Publications that primarily cover the activities of any sexual or political rights groups or organizations will normally be admitted.

k.    Before delivery of a publication may be denied, the Warden/designee must review the particular publication in question and make a specific, factual determination that the publication is detrimental to prisoner rehabilitation because it would encourage deviate, criminal sexual behavior. It is not necessary to find that the particular recipient is likely to personally engage in such behavior before delivery can be denied.

5.    Abuse of mail privileges by inmates may result in rejection and possible disciplinary action. Abuses included but are not limited to the following:

a.    The writing of letters containing obscene, profane, or indecent language.

b.    Writings that contain threats, derogatory or personal attack against any person.

c.    Writings that contain an escape plot or any other clear threats to the institution.

d.    Receipt of mail, identified as legal mail, from any individual or agency not meeting the legal mail definition.

e.    Writing which contain language purporting to solicit, claim, or demand money, goods, or services by false statements, threats, intimidation or extortion from another person or firm is prohibited.

f.    Any written material in outgoing or incoming mail not specifically intended for the addressee identified on the exterior of the

envelope, i.e. sending mail with contents addressed to another party for forwarding which constitutes mail kiting.

H.    Publications/Books

1.    Inmates may receive no more than two books per month and four magazines or newspapers or a combination thereof. (Refer to AR 338, *Inmate Property*, for the number of items an inmate may have in his/her possession at one time.)

2.    The publications should be received directly from the publisher or a recognized commercial distributor and be pre-paid from a family member or friend or from the inmate's Prisoners Money on Deposit Account (PMOD).

3.    Receipt of publications by inmates in segregation will be determined by provision indicated in AR 433, *Administrative Segregation and Housing for Close or Maximum Custody*, and AR 434, *Disciplinary Segregation*.

4.    Each Warden/designee shall personally inspect each issue of a publication when a reasonable expectation that the particular issue violates the standards of this regulation. If they determine that the issue of the publication violates these standards then they will temporarily exclude the publication.

5.    The Warden/designee shall notify the inmate to whom the publication was addressed of the temporary ban.

6.    If the inmate appeals the temporary ban, it will remain in effect pending a final resolution. Upon notice of the appeal, the Warden will furnish a copy of the documentation on the matter to the Commissioner/designee. This documentation will include copies of pages of the excluded issue that contain material that has been identified as violating the restrictions.

7.    The Commissioner/designee will review the action taken by the institution to exclude that issue and either confirm or deny them. If the temporary ban is confirmed, the inmate, the Warden, and all other institutions will be notified, the issue is permanently banned, and the matter closed. The documentation supporting the ban will be retained by the Legal Division and at the institution.

8.    If the temporary ban is denied, the publication will be given to the inmate and the entire matter dropped and all documentation destroyed.

9.    The permanent ban of an issue of a publication may not be relied upon to support an exclusion of a subsequent issue. For example, if the January issue of XYZ magazine is permanently banned, this ban may not be used

AR 448 – December 19, 2005

to justify an exclusion of the February issue of XYZ magazine. Each separate issue must be evaluated independently in accordance with this regulation.

10. Inmates will not be allowed to be members of, enter into contractual agreements with, or participate in book clubs.

I. Packages

1. All religious materials such as books, pamphlets, brochures, and religious study courses shall be sent to the inmate in care of the Chaplain, and will be distributed by the Chaplain after approval and limits have been obtained from the Warden.

2. Authorized inmates will be allowed to purchase, from their PMOD accounts, arts and craft items through approved reputable suppliers.

3. Prior to Christmas, the Commissioner will publish instructions concerning the receipt of Christmas packages for inmates.

4. Criteria for an inmate to receive Christmas packages are as follows:

   a. Inmates must have a four (4) month clear record prior to November 1st – no disciplinaries or behavior citations.

   b. Inmates who receives one (1) formal or informal disciplinary in the months of November and December will not be eligible to receive a package.

   c. Inmates found guilty of rules violations for indecent exposure/exhibitionism, assaults on staff, or other acts of violence of a serious nature will be restricted from receiving packages one year from the incident.

5. Incentive Packages will be accepted beginning May and September for one package per inmate from a person on the inmate's visitation/funds list. Packages postmarked after May 31 and September 30 will be returned to the sender C.O.D. Inmates must submit a request for an incentive package to the Warden/designee.

6. Criteria for an inmate to receive an incentive package are as follows:

   a. Inmate must have six-month clear record-no disciplinaries or behavior citations.

   b. Inmates found guilty of rules violations for indecent exposure/exhibitionism, assaults on staff, or other acts of violence

AR 448 – December 19, 2005

of a serious nature will be restricted from receiving packages one year from the incident.

    c.    Inmate should have two positive counselors/work reports within the six-month period preceding the package.

7.    An inmate may mail outgoing packages. However, these packages will be inspected for unauthorized items prior to dispatch. The sender-inmate must provide postage and wrapping materials.

8.    The Commissioner/designee may allow other packages as deemed appropriate.

## VI.    <u>DISPOSITION</u>

Any forms used will be disposed of and retained according to the Departmental Records Disposition Authority (RDA).

## VII.    <u>FORMS</u>

ADOC Form 448 – Notification of Rejected Mail

## VIII.    <u>SUPERCEDES</u>

This regulation formally included in Administrative Regulation 303, dated May 30, 2000.

## IX.    <u>PERFORMANCE</u>

ACA standards for Adult Correctional Institutions, fourth edition: 4-4487; 4-4490; 4-4491; 4-4492; 4-4494; 4-4496

Donal Campbell, Commissioner

AR 448 – December 19, 2005

STATE OF ALABAMA
DEPARTMENT OF CORRECTIONS

**Notification of Rejected Mail**

From: _____    Date: _____
           Institutional Mail Room

To: Inmate _____ AIS#: _____

    Cell/Dorm: _____ Bed #: _____

Correspondence From: _____

Date received at this Institution: _____

Is being returned to sender due to the following reason(s): _____
_____
_____
_____

The inmate has the option to return mail to sender at his/her own expense within thirty (30) days
or the property will be destroyed.

The inmate has seventy-two (72) hours from the above date to appeal this return. State your
reason(s) for appealing in writing below and return this form to the Warden/designee:

_____
_____
_____
_____
_____
_____
_____

_____ /_____
Inmate Signature                                  AIS#

_____
Date

**Appeal/Denied**                                  **Appeal/Upheld**

_____        _____
Printed Name                                  Printed Name

_____        _____
Authorized Signature                        Authorized Signature

_____        _____
Date returned to sender                     Date returned to inmate

**ADOC Form 448 – December 19, 2005**

AR 448 – December 19, 2005

CERTIFICATE OF SERVICE

I hereby certify that I have this 19th day of March, 2008 served a copy of the forgoing attached, by first-class United States Mail, postage prepaid and addressed upon the following:

Tara S. Knee

Assistant Attorney General
Assistant General Counsel
Alabama Department of Corrections
Legal Division
Post Office Box 301501
Montgomery, Alabama 36130-1501

Egbuonu Zephyr

Zephyrinus Egbuonu
(Acting Pro-Se)
27041-265 FDC
Federal Detention Center
Post Office Box 5010
Oakdale,
Louisiana 71463